**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **ANTHONY SCHOBERT AND** | : | JUDGE: |
| **JOHN YORK, INDIVIDUALLY** | : | |
| **AND ON BEHALF OF THOSE** | : | |
| **SIMILARLY SITUATED, ET AL.,** | : | CASE NO.: 1:19-CV-00076 |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | **COMPLAINT WITH JURY DEMAND** |
| **CSX TRANSPORTATION, INC.;** | : | **ENDORSED HEREON** |
| **CSX CORPORATION,** | : | |
| | : | |
| Defendants | : | |

<u>**COMPLAINT**</u>

1.     Plaintiffs Tony Schobert ("Schobert") and John York ("York"), on behalf of themselves and all others similarly situated, hereinafter described (collectively, "Plaintiffs") for their complaint against Defendants CSX Transportation, Inc. and CSX Corporation, state as follows:

<u>**NATURE OF ACTION, JURISDICTION AND VENUE**</u>

2.     This is an action for damages and equitable relief, including declaratory and injunctive relief, to redress the ongoing violation of rights of Plaintiffs and other similarly situated employees of  CSX Transportation, Inc. ("CSXT" or "Defendant") and CSX Corporation (hereinafter "CSX" or "Defendant") (collectively, "CSX" or "Defendants") under the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601, et seq., (hereinafter "FMLA"); the Employee Retirement Income Security Act (ERISA), 29 U.S.C. 1001, et seq. (hereinafter "ERISA"); and the Rehabilitation Act of 1973, 29 U.S.C. 794 et seq. (hereinafter "Rehabilitation Act").

3.     Jurisdiction over Plaintiffs' federal claims is premised on 28 U.S.C. § 1331 and

29 U.S.C. § 2617(a)(2).

4.     Venue is proper pursuant to 28 U.S.C. § 1391(b) in that CSX operates in this division and district, Plaintiffs live in and/or are employed by CSX in this division and district, and a substantial part of the events giving rise to Plaintiffs' claims occurred in this division and district.

## PARTIES

5.     Plaintiffs and all others similarly situated were or are employees of Defendants.

6.     CSXT is a national rail carrier and operator engaged in interstate commerce. CSXT is incorporated under the laws of Virginia, does business both in Cincinnati, Ohio and nationwide and maintains its corporate headquarters at 500 Water Street, Jacksonville, Florida 32202. CSXT is a wholly owned subsidiary of CSX and shares common ownership and control.

7.     CSX is a national rail transportation supplier engaged in interstate commerce and does business both in Cincinnati, Ohio and nationwide. It is incorporated under the laws of Virginia and maintains its headquarters at 500 Water Street, Jacksonville, Florida 32202. CSX owns, manages, operates, and/or controls numerous subsidiaries, including CSXT.

8.     The Defendants employ over 32,000 people nationwide.

## FACTS

A.     **CSX**

9.     CFR § 825.205, which addresses "Increments of FMLA leave for intermittent or reduced schedule leave," states, "If an employer accounts for other forms of leave use in increments greater than one hour, the employer must account for (intermittent) FMLA leave use in increments no greater than one hour."

10.     At all times relevant and presently, and on information and belief, CSX calculates intermittent FMLA leave in increments of 1/100 of a week, or 1.68 hours, for FMLA absences.

11.     At all times relevant and presently, and on information and belief, CSX calculates minimum increments of vacation leave at 24 hours, sick time at a minimum of 12 hours, personal business time off at a minimum of 4 hours and personal leave at 24-hour increments.

12.     At all times relevant and presently, CSX is required to pay engineers, conductors, and switchmen on-call pay or "guarantee" pay for periods during which the employee must be available to work but may not be called to work.

13.     However, if engineers use intermittent FMLA leave on or near a weekend during the on-call period, CSX strips the engineers of their guarantee pay for an entire week, even if the engineer would not have worked on the FMLA day.

14.     After stripping the engineers of their guarantee pay, CSX still requires the engineers to remain on call for days after the FMLA absence.

15.     Because of this, Plaintiffs have forgone FMLA leave they needed on or near weekend days to avoid losing an entire week's guarantee pay.

16.     Since 2015, CSX's "Crew Attendance Point System" or "CAPS" attendance policy assigns negative points for non-FMLA absences, but the employee can have the points removed if he or she has perfect attendance for one month.

