# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

ANTHONY SCHOBERT,
et al.,

               Plaintiffs,                  **Case No. 1:19-cv-76**
                                               **JUDGE DOUGLAS R. COLE**

v.

CSX TRANSPORTATION INC.,

               Defendant.

## OPINION AND ORDER

This cause is before the Court on three pending Motions, including: (i) Defendant CSX Transportation ("CSXT"), Inc.'s combined Motion for Judgment on the Pleadings, Motion for Summary Judgment, and/or Motion to Stay (Doc. 15); (ii) Plaintiffs Anthony Schobert's and John York's First Motion to Amend/Correct Complaint Pursuant to Civil Rule 15(a)(2) (Doc. 20); and (iii) Plaintiffs' Motion for Discovery Pursuant to Rule 56(d) (Doc. 21).

For the reasons below, the Court **DENIES** Plaintiffs' Motion for Leave to Amend (Doc. 20), **GRANTS** CSXT Judgment on the Pleadings as to Part I.A of its Motion (Doc. 15, #126–29[1]), **GRANTS IN PART AND DENIES IN PART** CSXT's Motion for Judgment on the Pleadings as to Part I.B of its Motion (*id.* at #130-34), **DENIES** CSXT Judgment on the Pleadings as to Part I.C of its Motion (*id.* at #135), **GRANTS** Plaintiffs' Motion for Discovery (Doc. 21), **DEFERS** ruling on CSXT's

---

[1] Refers to PageID Number.

Motion for Summary Judgment as to Parts II.A through II.C (Doc. 15 at #136–41), **DENIES** CSXT Summary Judgment as to Part II.D of its Motion (*id.* at #142–44), and **DENIES** CSXT's request for stay, which it advanced in Part III of its Summary Judgment Motion (*id.* at #145–48).

## BACKGROUND

Plaintiffs Anthony Schobert ("Schobert") and John York ("York") (collectively "Plaintiffs") take issue with how CSXT conducted certain FMLA-related investigations during the 2017–18 holiday season. Plaintiffs make several allegations on behalf of themselves and fourteen putative classes of current and former CSXT Train and Engineer employees, all related to those events. (*See* Compl., Doc. 1, #1–26).

While the specifics vary (not surprisingly, given fourteen separate putative classes), the Complaint generally alleges that CSXT violated: (1) the Family Medical Leave Act (Count I); (2) the Employee Retirement Income Security Act (Count II); and (3) the Rehabilitation Act (Count III), each in a variety of ways. (*See id.* at ¶¶ 154–71, #22–24). CSXT attacks each of the three counts on the merits, either by way of judgment on the pleadings or on summary judgment, and also seeks a stay of further proceedings to the extent any claims survive. Plaintiffs responded both on the merits of CSXT's arguments and also by requesting: (1) leave to amend their Complaint; and (2) an opportunity to conduct additional discovery before responding more fully to some of CSXT's summary judgment arguments. Given the interplay among the various pending motions, the Court will begin by discussing the factual

2

backdrop against which the motions arise (based on the allegations in the Complaint) and describe each of the motions in greater detail, before turning to its analysis of each.

## A.  Schobert And York, Two Locomotive Engineers, Take FMLA Leave Around The 2017–18 Winter Holidays.

CSXT is a rail carrier operating nationwide and employing more than 32,000 people. (Compl. at ¶ 7, #2). Schobert is, and York was, one of those employees. (*Id.* at ¶¶ 52, 94, #9, 14). Schobert first joined CSXT in 2003 and has been a locomotive engineer since 2012. (*Id.* at ¶ 52, #9). York began working with CSXT in 2001 and was a locomotive engineer from 2011 until his termination in 2018. (*Id.* at ¶ 94, #14). Locomotive engineers are part of a larger group of employees, Train & Engineer Employees ("T&E Employees"), which includes engineers, conductors, and switchmen, all of whom work pursuant to a collective bargaining agreement. (*See* Compl. at ¶ 38, #7). Instead of working a typical nine-to-five schedule, T&E Employees are "called up within two hours' notice for multiple-day shifts that include overnight stays[.]" (*Id.* at ¶ 31, #5). They "do not work a regular workday or Monday through Friday," but are "on call" most hours of most days. (*Id.* at ¶¶ 12, 31, #3, 5).

For Schobert and York, the on-call nature of their job is complicated by their alleged disability status, which they assert entitles them to intermittent FMLA leave. (*See* Compl. at ¶¶ 55–56, 97–98, #9, 15). Roughly six years ago, Schobert suffered an injury that resulted in a "continuing disability of the spine," allegedly causing him "intermittent neck and back pain." (*Id.* at ¶¶ 55-56, #9). He further alleges that, during painful flare-ups, he is unable to work. (*Id.* at ¶ 56, #9). York suffered a knee

injury approximately five years ago, which flares up from time to time and allegedly impairs his "ability to walk." (*Id.* at ¶¶ 97–98, #15). As part of addressing their respective conditions and flare-ups, Schobert and York sought, and they assert CSXT approved, pre-certified intermittent FMLA leave, which permits them time off to seek treatment. (*See id.* at ¶¶ 57–59, 99–101, #9, 15).

In late December 2017, Schobert experienced a flare-up that allegedly rendered him unable to work, but because it was Christmastime he was unable to get an appointment with his doctor until December 26, 2017. (*Id.* at ¶¶ 73–74, #12). Accordingly, he took four days of FMLA leave. (*Id.*). Separately, York's knee began to cause him problems around New Year's Eve, so he took two days of FMLA leave starting on December 30th. (*See id.* at ¶¶ 112–13, #17). While neither Plaintiff specifically alleges that he returned to work after his FMLA leave concluded, the Complaint indicates that they both did.

During the first few weeks of 2018, CSXT began investigating whether its employees who took FMLA leave during the winter holidays had done so improperly, i.e., merely to avoid being called into work on those holidays. (*See id.* at ¶ 37, #6). CSXT undertook this broad-sweeping inquiry because, according to a CSXT notice that Plaintiffs cite in their Complaint, the company had noticed "disruptions to its operations on holidays and weekends due to crew unavailability." (*Id.* at ¶ 24, #4 (purporting to quote a CSXT employee notice)). As part of that investigation, in early-to-mid January 2018, CSXT placed both Schobert and York on administrative leave

without pay pending a disciplinary hearing on whether they inappropriately used FMLA leave. (*See id.* at ¶¶ 76–79, 115–17, #12, 17).

Eventually, Schobert and York each had a hearing pursuant to the T&E Employees' collective bargaining agreement with CSXT. Schobert alleges that, at his hearing, CSXT accused him of misusing FMLA leave and lying to his employer. (*Id.* at ¶ 80, #13). He further claims that CSXT supported its accusation with only minimal evidence, consisting solely of the coincidental timing between his leave and the 2017 Christmas holiday. (*Id.* at ¶¶ 81–82, #13). Luckily for Schobert, he was "exonerated" because he "happened to bring documentation of his treatment," namely the December 26, 2017 appointment, to his disciplinary hearing. (*Id.* at ¶ 85, #13). Without expressly pleading as much, the Complaint seems to suggest that CSXT reinstated Schobert to his pre-leave position, as Schobert does not make any allegation to the contrary or assert that he was subject to additional discipline.

York was not so fortunate. Unlike Schobert, York did not provide any corroborating documents to substantiate his need for FMLA leave. So, at York's hearing, CSXT again cited the coincidental timing between FMLA leave and the holiday season to assert that its employee had wrongfully taken FMLA leave. CSXT's belief that York had misused leave led CSXT to find that York committed an act of dishonesty, a terminable offense under the T&E Employees' collective bargaining agreement. CSXT thus fired York on February 24, 2018. (*See id.* at ¶¶ 118–23, #17–18).

**B.   Schobert And York Sue CSXT Over Their FMLA Policies, The FMLA Investigations, And The Adverse Employment Actions That Followed.**

Schobert's disciplinary hearing and York's termination led them to jointly sue CSXT (on behalf of fourteen putative classes of employees). Based on the Complaint, it appears that Plaintiffs' grievances with CSXT and its FMLA leave policies had been festering for some time before Plaintiffs initiated this suit. For example, Schobert and York allege that, dating back to at least 2016 and continuing through at least 2017, CSXT "issued multiple company-wide Notices accusing employees who take FMLA of routinely abusing their leave." (Compl. at ¶ 20, #4). Plaintiffs assert that these notices "threatened employees with discipline[,]" "intended to and did cause animosity" between and among employees, "chilled employees' use of FMLA intermittent leave[,]" and "caused [employees] not to use FMLA leave when they needed it." (*See id.* at ¶¶ 19–28, #4–5). Plaintiffs say this left them and other T&E Employees who need FMLA leave in an untenable position—either take leave in conjunction with other days off and risk discipline or not take leave at all. (*See id.* at ¶ 28, #5).

Schobert and York also take issue with several of CSXT's policies more broadly, which they claim violate the FMLA outright. First, they allege that CSXT improperly calculates employees' FMLA time because it measures leave "in increments of 1/100 of a week, or 1.68 hours," not in an increment less than one hour as required by law. (*Id.* at ¶¶ 9–10, #2–3 (citing [29] C.F.R. § 825.205)).

Plaintiffs' second FMLA allegation concerns the way that CSXT allocates extra pay to T&E Employees. Schobert and York, in their roles as locomotive engineers,

could work for "guarantee" pay, which they would earn for remaining "on-call" to come in and operate a train, even if they are never actually called to do so. (*See id.* at ¶ 12, #3). They allege that if T&E Employees who are "on call" take FMLA leave (thus they are "on call" but unable to work if called to do so), then CSXT "strips the engineers of their guarantee pay for an entire week, regardless of whether the employee is actually called to work while on FMLA leave." (*Id.* at ¶ 13, #3). Plaintiffs further allege that even after "stripping" this pay, CSXT "still requires the engineers to remain on call for days after the FMLA absence," apparently without pay. (*Id.* at ¶ 14, #3).

Third, Plaintiffs allege CSXT's "Crew Attendance Point System" ("CAPS") violates the FMLA. As Plaintiffs describe it, this policy "assigns negative points for non-FMLA absences," but simultaneously enables employees to reduce or eliminate accrued points if they have "perfect attendance for one month." (*Id.* at ¶ 16, #3). If an employee takes FMLA leave, then that destroys perfect attendance, and thus precludes any point reduction for that month. (*See id.* at ¶ 17, #3). That is, an employee who takes FMLA leave on June 1st, returns on June 2nd, and does not miss another day that month, would be ineligible for a point reduction. (*See id.*). The converse is also true. An employee could have perfect attendance for the first thirty days of July, take FMLA leave on July 31st, and therefore be ineligible for a reduction that month too. This means, Plaintiffs argue, that when an employee has "a prior non-FMLA absence" (i.e., negative points already on their record), they are "actively discouraged from taking FMLA" because doing so could ruin otherwise perfect attendance. (*Id.* at ¶ 17–18, #3).

## C.     Plaintiffs Purport To Represent Fourteen Putative Classes Asserting Three Claims Against CSXT.

Schobert and York assert their claims as a putative class action on behalf of themselves and fourteen classes.[2] Each class is tied to one or more causes of action against CSXT. Classes One, Two, and Three are comprised of CSXT employees allegedly harmed by CSXT's FMLA leave calculations, CAPS policy, and guarantee pay reductions, respectively. (Compl. at ¶¶ 131–33, #19). Class Four concerns employees who were threatened with adverse employment action for, or chilled from, taking FMLA leave based on CSXT's FMLA notices. (*Id.* at ¶ 134, #19). Class Five contains employees whose FMLA leave information was "published" to unauthorized persons. (*Id.* at ¶ 135, #19). Class Six covers all employees who were disciplined, forewent leave, or took more leave than necessary because of CSXT's policies. (*Id.* at ¶ 136, #20). Classes Seven, Eight, and Nine are made up of employees who were certified for, but who CSXT deterred from, or terminated or disciplined for, taking FMLA leave. (*Id.* at ¶¶ 137–39, #20).

Class Ten addresses all *disabled* employees who were deterred from, disciplined for, or terminated for, taking FMLA leave despite it being the "reasonable accommodation for their disability[.]" (*Id.* at ¶ 140, #20–21). Classes Eleven and Twelve are employees who submitted medical information to CSXT in response to "threatening communications," or to refute charges of FMLA misuse. (*Id.* ¶¶ 141–42, #21). Class Thirteen concerns employees who had their medical information placed

---

[2] Plaintiffs have not moved for class certification and the Court does not address that question in this Order.

somewhere other than in their "confidential employee medical file," as Plaintiffs argue the law requires. (*Id.* at ¶ 143, #21). Finally, Class Fourteen is employees who were "deterred from availing themselves" of CSXT's ERISA-covered, employer-maintained healthcare plan. (*Id.* at ¶ 144, #21).

Based on Schobert and York's factual allegations and these fourteen putative classes, Plaintiffs assert three "claims," which are in actuality eight causes of action. The first two are that CSXT impermissibly denied or interfered with Plaintiffs' FMLA benefits and rights. (*Id.* at ¶¶ 154–59, #22–23). The next two allege that CSXT "harassed, disciplined, and discriminated against" Plaintiffs' regarding their rights under ERISA rights (Count II). (*Id.* at ¶¶ 160–63, #23). The final four are claims for alleged violations of the Rehabilitation Act, including: that CSXT committed disability-related discrimination and retaliation (*id.* at ¶ 170, #24); that CSXT denied Plaintiffs a reasonable accommodation (*id.* at ¶¶ 166–67, 169, #24); and that CSXT "mishandled and wrongfully disclosed" Plaintiffs' medical information (*id.* at ¶ 168, #24).

## PENDING MOTIONS

**A.   CSXT's Motion For Judgment On The Pleadings, Motion For Summary Judgment, And/Or Motion To Stay Pending Arbitration.**

On May 1, 2019, CSXT filed a combined motion seeking: (1) judgment on the pleadings on the entirety of two claims (ERISA and Rehabilitation Act) and an aspect of the remaining claim (FMLA); (2) summary judgment on the other aspects of the remaining FMLA claim; and/or (3) a stay of this proceeding pending arbitration. (*See* Mot. for J. on the Pleadings, Mot. for Summ. J. and/or Mot. to Stay ("CSXT's Mot."),

Doc. 15, #108–10; *see also* Mem. of Law in Support of Def. CSXT's Mot. ("CSXT's Mem."), Doc. 15-1, #111–49).

Regarding its Motion for Judgment on the Pleadings, CSXT argues the Complaint does not state a plausible ERISA claim because that statute imposes liability only if an employer acts with the specific intent to interfere with or violate ERISA, and Plaintiffs have failed to sufficiently plead that specific intent here. (*Id.* at #127–29 (Part I.A[3])). On the Rehabilitation Act front, CSXT argues Plaintiffs inadequately allege that they are "disabled" as defined by the Act, and that neither Plaintiff has sufficiently pled a plausible discrimination or disability-related inquiry cause of action. (*See id.* at #132–34 (Part I.B)). Last, as it relates to judgment on the pleadings, CSXT argues that it was improper for Plaintiffs to plead their putative class action under the FMLA while at the same time purporting to bring the action under Federal Rule of Civil Procedure 23. (*Id.* at #135 (Part I.C)). Instead, CSXT contends, Plaintiffs must bring their class action under the Fair Labor Standards Act's ("FLSA") collective action regime, given the textual similarities between the FLSA and the FMLA. (*See id.*).

As for summary judgment, CSXT argues that the indisputable facts show that the challenged CSXT policies, as a matter of law, do not violate the FMLA. (*See id.* at #136–41 (Parts II.A–II.C)). First, CSXT argues the CAPS policy is a "no-fault attendance policy" and does not violate the FMLA because that law does not mandate

---

[3] References to "Part" correspond to the specific sections of CSXT's Memorandum. As the Court ultimately grants, denies, or defers various portions of CSXT's Motion, referring to the memorandum portions aids in organization only.

that employees be allowed to accrue employment benefits while they are on leave. (*Id.* at #136). Second, CSXT argues that, as a matter of law, its guarantee policy does not violate the FMLA because it complies with Department of Labor guidelines, as the employees who are on the guarantee boards and take FMLA leave are treated the same as any other employees who take "equivalent" (i.e., unpaid) leave. (*Id.* at #138–40). Third, CSXT argues that Plaintiffs' allegation about how it calculates leave is simply "wrong" because CSXT calculates leave in increments of 1/100th of an hour, not 1/100th of a week. (*Id.* at #140–41). This, CSXT says, is actually more generous than what is required by the FMLA, as "an employee is never charged with taking *more* FMLA leave than the total time for which he or she was marked off; he or she is always charged with having taken *less* time." (*Id.*).

CSXT also seeks summary judgment on its argument that York's claim must be arbitrated pursuant to the Railway Labor Act ("RLA") and Supreme Court precedent in *Hawaiian Airlines v. Norris*, 512 U.S. 246 (1994). (CSXT's Mem. at #142 (Part II.D)). CSXT argues that York's claim must go to arbitration because it is a "minor claim," as CSX dismissed him for "dishonesty" (based on falsely claiming FMLA leave). (*See id.* at #144). Resolving whether CSXT could permissibly dismiss York, CSXT says, would require the Court to determine "whether CSXT properly managed its contractual allegation process" under the collective bargaining agreement and whether it met its burden to prove, by substantial evidence, that York engaged in FMLA misuse. (*See id.*). If the case is not dismissed, CSXT argues that

any remaining claims should be stayed pending that RLA-mandated arbitration. (*See id.* at #145–48 (Part III)).

**B.  Plaintiffs' Omnibus Response.**

Plaintiffs offer a three-part response to CSXT's Motion. First, they respond on the merits to CSXT's arguments. (Pls.' Mem. in Opp'n to Def. CSXT's Mots. for J. on the Pleadings, for Summ. J., and/or to Stay ("Plaintiffs' Response" or "Pls.' Resp. Mem."), Doc. 19, #210–29). Second, they move to amend the Complaint, (Pls.' First Mot. to Am. Compl. Pursuant to Civ. R. 15(a)(2) ("Plaintiffs' Motion to Amend" or "Pls.' Mot. to Am."), Doc. 20, #231–32), attaching the proposed amended pleading. (*See* Pls.' Mot. to Am. Ex. A ("Prop. Am. Compl."), Doc. 20-1, #233–57). Last, they file a Motion for Discovery pursuant to Federal Rule of Civil Procedure 56(d). (*See* Pls.' Mot. for Discovery Pursuant to Civ. R. 56(d) ("Plaintiffs' Rule 56(d) Motion" or "Pls.' R. 56(d) Mot."), Doc. 21, #258).

Plaintiffs' merits response first devotes substantial consideration to the pleading standard and what they argue is required of them at this stage in the litigation. (Pls.' Resp. Mem. at #210–12). They maintain there is no "heightened" pleading standard in discrimination cases and that a plaintiff need not plausibly allege "each evidentiary element of a claim." (*Id.* at #212). Based on this understanding of the pleading requirement, Plaintiffs argue the initial Complaint sufficiently and plausibly alleges viable ERISA and Rehabilitation Act claims. (*Id.* at #212–18).