17.     Under the CAPS system, points are not removed if the employee does not have perfect attendance because he or she took FMLA leave during that month.

18.     As a result, Plaintiffs were actively discouraged from taking FMLA if they received points for a prior non-FMLA absence, and they retained disciplinary points because of their subsequent FMLA leave following the non-FMLA absence.

19.     For years and presently CSX has threatened employees with discipline for taking FMLA on or around holidays and scheduled off days by sending letters and messages to individuals and on a mass scale.

20.     CSX has, since at least 2016 and as recently as November 19, 2018, also issued multiple company-wide Notices accusing employees who take FMLA of routinely abusing their leave.

21.     A Notice to all employees sent on August 31, 2016 from CSX COO Cindy Sanborn accused FMLA employees of "fraudulently" using FMLA to avoid working overtime, weekends, and holidays.  The Notice encouraged FMLA employees' coworkers to report them to a supervisor or CSX FMLA Benefits Manager Jolanda Johnson if they thought the employee misused FMLA, and stated, "Employees who misuse FMLA leave negatively impact their coworkers."

22.     This Notice and subsequent Notices were intended to and did cause animosity against Plaintiffs and the other individuals who took FMLA leave, especially if they had to take leave around a holiday or weekend.

23.     The Notices warn employees that if CSX "believes" their absence during or around a holiday "was inappropriate, the employee will be immediately charged and disciplined, up to and including termination."

24.     A "Crew Unavailability" Notice on May 9, 2018 stated, "CSX continues to experience disruptions to its operations on holidays and weekends due to crew unavailability." The notice said individuals who take FMLA around holidays and weekends "abuse these benefits through . . .misuse of the Family Medical Leave Act ('FMLA')".

25.     The Notice states, "CSX is again reviewing all leave-related mark offs for potential misuse and will continue monitoring mark offs, including FMLA mark offs" during upcoming holidays, such as Memorial Day or Mother's Day.

26.     On June 28, 2018, CSX issued a company-wide "FMLA Notice" warning employees that if CSX "believes" their absence during or around a holiday "was inappropriate, the employee will be immediately charged and disciplined, up to and including termination."

27.     Other dates on which similar notices were sent include, but are not limited to, December 20, 2016, November 21, 2017, January 1, 2018, and November 19, 2018.

28.     The threatening communications from CSX have chilled employees' use of FMLA intermittent leave, caused them not to use FMLA leave when they needed it, and caused them to schedule their anticipated FMLA leave in a manner that has resulted in lost shifts and pay.

29.     As recently as December 2018, employees are obliged to submit medical information beyond their certification to justify taking approved FMLA leave, because they receive threatening letters for taking leave.

30.     CSX also makes FMLA employees' leave usage available to and publishes it to every employee who has access to the CSX mainframe layoff board, including non-management employees.

31.     CSX engineers and conductors and switchmen do not work a regular workday or Monday through Friday.  They are typically called up within two hours' notice for multiple-day shifts that include overnight stays, and they almost never receive more than 24-hours' notice.  If they are called up and do not work, they are subject to CSX's disciplinary process.

32.     A CSX engineer, conductor, or switchman who needs time off for planned treatment or FMLA-covered appointment must also ensure that he or she is both home in time for the appointment and allocate additional time after the appointment is over to ensure enough time off to attend the appointment and still get to work if they are called up.

33.     Because of engineers' shift and guarantee period schedule and short call up notice, engineers often schedule FMLA-covered appointments in conjunction with other days off.

34.     If engineers do not schedule FMLA appointments or treatment in conjunction with other off days, they avoid taking leave or must unnecessarily take additional FMLA or other leave to avoid disciplinary action if they are called up.

35.     If engineers cannot take intermittent leave in conjunction with other days off, they are forced to choose between taking unprotected time off that results in discipline, forgoing leave altogether, or unnecessarily depleting their FMLA, vacation, personal, and other leave to ensure enough time to receive treatment.

36.     On information and belief, in late 2017 and early 2018, CSX suspended without pay and charged with discipline every employee who was properly certified for FMLA leave and took FMLA leave on or around Christmas 2017 and New Year's Day 2018. The hearing notices stated, "you misused FMLA leave."

37.     CSX did this without any information that Plaintiffs or any others who took FMLA leave at this time were actually abusing FMLA leave and did not request recertification of any employee. CSX simply suspended without pay every employee who took leave during this time, pending a disciplinary hearing afforded them under their collective bargaining agreement.