On the ERISA claims, Plaintiffs concede that they must plausibly allege that CSXT acted with the intent to deprive Plaintiffs of ERISA benefits, but maintain that they have met that burden, pointing to allegations in which they expressly state that CSXT acted with that intent. (*Id.* at #212 (citing, *e.g.*, Compl. at ¶ 93, #14 ("CSX's policies, threatening letters and messages, disciplinary threats, and other behavior discouraging FMLA and other absences at the end of the calendar year had the effect of and were intended to dissuade Schobert and other employees like him from using their ERISA health insurance coverage."))). Plaintiffs further argue that, to the extent that they must plead specific intent, they are happy to add the word "specific" to the intent allegations of their ERISA claim, thereby—they assert—curing any potential defect. (*Id.*).

As for the Rehabilitation Act claims, Plaintiffs believe they plausibly allege "disabled" status within the meaning of that Act, and, because they are disabled, it is plausible that CSXT discriminated against them and made a prohibited disability-related inquiry. (*Id.* at #213–18). Plaintiffs also argue that Rule 23 is the proper vehicle for this class action and that a number of courts have rejected CSXT's argument that the FLSA applies instead. (*Id.* at #218).

In terms of the RLA's "minor claim" framework precluding York's claims from proceeding outside arbitration, Plaintiffs argue that their claims do not require this Court to consider whether the collective bargaining agreement was satisfied, but rather the issue is whether CSXT was permitted to turn to that agreement at all. (*Id.* at #222-24). That is because, in their view, FMLA violations are a completely separate

issue from the T&E Employees' collective bargaining agreement. (*Id*.). Because the alleged violation at issue does not involve the collective bargaining agreement, Plaintiffs maintain that arbitration is neither required nor necessary, and a stay for such arbitration is both inappropriate and unwarranted. (*Id*. at #225–28).

As for the other summary judgment portions of CSXT's Motion (Parts II.A–II.C), Plaintiffs first argue that there are genuine issues of material fact about CSXT's FMLA leave calculation methods, the CAPS policy, and the guarantee policy. (*Id*. at #219–22). Plaintiffs' Response, however, fails to refute the affidavits and documents CSXT filed, which is why Plaintiffs also filed a Rule 56(d) motion.

In their Rule 56(d) Motion, Schobert and York argue that they were unable to adequately respond to the summary judgment portion of CSXT's Motion without some discovery on those issues. (Pls.' R. 56(d) Mot. at #258). Plaintiffs attach to that motion, as required by rule, a declaration from their attorney outlining what discovery, in particular, Plaintiffs believe they need in order to adequately respond. (*See* R. 56(d) Decl. of Tod J. Thompson ("Thompson Decl."), Doc. 21-1, #260–62).

In addition, Plaintiffs also seek leave to amend their Complaint pursuant to Federal Rule of Civil Procedure 15(a)(2) (*see* Pls.' Mot. to Am. Compl., Doc. 20, #231–32), attaching the proposed pleading (*see* Pls.' Mot. to Am. Compl. Ex. A ("Prop. Am. Compl."), Doc. 20-1, #233–59). That motion does not specify the exact changes Plaintiffs seek, but comparing it to the initial Complaint illustrates some differences, which are discussed more fully below in connection with the analysis of that Motion.

CSXT addresses Plaintiffs' Response and their related motions in its Reply. (Def.'s Reply Mem. of L. in Support CSXT's Mot. ("CSXT's Reply"), Doc. 24, #270–94). In addition to refuting Plaintiffs' merit arguments, CSXT also argues that amending the complaint is futile and that, because Plaintiffs did not submit any rebuttal affidavits, the notion that discovery will change the factual landscape is "purely speculative." (*See id.* at #276–87).

## LAW AND ANALYSIS

The Court first addresses Plaintiffs' Motion for Leave to Amend their Complaint, then turns to CSXT's combined Motion, along with Plaintiffs' responses.

### A.     Plaintiffs' Motion To Amend Their Complaint Is Futile.

Schobert and York's original Complaint levies three claims against CSXT, two of which are pertinent here, as CSXT's Motion for Judgment on the Pleadings attacks two of those claims. The first is Count II, which alleges that CSXT engaged in both interference with, and retaliation for, Plaintiffs' exercise of ERISA-protected rights. (*See* Compl. at ¶¶ 160–63, #23). More specifically, they allege that CSXT "harassed, disciplined, and discriminated against Plaintiffs … for exercising their [ERISA plan] rights … for the purpose of interfering with the attainment" of those rights. (*See id.* at ¶ 162, #23). The other relevant claim is Count III, the caption of which indicates Plaintiffs' attempt to assert four causes of action under the Rehabilitation Act: discrimination, retaliation, denial of accommodation, and impermissible medical file disclosure. (*See id.* at ¶¶ 164–71, #23–24). On the denial of accommodation front, Plaintiffs contend that they were "pre-approved" for FMLA leave, which was a

15

"reasonable accommodation" for their disabilities, and that CSX "refused to engage in the interactive process" with Plaintiffs. (*Id.* at ¶¶167-69, #24). As for disclosure, Plaintiffs claim that, in conducting the alleged FMLA investigation, CSXT "unlawfully obtained, mishandled, and wrongfully disclosed" Plaintiffs' "medical information … in violation of the Rehabilitation Act." (*Id.* at ¶¶ 167–70, #24).

Plaintiffs argue that leave to amend their Complaint as to these two claims is warranted. (Pls.' Mot. to Am. Compl. at #231). This is so, they say, because there is "no serious argument" that Plaintiffs are attempting to delay the matter or that CSXT would be prejudiced by any amendment at this point. (*See id.*). Beyond their brief motion, though, Plaintiffs do not describe the particular changes the proposed amended pleading would offer. (*See id.*). In response, CSXT defends its Motion for Judgment on the Pleadings, arguing that Plaintiffs' proposed amendments do not add any "new facts to support" their legal conclusion that CSXT violated ERISA, nor have they added the necessary factual allegations to make out any viable Rehabilitation Act claim. (*See* CSXT's Reply at #280–84).

### 1. *A District Court Is Afforded Broad Discretion In Deciding A Motion For Leave To Amend.*

A district court has broad discretion in deciding a motion for leave to amend a complaint. *See, e.g.*, *Cheryl & Co. v. Krueger*, No. 2:18-cv-1485, 2019 WL 7821056, at *1, (S.D. Ohio Dec. 12, 2019) (citing *Gen. Elec. Co. v. Sargent & Lundy*, 916 F.2d 1119, 1130 (6th Cir. 1990)). When analyzing a motion for leave filed after a defendant answers or files a Rule 12 motion, the Court applies the same standards as Federal Rule of Civil Procedure 15(a)(2), which instructs that courts should "freely" grant

leave "when justice so requires." Absent "'any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies … undue prejudice to the opposing party … futility of the amendment, etc.—the leave sought should, as the rules require, be freely given.'" *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 640–41 (6th Cir. 2018) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)). A district court's "outright refusal to grant the leave without any justifying reason … is not an exercise of discretion," but instead an abuse of it that is "inconsistent with the spirit of the Federal Rules." *Parchman v. SLM Corp.*, 896 F.3d 728, 736 (6th Cir. 2018) (citing *Foman*, 371 F.3d at 182) (quotation omitted).

As mentioned, one reason a court may exercise its discretion and deny a motion to amend is futility. A motion to amend a complaint is futile "'if the amendment could not withstand a Rule 12(b)(6) motion to dismiss.'" *Beydoun v. Sessions*, 871 F.3d 459, 469 (6th Cir. 2017) (quoting *Foman*, 371 U.S. at 182); *see also Parchman*, 896 F.3d at 737–38 (same); *Midkiff v. Adams Cnty. Reg'l Water Dist.*, 409 F.3d 758, 767 (6th Cir. 2005) (denying leave to amend when the proposed amended pleading consisted of conclusory allegations without factual support).

Reviewing the proposed amended pleading, the Court notes several changes Plaintiffs would like to make to their initial pleading. The proposed amended complaint first deletes several allegations related to the alleged mishandling of Schobert and York's "protected personal medical files" and "protected health information." (*Compare* Compl. at ¶¶ 41, 83, 86–88, 119, #7, 13, 18 *with* Prop. Am

17

Compl., Doc. 20-1, #239, 244-45, 248-49 (showing that the indicated paragraphs from the original Complaint have been removed)). Second, Plaintiffs seek to add various legal terms to the Rehabilitation Act medical inquiry claim (adding the phrase "disability-related") and to the ERISA claims (adding the adverb "specifically" to modify "intended"). (*See* Prop. Am. Compl. at ¶¶ 66–67, 69, 84, 89, 122, 156, 163, #242–43, 245, 249, 254–255). Plaintiffs also narrow their focus regarding the medical records issue, dropping their allegations that CSXT mishandled medical information by placing it in Plaintiffs' disciplinary files, but still maintaining that placing medical information in Plaintiffs' personnel files is nevertheless impermissible. (*See* Prop. Am. Compl. at ¶ 163, #255; Pls. Resp. Mem. at #217, 217 n.4). Plaintiffs also make an additional factual claim about Schobert's alleged disability: that his condition "substantially limits his ability to sit" and that his job "requires long periods of sitting." (Prop. Am. Compl. at ¶ 56, #241).

These proposed amendments are all futile, but for differing reasons. The deletions (for lack of a better term) regarding the allegedly mishandled "disability-related information" do not change the Court's outcome on the Rehabilitation Act claims, as discussed below. Schobert's additional factual claim about his alleged disability is useful, but unnecessary to the Court's analysis of the Rehabilitation Act claims. Last, the "technical phrases" Plaintiffs propose to add to their allegations do nothing to remedy the defects, also discussed in greater detail below, in either their Rehabilitation Act or ERISA claims. Therefore, as the proposed amended complaint

is futile, the Court **DENIES** Plaintiffs' Motion (Doc. 20), and will assess the remaining motions based on the extant Complaint.

**B.    The Court Grants Part I.A, Grants in Part and Denies in Part as to Part I.B, And Denies Part I.C, Of CSXT's Motion For Judgment On The Pleadings.**

With that antecedent matter resolved, the Court turns to Parts I.A, I.B, and I.C of CSXT's Motion, which seek Judgment on the Pleadings as to Plaintiffs' ERISA (Count II) and Rehabilitation Act (Count III) claims, as well as CSXT's argument that the FLSA collective action standard, not Federal Rule of Civil Procedure 23, applies here. (Doc. 15, #126–35).

**1.    *The Parties' Offer Differing Viewpoints About What Is Required To Plausibly Allege ERISA and Rehabilitation Act Claims.***

CSXT argues that Plaintiffs failed to state a claim under ERISA § 510 because that statute requires an employer to act with "specific intent" to violate ERISA, but Plaintiffs merely alleged CSXT's actions had *the effect of* preventing Plaintiffs from using their ERISA benefits. (CSXT's Mem. at #127–28). CSXT also contends that Plaintiffs failed to adequately plead a Rehabilitation Act claim because they did not plausibly allege that Schobert and York are "disabled" under that statute. (*Id.* at #130–31). Moreover, even if Plaintiffs are disabled, CSXT argues, they failed to plausibly allege that they were disciplined "solely by reason of" their disability and that they similarly failed to allege CSXT made a prohibited disability-related inquiry when it investigated purported FMLA misuse. (*Id.* at #132–34). Further, CSXT asserts that it is entitled to judgment on the pleadings regarding Plaintiffs' putative class action, arguing that Plaintiffs are not permitted to plead their class action under

19

Rule 23, but instead must adhere to the Fair Labor Standards Act's collective action requirements. (*Id.* at #135).

Plaintiffs disagree. First, they argue that their existing ERISA claim is plausible because they are not required to meet any heightened pleading standard and their Complaint meets ordinary pleading standards as it alleges a "direct linkage" between CSXT's actions and Plaintiffs' ERISA benefits "with particularity." (Pls. Resp. Mem. at #212 (citing Compl. at ¶¶ 51, 93, 127, #9, 14, 18)). As for the Rehabilitation Act claims, Plaintiffs assert that the Complaint plausibly alleges that both Schobert and York have qualifying disabilities under the Rehabilitation Act, as the Complaint states that both of their conditions limit a major life activity. Plaintiffs further contend that CSXT's reliance on *Bracken v. DASCO Home Medical Equipment, Inc.*, No. 1:12-CV-892, 2013 WL 3275479, at *10 (S.D. Ohio June 27, 2013), and its reliance on *Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999), is misplaced because Congress specifically overruled *Sutton* through amendments to the ADA in 2008. (Pls. Resp. Mem. At #213–14). Finally, Plaintiffs believe they sufficiently alleged: (1) that CSXT disciplined Schobert and York due to their disabilities; (2) that CSXT's medical inquiry violated the law; and (3) that pleading Rehabilitation Act claims along with ERISA and FMLA claims is not inconsistent pleading, but is rather permissible alternative pleading. (*Id.* at #215–17).

As for the Rule 23 class action or FLSA collective action issue, Plaintiffs argue that the case CSXT relies on, *Clary v. Southwest Airlines*, No. 3:07-cv-0126, 2007 WL

4947690 (N.D. Tex. Dec. 17, 2007), has been considered and rejected by a number of courts, and should similarly be rejected here. (Pls.' Resp. Mem. at #218).

In reply, CSXT reiterates its original grounds for judgment on the pleadings, but also elaborates on its argument that Plaintiffs have conflated an FMLA claim with a Rehabilitation Act claim, noting when the two causes of action are based on the same operative facts, they cannot be pled in the alternative. (CSXT's Reply at #281–82). As for whether Schobert and York plausibly alleged they were disabled, CSXT maintains Plaintiffs have not plead with sufficient particularity that they were "substantially limited" in a major life activity, and any proposed amendments did not cure that fatal defect. (*Id.* at #284). CSXT also rebuffs Plaintiffs' argument regarding the disability-related inquiry, reasserting its position that CSXT's inquiry was "generalized," "directed at both disabled and non-disabled employees[,]" and therefore did not violate the Rehabilitation Act. (*Id.* at #285). Last, CSXT restates its argument that the FLSA collective action framework is required here, but notes that this is a "matter of first impression" in this District. (*Id.* at #286).

### 2. *Judgment On The Pleadings Standard Of Review.*

Courts analyze a Rule 12(c) motion for judgment on the pleadings in the same manner as a motion to dismiss under Rule 12(b)(6). *See Tucker v. Middleburg-Legacy Place, LLC*, 539 F.3d 545, 549 (6th Cir. 2008). Accordingly, courts accept all factual allegations in the complaint as true and construe them in the light most favorable to the plaintiff, likewise drawing all reasonable inferences in the plaintiff's favor. *See Bullington v. Bedford Cnty.*, 905 F.3d 467, 469 (6th Cir. 2018).

All a plaintiff must do to survive a motion for judgment on the pleadings is provide "a short and plain statement of the claim showing that the pleader is entitled to relief." *Keys v. Humana, Inc.*, 684 F.3d 605, 608 (6th Cir. 2012) (quoting Fed. R. Civ. P. 8(a)(2)). But that short and plain statement must offer more than mere "labels and conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "'[A] formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Rather, there must be "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). This means a complaint must contain "either direct or inferential allegations respecting all material elements to sustain recovery under some viable legal theory." *Bishop v. Lucent Techs., Inc.*, 520 F.3d 516, 519 (6th Cir. 2008) (quotation omitted). "Conclusory allegations or legal conclusion masquerading as factual allegations will not suffice." *Id.* (citing *Mezibov v. Allen*, 411 F.3d 712, 716 (6th Cir. 2005)).

In sum, courts will dismiss an action under this standard if "there is no law to support the claims made." *Stew Farm, Ltd. v. Nat. Res. Conservation Serv.*, 967 F. Supp. 2d 1164, 1169 (S.D. Ohio 2013) (citing *Rauch v. Day & Night Mfg. Corp.*, 576 F.2d 697, 702 (6th Cir. 1978)). The same holds where "the facts alleged are insufficient to state a claim." *Id.*

### 3. *The Parties Disagree Over How The Pleading Standard Should Be Applied To Schobert And York's Claims.*

As a preliminary matter, Plaintiffs are correct that ERISA and Rehabilitation Act claims are not subject to any heightened pleading standard. *Rhodes v. R&L*

*Carriers, Inc.*, 491 F. App'x 579, 583–84 (6th Cir. 2012). But "[t]o survive a motion to dismiss, … a plaintiff must rest his claim to relief on more than conclusory allegations that the defendant violated the law." *Vartinelli v. Aramark Corr. Servs., LLC*, 796 F. App'x 867, 870 (6th Cir. 2019). Rather, the question is whether the plaintiff has pled *facts* giving rise to a *plausible* claim, an inquiry that the Court resolves in part by employing its "judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

In operationalizing this standard, the Sixth Circuit has instructed lower courts to respect the difference between plausibility, on the one hand, and facts that merely happen to be "consistent with liability," on the other. *16630 Southfield Ltd. P'ship v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 505 (6th Cir. 2013). And the distinction between the two can turn, at least in part, on the availability—and plausibility—of alternative explanations for the events that occurred. *Id.* ("How reasonable is it to infer that it rained last night from the fact that my lawn is wet? It depends, among other things, on whether I own a sprinkler."). This is especially true as it relates to pleading intent. The existence of an "obvious alternative explanation[,]" can help differentiate between facts merely "consistent with liability" and those sufficient to plausibly allege "discriminatory intent." *Id.* That is, an obvious alternative explanation can help "illustrate[] the unreasonableness of the inference sought and the implausibility of the claims made." *Id.*

That by no means suggests that all a defendant must do to secure dismissal is point to a potential alternative explanation. To the contrary, the Sixth Circuit has

observed that "the mere existence of more likely alternative explanations does not automatically entitle a defendant to dismissal." *Id.* (citing *Watson Carpet & Floor Covering, Inc. v. Mohawk Indus., Inc.*, 648 F.3d 452, 458 (6th Cir. 2011)). "Often, defendants' conduct has several plausible explanations. Ferreting out the most likely reason for the defendants' action is not appropriate at the pleading stage." *Watson Carpet*, 648 F.3d at 458. "Thus, if a plaintiff's claim is plausible, the availability of other explanations—even more likely explanations—does not bar the door to discovery." *16630 Southfield*, 727 F.3d at 505. Still, "you can't assess the plausibility of an inference in a vacuum" because the "reasonableness of one explanation for an incident depends, in part, on the strength of competing explanations." *Id.*

As this description shows, the impact of an alternative explanation in assessing plausibility appears to turn, to a large extent, on how much more likely the competing explanation is than the plaintiff's explanation. Comparing the allegations in *16630 Southfield* with those in *Keys* illustrates this point. In *16630 Southfield*, an Iraqi businessowner took out a loan immediately before the 2008 recession, which he promptly became unable to repay. 727 F.3d at 503. After refinancing, he sought another loan, but the bank denied his application. *See id.* He sued, claiming that the bank "treated comparable non-Iraqi applicants more favorably" and had discriminated against him by refusing to renegotiate his loan. *Id.* at 503–04. Reviewing the lower court's dismissal, the Sixth Circuit determined that the businessowner's "Iraqi origin does not by itself establish the requisite inference" of discrimination. *Id.* at 505. Instead, "[a] more obvious explanation, indeed the most

obvious explanation" was that the bank had an "understandable concern about repayment[.]" *Id.* "Common sense suggests that [the bank] denied [the plaintiff's] request for a further extension because it thought the extension was a bad business proposition, not because it wanted to discriminate against people of Iraqi origin." *Id.* The "obvious alternative explanation" for why the bank denied the businessman a second loan was the businessman's inability to repay the existing loan, not his national origin.