38.     At all times relevant and presently, removal of an employee from service is only appropriate under the bargaining agreement for moral turpitude, dishonesty, theft, or if safety or company property are at risk, so removal implied to all CSX managers, who had access to disciplinary records, that the employees had committed immoral or dishonest acts.

39.     CFR § 825.308 provides that if an employer "receives information that casts doubt upon the employee's stated reason for the absence or the continuing validity of the certification," then its remedy is to request recertification. "As part of the information allowed to be obtained on recertification for leave taken because of a serious health condition, the employer may provide the health care provider with a record of the employee's absence pattern and ask the health care provider if the serious health condition and need for leave is consistent with such a pattern."

40.     The employer cannot request additional proof of need for leave beyond the certification, regardless of the employer's policies.

41.     CSX entered into the hearing records protected health information from the employees' certification process, including but not limited to the frequency of and his or her need for treatment.

42.     On information and belief, if the employee did not produce medical documentation proving he or she had a need for leave on the days in question, CSX terminated the employee.

43.     On information and belief, CSX placed medical information presented by employees in defense of their right to FMLA leave into the hearing record and in their personnel file.

44.     29 C.F.R. 825.500(g) requires CSX to maintain "[r]ecords and documents relating to certifications, recertifications or medical histories of employees or employees' family members, created for purposes of FMLA . . .as confidential medical records in separate files/records from the usual personnel files."

45.     The Rehabilitation Act strictly limits when an employer may obtain medical information, how the information can be used, and who can have access to such information. Information obtained regarding the medical condition or history of an employee must be collected on separate forms, kept in separate medical files, and be treated as a "confidential medical record." 29 C.F.R. §1630.14(b)(1). Only authorized employees may have access to such information, then only on a need-to-know basis.

46.     Hearing records and personnel files at CSX are available to any member of CSX management.

47.     Plaintiffs were among those suspended and charged and received disciplinary hearings.

48.     The hearings led to employees being terminated, suspended, or having their private medical information mishandled.

49.     As a result of the widespread hearing and disciplinary "sweep," employees not terminated were intentionally chilled from exercising their FMLA rights or taking approved intermittent leave.

50.     Because of CSX's health benefit plan's terms, it is advantageous for employees to make appointments and seek treatment at the end of the year, because the deductible and annual out of pocket maximum reset on January 1 of each year.

51.     CSX's policies, threatening letters and messages, disciplinary threats, and other behavior discouraging FMLA and other absences at the end of the calendar year had the effect of and were intended to interfere with its employees' rights to ERISA health insurance coverage.

**B.      Plaintiff Tony Schobert**

52.     Plaintiff Tony Schobert has been employed by CSX since 2003 and as a locomotive engineer since 2012.

53.     At all relevant times, Schobert has participated in CSX's ERISA-covered health insurance plan.

54.     As an engineer, Schobert does not work a regular workday or Monday through Friday.  He is typically called up within two hours' notice for multiple-day shifts that include overnight stays, and he almost never receives more than 24-hours' notice.

55.     Over six years ago, Schobert suffered an injury that resulted in a continuing disability of the spine that has since remained a disability and a serious health condition.

56.     The disability causes Schobert intermittent neck and back pain that renders him temporarily unable to perform his job during the flareups.

57.     Schobert is also required to see his medical provider regularly to assess and treat his disability.

58.     Schobert requested intermittent FMLA leave for the periods where he was unable to perform his job and to seek assessment and treatment, and CSX approved the request.

59.     The leave Schobert requested and CSX approved was a reasonable accommodation of Schobert's disability.

60.     Because of the nature of Schobert's shift and guarantee period schedule, he was required to schedule his FMLA-covered appointments in conjunction with other days off to be sure he would not disqualify himself from working subsequent days, often for the entire week.

61.     In 2015 and throughout 2016, 2017, and 2018 Schobert received threatening "counseling letters" from CSX about using his FMLA. The letters alleged he had a "pattern of marking off FMLA days with other days off (i.e. rest days, personal days, vacation days, sick days)." The letters warned him that, "in the event that your pattern usage continues and absent extenuating circumstances, you will be handled under the IDPAP," which is CSX's disciplinary process.