Conversely in *Keys*, the Sixth Circuit reversed the district court and held that a claim should have survived a motion to dismiss because it "allege[d] facts that easily state[d] a plausible claim." *See Keys*, 684 F.3d at 610. There, the amended complaint alleged "a pattern or practice of discrimination against African American managers … in hiring, compensation, promotion discipline and termination[,]" "detail[ed] several specific events in each of those employment-action categories[,]" and "identifie[d] key supervisors and other relevant persons[.]" *Id.* Those factual allegations, the court said, were "at least as detailed, if not more so" than those the Supreme Court determined sufficient to survive a Rule 12(b)(6) in *Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 514–15 (2002), and thus more than sufficient to survive there. *Id.* In other words, the Sixth Circuit found it plausible, given those factual allegations, that the employer had the requisite discriminatory intent, even if there were other potential explanations for the employer's conduct.

The question here is whether Plaintiffs have alleged facts to support a plausible ERISA violation. Plaintiffs argue that their Complaint, at least as to their

ERISA and Rehabilitation Act claims, is like the one in *Keys* and thus more than sufficient to satisfy *Iqbal / Twombly*. CSXT disagrees. This Court, using its "judicial experience and common sense," *Iqbal*, 556 U.S. at 679, must assess the plausibility of those two claims.

### 4. *Plaintiffs Failed To Allege Plausible ERISA § 510 Claims.*

Section 510 of ERISA makes it unlawful to "discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary … for the purpose of interfering with the attainment of any right to which such participant may become entitled to under [an employee benefit] plan." 29 U.S.C. § 1140; *Williams v. Graphic Packaging Int'l, Inc.*, 790 F. App'x 745, 754 (6th Cir. 2019) (noting that ERISA "prohibits employers from terminating, or otherwise discriminating against, employees who choose to exercise a benefit to which they are entitled under their benefit plan"). This section aims to "prevent unscrupulous employers from discharging or harassing their employees in order to keep them from obtaining vested [ERISA plan] rights." *West v. Butler*, 621 F.2d 240, 245 (6th Cir. 1980).

Courts in this Circuit recognize two types of § 510 claims: "(1) an 'exercise' or 'retaliation' claim, … where adverse action is taken because a participant availed [him]self of an ERISA right; and (2) an 'interference' claim where the adverse action is taken as interference with the attainment of a right under ERISA." *Hamilton v. Starcom Mediavest Grp., Inc.*, 522 F.3d 623, 627–28 (6th Cir. 2008) (quotation and citation omitted).

The prima facie elements of an ERISA retaliation claim are: (1) that an employee engaged in activity that ERISA protects; (2) that the employee suffered an adverse employment action; and (3) that there is a causal link between the protected activity and the employer's adverse action. *See Williams*, 790 F. App'x at 755 (citing *Hamilton*, 522 F.3d at 628). The prima facie elements of an ERISA interference claim require a plaintiff to demonstrate "'(1) prohibited employer conduct (2) taken for the purpose of interfering (3) with the attainment of any right to which the employee may become entitled.'" *Bailey v. U.S. Enrichment Corp.*, 530 F. App'x 471, 477 (6th Cir. 2013) (quoting *Clark v. Walgreen Co.*, 424 F. App'x 467, 474 (6th Cir. 2011) (quoting *Humphreys v. Bellaire Corp.*, 966 F.2d 1037, 1043 (6th Cir. 1992)).

To prevail on an interference claim, a plaintiff must prove that the employer administered the adverse action—here Schobert's disciplinary hearing and York's termination—"'with the specific intent of violating ERISA.'" *Spangler v. E. Ky. Power Coop., Inc.*, 790 F. App'x 719, 721 (6th Cir. 2019) (quoting *Roush v. Weastec, Inc.*, 96 F.3d 840, 845 (6th Cir. 1996)). "The plaintiff is not required to show that the employer's sole purpose" was to interfere with ERISA benefits, but he or she must show that such interference "was a 'motivating factor' in the decision." *Id.* (quoting *Humphreys*, 966 F.2d at 1043). Conversely, if the loss of ERISA benefits was a "mere consequence" of an alleged action, then the § 510 claim fails. *See Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1113 (6th Cir. 2001). Given that this is a required element of the claim at trial, "[a]t the pleading stage, [Plaintiffs] 'must allege sufficient factual content from which a court, informed by its judicial

experience and common sense, could draw the reasonable inference' that" CSXT acted "with the intent to interfere with the attainment of" Plaintiffs' ERISA benefits. *Spangler*, 790 F. App'x at 721 (quoting *Keys*, 684 F.3d at 610).

Plaintiffs' ERISA claim founders because they have not plausibly alleged that CSXT conducted the alleged FMLA investigation "with the specific intent of violating ERISA," as defined above. *Spangler*, 790 F. App'x at 721 (quotation omitted). To be sure, Plaintiffs *say* that CSXT "harassed, disciplined, and discriminated against Plaintiffs … for the purpose of interfering with the attainment of the rights to which they were, may become, or may have become entitled" under the ERISA plan. But that is a mere legal conclusion that does not carry the day at the motion to dismiss stage. *Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). All in all, Plaintiffs must allege actual *facts* that would support a plausible inference that CSXT intended to impact Schobert and York's ERISA rights or benefits, rather than pleading that such impacts were a "mere consequence" CSXT's actions.

Plaintiffs struggle to provide any such facts. Their ERISA-related allegations include:

> ¶ 50. Because of CSXT's heath benefit plan's terms, it is advantageous for employees to make appointments and seek treatment at the end of the year, because the deductible and annual out of pocket maximum reset on January 1 of each year.

> ¶ 51. CSXT's policies, threating letters and messages, disciplinary threats, and other behavior discouraging FMLA and other absences at the end of the year had the effect of and were intended to interfere with its employees' rights to ERISA health insurance coverage.

...

¶ 53. At all relevant times, Schobert has participated in CSXT's ERISA-covered health insurance plan.

...

¶ 90. At all relevant times, Schobert has participated in CSXT's ERISA-covered health insurance plan.

¶ 91. Schobert reached his maximum deductible in a calendar year due to his disability.

¶ 92. As a result, it was medically necessary and financially advantageous for Schobert to schedule medical appointments and procedures after he had reached his maximum out of pocket and deductible, because CSXT's insurance would cover the cost.

¶ 93. CSXT's policies, threatening letters and messages, disciplinary threats, and other behavior discouraging FMLA and other absences at the end of the calendar year had the effect of and were intended to dissuade Schobert and other employees like him from using their ERISA health insurance coverage.

(Compl. at ¶¶ 50, 51, 53, 90–93, #8–9, 14). York makes the same individual allegations Schobert does regarding ERISA rights. (*See id.* at ¶¶ 95, 124–27, #14, 18).

Taking the Complaint as true and drawing all plausible inferences in Plaintiffs' favor, as the Court must, their argument appears like this: (1) Schobert or York, both CSXT employees, were covered by the ERISA healthcare plan; (2) CSXT took steps to dissuade them from taking, or investigated, disciplined, or terminated them for taking, FMLA leave; (3) while on FMLA leave they could have sought medical treatment, which may have been a covered benefit under CSXT's ERISA healthcare plan; meaning, in turn, (4) that CSXT, which is self-insured (or so Plaintiffs asserted at argument), would have had to pay for that treatment with its own funds; and

29

(5) therefore it is plausible that CSXT sought to dissuade FMLA leave with the intent of depriving its employees of those ERISA-based healthcare benefits.

For several reasons, this chain of reasoning is insufficient to plausibly allege that CSXT acted with the necessary specific intent to violate ERISA. First, any loss of ERISA benefits Schobert or York suffered was a "mere consequence" of CSXT's FMLA-related actions. *See Majewski*, 274 F.3d at 1113. Second, there is an "obvious alternative explanation … [that] illustrates the unreasonableness of the inference sought and the implausibility of" Plaintiffs' ERISA claim. *16630 Southfield*, 727 F.3d at 505. In particular, CSXT's FMLA investigation most plausibly appears to have been an effort to curb impermissible FMLA use, particularly around holidays, not an attempt to interfere with or retaliate against Plaintiffs for using their ERISA benefits.

Further confirming this view, as a general matter FMLA leave is afforded to a broader class of employees than just disabled employees who seek ERISA-covered treatment while on FMLA leave. There is nothing in the Complaint from which the Court could reasonably conclude that any significant portion of the employees taking FMLA leave were doing so for the purpose of seeking ERISA-covered healthcare treatments. Thus, there is no factual assertion from which the Court could plausibly infer that discouraging FMLA leave would result in substantial ERISA-covered treatment cost savings, which is the asserted motivation under Plaintiffs' theory. To be sure, the investigation (and its resulting incentive effects) may have had the collateral *consequence* of discouraging some employees who happen to take FMLA

leave for the purpose of obtaining ERISA-covered treatment from doing so, but absent more factual allegations about the significance of that impact, that is insufficient to create the plausible inference of intent that is needed to support a § 510 claim.

Third, the CSXT-did-it-to-save-on-ERISA-costs theory fails on another front. Schobert and York do not allege that CSXT "interfered" with FMLA leave only at the end of the year, when it was more plausible that employees may have met their deductibles and out of pocket maximums (thus rendering CSXT responsible for payments). Instead, they claim that CSXT discouraged the use of FMLA leave *all year long*. That is, Schobert and York claim CSXT sent missives to employees (or at least those with pre-approved FMLA leave) throughout the year, and they specifically recall, over the course of several years, receiving letters in May (Mother's Day and Memorial Day), late June (Fourth of July), and late August (Labor Day). (Compl. at ¶¶ 21, 24, 26, #4–5). But, earlier in the year it is increasingly unlikely that CSXT employees would have hit their deductibles, meaning CSXT would not be on the hook for the ERISA-covered treatment costs at that time. To be sure, Plaintiffs also recount receiving letters in mid-November (Thanksgiving) and late-December (Christmas, Hanukah, Kwanza, and New Year's), and, at those times, it may have been more likely that Plaintiffs already met their deductibles and out-of-pocket maximums. But, read against the pattern of CSXT sending notices tied to other holidays throughout the year, the fact that CSXT also sent such notices in connection with holidays near the end of the year does not create a plausible basis for inferring that CSXT sent the latter letters with the specific intent of interfering with the use of ERISA benefits.

Nor can Plaintiffs fix this problem by adding the modifier "specific" to the legal assertion in their Complaint that CSXT acted with the requisite "intent" required for these type ERISA claims. The problem is not that the Complaint omits the phrase "specific intent," but rather that it lacks any *facts* giving rise to a plausible inference that CSXT acted with that intent. Without such facts, a bare allegation that CSXT acted with "specific intent" is exactly the kind of legal conclusion that the *Iqbal/Twombly* line of cases prohibits the Court from considering.

Even drawing all inferences in Plaintiffs' favor, regardless of the type of claim, there is nothing to indicate CSXT acted with the specific intent of violating ERISA § 510. Accordingly, the Court **DISMISSES** Count II with prejudice and **STRIKES** putative Class 14 from the Complaint.

5.   *Plaintiffs Allege Plausible Retaliation and Failure to Accommodate Claims Under the Rehabilitation Act but Do Not Allege a Plausible Medical Inquiry Claim or Disability Discrimination Claim.*

Federal Rule of Civil Procedure 8's notice-pleading requirement serves another important function beyond those discussed above. That Rule also requires a "short and plain" statement that is sufficiently detailed to "'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" *Swierkiewicz*, 534 U.S. at 512 (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957), *abrogated on other grounds by Twombly*, 550 U.S. 544). "Rule 8 ensures simply that each party has adequate notice of the other's claims and an opportunity to meet them." *Lawson v. Huerta*, 692 F. App'x 790, 794 (6th Cir. 2017) (citing *Mayer v. Mylod*, 988 F.2d 635, 638 (6th Cir. 1993)). This "fair notice" requirement matters here, because Plaintiffs'

Rehabilitation Act claim (Count III) leaves the Court guessing to some extent about what, exactly, Schobert and York are alleging. By including the labels "discrimination, retaliation, denial of accommodation" and "employee medical file violation" in the caption for that Count, Plaintiffs appear to set out four causes of action. (*See* Compl. at Count III, #23). The substantive paragraphs that follow do little to clarify this. (*See id.* at ¶¶ 164–71, #23–24).

In fairness to Plaintiffs, the Rehabilitation Act recognizes multiple, distinct causes of action, including the claims Plaintiffs set forth in Count III's caption. But rather than merely assert conclusory labels, complaints must allege *facts*. That being said, the Court can glean some additional insights by comparing the allegations relating to the proposed putative classes against the paragraphs relating to Count III. Based on that comparison, it appears that Schobert and York are first asserting a disability discrimination claim. In particular, Plaintiffs allege that CSXT discriminated against employees with disabilities by launching its FMLA investigation. (*See* Compl. at ¶ 170, #24). They relatedly claim that CSXT retaliated against employees who made "requests for accommodation." (*Id.*). Third, Schobert and York allege that CSXT failed to provide reasonable accommodations for their disabilities and refused to engage in the "interactive process." (*Id.* at ¶ 169, #24). Finally, Plaintiffs' last claim appears to consist of two related claims: (1) that CSXT

engaged in prohibited conduct by collecting their "medical information[;]" and (2) that CSXT mishandled that information after receiving it. (*Id.* at ¶168, #24).[4]

In assessing these claims, the Court starts from the proposition that, as a general matter, the Rehabilitation Act prohibits, among other things, entities that receive federal funding from discriminating against any "qualified individual with a disability." 29 U.S.C. §§ 794(a)–(b). The Act accomplishes this objective largely by incorporating substantial portions of the Americans with Disabilities Act. 29 U.S.C. § 794(d) ("The standards used to determine whether this section has been violated in a complaint alleging employment discrimination" include those found in "title I of the Americans with Disabilities Act of 1990 (42 U.S.C. § 12111 et seq.) and provisions of sections 501 through 504 and 510, of the Americans with Disabilities Act of 1990 (42 U.S.C. §§ 12201 to 12204 and 12210), as such sections relate to employment.").

But, while the Rehabilitation Act and ADA are largely coextensive, there is a key difference: the Rehabilitation Act has a different—and more stringent—causation standard. Unlike the ADA's "but for" or "because of" standard, the Rehabilitation Act requires "solely by reason of" causation. *Bent-Crumbley v. Brennan*, 799 F. App'x 342, 345 (6th Cir. 2020); *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 315–16 (6th Cir. 2012) (en banc) (noting that regardless of "the common history and shared goals of the two laws, they do not share the same text" and that they employ "two distinct causation standards"). This difference in language matters.

---

[4] CSXT, perhaps also left guessing as to what, exactly, Schobert and York allege, attacked the base of several of the Rehabilitation Act claims by arguing Schobert and York are not "disabled." (*See* CSXT's Mem. at #130–31).

*See Gohl v. Livonia Pub. Schs. Sch. Dist.*, 836 F.3d 672, 682 (6th Cir. 2016) ("The Rehabilitation Act sets the higher bar, requiring plaintiffs to show that the defendant's acts were done 'solely by reason of' the disability.'" (citation and emphasis omitted)). Plaintiffs do not offer sufficient factual allegations to clear that higher bar with regard to their Disability Discrimination claim or their Medical Inquiry claim, but do offer sufficient factual allegations to plausibly allege a Retaliation and Failure to Accommodate claim.

### a. Schobert And York's Disability Discrimination Claim Fails As A Matter Of Law.

Plaintiffs first assert that CSXT discriminated against them because of their disabilities. A *prima facie* disability discrimination claim under the Rehabilitation Act requires plaintiffs to plausibly allege that they (1) are disabled, (2) are otherwise qualified to perform the essential functions of their position, with or without a reasonable accommodation, and (3) suffered an adverse employment action *solely because of* their disability. *See Mitchell v. United States Postal Serv.*, 738 F. App'x 838, 843 (6th Cir. 2018) (citing *Jones v. Potter*, 488 F.3d 397, 403 (6th Cir. 2007)); *Lewis*, 681 F.3d at 317 ("The sole-cause standard in the end is a creature of the Rehabilitation Act, and that is where we should leave it. The standard does not apply to claims under the ADA.").

Setting aside for now the first two factors, the third factor, the solely-because-of standard, provides the most obvious problem for Schobert and York's discrimination claim. Again, they certainly *state* the correct standard in their Complaint, alleging that CSXT's FMLA-related investigation was impermissible

discrimination taken "solely by reason of" their disabilities. But *facts* plausibly supporting that claim are more difficult to come by. Plaintiffs' argument appears to be this:[5]

- The Plaintiffs allege that they are disabled, which entitles them to take FMLA leave;

- Schobert and York took said leave around the winter holidays in late-2017 and early-2018, respectively;

- In response to an uptick in FMLA-related leave over the holidays, CSXT conducted a company-wide investigation, in which it interviewed anyone who took FMLA leave within a specific time period, and required employees to provide evidence to corroborate that particular instance of leave;

- Employees who failed to do so were disciplined or terminated;

- Therefore, because the investigation regarding FMLA-related leave affected disabled employees more than non-disabled employees (who may or may not also have taken FMLA leave), the company-wide investigation impacted disabled employees more than non-disabled employees and thus amounted to impermissible discrimination.

This sounds like a disparate impact claim. That presents a problem, though, because the Sixth Circuit has held that the Rehabilitation Act "does not prohibit disparate-impact discrimination." *See Doe v. BlueCross BlueShield of Tenn., Inc.*, 926 F.3d 235, 241 (6th Cir. 2019) ("We now resolve what *Choate* did not and conclude that § 504 does not prohibit disparate-impact discrimination." (citing *Alexander v. Choate*, 469 U.S. 287 (1985))). As that court explained, "[d]isparate-impact discrimination occurs when an entity acts for a nondiscriminatory reason but nevertheless disproportionately harms a protected group." *Id.* (citation omitted). Recognizing that § 504 of the Rehabilitation Act only prohibits discrimination "solely by reason of"

---

[5] This summation, the Court acknowledges, disregards multiple differences between the FMLA and the Rehabilitation Act, which are discussed more fully later in this Opinion.

disability, it "does not encompass actions taken for nondiscriminatory reasons." *Id.* at 242 (quoting 29 U.S.C. § 794(a)). The Sixth Circuit also explained the practical underpinnings of its rule: "Because many neutral (and well-intentioned) policies disparately affect the disabled[,]" allowing Rehabilitation Act disparate-impact claims "'could lead to a wholly unwieldy administrative and adjudicative burden.'" *Id.* (quoting *Choate*, 469 U.S. at 298).