62.     Schobert received follow up correspondence threatening to be his "final warning . . . If you continue your pattern of marking off FMLA on weekends or in conjunction with other days off," he would be subjected to IDPAP, which is CSX's disciplinary process. The correspondence did not specify what dates were in question or request additional information or recertification.

63.     Upon information and belief, these letters were sent to every single CSX employee in 2015-2018 who had been approved for intermittent FMLA and took FMLA leave in conjunction with another day off.

64.     The letters direct the receiving employees to call Jolanda Johnson with any questions.

65.     Schobert avoids taking FMLA leave when he needs it around personal days or holidays because of the threatening letters. If he had to use FMLA leave for an appointment, he lost income, because he was forced to take leave for an entire day that was not near a holiday or

other day off, which caused him to be unavailable for regular and guarantee shifts and thereby lose pay for those shifts.

66.     In response to one letter in 2017, Schobert called Johnson, who told him to provide her with additional documentation of his disability and need for intermittent leave, beyond the FMLA certification that the company had already approved, but she did not request recertification.

67.     Schobert submitted documentation to Johnson verifying that he had a legitimate need for FMLA leave on the days Johnson questioned.

68.     Regardless, Schobert continued to receive letters warning against taking FMLA leave in connection with off days, personal days, and vacation days.

69.     Schobert was obliged to submit medical information to Johnson again in December 2018 in response to another "final warning letter" on November 7, 2018, although he again was not requested to recertify, and the November 2018 letter referred to the 2017 final warning letter.

70.     CSX has sent Schobert multiple company-wide Notices accusing employees who take FMLA of routinely abusing their leave, including, but not limited to, the Notice to all employees sent on August 31, 2016 from CSX COO Cindy Sanborn, a letter sent on August 25, 2016 from CSX COO Cindy Sanborn to all individuals certified for FMLA leave, the "Crew Unavailability" Notice on May 9, 2018, the June 28, 2018 company-wide "FMLA Notice," and notices on December 20, 2016, November 21, 2017, January 1, 2018, and November 19, 2018.

71.     The threatening communications from CSX have chilled Schobert's use of his FMLA intermittent leave, caused him not to use FMLA leave when he needed it, and caused him to schedule his anticipated FMLA leave in a manner that has resulted in lost shifts and pay.

11

72.    Schobert's use of FMLA leave caused him to retain negative CAPS disciplinary points when he had to take FMLA leave during the 30-day attendance "cure" period following a non-FMLA absence.

73.    In December of 2017, Schobert had a flareup around Christmas that rendered him unable to perform his job, and he was unable to get an appointment for treatment until December 26, 2017.

74.    Accordingly, Schobert properly notified CSX of his need for FMLA leave and took FMLA leave, for which he was already certified and approved, beginning when the flareup started and ending after his chiropractor appointment, for a total of approximately four days.

75.    CSX has never requested recertification because it believed Schobert misused FMLA.

76.    In January 2018, CSX informed Schobert that he was taken out of service without pay pending disciplinary charges.

77.    Schobert received the charge letter, which informed him that he was required to attend a disciplinary hearing under the collective bargaining agreement's disciplinary provisions, and he would remain out of service without pay until the results of the hearing.

78.    Removal of an employee from service is only appropriate under the bargaining agreement for moral turpitude, dishonesty, theft, or if safety or company property are at risk, so removal of Schobert implied to all CSX managers, who had access to his disciplinary record, that Schobert had committed an immoral or dishonest act.

79.    The threatening Notices that were sent prior to the hearings were used as "proof" at Schobert's hearing to prove that Schobert had "misused" his FMLA leave. His 2017 warning letter was also used as "proof" in the hearing.

80.     At the hearing, a CSX witness testified that Schobert had misused his FMLA leave and lied to CSX, simply because Schobert and other employees had taken FMLA leave during a holiday.

81.     CSX presented at the hearing as proof that Schobert had misused FMLA leave a company-wide chart of FMLA Utilization that showed a company-wide spike in usage at Christmas.

82.     CSX presented no proof at the hearing that it had any reason to believe that Schobert had abused FMLA leave, other than the timing of the day on which he took the leave.

83.     CSX entered into the hearing record documents related to Schobert's FMLA leave that included Schobert's HIPAA-protected personal medical information.

84.     Prior to placing Schobert off service and charging him, CSX had never asked Schobert to recertify his leave and had never questioned his FMLA certification.