But such a forbidden disparate-impact claim is precisely what Schobert and York seek to pursue here. They allege that CSXT initiated its FMLA investigation against all employees who took FMLA leave, not just employees who were, or who were thought to be, disabled. (Compl. at ¶ 36, #6 ("On information and belief, in late 2017 and early 2018, CSX suspended without pay and charged with discipline *every employee who was properly certified for FMLA leave and took FMLA leave* on or around Christmas 2017 and New Year's Day 2018." (emphasis added))). This, they argue, amounts to intentional disability discrimination under the Rehabilitation Act because disabled employees are more likely to take FMLA leave than non-disabled employees, and thus the former would be disparately affected by the investigation. That argument does not work. The Court therefore dismisses that claim.

### b. Schobert and York Allege a Plausible Retaliation Claim Under the Rehabilitation Act.

Schobert and York have alleged a plausible retaliation claim. A Rehabilitation Act retaliation claim must plausibly allege that: (1) the employee engaged in activity protected under § 504 or the ADA; (2) the employer knew of the protected activity; (3) the employer took an adverse employment action against the employee; and

(4) there was a causal connection between the protected activity and the adverse employment action. *See, e.g.*, *A.C. v. Shelby Cnty. Bd. of Educ.*, 711 F.3d 687, 697 (6th Cir. 2013); *L.G. v. Bd. of Educ. of Fayette Cnty.*, 775 F. App'x 227, 232 (6th Cir. 2019) ("To state a retaliation claim successfully under either [§ 504 or state law] ... a plaintiff's pleading must establish a prima facie case of retaliation[.]"). Unlike a discrimination claim, a plaintiff need not be "disabled" to assert a retaliation claim. *See Barrett v. Lucent Tech.*, 36 F. App'x 835, 840 (6th Cir. 2002); *see also Wilbanks v. Ypsilanti Comm. Schs.*, 742 F. App'x 84, 87 (6th Cir. 2018) ("The anti-retaliation provisions of the ADA grant standing to non-disabled persons who are retaliated against for attempting to protect the rights of the disabled."). Rather, the key question is whether the facts in the Complaint lead to an inference that the plaintiff engaged in activity protected under § 504 or the ADA.

The first element refers to both § 504 and the ADA because the Rehabilitation Act has two separate anti-retaliation provisions. First, § 504 incorporates the anti-retaliation provision of Title VI of the Civil Rights Act. *See Wilbanks*, 742 F. App'x at 86–87 (quoting 29 U.S.C. § 794a(2)). The relevant section of Title VI states that no employer "shall intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by ... this part, or because he has made a complaint, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this part." *Id.* (quoting 34 C.F.R. § 100.7(e)).

Separately, the Rehabilitation Act also incorporates the ADA's anti-retaliation provisions, which preclude companies from "discriminat[ing] against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a). Discrimination in this context means retaliation. *E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 767 (6th Cir. 2015) (en banc) ("Discrimination here means retaliation—that 'but for' an employee's statutorily protected activity the employer would not have taken the 'adverse employment action.'"). The Sixth Circuit has held that requests for accommodation are protected acts that can give rise to a retaliation claim. *See Bryson v. Regis Corp.*, 498 F.3d 561, 577 (6th Cir. 2007); *Ellis v. Tennessee*, 603 F. App'x 355, 359 (6th Cir. 2015) ("The Rehabilitation Act prohibits recipients of federal funds from retaliating against an employee who has filed a complaint against the employer about disability discrimination or has requested a 'reasonable accommodation' for his or her disability." (citation omitted)).

At the time that CSXT investigated Plaintiffs (and terminated York), the only thing Plaintiffs allege they did was avail themselves of pre-approved FMLA leave. The pertinent question, then, is whether Schobert and York's pre-approved FMLA leave constituted a reasonable accommodation under either the Rehabilitation Act or the ADA, such that taking that leave was a "protected activity" under those statutes.

The relationship between FMLA leave and a reasonable accommodation under the Rehabilitation Act/ADA is a difficult issue. "Although the factual scenarios that

give rise to an FMLA or ADA cause of action may often coincide, the legal entitlements that flow from these facts will differ." *Chandler v. Specialty Tires of Am., Inc.*, 283 F.3d 818, 825 (6th Cir. 2002) (citing *Navarro v. Pfizer Corp.*, 261 F.3d 90, 101 (1st Cir. 2001) ("The ADA and the FMLA have divergent aims, operate in different ways, and offer disparate relief.")). That same divergence exists as to the FMLA and the Rehabilitation Act.

The FMLA provides eligible employees "as many as twelve weeks of leave" per year if that employee has, among other possible qualifiers, "a 'serious health condition that makes the employee unable to perform the functions of the position of such employee.'" *Id.* at 825. (quoting 29 U.S.C. § 2612(a)(1)(D)). The law also prohibits employers from "interfering, restraining, or denying" the use of FMLA leave in the first place and simultaneously ensures that an employee is restored to their pre-leave position upon return. *See id.* (citations omitted). That is, the FMLA entitles a worker to be *absent from* work, either to care for themselves or a qualifying family member, in response to a serious health condition.

The Rehabilitation Act does something different. Rather than protecting a right to be absent from work, the Act mandates an employer to engage with an employee who asserts that he or she may be disabled in a process designed to result in a mutually agreeable reasonable accommodation for the disability, thereby permitting the employee to continue working without imposing an undue burden on the employer. *See Rorrer v. City of Stow*, 743 F.3d 1025, 1045 (6th Cir. 2014) (discussing the reasonable accommodation framework and the interactive process).

The result of the interactive process may be a reasonable accommodation that allows an employee to remain in his or her role with some modification to account for the disability. *See, e.g.*, *Cooley v. E. Tenn. Human Res. Agency, Inc.*, 720 F. App'x 734, 741 (6th Cir. 2017) (citing *Cehrs v. Ne. Ohio Alzheimer's Rsch. Ctr.*, 155 F.3d 775, 783 (6th Cir. 1998)).

In short, as a general matter, the FMLA and the Rehab Act protect different things—the former is directed at protecting persons facing (in either themselves or a family member) "serious health issues", while the ADA and Rehabilitation Act protect those persons with "disabilities." *See Berry v. T-Mobile USA, Inc.*, 490 F.3d 1211, 1219 (10th Cir. 2007) ("ADA's 'disability' and the FMLA's 'serious health condition' are different concepts") (quoting *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1295 (11th Cir. 2006)). And the FMLA protects a worker's right to be absent from work for a designated period of time, while the Rehab Act is designed to allow the parties to address an employee's disability in a way that allows the employee to remain on the job.

Given this divergence, some courts have concluded, not surprisingly, that FMLA leave cannot constitute a reasonable accommodation. These courts reason that "an employee seeking FMLA leave is by nature arguing that he *cannot* perform the functions of the job, while an employee requesting a reasonable accommodation communicates that he *can* perform the essential functions of the job." *Acker v. Gen. Motors, L.L.C.*, 853 F.3d 784, 791-92 (5th Cir. 2017).

41

That said, other courts have recognized that "medical leave of absence can constitute a reasonable accommodation under appropriate circumstances," particularly where "uninterrupted attendance is [not] an essential job requirement." *Cehrs*, 155 F.3d at 783. Perhaps most importantly to this Court, the Sixth Circuit has suggested that FMLA leave can act as a reasonable accommodation for a disability. *Hurtt v. Int'l Servs., Inc.*, 627 F. App'x 414, 423 (6th Cir. 2015) (recognizing a request for FMLA leave as a request for a reasonable accommodation under the ADA). *See also Capps v. Mondelez Glob., LLC*, 847 F.3d 144, 156–57 (3d Cir. 2017); *Scruggs v. Pulaski Cnty., Ark.*, 817 F.3d 1087, 1093 (8th Cir. 2016).

In *Hurtt*, the key issue was whether an employee had engaged in "protected activity" as required to sustain a retaliation claim under the ADA. 627 F. App'x at 423. The employee in that case had, among other things, requested FMLA leave to address his acute anxiety and depression. *Id.* at 418. The court held that this request for leave was a "good faith" request for a reasonable accommodation, and thus requesting it was a protected activity under the ADA. *Id.* at 423.

Several district courts in our circuit echo this holding. For example, in *Garcia v. Third Federal Savings & Loan Association of Cleveland*, No. 1:06-CV-1990, 2007 WL 1235820, at *6 (N.D. Ohio Apr. 26, 2007), the Northern District of Ohio similarly asked whether requesting a reasonable accommodation in the form of FMLA leave was a protected activity for purposes of an ADA retaliation claim. The court answered the question in the affirmative, then went on to note that the plaintiff had engaged in such a protected activity when she "requested a reasonable accommodation in the

42

form of FMLA leave." *Id.* The Eastern District of Michigan, although perhaps begrudgingly, also "accept[ed] that [an employee's] FMLA request [was] "protected activity" within the meaning of the ADA. *Anderson v. Detroit Transp. Corp.*, 435 F. Supp. 3d 783, 799 (E.D. Mich. 2020).

And, if the FMLA leave at issue is serving as a reasonable accommodation, it receives the same analysis under the ADA/Rehabilitation Act—including for retaliation purposes—as any other form of accommodation. *See Cehrs*, 155 F.3d at 782. ("It is not clear why unpaid leave [or leave for a lengthy duration] should be analyzed differently from any other proposed accommodation under the ADA.") (quoting *Norris v. Allied–Sysco Food Services, Inc.*, 948 F. Supp. 1418, 1439 (N.D. Cal. 1996)).

Of course, if FMLA leave can be a disability accommodation, but is not always one, the question becomes how to distinguish those cases in which it acts as an accommodation from those where it does not. The answer to that may turn in part on whether the leave is of a reasonable, finite, and definite duration. *See Cleveland v. Fed. Express Corp.*, 83 Fed. App'x 74, 78-79 (6th Cir. 2003) (explaining that leave can only be an accommodation if it is for a reasonable time period and the employee has prospects for recovery); *Maat v. Cnty. of Ottawa, Mich.*, 657 F. App'x 404, 413 (6th Cir. 2016) (indefinite leave is not a reasonable accommodation).

Another part of the answer may turn on whether the employee requested the leave as a good-faith request for an accommodation of his or her disability. *Hurtt*, 627 F. App'x at 423 (noting that the relevant question in determining whether a request

for FMLA leave is a reasonable accommodation is if "[the employee] showed a good-faith request for reasonable accommodations" not if the request "reasonably appraise[d] [the employer] of [the employee's] alleged disability"). The question of whether the employee had reason to know of the disability may also be pertinent. *See Isley v. Aker Phila. Shipyard, Inc*, 275 F. Supp. 3d 620, 631 (E.D. Penn. 2017) ("As a matter of common sense then, before a request for FMLA leave could reasonably be construed as a request for ADA accommodation, the employer would need to know (or have reason to believe) that the request for FMLA leave was based on something [covered by the ADA]"). But on that front, "a prospective request for periodic FMLA leave might [] put [an employer] on notice that [the employee] was seeking a disability accommodation for an ongoing ailment". *Id.*

For example, in *Garcia v. Third Federal*, the Northern District of Ohio held that a request for a total of 7 weeks FMLA leave to recover from two surgeries for sleep apnea could be a reasonable accommodation. 2007 WL 1235820 at *6. The Eastern District of Pennsylvania likewise recognized FMLA leave as a reasonable accommodation in a case where the employee intended the request to address recurring problems from a chronic illness. *Dreibelbis v. Cnty. of Berks*, 438 F. Supp. 3d 304, 317-19 (E.D. Penn. 2020). There, an employer granted an employee intermittent FMLA leave for 3 days every 4 weeks so that the employee could address her anxiety and depression. *Id.* at 307. The employer fired the employee shortly after she used one of these pre-approved FMLA leave periods, and the employee sued for retaliation under the ADA. *Id.* at 307-08. In analyzing this retaliation claim, the

44

Court explained that the employee's request for FMLA leave "also constituted a request for a reasonable accommodation" because "the requested leave would enable the employee to perform [her] essential job functions in the near future." *Id.* at 317 (internal quotations omitted).

In sum, a request for FMLA leave is also a request reasonable accommodation under the ADA/Rehabilitation Act when the leave is designed to (1) "accommodate" (allow the employee to continue performing essential functions of the job); (2) a protected disability (not just a serious health issue under the FMLA). Accordingly, in order to plead that a FMLA leave request is a reasonable accommodation (and that punishing an employee for using such leave is retaliation under the Rehabilitation Act), a plaintiff will have to plausibly assert that: (1) the employee requested FMLA leave; (2) to address a protected "disability" not just a "serious health issue;" and (3) that FMLA leave would allow the employee to continue to perform the essential functions of his or her job.

As noted, both Schobert and York plausibly allege that they requested pre-approved periodic FMLA leave, but for that to be an accommodation (and thus serve as the basis for a Rehabilitation Act retaliation claim), they must also plausibly allege that they sought such leave based on a "disability."[6] The Rehabilitation Act defines a disability as "a physical or mental impairment which substantially limits one or more

---

[6] The Court noted above that, as a general matter, a plaintiff need not allege a "disability" in order to bring a retaliation claim. Instead, the plaintiff must merely allege that he or she engaged in activity protected by the Rehabilitation Act. Here, though, given the specific nature of the alleged conduct at issue (taking FMLA leave), in order to plausibly allege that the conduct represented protected activity under the Rehabilitation Act, as opposed merely to conduct under the FMLA, the plaintiffs must adequately allege a disability.

major life activities." 29 U.S.C. § 705(20)(B) (Rehabilitation Act definition); 42 U.S.C. § 12102(2) (ADA definition); *Mahon v. Crowell*, 295 F.3d 585, 589 (6th Cir. 2002). This statutory definition has three components: "(1) whether the plaintiff has a physical or mental impairment; (2) whether that impairment impacts "one or more major life activities"; and (3) whether the claimed disability imposes a "substantial limit[ation]" on that identified major life activity." *Hentze v. CSX Transp.*, --- F. Supp. 3d ----, 2020 WL 4569127, at *9 (S.D. Ohio Aug. 7, 2020) (citing *Bragdon v. Abbott*, 524 U.S. 624, 631(1998)).

Start with the first element. The definition of "physical impairment" is broad and includes "any physiological disorder…affecting…one or more…body systems" including the "musculoskeletal" system. *Thompson v. UGL Unicco Serv. Co.*, 750 F. Supp. 2d 907, 913 (W.D. Tenn. 2010) (quoting 29 C.F.R. § 1630.2(h)(1)). Both Schobert and York easily meet this first element. Schobert alleges that for six years he has suffered from a "disability of the spine" that causes him "intermittent neck and back pain." (Compl. at ¶¶ 55-56, #9). Similarly, York alleges that he has had a "muscular-skeletal disability of the knee" for five years "that impacts…his ability to walk." (*Id.* at ¶ 97, #15). Schobert's persistent spine condition and York's enduring issues with his knee both qualify as a "physical impairment" under the Rehabilitation Act given that it affects the Plaintiffs' "musculoskeletal" systems. *See Harrison v. Soave Enter. L.L.C.*, 826 F. App'x 517, 526 (6th Cir. 2020) (holding that a years-long knee injury qualifies as a physical impairment because it affects the musculoskeletal system); *Switala v. Schwan's Sales Enter.*, 231 F. Supp. 2d 672, 681 (N.D. Ohio 2002) (a

plaintiff who had disorders of the spine was "physically impaired" within the meaning of the ADA).

But the "long-term existence of an impairment in itself is not sufficient to establish a disability" under the ADA or the Rehabilitation Act. *Thompson*, 750 F. Supp. at 914. (citing *Collado v. United Parcel Serv., Co.*, 419 F.3d 1143, 1157 (11th Cir. 2005)). Plaintiffs must also establish that their physical impairments "substantially limit a major life activity." 29 U.S.C. § 705(20)(B). The question of whether Plaintiffs identify a "major life activity" is a question for the Court, while the issue of whether the impairment "substantially limits" that activity is a question for the jury. *Hentze*, 2020 WL 4569127, at *9. At this stage, then, Plaintiffs need to plausibly allege that their impairments affect a "major life activity."

The 2008 Amendments to the ADA provide a non-exhaustive list of major life activities, which include:

> caring for oneself, performing manual tasks, seeing, hearing, eating sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working."

42 U.S.C. § 12102(2)(A). Both Schobert and York allege that their impairment substantially limits one or more of these enumerated activities. For his part, York asserts that his "continuing muscular-skeletal disability of the knee … impacts, among other activities, his ability to walk[.]" (Compl. at ¶ 97, #15). Walking is undoubtedly a major life activity, and as York alleges that problems with his knee obstruct his ability to walk, he plausibly asserts that he has a disability under the Rehabilitation Act.

Schobert's case is more complex, but he too plausibly alleges a disability under the Rehabilitation Act. The relevant part of the Complaint states that Schobert has a "continuing disability of the spine" that causes him "intermittent neck and back pain that renders him temporarily unable to perform his job during the" flare-ups. (*Id.* at ¶¶ 55-56, #9). In short, Schobert is alleging that his impairment substantially limits his ability to work. "Working" is a major life activity that is included on the statutory list. 42 U.S.C. § 12102(2)(A). In order to allege that he is "substantially limited" in his ability to work, Schobert must plead facts plausibly alleging that his "impairment limits [his] ability to 'perform a class of jobs or broad range of jobs.'" *Tinsley v. Caterpillar Fin. Servs., Corp.*, 766 F. App'x 337, 341-42 (6th Cir. 2019). Schobert alleges that his impairment of the spine, coupled with his neck and back pain, prevent him from coming into work during flare-ups. (Compl. at ¶¶ 55-56, #9). If Schobert cannot come to work at CSXT during flare-ups, there is also reason to believe that he would not be able to perform a variety of jobs during that period of time. Moreover, Schobert's muscular-skeletal impairment, theoretically, would also limit his ability to perform numerous jobs that may aggravate his conditions. While that may not suffice at the summary judgment stage, *see Hentze*, the Court finds that Schobert's allegations are enough at this stage to plausibly allege that his impairment prevents him from performing a "broad range of jobs." Thus, Schobert too has alleged a disability within the meaning of the Rehabilitation Act.

In sum, both Plaintiffs allege that they requested FMLA leave to allow them to address an ongoing ailment that plausibly meets the definition of a "disability,"

and that, if they took the time off as planned, they could continue to perform the essential functions of their job. This is the kind of request for FMLA leave that can double as a reasonable accommodation.