85.     Schobert was only exonerated because he happened to bring documentation of his treatment visit to the hearing.

86.     When Schobert first offered the documentation at the hearing, the management Trainmaster representing CSX informed him that the medical documentation would be placed in his personnel file, which is available to any supervisory CSX employee.

87.     It was clear to Schobert that the Trainmaster told him the medical information would go in his personnel file to deter him from submitting it.

88.     CSX also entered into the record protected health information from his certification process, including but not limited to the frequency of and his need for treatment.

89.     Because of the CSX FMLA holiday "dragnet" operation, Schobert and the other CSX employees nationwide are aware that hundreds of employees were suspended, and many

were terminated for using already-certified FMLA leave, and they are afraid to use their FMLA leave now.

90.     At all relevant times, Schobert has participated in CSX's ERISA-covered health insurance plan.

91.     Schobert reached his maximum deductible in a calendar year due to his disability.

92.     As a result, it was medically necessary and financially advantageous for Schobert to schedule medical appointments and procedures after he had reached his maximum out of pocket and deductible, because CSX's insurance would cover the cost.

93.     CSX's policies, threatening letters and messages, disciplinary threats, and other behavior discouraging FMLA and other absences at the end of the calendar year had the effect of and were intended to dissuade Schobert and other employees like him from using their ERISA health insurance coverage.

**C.     Plaintiff John York**

94.     Plaintiff John York was employed by CSX from 2001 until his termination on or about February 24, 2018 and was employed as a locomotive engineer since 2011 until his termination.

95.     At all relevant times, York has participated in CSX's ERISA-covered health insurance plan.

96.     As a CSX engineer, York does not work a regular workday or Monday through Friday.  He was typically called up within two hours' notice for multiple-day shifts that include overnight stays, and he almost never received more than 24-hours' notice.

14

97.     Approximately five years ago, York incurred a continuing muscular-skeletal disability of the knee that impacts, among other activities, his ability to walk, and this condition has since remained a disability and a serious health condition.

98.     The disability caused York intermittent knee pain that rendered him temporarily unable to perform his job during the flareups.

99.     York was also required to see his medical provider regularly to assess and treat his disability.

100.     York requested intermittent FMLA leave for the periods where he was unable to perform his job and to seek assessment and treatment, and CSX approved the request.

101.     The leave York requested and CSX approved was a reasonable accommodation for his disability.

102.     Because of the nature of York's shift and guarantee period schedule, he was required to schedule his FMLA-covered appointments in conjunction with other days off to be sure he would not disqualify himself from working subsequent days, often for the entire week.

103.     Throughout 2016 and 2017, York received threatening letters from CSX about using his FMLA.

104.     For example, in 2016, York received a threatening "counseling letter" from CSX about using his FMLA.

105.     The letter alleged he had a "pattern of marking off FMLA days with other days off (i.e. rest days, personal days, vacation days, sick days)."  The letter warned him that, "in the event that your pattern usage continues and absent extenuating circumstances, you will be handled under the IDPAP."

106.    Upon information and belief, these letters were sent to all CSX employees in 2015-2017 who had been approved for intermittent FMLA and took FMLA leave in conjunction with another day off.

107.    York often would not take FMLA leave when he needed it around personal days or holidays because of the threatening letters.  If he had to use FMLA leave for an appointment, he lost income because he was forced to take leave for an entire day that was not near a holiday or other day off, which caused him to be unavailable for regular and guarantee shifts and thereby lose pay for those shifts.

108.    CSX has sent York multiple company-wide Notices accusing employees who take FMLA of routinely abusing their leave, including, but not limited to, the Notice to all employees sent on August 31, 2016 from CSX COO Cindy Sanborn , the letter sent on August 25, 2016 from CSX COO Cindy Sanborn to all individuals certified for FMLA leave, the "Crew Unavailability" Notice on May 9, 2018, the June 28, 2018 company-wide "FMLA Notice," and notices on December 20, 2016, November 21, 2017, and January 1, 2018.

109.    These Notices were used as "proof" at York's and the other employees' hearings to prove that York had "misused" his FMLA leave.  Individual warning letters, including a letter to York in June 2016, were also used as "proof" in the hearings.