In fact, Plaintiffs' requests for FMLA leave look much like *Dreibelbis*, where the Eastern District of Pennsylvania found that an FMLA request was a reasonable accommodation. 438 F. Supp. 3d at 317-19. The plaintiff in *Dreibelbis* requested intermittent FMLA leave to accommodate her anxiety and depression, her employer granted that prospective request for leave, and the plaintiff used some of that pre-approved leave. Here, Schobert and York also requested intermittent FMLA leave to accommodate their conditions, CSXT granted those prospective requests for leave, and then both Plaintiffs used some of that pre-approved leave. Like in *Dreibelbis*, Schobert and York assert facts that support a finding that their FMLA leave served as a reasonable accommodation. As such, Plaintiffs plausibly allege that, in requesting or taking such leave, they engaged in a protected activity, the first element of an ADA retaliation claim.

The Court must then consider whether Plaintiffs have plausibly alleged the remaining three elements of a retaliation claim: (1) that CSXT knew of the protected activity; (2) that CSXT took an adverse employment action against the employee; and (3) that there was a causal connection between the protected activity and the adverse employment action. *See, e.g.*, *Shelby Cnty.*, 711 F.3d at 697. The first of these is straightforward—no one disputes that CSXT knew that both Schobert and York took

FMLA leave. After all, CSXT approved both Plaintiffs' requests for leave. (Compl. at ¶¶ 58, 113, #9, 17).

The next question, then, is whether CSXT took an adverse employment action against Schobert and York. An adverse employment action in the retaliation context includes both actions that affect the terms, conditions or status of employment and those that would "dissuade a reasonable person from engaging in the protected activity." *Shelby Cnty.*, 711 F.3d 687, 698 (6th Cir. 2013), *see also Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 345 (6th Cir. 2008) (explaining that an adverse employment action is broader in the retaliation context than the discrimination context). York easily clears this bar. He claims CSXT fired him for taking FMLA leave (Compl. at ¶123, #18), which is perhaps the paradigmatic example of an "adverse employment action." *Spees v. James Marine, Inc.*, 617 F.3d 380, 391 (6th Cir. 2010). Although Schobert's case is not as straightforward, he too plausibly alleges that he suffered an adverse employment action. In Schobert's case, the alleged adverse action occurred when CSXT penalized and discouraged him from using his FMLA leave. Schobert alleges that CSXT sent company-wide notices accusing him of abusing his FMLA leave (Compl. at ¶¶61-70, #10-11), assigned him "negative CAPS disciplinary points when he had to take FMLA leave," (Compl. at ¶ 72, #12), took him out of service without pay, (Compl. at ¶ 76, #12), and required him to appear before a disciplinary hearing. (Compl. at ¶ 77, #12). Construed in the light most favorable to him, these allegations, especially when taken together, are enough to discourage a reasonable person from taking FMLA leave, a protected activity under the ADA.

Finally, both Schobert and York need to allege that their FMLA leave was the likely cause of the adverse employment action. *Shelby Cnty.*, 711 F.3d at 697. To establish a causal connection, Plaintiffs can offer either direct evidence of retaliation, or they can show that CSXT knew of the protected activity and took the adverse employment action close enough in time that it creates an inference of causation. *Nguyen v. City of Cleveland*, 229 F.3d 559, 566 (6th Cir. 2000) (quoting *Parnell v. West*, No. 95-2131, 1997 WL 271751, *2 (6th Cir. 1997). It is undisputed that CSXT discharged York for "misusing his FMLA leave." (Compl. at ¶ 123, #18; CSXT's Answer, Doc. 9, ¶ 123, #66). CSXT also does not dispute that it sent letters to Schobert that discussed misuse of FMLA leave, placed him on temporary leave without pay, and called him before a disciplinary hearing all specifically to address his use of FMLA leave. (Compl. at ¶¶ 61-70, 76, 77, #10-12; CSXT's Answer, Doc. 9, ¶¶ 68, 77, #60, 62). Thus, both Schobert and York plausibly assert a causal connection between their use of FMLA leave and the adverse employment actions in this case. Accordingly, Plaintiffs have plausibly alleged each element of a retaliation claim under the Rehabilitation Act. The Court therefore declines to dismiss either Plaintiff's retaliation claim.

### c. Plaintiffs Have Plausibly Alleged That CSXT Denied Them A Reasonable Accommodation.

Plaintiffs also contend that CSXT violated the Rehabilitation Act by denying them the reasonable accommodation of intermittent leave. (*See* Compl. at ¶¶ 59, 101, 167, #9, 15, 24). "A claim based on a denial of a reasonable accommodation differs from a disparate-impact claim." *Doe*, 926 F.3d at 243 (citing *Ability Ctr. of Greater*

*Toledo v. City of Sandusky*, 385 F.3d 901, 904 n.4 (6th Cir. 2004)). The ADA's definition of discrimination, which is incorporated into the Rehabilitation Act, is "broad" and "includes not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is … an employee" unless that accommodation would impose an undue hardship on the employer. *Fisher v. Nissan N. Am., Inc.*, 951 F.3d 409, 415 (6th Cir. 2020) (quoting 42 U.S.C. § 12112(b)(5)(A)).

To assert a failure to accommodate claim, Plaintiffs must plausibly allege that they are (1) disabled, yet (2) otherwise qualified for the position despite their disability: (a) without accommodation from the employer; (b) with an alleged essential job requirement eliminated; or (c) with a proposed reasonable accommodation; (3) that their employer was aware of their disability; (4) that they requested an accommodation; and (5) that their employer failed to provide the requested reasonable accommodation. *Moore v. Hexacomb Corp.*, 670 F. Supp. 2d 621, 626 (W.D. Mich. 2009); *Tchankpa v. Ascena Retail Grp., Inc.*, 951 F.3d 805, 811 (6th Cir. 2020) (quoting *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 869 (6th Cir. 2007)); *see also Booth v. Nissan N. Am., Inc.*, 927 F.3d 387 (6th Cir. 2019) (noting the same prima facie test).

As discussed above, Schobert and York have plausibly alleged that they have a disability, that they requested FMLA leave, that CSXT knew about those requests, and that, on the facts here, such requests for leave may double as requests for a reasonable accommodation under the Rehabilitation Act. That takes care of elements

1–4, at least for purposes of the pleading stage. The remaining inquiry, then, is whether CSXT failed to provide a reasonable accommodation.

In its traditional form, a failure to accommodate claim exists when an employee asks for a reasonable accommodation and the employer explicitly denies that request. *See, e.g.*, *Smith v. Henderson*, 376 F.3d 529, 534-39 (6th Cir. 2004) (allowing a failure to accommodate claim to survive summary judgment when the employer "flatly denied" the employee's requests for accommodations.). That kind of failure to accommodate claim does not work here because, as both Schobert and York acknowledge, every time they requested FMLA leave, CSXT granted their requests. (Compl., at ¶¶ 58, 74, 100, 113, #9, 12, 15, 17).

Instead, Plaintiffs assert as the basis for their failure to accommodate claim that CSXT "unlawfully restricted [their] ability to use their reasonable accommodation of intermittent leave[.]" (*Id.* at ¶ 169, #24). In particular, Plaintiffs point to several actions that CSXT took that "restricted" the use of their FMLA leave. First, CSXT allegedly "strips [] engineers of their guarantee pay for an entire week" if they use FMLA leave. (*Id.* at ¶ 13, #3). Second, CSXT refuses to remove negative disciplinary "points" on the employee's record if the employee uses FMLA leave after a non-FMLA absence. (*Id.* at ¶¶ 16-17, #3). Third, CSXT sent employees, including Schobert and York, notices threatening employees with discipline for taking FMLA leave around holidays and days-off from work. (*Id.* at ¶¶ 19-27, #4-5). Finally, CSXT subjected York, Schobert, and other CSXT employees to disciplinary hearings where they had to defend their use of FMLA leave. (*Id.* at ¶ 49, #8). Plaintiffs allege that

these actions, both alone and when taken together, caused them to forgo using their pre-approved FMLA leave. (*Id.* at ¶¶ 15, 18, 28, 65, 71, 100, #3, 5, 10, 11, 16).

In sum, Plaintiffs argue that CSXT *constructively* forbid them from taking their FMLA leave, and in so doing, denied them a reasonable accommodation. That raises the question: can an employer "fail to accommodate" an employee merely by discouraging that employee from seeking an accommodation? Generally, an employer does not have a duty to provide a reasonable accommodation unless the employee has made a request for an accommodation. *See, e.g., Johnson v. Cleveland City Sch. Dist.*, 443 F. App'x 974, 983 (6th Cir. 2011) ("The employee also bears the burden of proposing reasonable accommodations; an employee's claim must be dismissed if the employee fails to identify and request such reasonable accommodations.") (citing *Tubbs v. Formica Corp.*, 107 F. App'x 485, 488–89 (6th Cir. 2004)). This is because the individual with a disability typically has the most knowledge about the need for reasonable accommodation and, as such, bears the burden to first inform the employer that an accommodation is needed. *EEOC Enf't Guidance on Reasonable Accommodation and Undue Hardship Under the ADA* ("*EEOC Guidance*")*,* EEOC Notice Number 915.002, Oct. 17, 2002 at 40. In other words, courts do not require employers to "speculate as to the extent of the employee's disability or the employee's need or desire for an accommodation." *Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1046-47 (6th Cir. 1998).

This general rule, however, assumes that the employer is ready, willing, and able to grant a reasonable accommodation. But not all employers may be so eager to

help. An employer may reason that if it never *hears* about the need for an accommodation, then it will never need to provide an accommodation. In this case, the employer may adopt an offensive, rather than a defensive strategy. Specifically, the employer may choose to actively discourage its employees from seeking an accommodation because, under the general rule, no request for an accommodation means no obligation on the part of the employer. But courts, and the Equal Employment Opportunity Commission ("EEOC"), are unwilling to allow such manipulation. In fact, the EEOC's Guidance specifically provides that "[a]n employer may not assert that it never received a request for reasonable accommodation, as a defense to a claim of failure to provide reasonable accommodation, if it actively discouraged an individual from making such a request." *EEOC Guidance* at 40 n. 108.

Several courts have considered the question and arrived at a similar conclusion. Take for example, the *Moore v. Computer Sciences Corporations* case from the Northern District of Alabama. No.: 5:15-cv-00683-MHH, 2017 WL 3873777 (N.D. Ala. Sept. 5, 2017). That case involved an employee who began the process of requesting FMLA leave so that she could seek treatment for her cancer. *Id.* at *8. When her employer saw the request for leave, they warned her that her department had a "challenging" time ahead and that employees should avoid taking leave during that period. *Id.* As a result, the employee withdrew her request for leave and decided to wait until the end of that period to pursue FMLA leave. *Id.* But, as soon as the period was over, the employer fired the employee. *Id.* The employee sued, alleging that her employer had failed to accommodate her disability by pressuring her to wait

to take leave. *Id.* The court acknowledged that the employee had presented an "unusual" failure to accommodate claim, because she voluntarily withdrew her request for an accommodation before her employer had an opportunity to affirmatively "fail" to accommodate that request. *Id.* at *9. Nonetheless, the Court allowed the employee to proceed on her failure to accommodate claim. The Court reasoned that a "legitimate, objective threat of a layoff if [the employee] proceeded with her request for accommodation" which caused the employee to reverse "her initial effort to obtain [leave] as an ADA accommodation" could form the basis for a failure to accommodate claim. *Id.*

The District of Colorado came to a similar conclusion in *U.S. v. City and County of Denver*. 49 F. Supp. 2d 1233 (D. Colo. 1999). In that case, several disabled Denver police officers claimed that that the City violated the ADA when it refused to reassign them to a position that could accommodate their disabilities. *Id.* at 1236. The wrinkle, however, was that many of these officers had never actually requested reassignment, because the City had a strict "no-reassignment" policy, and the officers concluded that making such a request was futile. *Id.* The City argued that that "there was no duty to accommodate each claimant because no claimant performed the initial duty to inform the employer of his or her disability[.]" *Id.* at 1240. The court disagreed, explaining that the City's "express 'no-reassignment' policy may have actively discouraged claimants from making a knowingly futile request for reassignment" and as such, the City cannot "rais[e] the failure to make such request as a defense." *Id.* at 1241.

56

The Sixth Circuit's decision in *Burdett-Foster v. Blue Cross Blue Shield of Mich.*, 574 F. App'x 672 (6th Cir. 2014), also could be read to imply that a failure to accommodate claim may exist if an employer discourages an employee from seeking or using a reasonable accommodation. *Burdett-Foster v. Blue Cross Blue Shield of Mich.*, 574 F. App'x 672 (6th Cir. 2014). In *Burdett-Foster*, an employee asked her employer to let her use the bathroom frequently because of a side effect of her blood-pressure medication. *Id.* at 674. Her employer agreed to this accommodation, but when the employee used the restroom, she alleges that her supervisor followed her and stood outside the bathroom door with arms folded. *Id.* The employee sued, claiming that her employer failed to accommodate her because her employer "harassed" her based on the number of bathroom breaks she took. *Id.* at 680. The Sixth Circuit disagreed with that argument, but explained that it was doing so because the employer had not said or done "anything to discourage or prevent [the employee's] frequent use of the bathroom." Rather, the employer "accommodated [her] and permitted her to use the bathroom as much as necessary." *Id.* That at least seems to suggest that in cases where an employer has actively discouraged or prevented an employee from using her reasonable accommodation, the employee may have a viable failure to accommodate claim.

Taken together, these cases seem to allow the possibility that an employer may "fail to accommodate" an employee if the employer actively discourages that employee from pursuing or using a reasonable accommodation.[7] Here, Schobert and York allege

---

[7] That said, there is no liability under a failure to accommodate theory if the plaintiff withdraws their request for a reasonable accommodation on their own volition and without

that CSXT actively discouraged them from using their pre-approved FMLA leave as a reasonable accommodation in several ways, from subjecting them to a disciplinary hearing for use of that FMLA leave, to sending them notices "threatening" to punish them for using their FMLA leave. (Compl. at ¶¶ 15, 18, 28, 65, 71, 100, #3, 5, 10, 11, 16). These facts, if true, may be enough to discourage the average employee from pursuing a reasonable accommodation in the form of seeking or using FMLA leave. At least the Court is unwilling to conclusively rule that out at this early stage of the proceeding. Accordingly, Plaintiffs plausibly allege that CSXT failed to in fact actually offer them a reasonable accommodation.

In sum, Plaintiffs have plausibly alleged each element of a failure to accommodate claim: that they are disabled, that CSXT was aware of these disabilities, that Plaintiffs requested FMLA leave which would function as a reasonable accommodation for their disabilities, and that CSXT "failed" to accommodate Plaintiffs by discouraging their use of that leave. Therefore, the Court declines to dismiss Plaintiffs' failure to accommodate claims.

### d. Plaintiffs Have Not Plausibly Alleged That CSXT Violated The Rehabilitation Act's Medical File Provisions.

Plaintiffs further allege that CSXT engaged in an "employee medical file violation." (Compl. at Count III (caption), #23). There are two flavors of "medical file" claims that Plaintiffs assert. The first alleges that CSXT unlawfully obtained medical information from them (*id.* at ¶ 168)—i.e., the prohibited-inquiry claim. The second

---

any pressure or discouragement on the part of their employer. *See Kirilenko-Ison v. Bd. of Educ. of Danville Indep. Sch.*, 974 F.3d 652, 670 (6th Cir. 2020).

is that, once in possession of that information, CSXT "mishandled[] and wrongfully disclosed" it by placing it in their personnel files (*see id.*)—the mishandling claim.[8]

Let's take them in that order. The Rehabilitation Act precludes employers from making certain inquiries of employees. 29 U.S.C. § 794(d) (incorporating 42 U.S.C. §§ 12111, 12201–04, 12210); *see also Lee v. City of Columbus*, 636 F.3d 245, 252 (6th Cir. 2011) ("[W]e agree with the district court and other courts that the ADA's limitations on the disclosure of medical information … are incorporated by reference into the Rehabilitation Act."). For a viable Rehabilitation Act inquiry claim, at this stage, a plaintiff must allege facts that support the plausible inference that the employer's action amounted to either a "medical examination" or a "prohibited inquiry" into the employee's "medical disability within the meaning of the ADA," including inquiries into the "nature and severity of" such disability. *Lee*, 636 F.3d at 252 (citation omitted). The Rehabilitation Act forbids such activities unless they fall within the statutory safe harbor: that the examination or inquiry is both "job-related and consistent with a business necessity." 42 U.S.C. § 12112(d)(4)(A).

A "medical examination" consists of "a procedure or test that seeks information about an individual's physical or mental impairments or health[.]" *Bates v. Dura Auto. Sys.*, 767 F.3d 566, 574 (6th Cir. 2014). There are multiple factors used to determine whether something constitutes a "medical examination," including if it is administered by a healthcare professional or interpreted by a such a professional,

---

[8] Plaintiffs note that in their Proposed Amended Complaint, they "drop[] their allegations that [CSXT] mishandled their medical information by placing it in the 2018 disciplinary hearing files." (Pls.' Resp. at #217 n.4). Because the Court discussed and denied Plaintiffs' Motion to Amend as futile, this claim warrants brief discussion here.

among other factors. *See id.* at 574–75 (quoting EEOC, *Enforcement Guidance: Disability-Related Inquiries and Medical Examinations of Employees Under the Americans with Disabilities Act (ADA)* ("DRI & ME Guidance"), at Part B.2 (last visited July 27, 2000), http://www.eeoc.gov/policy/docs/guidance-inquiries.html). "Examples of medical examinations include vision tests, blood pressure and cholesterol screening, range-of-motion tests, and diagnostic procedures such as x-rays, CAT scans, and MRIs." *Id.* Here, Schobert and York do not allege that CSXT engaged in, or forced them to undergo, a "medical examination."

Absent a medical examination allegation, Plaintiffs must allege that CSXT engaged in a prohibited disability-related inquiry. To set forth such a claim, a plaintiff must plausibly allege that his or her employer inquired as to whether "an employee is an individual with a disability or as to the nature or severity of the disability." *Bates*, 767 F.3d at 578 (noting the EEOC has coined the umbrella phrase "disability-related inquiry"). Again, looking to the EEOC for guidance, the *Bates* court determined that a disability-related inquiry is "a question or series of questions that is likely to elicit information about a disability." *Id.* (quoting DRI & ME Guidance at Part B.1). The court also acknowledged that "questions that are not likely to elicit information about a disability" are not a forbidden inquiry. *Id.* (citation and quotation omitted); *see also Lee*, 636 F.3d at 254 ("Obviously, asking an employee whether he is taking prescription drugs or medication, or questions seek[ing] information about illnesses, mental conditions, or other impairments [an employee] has or had in the

past[,] trigger the ADA's (and hence the Rehabilitation Act's) protections." (internal citation and quotation marks omitted)).

The EEOC guidance cited in *Bates* proves useful here, as it helps differentiate between disability-related inquiries that are prohibited under the Rehabilitation Act and inquires that may arise under other policies:

> [Question] 15. May an employer request an employee to provide a **doctor's note or other explanation** to substantiate his/her use of sick leave?
>
> Yes. An employer is entitled to know why an employee is requesting sick leave. An employer, therefore, may ask an employee to justify his/her use of sick leave by providing a doctor's note or other explanation, so long as it has a policy or practice of requiring all employees, with and without disabilities, to do so.