110.    The threatening communications from CSX sent prior to York's termination chilled York's use of his FMLA intermittent leave, caused him not to use FMLA leave when he needed it, and caused him to schedule his anticipated FMLA leave in a manner that resulted in lost shifts and pay.

111.    York's use of FMLA leave repeatedly caused him to retain negative CAPS disciplinary points when he had to take FMLA leave during the 30-day attendance "cure" period following a non-FMLA absence.

112.    On December 30, 2017, York experienced knee pain that rendered him unable to perform his job.

113.    Accordingly, York properly notified CSX of his need for two days' FMLA leave and took FMLA leave, for which he was already certified, and CSX approved his leave.

114.    CSX did not request recertification on suspicion that York misused his FMLA leave, and it never has.

115.    On or about January 16, 2018, CSX informed York that he was taken out of service without pay, pending disciplinary charges.

116.    York received the charge letter, which informed him that he was required to attend a disciplinary hearing under the collective bargaining agreement's disciplinary provisions, and he would remain out of service without pay until the results of the hearing.

117.    Removal of an employee from service is only appropriate under the bargaining agreement for moral turpitude, dishonesty, theft, or if safety or company property are at risk, so removal of York implied to all CSX managers, who had access to his disciplinary record, that York had committed an immoral or dishonest act.

118.    At the hearing, Johnson testified that York was charged with misusing FMLA leave and dishonesty, because too many other employees had taken FMLA leave over the 2017-2018 holidays, and because York and the other employees had received the threatening letters and company-wide Notices.

119. CSX entered into the record protected health information from his certification process, including but not limited to the frequency of and his need for treatment.

120. CSX presented no proof at the hearing that it had any reason to believe that York had abused FMLA leave, other than the timing of the day on which he took the leave.

121. Johnson admitted during the hearing that she had no idea whether York was physically unable to work on the days in question.

122. Prior to placing York off service and charging him, CSX had never asked York for any proof that he needed to take FMLA leave on the days in question and had never questioned the legitimacy, accuracy, or scope of his FMLA certification.

123. York was terminated on or about February 24, 2018 for misusing FMLA leave and dishonesty as a result of the hearing and disciplinary process.

124. At all relevant times, York has participated in CSX's ERISA-covered health insurance plan.

125. York reached his out of pocket maximum expenditure and maximum deductible in a calendar year due to his disability.

126. As a result, it was medically necessary and financially advantageous for York to schedule medical appointments and procedures after he had reached his maximum out of pocket and deductible, because CSX's insurance would cover the cost.

127. CSX's policies, threatening letters and messages, disciplinary threats, and other behavior discouraging FMLA and other absences at the end of the calendar year had the effect of and were intended to dissuade York and other employees like him from using their ERISA health insurance coverage.

## CLASS ACTION ALLEGATIONS

128.    Plaintiffs reallege the forgoing paragraphs as if fully set forth herein.

129.    The class claims for relief are brought pursuant to the FMLA, ERISA, the

Rehabilitation Act, 29 U.S.C. §2617(a)(2)(B), and Fed. R. Civ. P. 23.

130.    Plaintiffs assert the existence of fourteen classes of eligible employees or former

employees of the Defendant, similarly situated to them, the members of each having been subject

to policies of Defendant acting in violation of state law, the FMLA, ERISA, and the

Rehabilitation Act:

131.    The first class ["Class 1"] is defined as follows: employees who were forced to

use more FMLA than necessary or whose available FMLA leave was reduced as a result of how

CSX calculated their leave.

132.    The second class ["Class 2"] is defined as follows: employees whom CSX

denied guarantee pay because they took FMLA leave or who did not use FMLA leave to avoid

same.

133.    The third class [Class 3"] is defined as follows: employees whom CSX

disciplined because they took FMLA leave during the CAPS cure period or who did not use

FMLA leave to avoid same.

134.    The fourth class [Class 4"] is defined as follows: employees who received mass

communications from CSX threatening adverse action for taking FMLA leave or accusing them

of abusing FMLA leave or who did not use FMLA leave because of such communications.

135.    The fifth class ["Class 5"] is defined as follows: employees whose leave

information was published or otherwise made available to unauthorized persons or who did not

use FMLA leave to avoid same.

136.    The sixth class ["Class 6"] is defined as follows:

A.    employees whom CSX disciplined because of Defendants' policies or practices that discourage taking FMLA leave in conjunction with other days off.