DRI & ME Guidance Part C.

In a footnote to that section, the EEOC Guidance further states, "[w]here an employee has been on leave under the FMLA, the employer must comply *with the requirements of that statute*." *Id.* at Part C. n.64 (emphasis added). That is, when investigating FMLA use (or misuse), an employer must comply with that statute, too. This further emphasizes that the FMLA and the Rehabilitation Act are different statutes and overlapping facts do not mean overlapping claims.

And even if the Rehabilitation Act were implicated here, there is a difference between "routine or general" inquiries that may be "legitimate and innocuous … not aimed at identifying a disability" and those that violate the law. *Lee*, 636 F.3d at 254. The Rehabilitation Act's "solely by reason of" standard provides a narrow cause of action that prohibits only those inquiries that are aimed at identifying a disability. Accordingly, the viability of a Rehabilitation Act claim depends "on whether a medical

inquiry is intended to reveal or necessitates revealing a disability, [or] whether the inquiry may merely *tend to* reveal a disability." *Id.*

To illustrate, in *Lee*, an employer's policy required all employees returning from three or more days of sick leave (not FMLA leave) to "supply information justifying the use of sick leave," by providing a "note to their immediate supervisor from their doctor stating the 'nature of the illness[.]'" *Id.* at 255. The Sixth Circuit held that a "request for employees to supply information justifying the use of sick leave [was] not an improper medical inquiry under the Rehabilitation Act or the ADA." *Id.* at 256. This was because "[a]sking an employee returning to work to describe the 'nature' of his illness … [was] not necessarily a question about whether the employee [was] disabled." *Id.* at 254–55 (emphasis added). Instead it was merely information that "may tend to lead to information about disabilities" and thus it "[fell] far short of the requisite proof that the employer is discriminating *solely* on the basis of disability." *Id.* at 255. (citing *Verkade v. U.S. Postal Serv.*, 378 F. App'x 567, 578 (6th Cir. 2010)).

The Fifth Circuit illustrated this point well when that court similarly held that "an inquiry into an employee's medical condition violates the Rehabilitation Act only if it is 'intended to reveal or necessitates revealing a disability.'" *Taylor v. City of Shreveport*, 798 F.3d 276, 284 (5th Cir. 2015) (quoting *Lee*, 636 F.3d at 255). This is different from an ADA medical inquiry violation, which requires only that an employer "request medical information that *may tend to reveal* a disability, including

62

a request for a general diagnosis[.]" *Id.* at 285. "As a result, a medical inquiry that violates Title I [of the ADA] will not necessarily violate the Rehabilitation Act." *Id.*

Accordingly, the policies at issue in *Lee* and *Taylor*, which both required employees to offer evidence of a general diagnosis to verify sick leave, did not violate the Rehabilitation Act. Plaintiffs do not assert any claims under the ADA. And although CSXT's requests for FMLA leave verification may lead to information about disabilities, that alone is insufficient to make out a Rehabilitation Act claim.[9] This is because, as noted previously, the FMLA provides for leave in a number of situations, not just for employees who need leave to address a disability. Corroborating FMLA leave is like corroborating sick leave in this regard—requesting verification may tend to lead to information that reveals a disability, but under the Rehabilitation Act, that is not enough to make out a claim.

Plaintiffs' "mishandling" claim likewise falls short. Schobert and York (really just Schobert, as he is the only one who claims to have submitted any corroborating information to CSXT) allege that CSXT mishandled confidential medical information related to their alleged disabilities because that information ultimately became part of their disciplinary hearing records. (*See* Compl. at ¶ 44–45, #8). They allege that those files, which contained "HIPPA-protected personal medical information" were made "available to any member of CSX[T] management." (*Id.* at ¶ 46). This, Plaintiffs say, also violates the Rehabilitation Act.

---

[9] There is some question as to whether a private cause of action akin to the Rehabilitation Act's "disability-related inquiries" prohibition exists under the FMLA. But as the Plaintiffs did not allege it, the Court need not address it.

In turn, CSXT argues that the Rehabilitation Act protects only a "very narrow class of records" and includes only those that are "obtained as a result of job-related medical examinations or inquiries into an employee's ability to perform job-related functions." (CSXT's Mem. at #134 (citing 42 U.S.C. §§ 12112(d)(3)–(4))). CSXT asserts that any information Schobert may have provided regarding FMLA leave does not fall into these "very narrow" categories. (*Id*.). Plaintiffs disagree, arguing that 29 C.F.R. § 1630.14(c) offers "no exception" and that the scope of the Rehabilitation Act is not as narrow as CSXT says. (Pls.' Resp. at #217). In reply, CSXT argues that Plaintiffs' claim "is premised on the allegation that CSXT made an unlawful disability-related inquiry in the first place. It did not." (CSXT's Reply at #285). Thus, the question is whether, based on the Complaint, it is plausible that during the course of the FMLA investigation, CSXT had some additional obligation *under the Rehabilitation Act* to keep information submitted by its employees confidential.

"As a preliminary matter ... the Rehabilitation Act addresses the confidentiality of medical records only in the limited context of pre-employment examinations." *Lee*, 636 F.3d at 252. "However ... the ADA's limitations on the disclosure of medical information set forth in 42 U.S.C. § 12112(d) are incorporated by reference into the Rehabilitation Act." *Id*. And any information gathered pursuant to § 12112(d)(4)'s safe harbor—an inquiry that is "job related and consistent with business necessity"—is "subject to the requirements of subparagraphs (B) and (C) of paragraph (3)." 42 U.S.C. § 12112(d)(4)(C). Those subsections provide that "information obtained regarding the medical condition or history" of an employee

64

must be "maintained on separate forms and in separate medical files and is treated as a confidential medical record[.]" *Id.* at § 12112(d)(3)(B).[10] As CSXT neither conducted a disability-related inquiry, nor required Plaintiffs to submit to a medical exam, that safe harbor provision is inapplicable, as are the provisions of subsection (B) and (C).

That being said, the FMLA still might apply. The FMLA requires an employer in possession of "records and documents relating to … medical histories of employees … created for purposes of FMLA" to maintain those records as "confidential medical records in separate files/records from the usual personnel files." 29 C.F.R. § 825.500(g).[11] But Schobert and York do not assert an FMLA claim based on mishandling information.[12] To the contrary, their Response doubles down on

---

[10] Say, for example, that CSXT did engage in a prohibited disability-related inquiry. That could certainly be a plausible violation of the Rehabilitation Act. Or say CSXT engaged in a permissible inquiry that was "job related and consistent with business necessity," obtained medical records in the course of that inquiry, and *then* mishandled them. That too would plausibly violate the Rehabilitation Act.

[11] That regulation continues on to state that "[i]f the ADA, as amended, *is also applicable*, such records shall be maintained in conformance with ADA confidentiality requirements," save several exceptions not applicable here. *Id.* (emphasis added) (citing the ADA regulation, 29 C.F.R. § 1630.14(c)).

[12] There appears to a question as to whether a private cause of action exists for this type of claim in the first place. *See Walker v. Gambrell*, 647 F. Supp. 2d 529, 539 n.5 (D. Md. 2009) ("It is not settled whether [29 C.F.R. § 825.500(g)] gives rise to a private right of action for disclosure[.]") (citing *Cash v. Smith*, 231 F.3d 1301, 1307 (11th Cir. 2000)). *Cash*, in avoiding the cause of action question, found the employee's "unlawful disclosure" claim failed because "voluntary disclosure" of medical information differs from disclosure as "the result of an examination ordered by" the employer. *See Cash*, 231 F.3d at 1307–08. Other courts have noted that when an employer does not comply with § 825.500 to keep FMLA records confidential, that gives rise to an interference claim, not a standalone cause of action. *See, e.g.*, *Withers v. Johnson*, 673 F.3d 998, 1005 (8th Cir. 2014) ("FMLA regulations permit an employer to require a medical clearance as a condition of restoring the employee to his position, 29 C.F.R. § 825.312(a)–(b), but the regulations—like those under the ADA—require

asserting that theirs is solely a Rehabilitation Act claim: "Plaintiffs adequately allege that Defendant made medical inquiries unauthorized by the Rehabilitation Act and then violated the Act's confidentiality provisions by disseminating the information to anyone in management by including it in the employees' personnel files." (Pls. Resp. at #217).

In short, Plaintiffs appear to have substituted a fatally flawed Rehabilitation Act claim for what may have been a viable FMLA claim. But they are the masters of their Complaint, and as such they have not plausibly alleged that, by engaging in the FMLA inquiry or by requiring Schobert to provide corroborating evidence of his doctor's appointment, CSXT violated the Rehabilitation Act's medical record provisions. Thus, the Court grants CSXT's Motion as to the "medical file" claims.

## C. The Court Denies Part I.C Of CSXT's Motion For Judgment On The Pleadings.

Plaintiffs allege that they were not the only employees harmed by CSXT's FMLA review, and therefore they also brought this action as a putative class action. They purport to represent fourteen separate classes, nine of which raise FMLA claims (the "FMLA Class Action"). (*See* Compl. at ¶ 129–44, #19–21).[13]

---

that those records be kept confidential from non-supervisory personnel. *Id.* § 825.500(g). FMLA regulations also provide that "[a]ny violations of the Act or of these regulations constitute interfering with ... the exercise of rights provided by the Act.") (citing § 825.220(b)); *Scarbrough v. Virginia Coll., LLC*, No. 2:18-cv-00738, 2019 WL 121277, at *1 (N.D. Ala. Jan. 7, 2019) ("Though courts have not settled whether the violation of this duty by itself gives rise to a cause of action, courts consider recordkeeping failures as evidence for claims of interference with FMLA rights." (citation omitted)). That question is not before this Court.

[13] The Court does not reach any issue regarding whether class certification is appropriate, under either framework, as Plaintiffs have not yet moved for the Court to consider that question.

CSXT argues that Plaintiffs should not be allowed to proceed with their FMLA Class Action under Federal Rule 23, but instead must abide by the requirements for collective actions under the Fair Labor Standards Act ("FLSA"). The FMLA and the FLSA should use the same collective action framework because, CSXT explains, both statutes permit employees to bring claims on behalf of "other employees similarly situated." (CSXT's Mem. at #135 (citing 29 U.S.C. § 2617(a)(2) (the FMLA); 29 U.S.C. § 216(b) (the FLSA))).

Plaintiffs disagree, arguing the default found in Rule 23 governs their FMLA Class Action and, CSXT's cited cases notwithstanding, other district courts have and do apply Rule 23 to FMLA class actions. (Pls.' Resp. Mem. at #218). Plaintiffs do note, however that this is a matter of first impression in this District.

In reply, CSXT argues that the "goal of statutory interpretation is divining congressional intent" and that because the FLSA and the FMLA both refer to actions for "similarly situated" employees, it was "not necessary for [Congress] to replicate the entire structure of § 216(b) in § 2617(a)(2)." (CSXT's Reply at #286).

### 1. *The Text Of The FMLA Does Not Support Adopting The FLSA's Collective Action Framework.*

"Which interpretation is correct? To decide, we start with the text of the statute, and as it turns out, it is not necessary to go any further." *Babb v. Wilkie*, --- U.S. ----, 140 S. Ct. 1168, 1172 (2020) (citation omitted).

Section 2617 of the FMLA concerns civil actions by employees brought to enforce §§ 2615(a)(1) and (a)(2), the FMLA's interference and retaliation provisions. *See* 29 U.S.C. § 2617(a)(1). Under § 2617, an employee has a statutory "right of action"

against "any employer … by any one or more employees *for and in behalf of*—the employees; or the employees and other employees similarly situated." 29 U.S.C. § 2617(a)(2) (emphasis added). The FLSA says the same thing. *See* 29 U.S.C. § 216(b) (an action can be brought by "any one or more employees *for and in behalf* of himself or themselves and all other employees similarly situated" (emphasis added)). But, unlike the FMLA, which stops at that point, the FLSA continues on. Section 216(b) adds that "No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought." 29 U.S.C. § 216(b).

Asking the Court to read this missing text into the FMLA, CSXT points to its lone authority: *Clary v. Southwest Airlines*, No. 3:07-CV-0126-P, 2007 WL 4947690, at *2–3 (N.D. Tex. Dec. 17, 2007).[14] CSXT argues this case correctly held that an FMLA claim brought as a class action under Rule 23(b)(2) should instead be considered a collective action and governed by the FLSA's "opt-in" framework. (CSXT's Mem. at #135).

*Clary* is not binding, nor is the Court inclined to follow it. Rather than focus on the differing text between the two statutes, the *Clary* court proceeded directly to the

---

[14] *Clary* has been cited only twice outside of the Fifth Circuit, and never by the Sixth Circuit or its District Courts. *See Andrews v. CSX Transp., Inc.*, No. 3:06-cv-704, 2009 WL 22324 (M.D. Fl. Jan. 2, 2009); *Carrel v. Medpro Grp., Inc.*, No. 1:16-CV-130-TLS, 2017 WL 1488359 (N.D. Ind. Apr. 26, 2017). *Andrews* addressed and disposed of *Clary* in a footnote because the "defendants … did not advocate for such a result." *Andrews*, 2009 WL 22324, at *2 n.4. *Carrel* discussed the Rule 23/FMLA/FLSA issue directly and expressly declined to adopt *Clary*'s reasoning. *Carrel*, 2017 WL 1488359, at *3 ("[C]ourts within the Circuit have analyzed arguments similar, if not identical, to those posed by the Defendant [that the FLSA should govern] and rejected them." (collecting cases)).

FMLA's legislative history, which that court read to show that "Congress intended the remedial provisions of the FMLA to mirror those in the FLSA." *Clary*, 2007 WL 4947690, at *2 (citing *Nero v. Indust. Molding Corp.*, 167 F.3d 921, 928 (5th Cir. 1999) (in turn quoting *Frizzell v. Sw. Motor Freight*, 154 F.3d 641, 644 (6th Cir. 1998))). But congressional intent not reflected in statutory language does not make for a convincing argument.

Even *Clary's* citation to *Nero* (and the latter's reference to *Frizzell*) obfuscates the textual issue. *Nero* discussed the statutory similarities in the context of reducing liquidated damages, which both statutes expressly address. *Nero*, 167 F.3d at 928. And *Frizzell*, despite being a Sixth Circuit case, is equally unavailing. *Frizzell* involved whether the FMLA provided a right to a jury trial, absent an express provision for one in that law. *Frizzell*, 154 F.3d at 644. In answering that question, the Sixth Circuit determined that the FMLA recognizes a jury trial right—not because of congressional intent—but because the statute's *text* differentiates between "damages" (determined by a jury) and "equitable relief" (determined by a judge). *Id.* at 643. This textual distinction reflected Congress's intent "to make juries available to plaintiffs pursuing remedies" under the FMLA. *Id.*

Other district courts have similarly rejected the argument that the FLSA collective action standard applies to FMLA class actions. *See, e.g.*, *Carrel v. MedPro Grp., Inc.*, No. 1:16-CV-130-TLS, 2017 WL 1488359, at *3 (N.D. Ind. Apr. 26, 2017) (rejecting *Clary* and holding that "Rule 23 is the correct mechanism by which to proceed with the analysis" of a motion to certify an FMLA class action); *Loy v.*

*Motorola, Inc.*, No. 03-C-50519, 2004 WL 2967069, at *3 (N.D. Ill. Nov. 23, 2004) ("Because the plain language of the FMLA is silent as to the appropriate vehicle for an action to proceed on the behalf of others, this court is inclined to apply Fed. R. Civ. P. 23 as it moves with this case through its discovery stages.").

The difference between § 216(b) and § 2617(a) is that the former contains additional language that simply is not present in the latter. Because the FMLA is silent as to the appropriate way to proceed "in behalf of other" employees, the Court concludes that the default procedures set forth in Federal Rule of Civil Procedure 23 must govern. That said, for the time being, the Court sets aside further discussion of any class action issues.

**D.** **The Court Defers Ruling On Parts II.A Through II.C Of CSXT's Motion For Summary Judgment Because The Court Grants Plaintiffs' Motion for Discovery.**

The next issue the Court must resolve is the summary judgment portion of CSXT's Motion. For its part, CSXT argues none of the three challenged FMLA-related polices—how it calculates leave, the CAPS policy, and the guarantee pay plan— violate the law. (CSXT's Mem. at #136–41). In response, Plaintiffs argue there exist genuine issues of material fact about each of those policies, as well as Sixth Circuit precedent that supports their position.[15] (Pls.' Resp. at #219–22). To the extent Plaintiffs did not refute the affidavits and documents that CSXT attached to their Motion, Schobert and York filed a motion for more discovery pursuant to Federal Rule

---

[15] On August 14, 2019, CSXT notified Judge Barrett, who was assigned this case at the time, of the Sixth Circuit's decision in *Dyer v. Ventra Sandusky, LLC*, 934 F.3d 472 (6th Cir. 2019). (Doc. 25). Plaintiffs responded to CSXT's Notice with one of their own on October 7, 2019. (Doc. 29).

of Civil Procedure 56(d). (*See* Doc. 21). CSXT replies by arguing Plaintiffs have not "identified a good faith dispute" about any of CSXT's arguments, and therefore, summary judgment is appropriate.

### 1. *CSXT's Motion For Summary Judgment Came Early In This Litigation.*

In addressing this portion of CSXT's motion and Plaintiffs' discovery motion, some procedural history is helpful. Plaintiffs filed this action on January 29, 2019, and after waiving service and answering, CSXT filed the Rule 26(f) Report on April 30, 2019, but filed the instant Motion the next day. (*See* Doc. 15). After an extension, Plaintiffs responded on June 24, 2019, filing not only their merits response, but also their motions for discovery and to amend. (*See* Docs. 19, 20, and 21). CSXT's June 24, 2019 reply addressed Plaintiffs' three-pronged response. (*See* Doc. 24).

The next month, Judge Barrett, to whom this case was originally assigned, held a status conference and requested new Rule 26(f) reports. (*See* Minute Entry, July 22, 2019). Judge Barrett set a calendar for the case, which was amended on October 16, 2019. (*See* Doc. 31). The Amended Calendar Order set a November 21, 2019 deadline to serve paper discovery and a June 8, 2020 deadline for class discovery. (*See id.*). After this case was reassigned to the undersigned judge, the deadline for class discovery was extended until August 8, 2020. (*See* Doc. 36). During the May 14, 2020 oral arguments, the parties reported discovery has progressed to some extent while all these motions have remained pending. This limited discovery occurred, however, well after Plaintiffs' response to CSXT's summary judgment motion was due.

Although Plaintiffs did offer a limited response to the summary judgment portion of CSXT's Motion, they simultaneously argued that they are entitled to relief under Federal Rule of Civil Procedure 56(d) and must have an opportunity for more thorough discovery before they can adequately respond. (*See* Pls.' Mot. for Disc. Pursuant To Civ. R. 56(d) ("Pls.' R. 56(d) Mot."), Doc. 21, #258). As discussed below, the Court concludes that Plaintiffs have met their burden under Rule 56(d) and accordingly, will allow them to pursue discovery before supplementing their response to the summary judgment portion of CSXT's Motion.