B.    employees who forwent FMLA leave because Defendants' policies or practices discouraged taking FMLA leave in conjunction with other days off.

C.    employees who took more FMLA leave than necessary because Defendants' policies or practices discouraged taking FMLA leave in conjunction with other days off.

137.    The seventh class ["Class 7"] is defined as follows: employees who were properly certified for FMLA leave, but who were nonetheless removed from service or charged with discipline for alleged misuse of FMLA leave, without request for re-certification or legitimate medical inquiry, and who were deterred from taking future FMLA leave as a result.

138.    The eighth class ["Class 8"] is defined as follows: employees who were properly certified for FMLA leave, but who were nonetheless removed from service or charged with discipline for alleged misuse of FMLA leave, without request for re-certification or legitimate medical inquiry, and who were terminated as a result.

139.    The ninth class ["Class 9"] is defined as follows: employees who were properly certified for FMLA leave, but who were nonetheless removed from service or charged with discipline for alleged misuse of FMLA leave, without request for re-certification or legitimate medical inquiry, and were disciplined as a result.

140.    The tenth class ["Class 10"] is defined as follows: disabled employees whose properly certified FMLA leave was a reasonable accommodation for their disability, but who were nonetheless terminated, disciplined, or charged with discipline for alleged misuse of leave,

without engaging in the interactive process.

141.   The eleventh class ["Class 11"] is defined as follows: employees approved for FMLA leave who submitted subsequent medical information to Defendants, without request for re-certification or legitimate medical inquiry, in response to threatening communication from Defendants.

142.   The twelfth class ["Class 12"] is defined as follows: employees who submitted medical information to Defendant to defend against allegations they misused FMLA leave.

143.   The thirteenth class ["Class 13"] is defined as follows: employees whose medical information Defendants placed into a hearing record, personnel file, or other location other than a confidential employee medical file.

144.   The fourteenth class ["Class 14"] is defined as follows: employees who were deterred from availing themselves of benefits under Defendant's employer-maintained healthcare benefits plan as result of any of Defendant's conduct alleged in this complaint, in violation of ERISA.

145.   Each class is so numerous that joinder of all members as plaintiffs is impractical.

146.   There are questions of law and fact common to each class, which predominate over any questions affecting only individual class members.

147.   The claims of the named Plaintiffs are typical of the claims of the class members.

148.   The named Plaintiffs can and will fairly and adequately protect the interests of the classes.

149.   Plaintiffs' counsel have experience as class action counsel and in litigating claims under the FMLA, ERISA, and the Rehabilitation Act and will represent the classes

adequately.

150. A class action should be maintained in this case, because separate actions by individual members of the classes would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendant.

151. Defendants have acted and refused to act on grounds generally applicable to each class, therefore making appropriate final injunctive relief and corresponding declaratory relief with respect to all members of each class.

152. Questions of law or fact predominate over questions that affect only individual members in each class.

153. A class action is superior to other available methods for the fair and efficient adjudication of the controversies.

## COUNT I

### FMLA - DENIAL & INTERFERENCE

154. Plaintiffs, on their own behalf and on behalf of other similarly situated putative class members, reallege all foregoing allegations by reference as if fully rewritten herein.

155. Plaintiffs and other similarly situated putative class members were eligible employees under the FMLA, had a serious medical condition as defined by the FMLA, and were properly certified to take FMLA leave.

156. Defendants were on notice of Plaintiffs' and other similarly situated putative class members' reasons for leave under the FMLA for their absences.

157. Defendants were aware of their serious health conditions before and after their need for medical leave of absence and approved the Plaintiffs' and putative class members' certifications.

158.     Defendants willfully violated Plaintiffs' and putative class members' rights under the FMLA and willfully interfered with, restrained and denied their rights provided by the FMLA.

159.     As a result of this conduct, Defendants have caused Plaintiffs and the putative class members damage, for which Plaintiffs and putative class members are entitled to relief.

## COUNT II

### ERISA – INTERFERENCE & RETALIATION

160.     Plaintiffs, on their own behalf and on behalf of other similarly situated putative class members, reallege all foregoing paragraphs by reference as if fully rewritten herein.

161.     Plaintiffs and putative class members were participants in Defendants' benefit plan.

162.     Defendants harassed, disciplined, and discriminated against Plaintiffs and other similarly situated putative class members for exercising their rights under Defendants' employee benefit plan for the purpose of interfering with the attainment of the rights to which they were, may become, or may have become entitled under the plan.