### 2. *Rule 56(d) May Afford A Party The Opportunity For Discovery.*

When a party asserts that additional discovery is necessary before it can respond to a motion for summary judgment, Rule 56(d) controls the Court's analysis of the issue. The rule provides:

> *When Facts Are Unavailable to the Nonmovant.* If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
>
> (1)     defer considering the motion or deny it;
> (2)     allow time to obtain affidavits or declarations or to take discovery; or
> (3)     issue any other appropriate order.

Fed. R. Civ. P. 56(d)(1)–(3).

"The purpose behind Rule 56(d) is to ensure that plaintiffs receive 'a full opportunity to conduct discovery' to be able to successfully defeat a motion for summary judgment." *Doe v. City of Memphis*, 928 F.3d 481, 490 (6th Cir. 2019) (quoting *Ball v. Union Carbide Corp.*, 385 F.3d 713, 719 (6th Cir. 2004)). "'A party invoking [the] protections [of Rule 56(d)] must do so in good faith by affirmatively

demonstrating … how postponement of a ruling on the motion will enable him … to rebut the movant's showing of the absence of a genuine issue of fact.'" *Id.* (alteration in original) (quoting *F.T.C. v. EMA Nationwide, Inc.*, 767 F.3d 611, 623 (6th Cir. 2014)).

It is true that "[t]he party opposing a motion for summary judgment … possesses no absolute right to additional time for discovery under Rule 56[.]" *Doe*, 928 F.3d at 490 (alteration in original) (quoting *Emmons v. McLaughlin*, 874 F.2d 351, 356 (6th Cir. 1989)). At the same time, denying a Rule 56(d) motion when the non-moving party has not yet received a full opportunity to conduct discovery would "likely constitute an abuse of discretion." *Ball*, 385 F.3d at 719. It would likely be improper to grant summary judgment if the parties seeking discovery under Rule 56(d) are not afforded a sufficient opportunity to conduct it. *See White's Landing Fisheries, Inc. v. Bucholzer*, 29 F.3d 229, 231–32 (6th Cir. 1994) ("It follows that a grant of summary judgment is improper if the non-movant is given an insufficient opportunity for discovery."). And although a district court's decision is reviewed for abuse of discretion, the Sixth Circuit "has cited approvingly other circuits' view that 'a … motion requesting time for additional discovery should be granted almost as a matter of course unless the non-moving party has not diligently pursued discovery of the evidence.'" *Doe*, 928 F.3d at 490–91 (alteration in original) (quoting *E.M.A. Nationwide*, 767 F.3d at 623 n.7).

In deciding a Rule 56(d) Motion, the Sixth Circuit instructs the district courts to consider five factors: (1) when the movant learned of the issue that is the subject

73

of the desired discovery; (2) whether the desired discovery has the potential to change the ruling at issue; (3) how long the discovery period had lasted; (4) whether the movant was dilatory in its discovery efforts; and (5) whether the party moving for summary judgment was responsive to discovery requests.[16] *See id.* (quoting *CenTra, Inc. v. Estrin*, 538 F.3d 402, 420 (6th Cir. 2008)); *Plott v. Gen. Motors Corp.*, 71 F.3d 1190, 1196–97 (6th Cir. 1995). Thus, the Court looks first to whether the movant complied with the procedural requirements of the Rule, then to whether the five *Plott* factors favor permitting discovery.

Plaintiffs have satisfied the technical requirements of Rule 56(d) by filing a motion and setting forth by declaration the specific information they need to adequately respond to the summary judgment portion of CSXT's Motion. (*See* Pls.' R. 56(d) Mot., #258–59; Thompson Decl. at #260–62).

### 3. *Considering The* Plott *Factors, Plaintiffs Are Entitled To The Discovery They Seek.*

For the reasons explained below and cognizant of the Sixth Circuit's preference that courts grant Rule 56(d) motions, the Court determines that Schobert and York are entitled to engage in the discovery they seek. An analysis of the *Plott* factors here leads to this same outcome.

Three of the *Plott* factors address issues related to the timing of discovery and whether the parties delayed that process. The third factor, whether Plaintiffs were

---

[16] These five factors are often called the "*Plott*" factors. *See Plott v. Gen. Motors Corp.*, 71 F.3d 1190, 1196–97 (6th Cir. 1995); *Doe*, 928 F.3d at 941 ("As an initial matter, it does not appear that the district court considered all five of the *Plott* factors, as it never acknowledged them.").

dilatory in their discovery efforts, is the "main inquiry," *Doe*, 928 F.3d at 941 (citation omitted), and thus the Court discusses it first. CSXT filed its summary judgment motion just shy of a month after answering the Complaint. In the parties' Rule 26(f) Report, filed just two days before CSXT filed its Motion, the parties stated that if the Court does not grant CSXT's Motion for Judgement on the Pleadings and Summary Judgment and does not stay this action, discovery will be needed on "CSXT's FMLA policies and procedures," "CSXT's method of accounting FMLA leave," and "CSXT's attendance policy for Train & Engine employees." (*See* Joint Discovery Plan, Doc. 14, #88–89). All of these are issues that Plaintiffs likewise now say they need discovery on before they would be able to respond to CSXT's summary judgment motion. (*See* Thompson Decl. at #260–62). There is no allegation or evidence that Plaintiffs delayed discovery or were not diligent in pursuing it because the time for discovery had only recently commenced. Thus, this factor—*Plott*'s "main inquiry"—favors Plaintiffs.

The other timing-related factors are neutral or favor Plaintiffs. The first factor, when Plaintiffs learned of the issue that is the subject of the requested discovery, "primarily pertains to situations when there was something that prevented a party from learning about a subject of desired discovery until after some discovery had already been sought." *Doe*, 928 F.3d at 492–93. As little to no discovery had occurred when Plaintiffs made their request, this factor is not applicable to the facts of this case and is neutral. *See id.* The fourth factor, how long the discovery period had lasted, is analyzed on a case-by-case basis. *See id.* at 494 ("[W]hat constitutes a

reasonable length of time for the duration of discovery is so particular to the facts and circumstances of a given case that examining what lengths of time this court has found sufficient for discovery in the past is not particularly helpful."). Here, again, little discovery had occurred and this factor cuts in favor of Plaintiffs.

The second factor, whether the desired discovery has the potential to change the ruling, also favors Plaintiffs. They seek additional discovery related directly to specific FMLA policies that CSXT had in place at the time of the alleged events. Moreover, CSXT attached several affidavits and exhibits to its Motion, but any information that could refute the contents of those attachments would have been, at that time, in CSXT's possession. To refute CSXT's summary judgment motion, Plaintiffs will necessarily need to discover what CSXT's FMLA policies were. That is unlikely to occur without the Plaintiffs at least being afforded the opportunity to see a clearer picture of how CSXT operated in order to have a fair chance to refute the company's declarations. This factor also favors the Plaintiffs.

The fifth and final factor, whether CSXT was responsive to Plaintiffs' discovery requests, is largely neutral, as the parties had exchanged little to no discovery at the time the Plaintiffs filed the Rule 56(d) Motion. There is nothing, at least that the Court is aware of, that would indicate CSXT has not been responsive to Plaintiffs' discovery requests since discovery began.[17]

---

[17] The Court does note that following oral argument (at Plaintiffs' request) and absent any ruling from this Court, the parties agreed to work together to define the proper scope of discovery that would enable Plaintiffs to respond to CSXT's summary judgment motion. (*See* Rule 56(d) Discovery Status Report re Motion for Hearing By CSXT, Doc. 40, #600–04). The parties have further discussed with the Court at a recent status conference the status of discovery, which appears to be progressing. After review of this Order, if questions remain

Considering these five factors, the Court grants Plaintiffs' Rule 56(d) Motion. (Doc. 21). Pursuant to Rule 56(d)(1), the Court defers ruling on parts II.A through II.C of CSXT's Motion for Summary Judgment (Doc. 15). Pursuant to Rule 56(d)(2), the Court will permit the parties time to define the scope of and engage in the discovery identified by Plaintiffs' Motion (Doc. 21) and attached affidavit. Under its discretion provided by Rule 56(d)(3), the Court permits Plaintiffs to supplement their response to CSXT's summary judgment motion, and will also afford CSXT an opportunity to supplement its reply.

To implement this part of the Order, the Court **ORDERS** the parties to confer regarding an appropriate schedule for completing any necessary discovery to comply with this Order, and also an appropriate schedule for the supplemental briefing that the Court directed above. If the parties are unable to agree, they are directed to present their competing proposals to the Court, and the Court will set a calendar.

## E. The Court Denies Part II.D of CSXT's Motion for Summary Judgment.

The last portion of CSXT's summary judgment motion argues that York's claim, because he was ultimately terminated, must go to arbitration.

CSXT contends that arbitration is mandatory under the Railway Labor Act ("RLA"), which governs disputes between labor and management in the railroad industry, and requires all "minor claims" to be arbitrated. (*See* CSXT's Mem. at #142). First, CSXT says York's claim is a "minor claim." (*Id.* at 143–44). Resolving that

---

regarding the appropriate scope of discovery, the parties are directed to contact the Court to arrange an additional status conference.

minor claim, it says, would require this Court to interpret the operative collective bargaining agreement (the "CBA") to determine whether CSXT had an "honest belief" for taking the actions that it did, and further, whether that "honest belief" was supported by "substantial evidence," an implied term in the CBA. (*See id.*). This means, according to CSXT, that because the CBA is implicated, the Court cannot resolve the FMLA issue.

Plaintiffs disagree, arguing this case is instead about whether the "FMLA prohibited [CSXT] from using the disciplinary process to challenge FMLA usage in the first place." (Pls. Resp. at #222–24). They further argue that the FMLA requires employers to follow a "specific statutory procedure" before resorting to a collectively-bargained-for disciplinary structure, and CSXT did not follow those procedures. (*Id.* at #223). Finally, Plaintiffs argue that because the CBA does not require arbitrating FMLA claims, despite the fact that it could, means this Court can and should adjudicate York's claim, as it is outside the RLA's preclusive reach. (*Id.* at #224).

1. ***The Summary Judgment Standard.***

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden is on the moving party to conclusively show no genuine issue of material fact exists. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *Lansing Dairy, Inc. v. Espy,* 39 F.3d 1339, 1347 (6th Cir. 1994). Once the movant presents evidence to meet its burden, the nonmoving party may not rest on its pleadings, but must come forward with significant probative evidence to support

its claim. *Celotex,* 477 U.S. at 324; *Lansing Dairy,* 39 F.3d at 1347. Whether summary judgment is appropriate depends upon "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Amway Distribs. Benefits Ass'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)).

The burden falls upon the nonmoving party to "designate specific facts or evidence in dispute." *Anderson*, 477 U.S. at 249–50. If the nonmoving party fails to make the necessary showing for an element upon which it has the burden of proof, the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323. In sum, in light of all the facts as to which CSXT shows a lack of dispute, Plaintiffs must present some remaining "sufficient disagreement" which would necessitate submission to a jury. *See Moore v. Phillip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993) (quoting *Anderson*, 477 U.S. at 251–52). In making that determination, though, this Court must view the evidence in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986); *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) ("In arriving at a resolution, the court must afford all reasonable inferences, and construe the evidence in the light most favorable to the nonmoving party.").

### 2.     *York Is Not Required To Arbitrate His Claims Because Resolving His FMLA Claim Does Not Require Interpreting The Collective Bargaining Agreement.*

There are several interrelated questions that the Court must consider before reaching a conclusion about whether York's claim must go to arbitration. The first is whether York is making a claim for FMLA interference, FMLA retaliation, or both, as the Complaint is a little vague on this point. (*Compare* Compl. at ¶¶ 154–59, #22–23, *with id.* at ¶¶ 138–39, #20). Assuming for a moment that York's claim may be treated as a retaliation claim, the second question is whether the honest-belief standard applies. If that answer is "yes," the Court must address whether CSXT's reliance on the "honest belief" standard would implicate the CBA to the extent that it would require York's claim to be arbitrated.

### a.     **York's Claim Is Better Understood As A Retaliation Claim.**

"Although we analyze an FMLA claim based on the interference theory differently from one based on the retaliation theory, notice pleading does not box plaintiffs into one theory or the other at the complaint stage of an FMLA action." *Wysong v. Dow Chem. Co.*, 503 F.3d 441, 446 (6th Cir. 2007).

The FMLA has two interference provisions. The first, 29 U.S.C. § 2615(a)(1), prohibits employers from "interfering, restraining, or denying the exercise of or attempted exercise of any FMLA right." *Wysong*, 503 F.3d at 446 (quoting *Chandler*, 283 F.3d at 825 (citation omitted)). Although labeled in terms of "interference," "[t]his prohibition includes retaliatory discharge for taking leave." *Id.* at 447. The second interference prohibition, 29 U.S.C. § 2614(a)(1), requires an employer to

restore an employee "to 'the position of employment held by the employee when the leave commenced' or 'to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment.'" *Grace v. USCAR*, 521 F.3d 655, 669 (6th Cir. 2008) (quoting 29 U.S.C. § 2614(a)(1)).

The prima facie elements of an interference claim are that: (1) the employee was FMLA-eligible; (2) the defendant was a covered employer; (3) the employee was entitled to leave under the FMLA; (4) the employee gave the employer notice of his intent to take leave; and (5) the employer denied the employee FMLA benefits to which he was entitled. *See, e.g.*, *Stein v. Atlas Indus. Inc.*, 730 F. App'x 317 (6th Cir. 2018) (citing *Hoge v. Honda of Am. Mfg., Inc.*, 384 F.3d 238, 244 (6th Cir. 2004)). The interference provisions focus "simply [on] whether the employer provided its employee with the entitlements set forth in the FMLA—for example, a twelve-week leave or reinstatement after taking medical leave." *Arban v. West Publ'g Corp.*, 345 F.3d 390, 401 (6th Cir. 2003).

Relatedly, the FMLA's anti-retaliation provision, 29 U.S.C. § 2615(a)(2), prohibits an employer from discharging "or in any other manner discriminat[ing] against any individual for opposing any practice made unlawful" by the FMLA. *Id.* For a prima facie retaliation claim, a plaintiff must establish that he or she was: (1) engaged in activity protected by the FMLA; (2) that the employer knew the employee was exercising his or her rights under the FMLA; (3) "after learning of the employee's exercise of FMLA rights, the employer took an adverse employment action adverse to [the employee]; and (4) there was a causal connection between the

protected FMLA activity and the adverse employment action." *Jaszczyszyn v. Advantage Health Physician Network*, 504 F. App'x 440, 447 (6th Cir 2012) (quoting *Killian v. Yorozu Auto. Tenn., Inc.*, 454 F.3d 549, 556 (6th Cir. 2006)). In other words, a retaliation claim is about whether the employer took some adverse action against an employee *after* they availed themselves of their FMLA rights, not about whether the employee's FMLA rights were impeded in the first place. *See Marshall v. Rawlings Co.*, 854 F.3d 368, 376 (6th Cir. 2017).

When the "essence" of a claim "is retaliation, not interference," a district court can consolidate a generally pled § 2615 claim and "consider[] them as one for retaliation under § 2615(a)(2)." *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 282 (6th Cir. 2012) (citing *Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1050 (8th Cir. 2006)); *see also LaBelle v. Cleveland Cliffs, Inc.*, 784 F. App'x 437, 443 (6th Cir. 2019) (affirming the district court's decision to merge the two FMLA claims "under the retaliation framework"). Consolidating FMLA claims into a retaliation claim is appropriate when an employee is afforded all the rights and privileges that FMLA contemplates but is retaliated against or terminated afterward. *See Seeger*, 681 F.3d at 282–23 (finding the Eighth Circuit's reasoning "persuasive" and treating an interference claim as one for retaliation when an employee is given the leave he requested but is later investigated and terminated for FMLA misuse); *LaBelle*, 784 F. App'x at 443 ("Given that LaBelle received all the FMLA leave he requested and was terminated afterwards for suspected fraud, the district court correctly found that the essence of LaBelle's claim is retaliation, not interference.").

Treating York's FMLA claim as a retaliation claim is appropriate here.[18] To be sure, the Complaint is somewhat ambiguous on that front, as Plaintiffs caption the FMLA cause of action "Denial and Interference" (*id.* at Count I (caption), #22). But they go on to allege that York was terminated, and he appears to be the putative representative for Classes 13 and 14, which are defined as CSXT employees who were allegedly terminated or disciplined "as a result" of taking FMLA leave. (*Id.* at ¶¶ 138–39, #20). Confirming that retaliation, not interference, seems to be the gravamen of the claim, York does not allege, beyond the letters and policies both Plaintiffs take issue with, that CSXT interfered with his ability to take leave or that it failed to restore him to his position when he returned.[19] (*See, e.g.*, Compl. at ¶¶ 100–01, 113, #15, 17). Therefore, although labeled as an interference claim, York's FMLA claim is better understood as one for retaliation.[20]

---

[18] This is not meant to restrict Plaintiffs to asserting solely a retaliation claim at this point in their action. To be sure, a plaintiff may plead both retaliation and interference causes of action. *See, e.g., Donald v. Sybra, Inc.*, 667 F.3d 757, 761-62 (6th Cir. 2012) (analyzing both types of FMLA claims). This is also not to say that Schobert (and presumably York as well) could not *also* prevail on interference claims separate from York's termination. But for purposes here, CSXT's "honest belief" and York's termination, treating the claim as retaliation is appropriate to resolve the RLA preclusion issue.

[19] Although York did not specifically state in the Complaint that he was restored to his locomotive engineer position after taking leave, that inference is certainly plausible. (*See id.* at ¶ 113 (took two days of leave on December 30, 2017; *id.* at ¶ 115 (taken out of service on January 16, 2018)). Nowhere does York indicate that he was not restored.

[20] Even in the proposed amended complaint (Doc. 20-1), for example, Plaintiffs do not appear to proceed any differently as it relates to York and his representation of Classes 13 and 14. If, for example, Plaintiffs decided to only pursue an interference claim, any conversation about the RLA and CSXT's "honest belief" would likely be unnecessary. *See Banks v. Bosch Rexroth Corp.*, 610 F. App'x 519, 533 (6th Cir. 2015) (citing *Tillman v. Ohio Bell Telephone Co.*, 545 F. App'x 340, 351 (6th Cir. 2013) (noting the honest belief rule "fits neatly into the retaliation context" but that it is "not applicable to claims where the employer's frame of mind is not at issue, FMLA interference claims for example")); *Shockley v. Corr. Healthcare Cos.*,

### b. The *McDonnell Douglas* Framework Applies To York's FMLA Retaliation Claim, Which In Turn Incorporates The Honest Belief Standard.

York's retaliation claim requires the court to employ a familiar framework. "There is no doubt" courts in this Circuit apply "the *McDonnell Douglas* burden-shifting framework to FMLA retaliation suits when the plaintiff produces indirect evidence of a causal connection between the protected activity and the adverse action." *Jaszczyszyn*, 504 F. App'x at 447.