163.     As a result of this conduct, Defendants have caused Plaintiffs and the putative class members damage, for which Plaintiffs and putative class members are entitled to relief.

## COUNT III

### REHABILITATION ACT § 504 – DISCRIMINATION, RETALIATION, DENIAL OF ACCOMMODATION & EMPLOYEE MEDICAL FILE VIOLATION

164.     Plaintiffs, on their own behalf and on behalf of other similarly situated putative class members, reallege all foregoing paragraphs by reference as if fully rewritten herein.

165.    At all relevant times, Defendants have received federal financial assistance, including, but not limited to, from the Federal-Aid Highways Act of 1944 ("FAHA").

166.    Plaintiffs and the putative class members are qualified individuals with disabilities, as defined by the Rehabilitation Act.

167.    Plaintiffs' and the putative class members' pre-approved FMLA leave for treatment and time off due to their disability was a reasonable accommodation for their disabilities, requested and approved through Defendants' FMLA certification process.

168.     Defendants unlawfully obtained, mishandled, and wrongfully disclosed the medical information of Plaintiffs and the putative class members, in violation of the Rehabilitation Act.

169.    Defendants unlawfully restricted Plaintiffs' and the putative class members' ability to use their reasonable accommodation of intermittent leave and refused to engage in the interactive process regarding Defendants' restrictions on their leave accommodation.

170.    Defendants discriminated against Plaintiffs and the putative class members because of their disability and in retaliation for their requests for accommodation by harassing, threatening, disciplining, suspending, terminating, and creating a hostile work environment for them.

171.    As a result of this conduct, Defendants have caused Plaintiffs and the putative class members damage, for which Plaintiffs and the putative class members are entitled to relief.

## **PRAYER FOR RELIEF**

WHEREFORE, the individual Plaintiffs, for themselves and on behalf of all persons similarly situated, respectfully request that the Court certify this action as a class action, designate Plaintiffs as the representatives of the classes and Plaintiffs' counsel as class counsel, and further pray:

a) that the Court order Defendants to issue notice to all similarly situated employees whose FMLA, ERISA, and Rehabilitation Act rights may have been violated informing them of their rights under this action;

b) that the Court order Defendants to make whole any adversely affected employee or former employee for any time, benefits, or pay lost as a result of Defendants' unlawful acts;

c) that the Court order Defendants to reinstate any adversely affected former employees who have lost their employment with Defendants as a result of Defendants' unlawful acts;

d) that the Court order Defendants to expunge any discipline or disciplinary points, as well as any reference to any allegation of FMLA misuse or of any disciplinary action taken or threatened in relation to use of FMLA leave;

e) that the Court order Defendants to change their practices and policies that interfere with employees' FMLA, ERISA, or Rehabilitation Act rights so that their practices and policies comply with the law;

f) that the Court declare Defendants' acts to be unlawful;

g) that the Court find that Defendants acted in willful disregard of the FMLA, thus extending the statute of limitations under the FMLA;

h) that the Court restrain and enjoin Defendants permanently from violating the FMLA, ERISA, and the Rehabilitation Act;

i) that the Court order Defendant to pay to Plaintiffs and the putative class members compensatory damages, damages for lost income, back pay, lost benefits, consequential damages, front pay, liquidated damages, and other damages in an amount to be determined by the trier of fact;

j) that the Court enter any additional order for such other relief as the Court deems just and equitable; and

k) that the Court order Defendants to pay Plaintiffs' and the putative class members' costs, including but not limited to reasonable expert witness fees, reasonable attorney fees, disbursements, and the interest incurred therein.

Respectfully submitted,

*/s/ Elizabeth Tuck Loring*

Elizabeth Tuck Loring (0076542 OH)
Loring Law Office, LLC
810 Sycamore St., 4th Floor
Cincinnati, OH 45202
Tel: (513) 545-6781
Fax: (513) 263-9081
*eloringlaw@gmail.com*

*/s/ Tod J. Thompson*

Tod J. Thompson (0076446 OH)
Tod J. Thompson, Atty. at Law
810 Sycamore St., 5th Floor
Cincinnati, OH 45202
Tel: (513) 322-4348
Fax: (513) 263-9001
*tod@tthompsonlaw.com*