Assuming York has met his prima facie showing based on circumstantial evidence (neither party argues this point[21]), the burden shifts to CSXT to articulate a "legitimate, nondiscriminatory reason" for taking the adverse action it did. *See Seeger*, 681 F.3d at 284. "Fraud and dishonesty constitute lawful, non-retaliatory bases for termination" and "*[n]othing in the FMLA prevents employers from ensuring that employees who are on leave from work do not abuse their leave.*" *Id.* (citation and quotation omitted). Assuming CSXT would make this argument to satisfy its burden, the burden of production returns to York to demonstrate pretext.

At the pretext stage, the question is whether York can demonstrate that CSXT's proffered reason for his termination was instead pretext for some

---

*Inc.*, No. 1:16-cv-599, 2018 WL 1565614, at *4 (S.D. Ohio Mar. 30, 2018) (Barrett, J.) (noting the "Sixth Circuit has questioned whether the 'honest belief' rule should be applied to FMLA interference claims"). *Cf. Redick v. Molina Healthcare, Inc.*, No. 2:18-cv-60, 2020 WL 59796, at *7–12 (S.D. Ohio Jan. 6, 2020) (Sargus, J.) (applying the "honest belief" rule to both FMLA interference and retaliation claims).

[21] The Court refrains from ruling on whether York can establish a prima facie case, whether CSXT's reasoning was legitimate and nondiscriminatory, and whether York can demonstrate pretext. To reach the issue of RLA preclusion, however, which CSXT bases on having an "honest belief," the Court must assume, and again, no party addresses whether, York has met his prima facie burden.

impermissible purpose. *See id.* "A plaintiff may establish pretext by showing that the employer's proffered reasons (1) have no basis in fact; (2) did not actually motivate the action; or (3) were insufficient to warrant the action." *Id.* at 285 (citing *Dews v. A.B. Dick, Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000)). York might argue that CSXT's decision had no basis in fact, and CSXT will likely, or at least it so appears based on CSXT's briefing, raise its "honest belief."

Under the honest-belief rule, "an employer's proffered reason is considered honestly held where the employer can establish it reasonably relied on particularized facts that were before it at the time the decision was made." *Id.* (quoting *Joostberns v. United Parcel Servs., Inc.*, 166 F. App'x 783, 791 (6th Cir. 2006)). "Thereafter, the burden is on the plaintiff to demonstrate that the employer's belief was not honestly held." *Id.* "An employee's bare assertion that the employer's proffered reason has no basis in fact is insufficient to call an employer's honest belief into question, and fails to create a genuine issue of material fact." *Id.* (quotation omitted); *see also Majewski v. Auto. Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001) ("Under this rule, as long as the employer had an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it was ultimately shown to be incorrect."). York must "show 'more than a dispute over the facts upon which the discharge was based.'" *Seeger*, 681 F.3d at 285 (quoting *Braithwaite v. Timken Co.*, 258 F.3d 488, 493–94 (6th Cir. 2001)).

Perhaps recognizing that this will ultimately come down to pretext, CSXT asserts "the core merits question presented … is whether CSXT honestly believed

that York (and the employees he purports to represent) used FMLA leave dishonestly." (CSXT's Mem. at #143). But instead of arguing York cannot defeat CSXT's "honest belief," CSXT argues instead that because its "honest belief" is relevant, the Railway Labor Act requires York's claim be resolved in arbitration. (*See id.*).

### c. The Railway Labor Act Does Not Preclude York's FMLA Claim.

The Railway Labor Act provides a "comprehensive framework for the resolution of labor disputes in the railroad industry" and establishes a mandatory arbitration regime for "minor" disputes. *Atchinson, Topeka & Santa Fe Ry. Co. v. Buell*, 480 U.S. 557, 562 (1987); 45 U.S.C. § 151 *et seq.* "Minor disputes" involve controversies over the interpretation of an existing collective bargaining agreement and disputes invoking contract-based rights. *See Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 252–54 (1994). A federal court, however, may resolve claims arising under federal or state statutory law if the underlying factual issues do not require a court to interpret or construe an existing collective bargaining agreement. *See Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 411 (1988). The question here is how to distinguish between a "minor dispute" that is precluded by the Railway Labor Act ("RLA") and one that is not.

To aid district courts in answering this question, the Sixth Circuit instructs this Court to ask two questions: "(1) whether proof of the [federal] law claim would require interpretation of the CBA; and (2) whether the right claimed by the plaintiff is created by the collective bargaining agreement or by [federal] law." *Emswiler v.*

*CSX Transp., Inc.*, 691 F.3d 782, 792 (6th Cir. 2012) (citing *DeCoe v. Gen. Motors Corp.*, 32 F.3d 212, 216 (6th Cir. 1994)); *see also Stanley v. ExpressJet Airlines, Inc.*, 356 F. Supp. 3d 667, 684–85 (E.D. Mich. 2018), *aff'd*, 808 F. App'x 351 (6th Cir. 2020) (describing the two-part test as "(1) does proof of the plaintiff's claim require interpretation of the CBA; and (2) is the right claimed by the plaintiff created by the CBA or by state or federal law"). Relatedly, "[a]n employer cannot take an otherwise valid claim and cause it to become preempted by claiming the CBA as a defense." *Stanley*, 808 F. App'x at 355 (citation omitted).

Two district court cases in this circuit, *Stanley* and *Yelder*, both provide helpful guidance in answering *Emswiler*'s inquiry. *See Stanley*, 356 F. Supp. 3d at 684–85; *Yelder v. Norfolk S. Ry. Co.*, No. 2:18-CV-10576, 2020 WL 0183785, at *5 (E.D. Mich. Mar. 6, 2020).

In *Stanley*, a Muslim flight attendant sued under Title VII for religious discrimination after her employer would not provide an accommodation excusing her from serving alcohol, which the employee said Islam forbids. *Stanley,* 808 F. App'x at 352. The employer suggested Stanley take an informal approach by working it out with other flight attendants on a flight-by-flight basis, but that "arrangement was unlikely to succeed in the long-term as it violated several provisions of the CBA." *Id.* at 353. Stanley's proposed accommodation—that she would never have to assist in serving alcoholic beverages—implicated all these CBA provisions. *Id.* Particularly, the proposed accommodation ran afoul of provisions related to shift bidding, vacancies, seniority roles onboard any particular flight, and rights associated with

"downgrading" from flights. *See id.* Based on this, the employer offered Stanley three options: take personal leave and find another position with the airline, serve and sell alcohol, or resign. *Id.* at 354. She rejected all three, and instead submitted a formal request for her accommodation. After her request was denied, she sued. *Id.*

Affirming the district court's decision that Stanley's Title VII claims were preempted by the RLA, the Sixth Circuit took as given that Stanley met her prima facie case and that her proposed accommodation would force her employer to "violate the CBA," which is a recognized undue hardship on an employer. *Id.* at 356. Instead of analyzing the proposed accommodation, the court focused on "whether the CBA [could] conclusively resolve" the Title VII claim. *Id.* The court determined that the CBA "and only the CBA" could resolve the question of whether Stanley's proposed accommodation violated the seniority provisions of the CBA itself, and therefore, the RLA precluded her claims. *Id.*

Conversely in *Yelder*, the district court determined an employee's Title VII race discrimination claims were *not* subject to RLA preclusion because his claims did not depend on interpreting any CBA provision. *Yelder*, 2020 WL 1083785, at *5. Bringing both Title VII discrimination and retaliatory discharge claims, Yelder argued they were not precluded because "he [did] not claim that the CBA provisions themselves are racially discriminatory[,]" and that it was necessary to refer to the CBA only "to determine what the assignment opportunities were and how assignments were made," (i.e., whether they were done in a way that violated Title VII). The court agreed and drew a distinction between claims like Stanley's, which were conclusively

resolved by interpreting the CBA, and claims like Yelder's, in which he did not challenge the "meaning" of a CBA provision, but instead asserted only that the CBA was "*applied* in a discriminatory manner." *Yelder*, 2020 WL 1083785, at *7 (quoting *Carmona v. Sw. Airlines, Co.*, 536 F.3d 344, 349 (5th Cir. 2008)). The court ultimately determined the RLA did not preclude his claims because "'consideration of the CBA as applied to Title VII … —not interpretation of the CBA itself—[was] what [was] required to resolve [Yelder's] claims." *Id.* at *8 (alteration in original) (quoting *Carmona v. Sw. Airlines Co.*, 536 F.3d 344, 349–50 (5th Cir. 2008)).

The court reasoned, "while 'certain provisions of the CBA must be examined and weighed as a relevant but non-dispositive factor' in deciding whether Yelder was subject to disparate treatment or faced racially motivated termination, the fact that such consideration of the CBA is necessary does not mean that the claims are precluded by the RLA." *Id.* (quoting *Brown v. Il. Cent. R.R. Co.*, 254 F.3d 654, 667–68 (7th Cir. 2001)). Yelder's claims, unlike Stanley's, turned on the employer's "conduct and motives in relation to the CBA's requirements," and despite claims to the contrary, the claims that Yelder was asserting were "that Defendant violated rights created by *federal statute*, … not by the CBA." *Id.* at *8. Thus, the answer to each of the *Emswiler* questions was "no" and the claims were not precluded. *Id.*

These two cases aid this Court in resolving whether York's FMLA retaliation claim is precluded by the RLA. In reaching the conclusion that it is not, the Court looks no further than *Emswiler*'s two-part inquiry: (1) does proof of York's claim

require interpretation of the CBA; and (2) is the right York claims created by the CBA, or instead by federal or state law? *See Emswiler*, 691 F.3d at 792.

As to the first question—whether proof of York's claim requires interpretation of the CBA—the answer is "no." York's retaliation claim is more like the one in *Yelder* than the one in *Stanley*. It may require *examining* the CBA, but that examination is a non-dispositive factor in deciding whether CSCT retaliated against York for exercising his FMLA rights. The term "honest belief" does not appear in the portion of the CBA related to termination of T&E Employees.[22] And while the "substantial evidence" evidentiary standard may be implied in the CBA, which CSXS does argue in a footnote, it has little to do with York's federal cause of action under the FMLA. Moreover, the fact that CSXT argues it had an "honest belief" for its actions does not mean York's claim must be arbitrated merely because that is how CSXT may respond to York's claim at the pretext stage. *See Yelder*, 2020 WL 1083785, at *6 ("[A]n employer cannot ensure preclusion of a plaintiff's claim merely by asserting CBA-based defenses to what is essentially a non-CBA-based claim." (quotation omitted)).

The second question—what is the source of the claimed right, the CBA or federal law?—also cuts against RLA preclusion. The right York is asserting does not arise from the CBA, but rather from a federal statute. While an arbitrator may be called upon to assess the facts surrounding York's termination and whether CSXT's

---

[22] The specific provision regarding discharge, not the process by which it is accomplished, is contained in Article 30 of the CBA. As provided to the Court by CSXT, that provision reads in full: "An employee shall not be discharged, suspended or otherwise disciplined without just cause and without a fair and impartial hearing, except that an employee may waive a hearing in accordance with B(2) below." (John Johnson Decl., Doc. 15-2, Ex. 1, at #157).

actions complied with the CBA, arbitration will not resolve the federal law in question. There is likewise nothing in the CBA, at least that CSXT identified to the Court, to indicate T&E Employees expressly agreed to bring FMLA claims exclusively to arbitration. Selecting arbitration as the only forum for federal claims was certainly a possible agreement CSXT and T&E Employees could have made when they negotiated the CBA. *See Gaffers v. Kelly Servs, Inc.,* 900 F.3d 293, 296 (6th Cir. 2018) (holding that employees can, through collective bargaining, choose arbitration as the forum to resolve federal statutory claims). The parties' failure to include any such provision in the CBA, paired with the fact that the right York asserts arises under federal law, also indicates arbitration is inappropriate here.

Accordingly, as the answers to both of *Emswiler*'s questions point the same way, this Court determines York's FMLA claims are not precluded by the RLA and arbitration of them is not required.[23]

---

[23] Other courts faced with this question in similar contexts have drawn the same distinction between claims that require interpreting a CBA and those that do not. *Compare South v. GoJet Airlines, LLC*, No. 4:12-cv-378, 2013 WL 6253582, at *3 (S.D. Iowa Sept. 30, 2013) ("The claim at issue in the present case is derived from the FMLA, not the CBA, and is thereby not subject to the CBA's arbitration provision.") *and Staunch v. Continental Airlines, Inc.*, No. 1:06-cv-1011, 2007 WL 218729, at *5 (N.D. Ohio Jan. 26, 2007) (finding an employee's FMLA claims were not a "minor dispute" subject to RLA preclusion because the claim arose under federal law, not the collective bargaining agreement) *with VanSlyck v. GoJet Airlines, LLC*, 323 F.R.D. 266, 274 (N.D. Ill. Jan. 11, 2018) (airline pilot's FMLA claim for failing to restore him to his previous position was subject to RLA arbitration because a CBA provision required a fitness for duty exam before restoration and to succeed, the pilot would have had to establish the airline "violated the return-to-work provisions" of the CBA, which required "interpretation and application" of the CBA) *and Montgomery v. Compass Airlines, LLC*, 98 F. Supp. 3d 1012, 1018 (D. Minn. 2015) (arbitration proper when "the CBA clearly and unmistakably mandates arbitration of FMLA claims"). Otherwise, CSXT could raise its "honest belief" and thereby transform every claim like this (or any other federal statutory claim subject to *McDonnell Douglas*) into one that is precluded by the RLA and results in mandatory arbitration.

**F.  The Court Denies Part III of CSXT's Motion and Declines To Stay This Action.**

The last issue to resolve is whether a stay is appropriate. CSXT asserts several reasons favoring a stay, including that York's arbitration decision may "bear on" non-arbitrable claims, that York still has yet to decide whether he will appeal the initial arbitration decision, that there are several other cases just like this one proceeding in other districts, and that judicial economy favors a stay. (CSXT's Mem. at #145–48). CSXT also filed a motion to transfer this action to the United States District Court for the District of Maryland. (*See* Doc. 38, #350–51).

Plaintiffs respond to CSXT's request for stay by arguing it has not articulated any "pressing need" for delay and that CSXT has similarly failed to show how a stay would not harm the Plaintiffs. (Pls.' Resp. Mem. at #225–26). CSXT counters that it will take longer to litigate Plaintiffs claims than it will to arbitrate them, and Plaintiffs can be compensated for any delay through interest payments under the FMLA, should they ultimately prevail. (*See* CSXT's Reply Mem. at #292–94).

**1.  *The District Court Has Discretion In Deciding Whether To Stay A Civil Matter.***

"The power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes in its docket with economy of time and effort for itself, for counsel[,] and for litigants" and the decision to stay a proceeding "ordinarily rests with the sound discretion of the District Court." *F.T.C. v. E.M.A. Nationwide, Inc.*, 767 F.3d 611, 626 (6th Cir. 2014) (quoting *Ohio Env'tl. Council v. U.S. Dist. Court, S. Dist. of Ohio, E. Div.*, 565 F.2d 393, 396 (6th Cir. 1977)); *see also*

*Landis v. N. Am. Co.*, 299 U.S. 248, 254–55 (1936). At the same time, the court "must tread carefully in granting a stay of proceedings since a party has a right to a determination of its rights and liabilities without undue delay." *Ohio Env'tl. Council*, 565 F.2d at 396.

"There is no precise test in this Circuit for when a stay is appropriate." *Ferrell v. Wyeth-Ayerst Labs., Inc.*, No. 1:01-CV-447, 2005 WL 2709623, at *1 (S.D. Ohio Oct. 21, 2005). In addressing that issue, courts commonly consider several factors, including: (1) the need for a stay; (2) the stage of litigation; (3) whether the non-moving party will be "unduly prejudiced or tactically disadvantaged"; (4) whether a stay will simplify the issues; and (5) whether a stay would lessen the burden of litigation for the parties and the court. *See, e.g.*, *Kirby Devs., LLC v. XPO Global Forwarding, Inc.*, No. 2:18-cv-500, 2018 WL 6075071, at *2 (S.D. Ohio Nov. 20, 2018) (citations omitted). And it is the party seeking stay who "bears the burden of showing both a need for delay and that 'neither the other party nor the public will suffer harm from entry of the order.'" *Id.* (quoting *Ohio Env'tl. Council*, 565 F.2d at 396).

Applying those factors here, the Court concludes that a stay is unnecessary at this time. As for the first factor, CSXT is litigating several actions similar to this one and the first-filed case in Maryland raises kindred questions of law based on similar underlying facts. *See Bell v. CSX Transp., Inc.*, Case No. 1:18-cv-744-JKB (D. Md. 2018). But CSXT has recently filed a motion seeking to transfer this case to that court. Although this Court has yet to decide whether that transfer is warranted, either way, a stay here will not promote final resolution of this matter. Second, this action has

yet to reach the class certification stage and discovery is still ongoing, but any additional discovery that will occur will be greatly trimmed by this Order, limiting any benefit a stay might provide in terms of avoided discovery. Third, CSXT may well be correct that there is no particular prejudice or disadvantage Plaintiffs will suffer if the Court implements a stay, as they could be compensated for that delay by way of interest payments should they prevail on the merits. But again, Plaintiffs are due their day in court and to delay that for some indeterminate amount of time, without some strong reason in support, is unwarranted. Fourth, while it may be true that a stay could simplify the issues, as this Court will be able to review any arbitration decision that might occur, there is no pressing need for a stay at this point. Fifth, there is no indication that a stay would lessen (or impose more of) any burden on the parties or the Court, again especially in light of this Order. Based on these factors, the Court concludes that a stay is not appropriate.

## CONCLUSION

For the reasons above, the Court **DENIES** Plaintiffs' Motion for Leave to Amend (Doc. 20), **GRANTS** CSXT's Motion for Judgment on the Pleadings as to Part I.A of its Motion (Doc. 15, #126–29), **GRANTS IN PART AND DENIES IN PART** CSXT's Motion for Judgment on the Pleadings as to Part I.B of its Motion (*id.* at #130-34), **STRIKES** Classes 11, 12, 13, and 14 from the Complaint, and **DISMISSES WITH PREJUDICE** Count II and the portions of Count III of the Complaint that set forth Plaintiffs' Medical Inquiry and Disability Discrimination claims. (Doc. 1).

The Court, however, **DENIES** CSXT's Motion for Judgment on the Pleadings as to Part I.C of its Motion (Doc. 15 at #135).

The Court further **GRANTS** Plaintiffs' Motion for Discovery (Doc. 21) and **DEFERS** ruling on CSXT's Motion for Summary Judgment as to Parts II.A through II.C (Doc. 15 at #136–41). Finally, the Court **DENIES** CSXT Summary Judgment as to Part II.D of its Motion (*id.* at #142–44) and **DENIES** CSXT a stay pursuant to Part III of its Motion (*id.* at #145–48).

      **SO ORDERED.**

 November 30, 2020
**DATE**

        **DOUGLAS R. COLE**
        **UNITED STATES DISTRICT JUDGE**