**SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
**Anita Tingley on 10/28/2021**

```
 1            IN THE UNITED STATES DISTRICT COURT

 2               SOUTHERN DISTRICT OF OHIO

 3                    WESTERN DIVISION

 4                       - - -

 5   SCHOBERT, et al.,           :
                                 :
 6         Plaintiffs,           :
                                 :
 7            vs.                : Case No. 1:19-cv-00076
                                 :
 8   CSX TRANSPORTATION, INC.,   :
                                 :
 9         Defendant.            :

10

11                       - - -

12                   Deposition of

13                   ANITA TINGLEY

14

15        Taken via Zoom Videoconference

16

17        On October 28, 2021 at 9:38 a.m.

18

19        Reported By:  Nancy J. Rodriguez.

20                       - - -

21

22

23

24

25
```

**SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
**Anita Tingley on 10/28/2021**                    **Pages 2..5**

**Page 2**

```
 1  APPEARANCES:
 2          JOSEPH F. ALBRECHTA, Esquire
            Albrechta & Coble, Ltd.
 3          2228 Hayes Avenue, Suite A
            Fremont, Ohio  43420
 4          419.332.9999
            jalbrechta@lawyer-ac.com
 5
            and
 6
            ELIZABETH S. TUCK, Esquire
 7          The Tuck Firm, LLC
            810 Sycamore Street, 4th Floor
 8          Cincinnati, Ohio  45202
            513.545.6781
 9          lisa@tuckfirm.com
10               On behalf of the Plaintiffs.
11
            THOMAS R. CHIAVETTA, Esquire
12          Jones Day
            51 Louisiana Avenue, N.W.
13          Washington, D.C.  20001-2113
            202.879.3939
14          tchiavetta@jonesday.com
15               On behalf of the Defendant.
16
17                    - - -
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1              Thursday Morning Session,
                October 28, 2021
 2              9:38 a.m.
 3                   - - -
 4          STIPULATIONS
 5       It is hereby stipulated by and between
 6  counsel for the respective parties herein that the
 7  deposition of ANITA TINGLEY, a witness, may be taken
 8  at this time in stenotypy by the Notary; that said
 9  deposition is being taken pursuant to Notice of
10  counsel; that said deposition may be reduced to
11  writing in stenotypy by the Notary, whose notes may
12  thereafter be transcribed out of the presence of the
13  witness; that proof of the official character and
14  qualifications of the Notary are waived; the time and
15  place of the taking of said deposition are waived.
16                   - - -
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1              I N D E X
 2                   - - -
 3  Witness:                              Page
 4  Anita Tingley
 5      Cross-examination, by Ms. Tuck       5
 6                   - - -
 7          E X H I B I T S
 8  Deposition Exhibits                   Page
 9  Exhibit XX  - Notice of Deposition      24
10  Exhibit YY  - Amended Responses         33
11  Exhibit ZZ  - Business requirements for
                  the CAPS policy           49
12
    Exhibit AA1 - FMLA Q & A                62
13
14                   - - -
15
16
17
18
19
20
21
22
23
24
25
```

**Page 5**

```
 1          P R O C E E D I N G S
 2                   - - -
 3              ANITA TINGLEY
 4      being by me first duly sworn, as hereinafter
 5      certified, testifies and says as follows:
 6              CROSS-EXAMINATION
 7  BY MS. TUCK:
 8      Q    Good morning, Ms. Tingley.  My name is
 9  Elizabeth Tuck, and I'm an attorney for two, one
10  current and one former employee at CSX, Tony
11  Schobert and Andy Dork.  I'm here to ask you some
12  questions relating to their lawsuit against CSX
13  Transportation, primarily related to how they are
14  FMLA leave and people like them, their FMLA leave
15  sort of interact with different policies and
16  procedures or impacted by policies and procedures
17  of CSX.  So that's why we are here today.
18          So I will be asking you, I think,
19  primarily questions about the CAPS program.
20          Have you ever been deposed before?
21      A    Yes.
22      Q    Okay.  How long has it been?
23      A    I did two depositions this year.
24      Q    Oh, okay.  So you're a pro.
25          Were those on behalf of CSX?
```

**SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
**Anita Tingley on 10/28/2021**

Pages 6..9

Page 6

```
 1    A      Those were different than this one.
 2    Q      Okay.  But they were in your
 3 employment.  It wasn't like a personal issue.
 4    A      It was for CSX.
 5    Q      All right.  Usually, the rules are
 6 about the same, but I will just kind of go through
 7 them quickly.
 8           So the first is that this is your
 9 deposition, not mine or anyone else's, so if you
10 need a break for any reason, you should speak up
11 right away and let us know.  The only kind of
12 thumb there, if I have a question pending, you
13 need to answer the question before you take a
14 break.  I'm hoping this won't go too terribly
15 long, but we will probably take at least one or
16 two breaks, you know, that I'll initiate.  But if
17 there is any time that you feel like you need a
18 break, you should go ahead and let us know and we
19 can accomodate that.
20           We are doing that remotely, so it's
21 especially important that we not talk at the same
22 time as anyone else.  So we got Nancy here, she is
23 taking down everything that we have to say; and
24 it's difficult for her, even when we are in the
25 same room to get everybody when they are going at
```

Page 7

```
 1 the same time, but, in particular, with the audio,
 2 if people are talking over each other, sometimes
 3 that cancels the other person out.  So we just
 4 need to make sure that only one person is talking
 5 at once.  So if I'm asking a question and you feel
 6 like you know what the question is and you already
 7 know the answer, just wait until I'm finished
 8 asking the question so that Nancy can get what
 9 everybody has to say on the record.
10           Same thing, from time to time, your
11 attorney, Mr. Chiavetta, will probably have some,
12 you know, objections to my questions.  Just let
13 him say whatever he needs to say, and then you can
14 go ahead and answer the question.  You do have to
15 answer all of the questions, unless he tells you
16 do not answer the question.  Okay?
17    A      Yes.
18    Q      All right.  So let's see, speaking of
19 questions, so like I said, I'm going to be asking
20 you a lot of questions today.  If for any reason
21 you do not understand the question, prior question
22 or all the question, forget the question, you
23 don't hear the question, anything like that,
24 again, please let us know right away.  I will do
25 my best to restate or revise or reask the question
```

Page 8

```
 1 in a way that you understand.  If you go ahead and
 2 answer a question, the assumption will be that you
 3 heard and understood the question.  Okay?
 4    A      Yes.
 5    Q      All right.  Let's start with the easy
 6 stuff.
 7           Can you state and spell your name for
 8 the record, please.
 9    A      Anita, A-N-I-T-A, Tingley,
10 T-I-N-G-L-E-Y.
11    Q      Do you have a middle name?
12    A      Marie, M-A-R-I-E.
13    Q      What is your current home address?
14    A      2760 Myra Street, M-Y-R-A,
15 Jacksonville, Florida, 32205.
16    Q      And how long have you been at that
17 address?
18    A      It's probably been about three,
19 three-and-a-half years.
20    Q      What was your address prior to that?
21    A      It was Dongalla, 6945 Dongalla Court,
22 Jacksonville, 32211.
23    Q      And how long were you at that address?
24    A      Since probably 2001, I think.
25    Q      Okay.  Do you have a cell phone that
```

Page 9

```
 1 you use for work ever?
 2    A      I have a personal cell phone.
 3    Q      Do you use it for work ever?
 4    A      Yes.
 5    Q      Okay.  What's the number?
 6    A      904-422-1362.
 7    Q      What is your carrier?
 8    A      Verizon.
 9    Q      And how long have you been with
10 Verizon, roughly?
11    A      At least five years.
12    Q      Okay.  And have you had that number
13 for at least five years as well?
14    A      Yes.
15    Q      What is your month and year of birth?
16 Not the date.
17    A      August 1968.
18    Q      Okay.  So as we -- as I mentioned,
19 we're going to be talking today primarily about
20 the CAPS policies and processes at CSX.
21           Do you understand what I mean when I
22 say CAPS?
23    A      Yes.
24    Q      Okay.  What do you understand CAPS to
25 mean?
```

**SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
**Anita Tingley on 10/28/2021**                        Pages 10..13

1    A     Crew Attendance Point System.
2    Q     And what is the Crew Attendance Point
3  System briefly?
4    A     It is a system that houses and
5  maintains our attendance policy for our craft
6  employees.
7    Q     Did you say "Craft employees"?
8    A     Yes.
9    Q     C-R-A-F-T?
10   A     Correct.
11   Q     Does that stand for something?
12   A     Union employees.
13   Q     Oh, union employees.  Okay.  All union
14 employees at CSX or just certain ones?
15   A     There are certain craft employees or
16 union employees that are under the point system
17 and CAPS.
18   Q     Okay.  Are all train and engine
19 employees subject to CAPS?
20   A     Yes.
21   Q     And is CAPS applied uniformly across
22 all of those employees regardless of union?
23   A     There are different points for
24 different departments, but it is a point system.
25   Q     Okay.  So train and engine employees,

1  regardless of union, do they receive the same
2  points?
3    A     Yes.
4    Q     And the same disciplinary process?
5    A     Yes.
6    Q     Including counseling letters, under
7  the old policy?
8    A     Yes.
9    Q     And isn't it correct that the CAPS
10 policy was changed in 2009 at some point?
11   A     June 1, 2019.
12   Q     Okay.  Did I say 2009?
13   A     Yes.
14   Q     I haven't had all my coffee yet.
15         All right.  So changed in June, you
16 say June 1st of 2019, right?
17   A     Yes.
18   Q     Okay.  So when I say the old policy,
19 you understand that to be the policy in place
20 prior to June 1, 2019, correct?
21   A     Correct.
22   Q     So what is your current position?
23   A     Senior manager labor relations.
24   Q     And what briefly are your
25 responsibilities in your current position?  I said

1  to someone yesterday, what would you put on your
2  resume in terms of --
3    A     I handle all the attendance for our
4  craft employees that be under the attendance
5  policy, sending -- we send long-term medical
6  letters when employees are out so that they can
7  send in documentation.  We process when employees
8  are either recalled or they just stop coming to
9  work.  There is processes in each agreement to
10 remove their seniority.  Dealing with anything
11 with the availability of our employees, our
12 incentive programs for the employees to work.  I
13 handle the train and engine vacation scheduling
14 each year for the next year.
15   Q     Okay.  So you handle those issues for
16 craft employees only?
17   A     Yes.  For our union employees, yes.
18   Q     Okay.  I don't know that this matters,
19 but do you know what craft stands for or where the
20 word craft comes from in terms of referring to
21 union employees?
22   A     Well, each one of them, like a train
23 or engine employee, that's their craft.
24 Engineering would be like the BMWE craft.  It's
25 like their agreement, craft.

1    Q     Okay.  So it really is craft in the
2  traditional sense of the word, my craft is to
3  drive a train kind of thing?
4    A     Yes.
5    Q     Okay.  So it's not really an acronym.
6  It's really just more of a description, fair?
7    A     Yes.
8    Q     Okay.  All right.  When you say
9  incentive programs, you are talking about
10 attendance incentive programs?
11   A     Yes.
12   Q     What are the attendance incentive
13 programs that CSX has?
14   A     Well, right now we are buying back
15 entitlements or vacation, and if the employee --
16   Q     Let's -- yeah.  You know what, I
17 should clarify.  Let's stick to -- well, how long
18 have you been in this position?  Let's ask that.
19   A     I have been the manager over the
20 attendance since 2009.  My title has changed from
21 manager to -- into we went to the safety
22 department, then in labor relations where I was
23 senior manager field administration and then
24 senior manager labor relations.  It's been the
25 same job.  It's just different titles since 2009,

**SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
**Anita Tingley on 10/28/2021**                    Pages 14..17

Page 14

1  and I was a specialist since 2000 in the
2  attendance department.  So it's been 22 years in
3  attendance.
4       Q     Okay.  So you've been, essentially,
5  the person responsible for handling the
6  responsibilities that you just enumerated that you
7  just listed since 2009, you've just had sort of a
8  different title, right?
9       A     Yeah.
10      Q     Is that fair?
11      A     Yes.
12      Q     Okay.  All right.  So we're going to
13  be talking today strictly about the period of time
14  between, well, for the most part, between, the
15  years 2016 through 2019.  Okay?
16            So what incentive programs, attendance
17  incentive programs did CSX have in place during
18  that period of time?
19      A     For the engineers, they have the
20  demand date and stock incentive program.
21      Q     Okay.  Anything else for the engineers
22  in that timeframe?
23      A     No.
24      Q     As an attendance incentive program?
25      A     No.

Page 15

1       Q     Okay.  What about conductors, or I
2  think they are also called trainmen?
3       A     Trainmen.  From 2015, they do not.
4  Until June of 2019, they were not under an
5  attendance incentive program.
6       Q     Okay.  So none till 2019.  Okay.  And
7  what was --
8       A     I'm sorry.  No.  You said through
9  June 1, 2019, there was none.
10      Q     Okay.  So none until June 1 of 2019.
11  Okay?
12      A     We -- I'm sorry.  But we do not
13  have -- the conductors did not have anything until
14  2021.
15      Q     Okay.  Let's start over.  So in the
16  years 2016 to 2019, and I understand CAPS changed,
17  you know, in June of 2019, but in terms of what
18  you refer to as attendance incentive programs, for
19  the engineers you said there were demand dates and
20  stock bonuses, and I just want to clarify nothing
21  for conductors in that period of time?
22      A     Correct.
23      Q     Including after June of 2019?
24      A     Correct.
25      Q     Okay.  And you said there's something

Page 16

1  that was added, did you say this year for
2  conductors?
3       A     2021, yes.
4       Q     Okay.  What was added this year for
5  conductors?
6       A     Buying back of the vacation or
7  personal leave days or daily vacation entitlement,
8  and then they have a markup incentive program, and
9  then they have a drive for success program.
10      Q     So you told me about all of the
11  attendance incentive programs available to
12  engineers and conductors for 2016 to 2019.  I know
13  that there are none for conductors.
14      A     Yes.
15      Q     Okay.  Who do you report to in your
16  current role?
17      A     Shannon Scott.
18      Q     What is her title?
19      A     Senior director labor relations.
20      Q     And do you know who she reports to?
21      A     Jeff Wall.
22      Q     And what is his title?
23      A     Vice president labor relations.
24      Q     Is labor relations different than Crew
25  Management?

Page 17

1       A     Yes.
2       Q     Generally speaking, do you have an
3  understanding what the labor relations -- do you
4  call it the department or area?
5       A     Department.
6       Q     Okay.  Generally speaking, what is the
7  labor relations department responsible for at CSX,
8  if you know?
9       A     Well, there is different parts of
10 labor relations, but there is HDOs or highest
11 designated officers of the agreement which deal
12 with the general chairman on the agreement, the
13 interpretation of what the agreements state.
14 Field administration falls under labor relations,
15 and that is a system that shows all of the
16 employee's history for absenteeism or under the
17 IDPAP policy, and the attendance, we all fall
18 under labor relations department.
19      Q     Okay.  What about discipline of the
20 craft employees is that under labor relations?
21      A     Yes.  That is the IDPAP policy.
22      Q     Okay.  So when you say or I read IDPAP
23 policy, what is that?
24      A     Inner development performance -- I
25 don't know.  I'd --

**SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Anita Tingley on 10/28/2021
Pages 18..21

Page 18

```
 1     Q      Okay.
 2     A      I'd have to look it up.
 3     Q      I guess I should ask, like, generally
 4  speaking, what does that policy encompass?
 5     A      So when the employees if there is a
 6  rule violation out in the field, if they didn't
 7  wear their safety glasses or they didn't follow
 8  any major or minor rules of our safety rules, then
 9  the employee would be handled under a policy for
10  that.
11     Q      Okay.  So if the -- so IDPAP, that's
12  when someone breaks a rule of the company,
13  essentially?
14     A      Yes.
15     Q      Okay.  So we're going to be showing
16  you some documents today.  Well, actually, let me
17  ask you this:  You say you've been deposed twice
18  this year for CSX.  Did any of it have to do with
19  the CAPS policy?
20     A      Yes.
21     Q      And do you remember what case that
22  was?
23     A      No.
24     Q      Was Mr. Chiavetta present?
25     A      I'm trying to think if -- no, it was a
```

Page 19

```
 1  different lawyer.
 2     Q      Did they ask you questions about CAPS
 3  and FMLA?
 4     A      They asked about the CAPS policy.
 5     Q      Did they ask about FMLA and how FMLA
 6  works with the CAPS policy?
 7     A      No.
 8     Q      What was the nature of the case as you
 9  understand it?
10     A      The cases had to do with charges under
11  the other policy, and then they were asking
12  questions about how the CAPS policy, if it
13  intermingled with the other IDPAP policy.
14     Q      Okay.  And you say charges under the
15  other policy.  Is that the 2015 policy?
16     A      No.  The IDPAP policy, like when
17  someone, like, breaks a work, like, rule, like out
18  in the field.
19     Q      Okay.  So they were asking you how
20  CAPS interacts with IDPAP?
21     A      Correct.
22     Q      And how those two disciplinary
23  processes work together or don't; is that correct?
24     A      Correct.  Yes.
25     Q      And were they asking with respect to
```

Page 20

```
 1  2019 forward or prior to that or both?
 2     A      It was in the 2015 policy.
 3     Q      In the 2015 policy.  Okay.  And were
 4  both depositions in the same case that you said
 5  you had?
 6     A      They were the same lawyer, two
 7  different cases.
 8     Q      Same lawyer, two cases.  Same lawyer
 9  on the other side or same lawyer on your side?
10     A      Both.
11     Q      Oh, okay.  Well, busy lawyers.  All
12  right.
13            Other than those two times, have you
14  ever been deposed before?
15     A      Yes.
16     Q      Have you been deposed for CSX --
17     A      Yes.
18     Q      -- before other than those two times?
19     A      Yes.
20     Q      Prior to those depositions, when did
21  those depositions take place?  How many times?
22     A      It's probably been about at least
23  three other times.
24     Q      Okay.  I think you and Jolanda Johnson
25  might get my award for the most deposed people
```

Page 21

```
 1  I've ever had the pleasure of talking to in this
 2  context.  My goodness.
 3            Okay.  All right.  Do you have -- do
 4  you remember when those depositions took place,
 5  even if it is just the year, roughly?
 6     A      No.  It's been probably within the
 7  last five or six years.  I couldn't pinpoint.
 8  Like the last one was probably, what, two, maybe
 9  two years ago, I think, before the ones in 2021.
10     Q      In any of those depositions, did you
11  talk about FMLA leave?
12     A      Yes.
13     Q      How many of those depositions do you
14  remember talking about FMLA leave?
15     A      One.
16     Q      Around how long ago was that?
17     A      I think that was the one that was
18  about two years ago.
19     Q      Do you remember whether the case was
20  called Bell versus CSX?
21     A      I think that is the one.
22     Q      Rings a bell?  I couldn't resist.  I'm
23  sorry.  We got to have a little fun with these,
24  right?  Other than that or I've just been doing
25  this too much this week, and I'm getting punchy,
```

**SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
**Anita Tingley on 10/28/2021**                    Pages 22..25

Page 22

1 but, anyway, that could be the case.
2          All right.  So your testimony in that
3 case, did that surround FMLA and CAPS and how
4 those two interacted?
5     A     Yes.
6     Q     Okay.  Have you ever read a copy of a
7 transcript of that testimony?
8     A     No.
9     Q     Okay.  All right.  Let me get some
10 documents here.
11          MS. TUCK:  Micaela, can you put up the
12 Notice of Deposition, please.
13 BY MS. TUCK:
14     Q     Okay.  So a little bit about exhibits.
15 I'm sure you've dealt with exhibits before in
16 prior depositions.  You know, a lot of times
17 normally in the before times you would have been
18 in a conference room and you would have been able
19 to, you know, read these documents, you know, sort
20 of at your leisure and at your pace.  Because we
21 are doing it this way with the share screen --
22 have you done a deposition over Zoom or something
23 like this before?
24     A     Yes.
25     Q     Okay.  All right.  So probably

Page 23

1 similar, you know, we're going to be showing you
2 these documents, and some of the questions, you
3 know, it may be just we're asking you to identify
4 a document, and so I might ask Micaela to kind of
5 scroll through them at medium pace so you can kind
6 of just see what it is.  Others we will be having
7 more specifically about.  But if you need her to
8 scroll to another page, go to a past document that
9 you've already seen, fast or slow or whatever,
10 please speak up and let her know what pace you
11 need or page you need or what it is you need to
12 look at because we want to make sure that you
13 have, you know, an adequate opportunity to look at
14 the document in this way, so.
15          MS. TUCK:  All right.  So, Micaela,
16 can you just kind of scroll through medium through
17 this.  Okay.  All right.  You can go back to the
18 top.  Thank you.
19 BY MS. TUCK:
20     Q     So, Ms. Tingley, do you recognize this
21 document?
22     A     Yes.
23     Q     So this is a Notice of your deposition
24 for today.  And you've received a copy of this
25 document?

Page 24

1     A     Yes.
2     Q     And you read the document at some
3 point after you received it and before today,
4 right?
5     A     Yes.
6          MS. TUCK:  All right.  Can you scroll
7 down, Micaela, to A.  Okay.
8 BY MS. TUCK:
9     Q     Are you prepared to testify today on
10 behalf of the company with respect to the topics
11 listed here under A?
12     A     Yes.
13     Q     You understand your testimony today
14 will be on behalf of the company, right?
15     A     Yes.
16     Q     Okay.  I've already asked, did you
17 have that understanding before I showed you that
18 document, that your testimony today is on behalf
19 of the company?
20     A     Yes.
21     Q     And your answers prior to me showing
22 this document were on behalf of the company in
23 that capacity, right?
24          MR CHIAVETTA:  Objection to form.
25     A     Yes.

Page 25

1     Q     I'm sorry.  Can you repeat your
2 answer, Ms. Tingley?
3     A     Yes.
4          MR CHIAVETTA:  I objected.  You can
5 answer, though.
6          THE WITNESS:  Yes.
7 BY MS. TUCK:
8     Q     Thank you.
9          All right.  And then if you could
10 scroll down to the next page.  And then
11 communications, this is something that I think my
12 co-counsel, Mr. Albrechta, will be talking to you
13 about perhaps later in the day.
14          But is this something that you also
15 are prepared to testify to on behalf of the
16 company today?  Ms. Tingley, are you there?
17     A     I'm reading it.
18     Q     Oh, okay.  Sorry.
19     A     Yes.
20     Q     Okay.  So the answer is yes, right?
21     A     Yes.
22     Q     Okay.  Thank you.  Let's see.
23          MS. TUCK:  Okay, then you can stop
24 sharing this.  Let's go off the record.
25          (Discussion off the record.)

**SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
**Anita Tingley on 10/28/2021**                    Pages 26..29

Page 26

1          MS. TUCK:  Micaela, can you put up the
2  first responses to interrogatories to their Rule
3  56 -- let me see what it is called here.  Yeah.
4  Defendant Responses 8/26/20.
5          Okay.  All right.  So we're just going
6  to scroll through this sort of at a medium speed
7  so you can kind of identify this.  All right.
8  Slow down a little bit.  Okay.  Keep going.
9          Okay.  Now you can skip down to
10  Ms. Tingley's signature.  Here we go.
11  BY MS. TUCK:
12      Q      Okay.  So, Ms. Tingley, do you
13  recognize this document?
14      A      Yes.
15      Q      This is CSX's responses to our first
16  interrogatories.  Basically about, in part, the
17  CAPS policy.
18          So did you -- is this your signature
19  on this page?
20      A      Yes.
21      Q      Okay.
22          MS. TUCK:  Can you scroll up a little
23  bit there, Micaela.  Okay.
24  BY MS. TUCK:
25      Q      And I understand that you changed or

Page 27

1  you were involved in changing some of the
2  responses to the first version of these; is that
3  correct?
4      A      Yes.
5      Q      At the time that you signed this
6  verification, did you believe that the responses
7  to the interrogatories for which you assisted,
8  that those answers were true and correct?
9      A      When I signed it, I did not see the --
10  I did not notice that the union business should
11  have been stated differently than what it was when
12  I signed it.
13      Q      Did you bring that -- okay.  So after
14  you signed this, did you at some point realize
15  that you had made that mistake?
16      A      Yes.  It was brought to the attention
17  that that was incorrect.
18      Q      It was brought to your attention or
19  you brought it to someone else's attention?
20      A      It was brought to the attention that
21  it was incorrect when going through the document.
22      Q      It was brought to the attention of
23  who, you or someone else?
24      A      When having conversation on it, it
25  was, like, well, that is incorrect.

Page 28

1          MR CHIAVETTA:  Hold on.  Hold on,
2  Anita.
3          It's not -- I need to -- Lisa, I need
4  to consult with the witness because I need to make
5  sure that she is not revealing privileged
6  communications.
7          MS. TUCK:  Well, maybe I can just ask
8  the question a different way.
9  BY MS. TUCK:
10      Q      Ms. Tingley, did you figure out on
11  your own that the responses, at least in part,
12  were not correct?  Did you figure that out on your
13  own?  Just a yes or no without talking about the
14  process.
15      A      No.
16      Q      Okay.  Did the policy change at any
17  point between when you amended, when you first
18  signed this and then when you amended your
19  answers --
20      A      No.
21      Q      -- did the policy change?
22          Did any procedure at CSX change with
23  respect to CAPS?
24      A      No.
25      Q      All right.  So if you -- let's go up

Page 29

1  to the chart on page 6.  Actually, let's go to
2  page 5.
3          Okay.  So your signature stated that
4  you verified the responses to this interrogatory,
5  correct?
6      A      No.
7          MS. TUCK:  Can you scroll down so she
8  can see the whole thing and the response.  You
9  don't -- she doesn't -- there you go.  Perfect.
10  BY MS. TUCK:
11      Q      Is that correct?
12      A      Correct.
13      Q      Okay.  And when you answered this
14  question the first time, did you understand the
15  interrogatories to be asking about category --
16  what did you understand the question to be in
17  terms of describing every category of paid or
18  unpaid leave?  What was your understanding as to
19  paid or unpaid at the time that you first answered
20  this?
21      A      So paid just means that I get paid for
22  the day, or unpaid means that if I'm in an unpaid
23  mark off, that I do not get paid for that day.
24      Q      Paid by who?  And I'm talking about
25  your understanding when you first signed these.

**SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
**Anita Tingley on 10/28/2021**                                    Pages 30..33

Page 30

1  Paid by anybody?  Or paid by CSX?
2      A     Paid by CSX.
3      Q     And at the time that you verified your
4  responses, did you believe them to be truthful in
5  that respect that the items that you -- let's go
6  down to the chart so she can take a look at the
7  chart.  Okay.  Let's leave it there.
8            And I can show it to you.  This isn't
9  really a trick question.  But when I compared the
10 two, it appeared that military meaning business,
11 that the responses were changed or amended.  Is
12 that your recollection as well?  I mean, I can
13 show you the document.  It's just --
14     A     So, yes.
15     Q     Okay.  And when you answered the
16 question as to whether union business was paid or
17 unpaid, you answered it as unpaid, and is that
18 because you understood unpaid to be unpaid by CSX?
19     A     Yes.
20     Q     Okay.  Now military you got sort of
21 this, like, footnote there.  Can we scroll down to
22 that.  You have got it as unpaid but with a
23 footnote.  And you say, "Engineers receive a pay
24 differential between their military pay and CSX
25 pay for training up."

Page 31

1            So why -- explain to me "up."  What
2  part of that -- why did you consider that at the
3  time to be unpaid?
4      A     The pay differential between military
5  pay and the pay for training, so it is up to 15
6  days for their training.
7      Q     Right.  So -- all right.  So when you
8  said military unpaid, I'm not sure I understand
9  your answer.  Are you saying that you said unpaid
10 because after 15 days they are unpaid?  Is that
11 what you mean?
12     A     Correct.  The military is when I am on
13 training, it is up to 15 days for training.
14     Q     Did you say when you are training?
15     A     No.  When the employee --
16     Q     Oh, okay.
17     A     -- if it is military pay.
18     Q     Okay.
19     A     It is up to 15 days for that training,
20 and they do receive pay differential between the
21 military pay and CSX pay.
22     Q     Okay.  So CSX pays something but not
23 their entire pay during that 15-day period, right?
24     A     So there is a pay differential when
25 they are on military pay, right, if there is a

Page 32

1  difference, and then they are paid up to 15 days
2  for their training periods during the year.
3      Q     Okay.  So just to use fake numbers,
4  right, for easy math.  If I normally make $200 a
5  day, and I know the pay for these folks is
6  extremely complicated, but I'm just trying to use
7  a hypothetical.  If my normal pay is $200 a day
8  and the military pay is $100 a day, then CSX makes
9  up that extra $100, right?
10     A     That would be a pay differential, yes.
11     Q     Okay.  So when you say "pay
12 differential," that's what you are talking about,
13 right?
14     A     Yes.
15     Q     Okay.  But for training, they just pay
16 them their normal salary or is it still a
17 differential or their normal pay, not salary?  So
18 do I get my $200 if I'm training, do I get $200 a
19 day from CSX under that math?
20     A     I would have to stop and look that up.
21     Q     Okay.  But there is some difference
22 between whether you are just getting the
23 differential and whether you are training or is it
24 still a differential?  That's what I'm trying to
25 figure out.

Page 33

1      A     As I stated, I would have to stop,
2  look it up to be able to completely answer that
3  question.
4      Q     Okay.  Where would you look that up?
5      A     Either it would be out on our Gateway
6  or I would have to get with the department that
7  handles that.
8      Q     What department handles that?
9      A     The military administrator.
10     Q     Oh, okay.  Are they part of the labor
11 relations department or somewhere else?
12     A     They are HR.
13     Q     They are in HR.  Okay.  All right.  We
14 can move on.
15           MS. TUCK:  All right.  So let's take a
16 look at the Amended Responses.  So that's called
17 Micaela's desk amend dated January 13, '21.  You
18 got that?  Okay.  Great.
19           So let's sort of medium scroll through
20 this as well.
21           This is going to be YY.  You can
22 probably go a little bit faster and, Ms. Tingley,
23 if you disagree, just let me know.  We are going
24 to just ask you if you recognize this to start.
25           Keep going.  Okay.  Keep going little

**SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
**Anita Tingley on 10/28/2021**                    Pages 34..37

Page 34

1  bit more.  All right.
2  BY MS. TUCK:
3      Q      So, Ms. Tingley, do you recognize this
4  document?
5      A      Yes.
6      Q      Okay.  This is the Amended Responses
7  to the Interrogatories that you responded to in
8  the version that we last looked at, right?
9      A      Yes.
10            MS. TUCK:  Okay.  And if you could go
11  to the -- let's go back up to first page.  Okay.
12            So we've got the same chart.
13            So let's go down.  Let's go down the
14  chart.  Okay.  Stop.
15  BY MS. TUCK:
16      Q      So in this chart we've got -- we've
17  taken off military and union, right?
18      A      Yes.
19      Q      Removed it off the chart.  Nothing
20  else changed, right?  Everything else is still
21  unpaid, yes, no, you didn't change any of those
22  answers?
23      A      That is correct.
24      Q      Okay.  Let's just actually take a
25  moment with this chart.

Page 35

1            How did you determine whether or not
2  these types of leave were paid or unpaid for their
3  purposes of this question?  What did you do to
4  answer that part of the question?
5            MR CHIAVETTA:  And, Anita, if the
6  answer involves discussions with counsel, you can
7  say you talked with counsel, but you can't get
8  into the substance of those discussions.
9            THE WITNESS:  Okay.
10  BY MS. TUCK:
11      Q      Other than communications with
12  counsel, what did you do to prepare the answer in
13  this chart as to whether something was paid or
14  unpaid?  Other than communications with counsel.
15      A      Well, the mark off, some of them are
16  unavailable days, which means that the employee
17  would not be paid for those days.  And then if
18  they are entitlements, then that would be a paid
19  day.
20      Q      So did you do this from memory or did
21  you go look at something or talk to someone other
22  than a lawyer?
23      A      From memory.
24      Q      From memory.  Okay.
25            So you were able to fill out the

Page 36

1  entire paid or unpaid column essentially from
2  memory, is that correct, or just certain ones?
3      A      Well, the ones that are being shown is
4  by memory.
5      Q      Okay.  So when you sat down to respond
6  to this question or assist in responding to this
7  question, did you identify these types of leave as
8  paid or unpaid on your own?
9            Well, let's just put it this way:  Did
10  your memory match up with what is reflected here?
11      A      With what is being shown, yes.
12      Q      Okay.  All right.  Now injury on duty,
13  that's unpaid, right?
14      A      Yes.
15      Q      Unpaid by anyone as far as you know?
16      A      It is unpaid by CSX.
17      Q      It is unpaid by CSX.  Okay.  Is it
18  paid by someone else?
19      A      I do not have knowledge of that.
20      Q      You don't know.  Okay.  All right.
21            MS. TUCK:  And then go back under the
22  chart.  Okay.  Little more.  Little more.  Right
23  there.  Okay.
24  BY MS. TUCK:
25      Q      Now, you took union and military off

Page 37

1  the chart, but then you added these explanatory
2  paragraphs regarding each one of those leaves.  Is
3  that a fair summary of what happened?
4      A      Yes.
5      Q      Okay.  And as you sit here today, are
6  those answers still true and accurate as you
7  verified in January of this year?
8      A      Yes.
9      Q      And that is your signature on the
10  verifications, right?
11      A      Yes.
12      Q      That we showed you.  Okay.
13            And in your responses you explain, and
14  if I'm mischaracterizing, please let me know, that
15  the union pays for the union time off.  So if
16  somebody is on union business, they are not paid
17  by CSX.  They are paid by the union, right?
18      A      Correct.
19      Q      And we already discussed the military
20  pay, bus is our discussion we had with respect to
21  the military pay on the last version, essentially,
22  what you are explaining here, which is that there
23  is a differential?
24      A      Yes.
25      Q      And that long-term, it is unpaid,

**SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Anita Tingley on 10/28/2021                    Pages 38..41

Page 38

1  right?
2      A      For the long-term it says --
3             MR CHIAVETTA:  Micaela, can you just
4  scroll down just so we can see the full -- thank
5  you.
6             MS. TUCK:  Oh, sorry.
7             MR CHIAVETTA:  No, that's okay.
8  BY MS. TUCK:
9      Q      So if someone is on military leave for
10 more than 15 days, are they unpaid?
11     A      It says that for military
12 mobilizations up to five years, employees on
13 military leave are eligible for a pay differential
14 between their military pay and CSX pay for
15 training up to 15 days per year and for
16 involuntary mobilizations up to five years.
17     Q      Okay.  So does that mean that if I'm
18 training I get differential for 15 days, right?
19     A      Yes.
20     Q      Okay.  And if I get deployed, I get a
21 differential, right?
22     A      Involuntary mobilization up to five
23 years.
24     Q      Okay.  Well, isn't involuntary
25 mobilization essentially deployment?

Page 39

1      A      It would be anything over like the 30
2  days, yes.
3      Q      Well, it didn't say over 30 days, it
4  says involuntary mobilization.  So what does
5  involuntary mobilization mean?
6      A      Deployed for long-term.
7      Q      Okay.  So if I'm on military leave for
8  more than 15 days but I am not involuntarily
9  mobilized, that period of time is unpaid, right?
10     A      Yes.
11     Q      And once that, if I'm not receiving a
12 pay differential, if it is unpaid, then I am not
13 eligible for the good attendance credit or am I
14 still eligible for good attendance credit?
15     A      Ineligible.
16     Q      Okay.  Is that spelled out somewhere
17 in a policy or a document, anywhere other than
18 this place, this response?  The fact that if you
19 are in that post-15 day period that you are
20 ineligible for the good attendance credit, is that
21 spelled out anywhere?
22     A      No.
23     Q      Okay.  So how do you know that to be
24 the case?  Did you just make that decision now or
25 did someone tell you that?

Page 40

1      A      Because under the CAPS policy there
2  are certain reasons or that employees are eligible
3  for a good attendance credit and when employees
4  are not eligible for a good attendance credit.
5      Q      Is military leave ever eligible for
6  good attendance credit?
7      A      Yes.
8      Q      When is it eligible for good
9  attendance credit?
10     A      When the employee is being paid for
11 their 15 days per year short-term military.
12     Q      Has that always been the practice
13 since 2016?
14     A      Since 2015, yes.
15     Q      Okay.  So if you got the pay
16 differential, you were eligible for the good
17 attendance credit, but if you weren't, you did not
18 get the good attendance credit, right?
19     A      Correct.
20     Q      Have you ever become aware -- has
21 there ever been a circumstance where somebody took
22 more than 15 days of military leave and was not
23 deployed?
24     A      Not to my knowledge.
25     Q      Okay.  So the situation that I just

Page 41

1  described, as far as you know is just a
2  hypothetical, it is something that hasn't had to
3  have been decided to CSX as far as you know?
4             MR CHIAVETTA:  Object to form.
5             You can answer.
6      Q      Since 2015?
7      A      Could you ask the question again?
8      Q      Well, so remember I asked you what
9  happens if, you know, you exhaust your 15 days of
10 pay differential but you are not not deployed, are
11 you ineligible for the good attendance credit, and
12 you said yes you are not eligible for the good
13 attendance credit, right?
14     A      Correct.
15     Q      And I asked you if that was set forth
16 or written down anywhere and you said no.  And
17 then I asked if to your knowledge if it ever
18 happened and I believe you said no.  So is all of
19 that correct, what I just said?
20     Q      Okay.  So as far as you know, the
21 company has never had to make that decision as to
22 whether or not they get the good attendance credit
23 or not, right?
24     A      I don't know if anybody has been not

**SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
**Anita Tingley on 10/28/2021**                          Pages 42..45

---

Page 42

1  paid for anything over 15 days.  But if somebody
2  was off in a military leave status, short-term
3  military leave and it was past that time, then if
4  it was within the time period for that six-month
5  look back for the good attendance credit and if
6  that was the only reason that the employee, right,
7  was off, then the employee would not receive the
8  good attendance credit if it is over those 15
9  days.
10     Q     And you know this why again?
11     A     Because that is in our policy and that
12  is how our system works.
13     Q     Okay.  So you don't -- you are not
14  aware of that ever actually happening, but your
15  understanding of the policy, that's what you
16  believe would happen, right?
17     A     That is what the policy is, and that
18  is how the system is set up.
19     Q     Okay.  So is this like a computerized
20  system that would make that decision?
21     A     CAPS is in a computer system, yes.
22     Q     Okay.  So what is that system called?
23     A     CAPS.
24     Q     It's a computerized system called
25  CAPS?

Page 43

1     A     The program is CAPS.
2     Q     And the program resides where, in what
3  system?
4     A     In Crew.  Crew Web.  I'm sorry.
5     Q     Is Crew Web another name for Crew
6  Life?  We've heard about Crew Life.
7     A     Crew Life is a -- no.  It is
8  different.
9     Q     Okay.  So what's the difference
10  between Crew Life and Crew Web?
11     A     Crew Life is where the employees can
12  go out.  It is like a web, www.CrewLife.com or CSX
13  something .com where they can go out, they can see
14  their standing, they can see the trains, they
15  can -- there is certain statuses that the
16  employees can mark off using Crew Life.  They can
17  take and sign up for TECS to work from Crew Life.
18          Crew Web is layer system that deals
19  with our T&E employees, our house.
20     Q     Okay.  So do T&E employees just, not
21  management employees, but do T&E employees have
22  access to Crew Web?
23     A     Certain things in Crew Web, yes.
24     Q     Okay.  What do they have access to in
25  Crew Web that they don't have access to in Crew

Page 44

1  Life?
2     A     Their CAPS employee detail page.
3     Q     Anything else?
4     A     Hours of service is in there.  Payroll
5  is in there.  And they may be able to get to those
6  other two things from Crew Life.  But for their
7  CAPS employee detail page, they cannot get to that
8  from Crew Life.  They can see their points, but
9  they cannot see the detail.
10     Q     Okay.  So and in Crew Web, how do they
11  get on to Crew Web?  Is that not through the
12  Internet or --
13     A     They can go onto the Gateway, and
14  under tools they can click on under that, and it
15  says CAPS, and they click on that, and it will
16  take them to their employee detail page.
17     Q     Okay.  Are there things on -- and
18  Gateway essentially is the company's intranet,
19  right?  Do you understand what I mean when I say
20  that?
21     A     Yes.
22     Q     And we've heard some testimony about
23  Gateway and what kinds of things are on there.
24  Are there any tools on Gateway with respect to
25  CAPS for train and engine employees other than

Page 45

1  just, you know, this sort of point and detail
2  information that you just explained?
3     A     There's the CAPS policy, the question
4  and answers, a fax document for the employees if
5  they want to send in information to the medical
6  department of what information needs to be sent.
7     Q     Okay.
8     A     It has the FMLA phone number.  It has
9  ongoing injury and illness form out there for the
10  employees.  It has all the information, our 800
11  number, our attendance email address.  Any
12  information they would need for attendance is
13  there for them.
14     Q     Okay.  So you've got the CAPS policy,
15  the Q & A, there's a fax cover for the medical
16  department.  Then you said an injury or illness
17  form, right?
18     A     Yes.
19     Q     And then some contact information for
20  your department and some other areas, fair?
21     A     For my department is the email
22  address, phone numbers to contact us.
23     Q     And you said the FMLA phone number as
24  well?
25     A     FMLA, and then FMLA questions and

---

**SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
**Anita Tingley on 10/28/2021**                                    Pages 46..49

---

Page 46

1  answers and medical department phone numbers and
2  fax numbers.
3      Q      So there is FMLA Q & A available to
4  someone on there through the Gateway?
5      A      Yes.
6      Q      And that's part of your -- that's part
7  of the attendance area that you provide that
8  information?
9      A      It's on the employee detail page.
10     Q      It's on the employee detail page.
11     Are the FMLA Q & As, are they specific
12  to attendance or is that just kind of a reprint
13  of -- what kind of information is on the FMLA
14  Q & A?
15     A      It's from the FMLA department that was
16  put together.
17     Q      What kind of information is on there?
18     A      I would have to review the document to
19  tell you exactly what's in the document.  But
20  there is a FMLA question and answer that is on
21  there on the page for the employees.
22     Q      Okay.  On that employee --
23     A      Detail.
24     Q      -- detail.  Okay.
25     Is that something that on a break you

Page 47

1  could easily find and send to Mr. Chiavetta?
2      A      Yes.
3      Q      Okay.
4      MS. TUCK:  Tom, do you have any
5  objection to that?
6      MR CHIAVETTA:  No.  I'll take a look
7  at it.  I don't know if it's something that's been
8  produced or not, frankly, but we'll take a look at
9  it.
10     MS. TUCK:  Okay.  Well, if it has
11  already been produced, you know, if it wasn't
12  produced as something that was CAPS related, so it
13  sounds to me, if it has been already produced, if
14  you wouldn't mind letting us know what the Bates
15  number is.  But I don't remember seeing anything
16  like that based on the description.  Okay.
17  BY MS. TUCK:
18     Q      All right.  Anything else that is sort
19  of informational in that Gateway space with
20  respect to attendance, other than just sort of
21  contact information for various things or people?
22     A      For attendance, that is the
23  information that I went through.
24     Q      Okay.  So we got the detail.  When you
25  say detail, you're talking about, you know, the

Page 48

1  detail of their points, right?
2      A      Yes.
3      Q      Does that detail also show the good
4  attendance credit?
5      A      Yes.
6      Q      You say the CAPS policy, a Q & A, the
7  medical department fax number, the injury and
8  illness form, FMLA Q & A.  Anything else other
9  than contact information in that space?
10     A      No.
11     Q      All right.
12     MS. TUCK:  Do you want to take a short
13  break and maybe we can find that Q & A?
14     MR CHIAVETTA:  Yeah.
15     Anita -- are we off the record.
16     MS. TUCK:  Yeah, we can go off the
17  record now.
18     (Recess taken.)
19     MS. TUCK:  Okay.  So we're back on the
20  record.
21     Micaela, can you pull up the document
22  that was sent this morning at 9:47, Bates number
23  29262.
24     Nancy, the initial interrogatories
25  that we discussed, the first version that was

Page 49

1  previously marked as PP.  So that is not going to
2  be YY.  Okay?
3      THE REPORTER:  Okay.
4      MS. TUCK:  All right.  The second
5  version, the second interrogatories that we
6  discussed are YY.  So this is going to be ZZ, I
7  think.  Right?  Okay.
8  BY MS. TUCK:
9      Q      Ms. Tingley, do you know -- this was
10  produced to us this morning.  Do you know what
11  this document is?
12     A      It's the business requirements for the
13  CAPS program.
14     Q      Okay.  Have you seen this document
15  before?  I mean, anything that you need to see in
16  the document to identify it, just let us know.  I
17  mean, we can scroll through it if you want.  It's
18  72 pages.
19     A      Yes, I have seen it.
20     Q      Okay.  Have you provided this to
21  anyone in this lawsuit before today?
22     A      No.
23     Q      Did you provide it to anyone
24  yesterday?
25     A      I sent it to Tom.

**SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
**Anita Tingley on 10/28/2021**                    Pages 50..53

Page 50

1    Q       Yesterday?
2    A       It was late last night.
3    Q       Okay.  Were you responsible at any
4 point for gathering any documents to respond to
5 requests for documents in this lawsuit prior to
6 yesterday?
7    A       Yes.
8    Q       Is there a reason why you didn't
9 produce this initially?
10   A       Because the CAPS policy --
11   Q       No.  Is there a reason why you did not
12 produce, why you waited until yesterday to provide
13 this document?
14   A       Because the documents for the CAPS
15 policy is the policy in the questions and answers.
16 This is a business requirement that takes the
17 policy and puts it into a system.
18   Q       Why did you decide to provide it
19 yesterday?
20           MR CHIAVETTA:  Anita, if it was based
21 on discussions with an attorney, you can say that
22 but don't get into the substance of the
23 discussions.
24           THE WITNESS:  Based on conversation
25 with counsel.

Page 51

1 BY MS. TUCK:
2    Q       Do you think there are any other
3 documents that you haven't provided in this
4 lawsuit that relate to the CAPS system and how the
5 CAPS system operates?
6    A       No.
7    Q       And you understand that you would have
8 a responsibility to provide those documents,
9 right, subject to your counsel's review?
10   A       Yes.
11   Q       All right.
12           MS. TUCK:  You can put this down.
13 BY MS. TUCK:
14   Q       All right.  So we're going to take a
15 look at the CAPS policies that we have been sort
16 of semi-discussing.  Okay.
17           MS. TUCK:  Micaela, can you pull up
18 the CAPS policy for March 2015, please.
19 BY MS. TUCK:
20   Q       Okay.  Do you have a screen big enough
21 to kind of see.  The woman yesterday had a second
22 screen.  So if you need to have her zoom at any
23 point, just let her know, okay.
24   A       All right.
25   Q       All right.  Now is this the CAPS

Page 52

1 policy that went into effect March 1, 2015?
2    A       Yes.
3    Q       And did this policy remain in effect
4 until it was changed on June 1, 2019?
5    A       Yes.
6    Q       And were there any changes to this
7 policy in that period of time between March of --
8 between March 1 of 2015 and June 1 of 2019?
9    A       There was one change which was how
10 we -- if an employee used an entitlement for FMLA
11 and that's the only day that would make the
12 employee -- would have made the employee
13 ineligible, that was changed to allow the employee
14 to get the good attendance credit within that time
15 period.
16   Q       When was that changed?
17   A       It was changed in 2018.
18   Q       What date in 2018?
19   A       I do not have an exact date.  It was
20 like the middle, like June, July of 2018.
21   Q       You understand that you are here to
22 testify on behalf of the company today as to the
23 policies, procedures, et cetera, for CAPS, right?
24   A       Yes.
25   Q       And did you understand that to include

Page 53

1 changes to those policies?
2    A       Yes.
3    Q       So why can't you answer that question,
4 when it was changed?
5           MR CHIAVETTA:  She said June or July
6 of '18.
7 BY MS. TUCK:
8    Q       Why can't you give me a date?
9    A       Because I do not have the exact date
10 that we made that change.  It was in the middle of
11 2018 when that change was made.
12   Q       How would you go about finding the
13 answer to that question?
14   A       I would have to research back in my
15 2018 emails of when we made that change.
16   Q       Okay.  And are you able to do that?
17 Is there any reason why you couldn't do that today
18 if you have the time?
19   A       Yes.
20   Q       There is a reason why you couldn't do
21 that?
22   A       No.  I mean, I could do that.
23   Q       You could do that.  Okay.
24           And what do you believe is in your
25 2018 emails that would help you answer that

**SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
**Anita Tingley on 10/28/2021**                    Pages 54..57

Page 54

1 question?
2      A       You asked me a specific date.
3      Q       Right.
4      A       When it went into effect.  So we
5 would -- I would have an email when we put that
6 in.
7      Q       Okay.  And was that change
8 communicated to anyone at CSX internally?
9      A       Yes.  It came from technology, and
10 then I would have gotten the email saying that we
11 made that change.
12     Q       Okay.  So the nature of the change
13 would also be in those emails, right?
14     A       Yes.
15     Q       Why was that change made?
16             MR CHIAVETTA:  Anita, if it's based on
17 discussions with counsel, you can say that, but,
18 again, don't get into the substance of those
19 discussions.
20             THE WITNESS:  It was based on
21 conversations with counsel.
22 BY MS. TUCK:
23     Q       Conversations with outside counsel or
24 inside counsel?
25     A       Inside counsel.

Page 55

1      Q       Was this change explained in any memo,
2 email, posting, anything that was not a
3 communication with counsel, to any one?
4      A       It was a technology change, so
5 technology, there would be communication with
6 technology.
7      Q       Okay.  Communication between just you
8 and technology or were other people involved in
9 those communications that are not -- that counsel
10 was not on?
11     A       It would have been whoever was in
12 the -- in that handling those changes to the
13 system.
14     Q       Okay.  On your end, were you the only
15 person involved in that change in labor relations?
16     A       I worked with technology, with
17 technology to make sure that the change was made.
18     Q       I understand that.  Do you work with
19 anybody else in labor relations with respect to
20 that change?
21     A       I would need to go back and check the
22 communications to see if there was anybody else
23 from labor relations on the communications.
24     Q       Did you have any discussions with your
25 supervisor about this change, like where counsel

Page 56

1 was not present, in writing or verbal?
2      A       I'm trying to remember who my manager
3 was in 2018.
4      Q       Even if you don't remember the name,
5 do you believe you had conversations with your
6 supervisor where counsel was not present regarding
7 this change?  It seems like the kind of thing that
8 you know, wouldn't just be your decision.
9      A       It wasn't just my decision.
10     Q       Okay.  Who else was involved in the
11 decision, other than you and legal counsel?
12     A       I would need to pull the
13 documentation, the emails to see who is on the
14 emails.
15     Q       So do you have any recollection
16 whatsoever?  I understand you would have to pull
17 the emails to be sure, but do you have any
18 recollection as to who else would have been
19 involved in that decision other than counsel?
20     A       I'm trying to think who would have
21 been -- who would have been the manager, my
22 manager over me or their manager at the time.
23     Q       Okay.  So you believe your, whoever
24 your manager was involved in that decision, right,
25 whoever it was?

Page 57

1      A       Yes.
2      Q       And you believe that their manager,
3 whoever it was, was also involved, right?
4      A       I said I would have to check the
5 document.
6      Q       To do what?  To determine whether your
7 manager's manager was involved or who that manager
8 was?
9      A       To see exactly everybody up the line
10 who was involved.
11     Q       Okay.  Was your manager's manager
12 involved, regardless of what their name was, or
13 can you answer that?
14     A       I cannot answer that.
15     Q       Okay.  So you don't know?
16     A       I cannot answer that unless I look at
17 the documents.
18     Q       Okay.  So you don't know without
19 looking at the document, right --
20     A       Correct.
21     Q       -- whether that person was involved,
22 whatever their name is?
23     A       Correct.
24     Q       Do you have an understanding as to why
25 that -- was that change communicated to the

SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.
Anita Tingley on 10/28/2021

Pages 58..61

Page 58

1 employee?
2     A     No.
3     Q     Just so I'm clear, your testimony is
4 that in 2018, the CAPS policy was changed such
5 that if an employee used an entitlement for FMLA
6 leave, that that absence would not -- would count
7 towards the good attendance credit.  Am I
8 summarizing that accurately?
9     A     Could you repeat that?
10     Q     Okay.  So you said that there was a
11 change in the summer of 2018, right?
12     A     There was a technology change.  The
13 policy did not change.
14     Q     Was there a change such that people
15 who previously on FMLA leave were not able to earn
16 a good attendance credit and now some of those
17 people were able to earn it?
18     A     So the employees had been able to use
19 an entitlement before.
20     Q     Right.
21     A     The change is that the employee using
22 an entitlement when they are off FMLA, then if
23 that was the only other day in that time period,
24 then the employee would be entitled to the good
25 attendance credit.

Page 59

1     Q     Okay.  And previously under those
2 circumstances, they would not have been entitled
3 to good attendance credit, right?
4     A     Correct.
5     Q     Okay.  Isn't that a change in policy?
6 I get that you had to make technological changes
7 to make that happen, but you don't consider that a
8 change in policy?
9     A     No.
10     Q     What do you -- what's the word policy
11 mean to you?
12     A     The policy did not change.  How --
13     Q     What -- when you say "policy," how are
14 you defining policy in that context?  The written
15 policy?
16     A     The CAPS policy effective March 1,
17 2015 that we are looking at.
18     Q     The written policy?
19     A     Correct.
20     Q     And this change, which you say was not
21 a policy change, does the company take the
22 position that that's not a policy change?  I just
23 want to make sure that that's the company's
24 testimony, not your testimony.  Is it the
25 company's testimony that that was not a policy

Page 60

1 change?
2     A     The policy did not change.
3     Q     Okay.  So that is a technology change,
4 not a policy change in the eyes of the company,
5 correct?
6     A     Yes.
7     Q     I see.  But that does impact a train
8 and engine employee's CAPS points, right,
9 theoretically, right?
10     A     Can we go down into the policy?
11     Q     I'm asking you a question.  After that
12 change was made, that would impact potentially a
13 train and engine employee's CAPS points, right?
14 Get a credit that you wouldn't otherwise have
15 gotten, correct?
16     A     Potentially, yes.
17     Q     Okay.  And employees were not informed
18 of this technology change, correct?
19     A     No.
20     Q     Not verbally, not in writing, not at
21 all, correct?
22     A     They were not informed at all.
23     Q     Okay.  All right.  So let's take a
24 look at the -- any other changes how CAPS operated
25 between March 1, 2015 and June 1, 2019, that you

Page 61

1 haven't already discussed, any other changes like
2 that or in any other regard?
3     A     No.
4     Q     No technology changes?
5     A     No.
6     Q     Okay.
7          MS. TUCK:  And, Micaela, I'm going to
8 share my screen right now, so we can take that
9 down and we can come back to that real quick.
10 Okay.
11 BY MS. TUCK:
12     Q     So, Ms. Tingley, you were talking
13 earlier about items that exist on the attendance
14 space in the Gateway.  And you said that there was
15 a FMLA Q & A that resided there, correct?
16     A     Yes.
17     Q     Okay.  And I'm just going to kind of
18 scroll relatively quickly, and you sent that to
19 your counsel during a break, right?
20     A     Yes.
21     Q     Okay.  Is this that document?
22     A     Yes.
23     Q     Okay.  And the Bates number is 29335,
24 so this is going to be, what, triple A, I guess at
25 this point.

**SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
**Anita Tingley on 10/28/2021**

Pages 62..65

Page 62

1      MS. TUCK:  This is going to get out of
2  hand.  Can we just start with A-1?  Can we start
3  over?  Actually, let's do double A-1.
4  BY MS. TUCK:
5      Q      All right.  I don't have any other
6  questions about this document.  All right.
7             Let's go back to the policy that we
8  were just looking at before.
9             MS. EBERHARD:  You have to stop
10  sharing your screen first.
11            MS. TUCK:  Yes, I do.  Sorry.  Okay.
12  Sorry.
13  BY MS. TUCK:
14      Q      Okay.  Now you've already identified
15  this as the policy that went into effect on
16  March 1, 2015.  And it says Employee Gateway at
17  the top.  So this was at the time available on the
18  Gateway?
19      A      Yes.
20      Q      Okay.  And this policy applies to all,
21  would you say all the craft employees or all the
22  train and engine employees?
23      A      This is the train and engine
24  employees.
25      Q      Sorry.  Regardless of union, right,

Page 63

1  which union they are in?
2      A      It's for train and engine employees,
3  yes.
4      Q      Regardless of what union they are in,
5  right?
6      A      Yes.
7      Q      Okay.  Under assessment of points, it
8  says that they will be -- so 1-A.  "They will be
9  assessed points for various incidents of
10  nonattendance."
11            What does nonattendance mean?
12      A      That the employee was unavailable for
13  work.
14      Q      Okay.  And if somebody marks off, are
15  they then unavailable or does something else have
16  to happen?
17      A      When the employee marks off or the
18  employee misses a call or is in any displaced
19  status, so when they are in an unavailable status.
20      Q      Okay.  And who determines what is the
21  availability status?  Does labor relations make
22  that determination or is there another department
23  that does that?
24      A      I'm not quite sure of your question.
25      Q      How -- okay.  Well, in 2016, how would

Page 64

1  you figure out whether somebody was unavailable?
2      A      So the unavailable statuses which is
3  on the page that we're looking at that has point
4  values, those are statuses that an employee in
5  their work history would be placed into.
6      Q      Okay.  There was some testimony
7  yesterday that for the guarantee pay, that there
8  needs -- someone needs to be, at least when it
9  comes to FMLA leave, you have to be marked off and
10  you have to lose work.  That's kind of what I'm
11  driving at.
12            So does somebody have to either be
13  marked off and lose work or is just marking off
14  enough?  I understand missing call is somebody
15  just doesn't show up for work, right, essentially?
16      A      So a missed call is when an employee,
17  we call them to go to work and then they do not
18  answer or they mark off on call.
19      Q      Okay.  Right.  So they get called up
20  and they don't show up essentially, right?
21      A      Yes.
22      Q      Okay.  So that's a separate
23  circumstance.  But if somebody just marks off, do
24  they also have to lose work to be considered under
25  this, as you say, unavailable?

Page 65

1      A      So the employee needs to lose work on
2  the first day that the employee is off, and then
3  any time after that it is unavailable and they
4  receive points for each day.
5      Q      Okay.  So if I am marking off on FMLA
6  leave, intermittent FMLA leave -- you know, what
7  intermittent FMLA leave is generally, right?
8      A      Yes.
9      Q      Okay.  If I'm marking off on
10  intermittent FMLA leave and I don't lose work at
11  all while I'm marked off, is that considered
12  unavailable or no, under this policy?
13      A      An employee does not receive points
14  for FMLA.
15      Q      Oh, okay.
16      A      Yes.
17      Q      All right.  So let's say I do -- oh,
18  if I call off sick, and I really don't have sick
19  time, so I call off sick and I don't lose any
20  work, am I unavailable under this policy?  Is that
21  a nonattendance or do I have to actually miss
22  work, too, under that scenario, sick time, calling
23  in sick?
24      A      The employee has to lose work on the
25  first one time, and then any time after that is

**SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Anita Tingley on 10/28/2021

Pages 66..69

Page 66

1 all unavailability.
2     Q      So if I don't lose work, then there is
3 no points, right?
4     A      Correct.
5     Q      Okay.  And then it says, "including
6 both full and partial day absences."
7            How does partial day -- how is a
8 partial day absence defined?
9     A      An employee that is late to work or
10 they leave early before their assignment is
11 completed for the day.
12    Q      Okay.  So like if I went home sick,
13 that would be a partial day absence?
14    A      Yes.
15    Q      Okay.  Is there any sort of minimum
16 increment that that's counted?  So if I leave, for
17 example, one minute before my shift is over, is
18 that considered a partial day absence?
19    A      The shift would have to not have been
20 completed.  So their work was not done in the time
21 period.
22    Q      Okay.  And if I leave one minute
23 early, is that considered a partial day absence?
24    A      It depends on if their work was
25 completed or not.

Page 67

1     Q      All right.  Well, let's just do the
2 scenario where I'm late.  If I'm one minute late,
3 is that a partial day absence?
4     A      If the assessment is put in that the
5 employee was late, then the employee would receive
6 points.
7     Q      And who puts the assessment in?
8     A      The manager of field operations that
9 is out there that observed that the employee was
10 late to work.
11    Q      Okay.  And is there a minimum period
12 of time where someone can be assessed as late?
13    A      No.
14    Q      Okay.  So they can be one minute late
15 and the manager of field ops can put the
16 assessment in the system, right?
17    A      Yes.
18    Q      And then they would receive CAPS
19 points as applicable under the policy?
20    A      Yes.
21    Q      Okay.  Then under B it says, "points
22 will accumulate and will result in handling each
23 time the point total is equal to or greater than
24 20."
25            Is "handling," is that essentially the

Page 68

1 progressive disciplinary steps that this policy
2 describes?
3     A      Yes.
4     Q      All right.  Now we get under the
5 attendance point schedule.  Miss call we
6 discussed.  Unauthorized and unavailable full or
7 partial day.  What kinds of absences would those
8 be?  So you get four, if it is Monday through
9 Thursday, and then six if it is Friday through
10 Sunday?
11    A      Yes.  And that is late to report,
12 that's leaving early, that's displacement days.
13    Q      Okay.  And displacement days, that's
14 only applicable to UTU, right?
15    A      Yes.
16            THE REPORTER:  Excuse me.  Only
17 applicable to?
18            MS. TUCK:  UTU.
19 BY MS. TUCK:
20    Q      And then your response was, Anita?
21    A      Northern ones.
22    Q      Just the northern ones.  Okay.
23            What is a displacement day?
24    A      A displacement is that the employee is
25 not holding a position that they get, say, bumped

Page 69

1 by senior employee, and under their collective
2 bargaining agreement they have so long to make a
3 seniority move.  But if there is open position or
4 junior employees that are holding positions, then
5 the employee should make a move in a reasonable
6 amount of time since they would be able to work.
7     Q      Okay.  So we heard testimony yesterday
8 that train and engine employees can bid on certain
9 jobs, depending on their seniority; is that
10 accurate?
11    A      When they bid -- so, I need
12 clarification because that's -- are we talking
13 about the job or the EBS?
14    Q      I don't know what an EBS is.  What's
15 an EBS?
16    A      So the CSRI, which is your South UTU
17 and then your engineers, your BLET, each week they
18 can bid, they put in a bid card.  And then each
19 Saturday they are put on to a different position
20 or the same position depending on their seniority.
21    Q      Okay.  And that's just for engineers?
22    A      And the south UTU.
23    Q      Okay.  Does that have something to do
24 with displacement?
25    A      So those two agreements, the engineers

**SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
**Anita Tingley on 10/28/2021**                    Pages 70..73

Page 70

1  and the south UTU conductors, they bid, and so
2  they are not in a displacement.  So they are
3  always -- they can -- they are putting in bids.
4      Q    Oh, I see.
5      A    They can go to a job, a different job
6  or stay on the same job, depending on their
7  seniority and what they bid.
8      Q    Okay.  So this displacement days is
9  just one small unique thing, just one small
10 difference unique only to these UTU Northern
11 employees; is that correct?
12     A    Yes.
13     Q    Okay.  Are there any other differences
14 based on what union contract you are under when it
15 comes to CAPS, other than this displacement
16 category of absence?
17     A    No.  Except for union business that
18 are not pre, you know, pre-authorized, then they
19 would be able to receive points if they are off on
20 the weekends under the agreement.
21     Q    But are all the agreements the same in
22 that regard or are there differences between the
23 agreements?
24     A    The BLET and the south UTU are the
25 same in that regard.

Page 71

1      Q    Okay.  So that is one more difference
2  that applies to the Northern employees.
3           All right.  Any other differences in
4  comparing the different unions --
5      A    No.
6      Q    -- on the CAPS?
7      A    No.
8      Q    Okay.  Okay.  So you said leaving.  So
9  unauthorized and unavailable.  So is that
10 basically what we were discussing earlier when you
11 said incidents of nonattendance and you said
12 unavailable, unauthorized and unavailable, or is
13 that different?
14     A    No.  I mean, anything that is
15 unavailable, right, these codes, and then the
16 unauthorized and unavailable would be your leaving
17 early, late, displacement.
18     Q    Okay.  So would sick and
19 hospitalization be considered authorized?
20     A    So the employee is off sick, they are
21 in a sick status, it's just that the employee has
22 provided documentation to the medical department,
23 and it was deemed hospitalization emergency room.
24     Q    Okay.  So unauthorized and
25 unavailable, full or partial day, you said showing

Page 72

1  up late, leaving early, displacement days.  Any
2  other examples in that category?
3      A    No.
4      Q    And then sick without documentation,
5  four if it's a weekday, six if it is a weekend.
6           Now, do you have an understanding why
7  those two categories assess more points if you do
8  it over the weekend as opposed to the week?
9      A    Because we are a seven-day-a-week
10 24-hour operation, and when the employees are off
11 on the weekends, it hurts us more because we are
12 moving our product every day, and we have more
13 employees that mark off on the weekends.
14     Q    Okay.  So it hurts the company more
15 because more people mark off on the weekends?
16     A    Right.  It affects our availability.
17     Q    Not because it is more important to
18 run a train on Sunday versus Wednesday, right, you
19 have to run the train every day?
20     A    We have to run the train every day.
21     Q    Okay.  So it's really just to
22 discourage people from marking off on the weekend,
23 right?
24     A    Our availability reduces on the
25 weekend, so the point value is higher.

Page 73

1      Q    And why is the point value higher?
2           MR CHIAVETTA:  Asked and answered.
3           You can answer again, Anita.
4           THE WITNESS:  Because we need to run
5  our trains every day.
6  BY MS. TUCK:
7      Q    Well, I understand, but why do you
8  need to run the train more on Friday than you do
9  on Monday?
10     A    We have more employees off on the
11 weekend than Monday through Thursday.
12     Q    Right.  Because you said you have more
13 employees marking off on those days, right?
14     A    Yes.
15     Q    Okay.  So would you agree with me that
16 somebody is being penalized more for marking off
17 on the weekend than during the week?
18     A    The employee is receiving more points
19 for those days.
20     Q    That's not a penalty?  You don't
21 consider that a penalty or the company doesn't
22 consider that a penalty?
23     A    Yes.
24     Q    Yes, it is a penalty, right?
25     A    They are receiving more points for

**SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Anita Tingley on 10/28/2021                                    Pages 74..77

Page 74

1  those days.
2      Q      They are penalized more for taking off
3  on those days under this policy, correct?
4      A      Yes.
5      Q      Now if someone is hospitalized under
6  this policy, they receive no points or receive
7  emergency treatment?
8      A      If it is deemed an emergency or
9  hospitalization.
10     Q      Right, and there is procedures in here
11 on how to determine that, right?
12     A      Yes.
13     Q      Okay.  And then sick with valid
14 medical documentation, those folks are not
15 penalized more for the weekend, correct?
16     A      If the employee sends in medical
17 documentation, the point value is the same.
18     Q      Right.  That's what I just said.  So
19 you are agreeing with me, right?
20     A      Yes.  I answered your question.
21     Q      Okay.  Now, this Monday through
22 Thursday, Friday through Sunday, when we spoke to
23 Jennifer yesterday about the guarantee pay, she
24 said that there is sort of a similar circumstance.
25 And she said that Monday through Thursday is

Page 75

1  basically a midnight to midnight window.  Does
2  that -- is that true also for CAPS?  So does
3  midnight -- so when we are saying Monday to
4  Thursday, are we talking about 12:00 a.m. Monday
5  through, I think she said 23:59 on Thursday?
6      A      Yes.
7      Q      Okay.  And then Friday would be
8  midnight Friday through 23:59 on Sunday, right?
9      A      Yes.
10     Q      And that's not different in the new
11 policy?  That was not changed in 2019, right?
12     A      No.  There is a difference between the
13 days.  In the other policy, we added holidays for
14 the higher point value.
15     Q      Okay.  But I'm just talking about the
16 Monday through Thursday, Friday through Sunday,
17 that's a midnight to midnight scenario, right,
18 that didn't change?
19     A      It's midnight to 23:59, yes.
20     Q      Right.  I mean, yes.  Okay.
21            Now, for sick, for the two sick
22 categories and hospitalization or emergency
23 treatment, does that have to be a full or partial
24 day?  Does that have to be a full day absence to
25 get a point value or would a partial absence also

Page 76

1  potentially generate points, sick, I'm talking
2  about sick obviously?
3      A      Partial, the employee would receive
4  points or could.
5      Q      Could receive points.  Well, if he was
6  sick, regardless of whether you have documentation
7  or not, you are going to get points, right?
8      A      Yes.
9      Q      Under this policy.  All right.  And
10 that -- and partial absences for sick, whether or
11 not you have documentation, those also generate
12 points, right?
13     A      Yes.
14     Q      And you said earlier, you know, if you
15 are unavailable, you get points for every day.  Is
16 that true for all of the absences that generate
17 points, you get points for every day that you are
18 sort of in violation or unavailable, I should say,
19 unavailable?
20     A      Yes.
21     Q      All right.  And is there a minimum
22 amount of time for sick where that is considered a
23 partial day absence?  So similar to what we were
24 saying, you know, if you just leave, you're late
25 for work because, you know, you are two minutes

Page 77

1  late, a minute late for work.  If you are a minute
2  late for work because you're sick with
3  documentation, is that a partial day?
4      A      Well, that day would have been coded
5  as late.
6      Q      Well, you have medical documentation
7  for being, let's just say, five minutes late.  I,
8  you know, I was sick to my stomach.  I threw up
9  this morning, I am five minutes late.  Then I go
10 back to my doctor and doctor says, yeah, they
11 definitely were throwing up that morning, would
12 that be considered a partial day's absence under
13 sick with documentation?
14     A      If documentation was sent in and it
15 was considered sick with medical documentation,
16 then that would be changed from the late to a sick
17 with documents.
18     Q      That would be a partial day attendance
19 incident under sick with documentation, right?
20     A      Yes.
21     Q      Okay.  Okay.  Then we get to the good
22 attendance credit.  Now this says -- so, now
23 someone accumulates points under the system, say,
24 you know, I understand that FMLA, you don't get
25 points.  But it is true, is it not, that up until

Page 78

1 this change in 2018, if you took FMLA leave during
2 the good attendance credit period, you would not
3 get the credit, true?
4       A       True.
5       Q       And after that change, you only got
6 the credit if you used an entitlement for your
7 leave, true?
8       A       Yes.  If that is the only absence in
9 that time period.
10      Q       Well, that's true of the last
11 statement, too, right, to FMLA leave, you didn't
12 get the attendance credit?  Oh, I see a what you
13 are saying.  Yeah, as long as you didn't have some
14 other, you know --
15      A       Other absence.
16      Q       Yeah, I understand that.  Okay.
17              And it says here that you would -- but
18 you do get good attendance credit if you are
19 absent for vacation, demand day off, personal
20 leave, jury duty, work-related illness or injury
21 with a doctor's note, and bereavement.
22              Are those the only exceptions to in
23 the 2015 policy where you would get -- you could
24 be absent and get a good attendance credit, are
25 those the only examples?

Page 79

1       A       No.
2       Q       What would be the other examples?
3       A       Short-term military.  And then the
4 union business.
5               Can you make that a little bit bigger.
6 Thank you.  That's much better.
7       Q       So you're saying that since this
8 policy was implemented, that union business, a
9 union business absence was eligible, would not
10 prevent them from getting a good attendance
11 credit, right?
12      A       As long as they prenotified us under
13 their CBA of the absence.
14      Q       Okay.  So is that part of -- where is
15 that spelled out?  That's not in this policy.
16 Where is that spelled out?
17      A       Under the collective bargaining
18 agreement.
19      Q       Okay.
20      A       For the local chairman, that's what
21 the union business is for.
22      Q       So only local chairmen get that
23 benefit?
24      A       Yes.
25      Q       If a train and engine employee has to

Page 80

1 attend a hearing or some other kind of union
2 business, does that absence prevent them from
3 getting a good attendance credit?
4               MR CHIAVETTA:  Object to form.
5               You can answer.
6               THE WITNESS:  Yes.
7 BY MS. TUCK:
8       Q       Okay.  So it's -- all right.
9               So if I go to a hearing with my local
10 chairman, and we're both absent, he gets -- he
11 still remains eligible for good attendance credit
12 but I am not, correct?
13      A       Correct.
14      Q       Okay.  And, again, assuming we're in
15 that window, you understood my questions to be,
16 you know, talking about the window of time during
17 which you can earn that credit, right?
18      A       Yeah.
19      Q       All right.
20              Any other exceptions that are not
21 listed here in this policy when this policy was in
22 effect, any other exceptions?
23      A       No.
24      Q       Now, three is a fairly detailed
25 medical review process.

Page 81

1               Is this the review process that is
2 undertaken to verify whether or not somebody has
3 a -- was really unwell enough to be at work?
4       A       This is the medical review process if
5 the employee wants to send in documentation for
6 their absences.
7       Q       What is the intention of the medical
8 review process?
9       A       So the information is sent to our
10 medical department, and it is reviewed by our
11 nurses and our doctor if need be, and then it is
12 either deemed emergency hospitalization or sick
13 with documents.
14      Q       Okay.  I'm sorry, but this is going to
15 go a lot faster if you could just answer the
16 questions I'm asking.
17              What is the intention of the medical
18 review process?  I didn't ask how it worked.  I
19 asked what the intention behind it was.
20              MR CHIAVETTA:  Objection.
21 Argumentative.  She did answer the question.
22              You can answer again, Anita.
23              THE WITNESS:  The medical review
24 process, if the employee chooses to send in the
25 documentation, it depends on what point value that

**SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
**Anita Tingley on 10/28/2021**                      Pages 82..85

Page 82

1  the employee will receive under further mark off.
2      Q      What is the intention behind having
3  this policy?  Why does CSX have this policy in
4  place, the medical review process?
5              MR CHIAVETTA:  Asked and answered.
6              MS. TUCK:  No, it has not been
7  answered.
8              MR CHIAVETTA:  Yes, it has.
9              MS. TUCK:  And please stop coaching
10 the witness to just repeat her answer.
11             MR CHIAVETTA:  Making an objection
12 asked and answered is entirely proper, and I will
13 continue to do it.
14             So objection.  Asked and answered.
15             You can answer, Anita.
16             THE WITNESS:  If an employee chooses
17 to send in a medical documentation for their
18 absence, so that -- that's what this process is
19 for, that the employee has three days to send in
20 the documentation to have it reviewed by the
21 medical department so that it can -- it depends on
22 what point value the employee will receive for
23 those mark offs.
24 BY MS. TUCK:
25     Q      Ms. Tingley, I can read.  I'm asking

Page 83

1  why this process in place.
2              MR CHIAVETTA:  She has answered the
3  question, Lisa.
4              MS. TUCK:  No, she has not.  And we
5  are going to keep asking the question --
6              MR CHIAVETTA:  Lisa, cut it out with
7  the abusive comments.
8              MS. TUCK:  No, she has not.
9              MR CHIAVETTA:  No, Lisa.
10             THE REPORTER:  I can only get one
11 person at a time if you want this on the record.
12             MS. TUCK:  I started talking first.
13             MR CHIAVETTA:  If you want to
14 continue, you are going to stop disrespecting the
15 witness.
16             MS. TUCK:  I am not disrespecting the
17 witness.
18             MR CHIAVETTA:  Yes, you are.
19             MS. TUCK:  She is not answering my
20 question.
21             MR CHIAVETTA:  She is.
22             MS. TUCK:  No, she is not.
23 BY MS. TUCK:
24     Q      Ms. Tingley, what is the intention
25 behind this process?  Why does CSX have this

Page 84

1  process in place?  Why?
2              MR CHIAVETTA:  Asked and answered.
3  BY MS. TUCK:
4      Q      Ms. Tingley, will you please answer
5  the question.  Why is this process in place?
6      A      I already answered your question.  I
7  don't have another answer for you.  It is for if
8  an employee wants to send in documentation so that
9  their points can be reduced.
10     Q      Okay.  But why can't the employee just
11 show up and say, with a note, and say here is my
12 note and then it gets excused?  Why does CSX
13 require the medical department to review that
14 documentation?  Can you answer that question?
15     A      The medical department reviews the
16 information for that employee.  It is -- that's
17 their private information, the employee's private
18 information, and that's why it is sent to the
19 medical department and not just to any person.
20     Q      Okay.  But why does the medical
21 department even bother to investigate whether or
22 not the medical excuse is valid?  Just send it to
23 the medical department, they could say, okay,
24 great, rubber stamp, off you go.  Why does the
25 medical department actually review the

Page 85

1  circumstances or the documentation?  Is it to
2  determine whether or not they were unwell enough
3  not to be at work?
4      A      It is to deem it.  If something is
5  deemed an emergency or hospitalization, then the
6  employee would receive zero points for that day.
7      Q      Why?  What's the purpose behind not
8  assessing somebody's points if they are in the
9  hospital?  Is it because they are clearly unwell
10 enough to work?
11     A      Because those employees that are
12 having emergency or hospitalization, it would be
13 zero points.
14     Q      I know it is zero points.  We've
15 covered that.  Why?
16             Who at CSX would be able to tell me
17 why these processes are in place?
18     A      Well, under the CBA of the engineer
19 agreement, it is in the agreement that if
20 something is emergency or hospitalization, that
21 the employees would -- it would not be held under
22 absenteeism.
23     Q      Are you able to tell me -- is the
24 company able to tell me why it reviews the medical
25 documentation requested under this policy?  Is the

**SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
**Anita Tingley on 10/28/2021**                    **Pages 86..89**

Page 86

1  company able to tell me why it does that?
2      A      Because in the policy it determines
3  your point value.
4      Q      Is the company able to tell me why
5  that is in the policy?
6      A      So the point of our policy is the
7  employee can mark off and they can mark off and
8  are not handled until they hit a threshold.  So an
9  employee can choose to be off in an unavailable
10  status, and they won't be held or be handled until
11  they hit like the 20-point threshold.
12          So an employee could be off in a sick
13  status and receive four points, but if they are --
14  if they have doctor's notes or it was deemed an
15  emergency or hospitalization, then those points
16  would be less.
17      Q      And who decides that?  The medical
18  department?
19      A      Can you -- who decides what?
20      Q      Well, I don't know.  I was just trying
21  to figure out how your answer responded.
22          Is the company able to tell me why
23  this process is in the policy?  I know it is in
24  the policy.  I don't -- I'm not asking you what
25  the policy says.  I'm not asking you what the

Page 87

1  policy provides.  I'm not asking you what the
2  process is.  I'm asking you, can the company tell
3  me why this process is in the policy?  That's a
4  yes or no question.
5      A      I already answered your question.
6      Q      That's a yes or no question.  Can the
7  company -- if you think you've answered it, then I
8  guess the answer is yes.  Can the company answer
9  that question?
10      A      Yes.
11      Q      And is there anything else that you
12  want to add to what you say was the answer to that
13  question?
14      A      Not at this time.
15      Q      Is there something that you might need
16  to look at later that would help you answer that
17  might refresh your memory so that your answer
18  might change?
19      A      No.
20      Q      Okay.  So under the medical review
21  process if they submit their documentation to the
22  medical department within three days, correct?
23      A      From three days from the date that
24  they marked off, yes.
25      Q      Okay.  And then go on to the next

Page 88

1  page.  So the employee has to give the date of
2  onset or injury illness, right?
3      A      Yes.
4      Q      They have to give the dates of
5  examination, consultation or treatment for that
6  illness, right?
7      A      Yes.
8      Q      If it's for non-hospitalization, they
9  need to provide sufficient information from the
10  treating healthcare provider to support that the
11  absence is related to a medical issue, correct?
12      A      Yes.
13      Q      And then for hospitalization, they
14  have to provide sufficient medical information
15  from the treating healthcare provider to help CSX
16  determine whether the absence should be excused
17  from point assessment under the policy, correct?
18      A      Yes.
19      Q      And this examples of medical
20  information are that the policy gives, include
21  documentation from healthcare provider they were
22  admitted to the hospital, right?
23      A      Yes.
24      Q      That identifies the nature of the
25  emergency, right?

Page 89

1      A      Yes.
2      Q      Okay.  And also they are required to
3  give the healthcare provider's name and
4  information, contact information, right?
5      A      Yes.
6      Q      And the healthcare provider is
7  required to sign off on that, correct?
8      A      Yes.
9      Q      And if the employee provides the
10  information listed here and the medical department
11  deems it sufficient, you would agree with me that
12  under this policy, they would -- you know, the
13  appropriate points would be assessed, if any,
14  correct?
15      A      Yes.
16      Q      And then under E it says, they reserve
17  the right to seek additional information from the
18  employer and healthcare provider with the
19  employee's consent.
20          So the medical department, if they
21  have questions about the documentation, they
22  can -- they can -- they are able to talk to the
23  employee healthcare provider if that permission is
24  granted, correct?
25      A      Yes.

**SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
**Anita Tingley on 10/28/2021**                                Pages 90..93

Page 90

1    Q    And all of this is to determine
2  whether or not they have valid medical
3  documentation for either being sick or
4  hospitalized for emergency care, correct?
5    A    Yes.
6    Q    Okay.  Then we get to the schedule,
7  the attendance handling schedule.  So once
8  somebody gets 20 attendance points, they begin to
9  be handled or subject to progressive handling as
10 we discussed handling earlier, correct?
11   A    Yes.
12   Q    And so the first step is a counseling
13 letter.
14        Now it says below that, for each of
15 the steps, including counseling letters, 10 points
16 will be deducted from the point total.  So I get
17 to 20 points, and I get a counseling letter, then
18 I go back to 10 under this policy, right?
19   A    Yes.
20   Q    Okay.  And then I get back up to --
21 but then I get 10 more, then I'm at counseling
22 letter 2, I'm at Step 2?
23   A    Yes.
24   Q    All right.  And it keeps going like
25 that until eventually I can be dismissed, right?

Page 91

1    A    Up to dismissal.
2    Q    Right.  But a dismissal, there is some
3  sort of a seniority extra points that gets
4  calculated, but that's only for dismissal, right?
5    A    Yes.
6    Q    All right.  So for the three lower
7  stages of discipline, it doesn't matter how long
8  I've been with the company, I don't get any extra
9  points, right?
10   A    Correct.
11   Q    All right.  And if I have good
12 attendance credits, so under this policy I would
13 get three points deducted for every calendar month
14 in which I have no attendance incidents covered
15 under the policy and not otherwise been absent,
16 right?
17   A    Correct.
18   Q    Okay.  And the FMLA, I asked you about
19 FMLA use under this policy.  That would fall under
20 the sentence, "And has not otherwise been absent,"
21 right?
22   A    Yes.
23   Q    Because it is not an attendance
24 incident, but they are otherwise absent, correct?
25   A    Yes.

Page 92

1    Q    And we looked at the chart earlier
2  that you provided.  There were a variety -- those
3  were the ones there was sort of a subsequent
4  explanation regarding military.  Was that chart
5  all of the types of absences otherwise been absent
6  under that policy, other than the exceptions?
7  Because I understand the exceptions were also on
8  that table.
9    A    We're talking of the chart that I
10 signed off on?
11   Q    Yes.
12   A    So you're asking if the chart that I
13 signed off on, the second one, is all of the codes
14 that would make somebody be able to get a good
15 attendance credit or not?
16   Q    No.
17   A    Okay.
18   Q    And, I'm sorry, I didn't ask the
19 question very clearly.
20        So these exceptions are on the chart,
21 right, vacation, demand day, personal leave, jury
22 duty, work-related illness or injury and
23 bereavement.  Those are on the chart, right?
24   A    Yes.
25   Q    Okay.  Those are exceptions.

Page 93

1        Then there were a bunch of other
2  absences.  Are those considered otherwise than
3  absent under this policy, including FMLA?
4    A    Can we go back to the information?
5    Q    Yeah.  Let's see, personal business is
6  that otherwise than absent?
7    A    Yes.
8    Q    You explained military.  Weather?
9    A    Yes.
10   Q    Sick with doctor's appointment, is
11 that different than sick with valid medical
12 documentation or is that kind of the same thing?
13   A    The sick with is the lesser of the
14 point deduction.
15   Q    Okay.  But you've got sick, sick with
16 family, sick with doctor's appointment, those are
17 all considered sick under the CAPS policy with or
18 without documentation, right?
19   A    Yes.
20   Q    Anything other than what I just
21 described that would be considered otherwise than
22 absent?
23   A    Demand day.
24   Q    Well, demand day is an exception?
25   A    Oh, I'm sorry.  It is absence or would

**SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Anita Tingley on 10/28/2021                                    Pages 94..97

Page 94

1  make the employee ineligible.
2       Q       Correct.  Anything else?
3       A       Besides the FMLA, no.
4       Q       Right.  Okay.  So, if I -- so if I
5  have, you know, I call off -- my -- let's just put
6  it this way.  Let's say my car breaks down and I
7  can't make it to work, that would be an
8  unauthorized or unavailable full or impartial day,
9  right?
10      A       That would be a missed call.
11      Q       Well -- oh, you are right.  Okay.  So
12 that's a missed call.
13              But if I earn a good attendance
14 credit, I can eventually get that reduced to zero,
15 right, if I get enough of them?
16      A       So your question is if I had a ten
17 point, if I had missed a call, can I get those
18 points reduced to zero.
19      Q       Yes, under the good attendance credit.
20      A       Yes, after four months of good
21 attendance credits.
22      Q       Right.  Because it is three points per
23 month, so it would have to be four months?
24      A       Yes.
25      Q       Okay.  But if I have intermittent

Page 95

1  FMLA leave and I have to take time off at any
2  point, if I have to take time off, you know, once
3  in every calendar month, maybe I have go to the
4  doctor once a month for treatment, I don't get
5  that opportunity, right?  Those points stay?
6       A       Yes.
7       Q       Yes.  All right.  So -- can we pull
8  up -- let's see.
9               Okay.  I'm going to go ahead and share
10 my screen at this point.
11              So I'm showing you now, it was
12 previously marked in Jolanda Johnson's deposition,
13 I don't know which one.  I'm sorry.  We will get
14 that for you, Nancy.  And this is Mr. York.  He is
15 one of the Plaintiffs in this case, and that is
16 FMLA certification for him.
17              So I'm going to go to -- have you ever
18 seen a FMLA certification form before filled out?
19      A       No.
20      Q       Okay.  Well, if Mr. Chiavetta thinks
21 I'm mischaracterizing this in any way, he will
22 certainly let us know.
23              So on this certification, this
24 healthcare provider has indicated that Mr. York
25 needs two incidents of FMLA leave per month and

Page 96

1  that each incident would be 48 hours, correct?
2  Does it look that way to you?
3       A       Yes.
4       Q       So if Mr. York has to use as his
5  healthcare provider has indicated, has to be
6  absent twice a month for at least a day, he can
7  never get rid of these points, can he?  He can
8  never get rid of the points?
9       A       Unless he covers the days with
10 entitlements with paid days.
11      Q       Right.  Exactly.  But he wasn't even
12 able to do that until 2018, right?
13      A       Correct.
14      Q       Okay.  So even if he used an
15 entitlement prior to that change, he still would
16 never have been able to get a good attendance
17 credit if he follows his doctor's recommendations,
18 do you agree?
19              MR CHIAVETTA:  Object to form.
20              You can answer, Anita.
21              THE WITNESS:  Based on the information
22 if he used his FMLA, he would not receive the good
23 attendance credit.
24 BY MS. TUCK:
25      Q       Right.  And so long as he has this

Page 97

1  kind of need and he uses it in the way that it's
2  indicated here, he will never get a good
3  attendance credit at all under the 2015 policy
4  until June or July of 2019, and then only if he
5  uses his entitlements, correct?
6               MR CHIAVETTA:  Objection.
7       A       Yes.
8       Q       Okay.  Let's go back to the policy.
9  Now let's go to the next page at the top.
10              So under C it says that "Employees who
11 are absent as part of a request for reasonable job
12 accommodation, should follow the CSX job
13 accommodation process."
14              Is there a short name for that, like
15 an acronym, a job accommodation process that you
16 know of?
17      A       I don't know what the name is.  I'd
18 have to bring it up to see --
19      Q       Okay.
20      A       -- if there is.
21      Q       That's fine.  I'm just wondering if
22 there was like a short way of saying that just for
23 purposes of today.
24              Okay.  So if somebody is absent as
25 part of a reasonable job accommodation that has

SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.
Anita Tingley on 10/28/2021
Pages 98..101

Page 98

1  been approved by CSX, are those absences eligible
2  for good attendance credits?
3      A       Our train and engine employees would
4  have to be able to work full time to be up and
5  working as a train and engine employee.
6      Q       Okay.
7      A       So they wouldn't be on those positions
8  if they were on a job accommodation process.
9      Q       Okay.  Is the job accommodation
10  process part of labor relations?  Does that fall
11  under labor relations department?
12      A       It goes through the medical
13  department.
14      Q       Okay.  Well, yes, okay, so it goes
15  through the medical department.  But -- okay.
16          Is there any other department that
17  handles or has any involvement with reasonable job
18  accommodation other than the medical department?
19      A       It would probably be HR.
20      Q       HR.  Okay.  So if you had a question
21  about a reasonable job accommodation, what would
22  you call, in what department would you call?
23      A       I would call somebody in HR or I would
24  try medical department.
25      Q       Okay.  Do you believe that you are

Page 99

1  able to testify on behalf of the company regarding
2  reasonable job accommodations?
3          MR CHIAVETTA:  Object to form.  It's
4  outside the scope of the 30(b)(6).
5          MS. TUCK:  I would agree.  That's what
6  I'm trying to clarify.
7          MR CHIAVETTA:  Well, what I'm
8  clarifying that regardless of what she thinks, if
9  she is not the 30(b)(6) witness on that topic, she
10  can't testify on behalf of the company.  She can
11  testify to her personal knowledge.
12  BY MS. TUCK:
13      Q       Okay.  So you would agree with me,
14  Ms. Tingley, that you are not able to testify on
15  behalf of the company regarding reasonable job
16  accommodations what those are?
17      A       Correct.
18      Q       Okay.  But are you able to tell me
19  whether if somebody has a reasonable job
20  accommodation that prevents them from working for
21  a short period of time, are you able to tell me
22  whether or not that precludes them from a good
23  attendance credit?  Because that's what you are
24  here today to talk about.  That's my question.
25      A       If somebody was on a job

Page 100

1  accommodation, then it would depend on what status
2  the employee was in if the employee would be
3  eligible for a good attendance credit or not.
4      Q       When you say "status," what do you
5  mean?
6      A       The, like, sick or if they were off,
7  miss call, right.  So the statuses of the employee
8  is what drives the good attendance credit or not.
9  Like vacation, like that whole list of --
10      Q       Right.  Well, that's what I'm saying
11  is a reasonable job accommodation is not a type of
12  leave that is indicated there.  So if someone has
13  a reasonable accommodation or a disability -- you
14  understand that these reasonable job
15  accommodations are for people who have
16  disabilities, right?
17      A       I do understand that, yes.
18      Q       Okay.  And I know you are not
19  qualified to say what a disability is under APA,
20  but, you know, somebody that has some sort of a
21  disability, you understand that, right?
22      A       Yes.
23      Q       Okay.  So if somebody has an approved
24  reasonable job accommodation that they cannot come
25  to work for a couple of days, do they get

Page 101

1  assessed -- are they able to still earn their good
2  attendance credit?
3      A       And I will go back to my answer.
4      Q       Okay.
5      A       That goes back to what kind of status
6  the employee was in.
7      Q       So what would the status be in that
8  circumstance?
9      A       If they were off, I don't know what
10  the status would be.  I can be off medical.  I can
11  be off sick.
12      Q       So you don't know what the status
13  would be under that circumstance?
14      A       No, I do not.
15      Q       Okay.  So there would be some -- so,
16  would you say that there are some circumstances
17  under which someone with that kind of
18  accommodation could earn a good attendance credit?
19  Is that a possibility?
20      A       If an employee is in an unavailable
21  status, the employee would not receive the good
22  attendance credit.
23      Q       Is there a circumstance where someone
24  has a reasonable job accommodation that keeps them
25  out of work where their status could be considered

**SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
**Anita Tingley on 10/28/2021**                    Pages 102..105

Page 102

1  available?

2     A      Not that I am aware of.

3     Q      Who might be aware of that?  You're
4  testifying as the company today.  Are you saying
5  that the company isn't aware of that?

6     A      If a T&E employee is marked up and
7  they are available to work, they will receive the
8  good attendance credit.  If they are in any of our
9  unavailable statuses that we have gone through,
10 than the employee would not be eligible for the
11 good attendance credit.

12    Q      Is there a circumstance where somebody
13 who has that kind of reasonable job accommodation,
14 their status could be available?  Is that
15 possible?

16    A      If I'm available, then I would be
17 eligible to go to work.

18    Q      Well, no, because if I'm on vacation,
19 I'm available, right?

20    A      I'm sorry.  Available in marked up and
21 available would mean that I am eligible to go to
22 work.  If I'm marked off entitlement, which would
23 be vacation, then I would not be ineligible.  I
24 would not have to protect the job if I'm on an
25 entitlement.

Page 103

1     Q      Okay.  My question is really simple.
2  Is there a circumstance where somebody who has a
3  reasonable job accommodation that keeps them out
4  of work could have their status be available?  I
5  know it happens when you are available when you
6  are not available.  Is there a circumstance when
7  they could be considered available?

8     A      When you are using available, then you
9  are available to go to work.

10    Q      Okay.  I asked you what you meant by
11 status.  You said available.  So when you said
12 available when it comes to status, I thought you
13 meant an official determination by CSX at some
14 point that somebody was available.  Were you
15 talking about just the dictionary version of
16 available where you can go to work?

17    A      So in -- in the T&E world, if you are
18 marked up and you are available, then you are
19 marked up to go to work.

20    Q      Okay.  Where is available defined, in
21 what document as you just used that term?

22    A      The employee is not in any of the
23 unavailable statuses or on an entitlement.  They
24 are marked up to go to work on their job.

25    Q      Where is that defined in a document?

Page 104

1     A      We define the unavailable days.

2     Q      Where is that defined?

3     A      The employee is marked up.  They are
4  not in an unavailable status.  They are not in any
5  other status except that they are going to be
6  marked up to go to work.

7     Q      I'm asking you where is unavailable
8  defined, in what document as you just used it?

9     A      You mean unavailable?

10    Q      Yes.

11    A      The document that we have already gone
12 through.

13    Q      So you're talking about the CAPS
14 policy?  What document are you referring to?

15    A      The CAPS policy, plus the other, the
16 other mark offs like vacation.

17    Q      Okay.  You are not talking about a
18 document right now, you are talking about
19 something else.  So what documents have we looked
20 at that you say defined what is unavailable?

21    A      Unavailability is our CAPS policy.

22    Q      Okay.  So CAPS policy defines what is
23 unavailable as you are using that word now, right?

24    A      Yes.

25    Q      Okay.  So if your status is

Page 105

1  unavailable, that answer is in the CAPS policy,
2  right?

3     A      It is in the CAPS policy, yes.  And
4  then --

5     Q      Okay.

6     A      -- if I am in a not a marked up status
7  but in entitlements, right, that is in the other
8  document.  Because there are different codes.

9     Q      What other document are you referring
10 to?

11    A      The one that I signed that has union
12 business, that has vacation days, that has the
13 mark offs.

14    Q      Other than the CAPS policy, does --
15 other than the CAPS policy, does CSX have any
16 written document that indicates or defines what is
17 unavailable in terms of someone's status?

18    A      The unavailable statuses are already
19 in the CAPS policy.

20    Q      Okay.  Are they defined anywhere else,
21 in any other CSX documents?

22    A      No.

23    Q      Okay.  So if I want to know what
24 unavailable means for status, I go to CAPS, right?

25    A      For unavailability, yes.

**SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
**Anita Tingley on 10/28/2021**                    Pages 106..109

---

**Page 106**

1  Q      Okay.  And you used the policy to come
2  up with the availability categories for the chart,
3  right?
4      A      Yes.
5      Q      Did you rely on any other document to
6  come up with that chart?
7      A      No.
8      Q      Okay.  So show me where in this policy
9  it says that somebody who has a reasonable job
10 accommodation that causes them to be absent is
11 either available or unavailable, show me where it
12 says that.
13             And let Micaela know if you need to
14 scroll.  Do you need her to?
15     A      I'm reading that paragraph.
16     Q      Okay.  I just wanted to make sure.
17     A      So employees who are seeking to be
18 absent as part of a request for a reasonable job
19 accommodation should follow the CSX job
20 accommodation process, which includes making a
21 request prior to the absence unless extraordinary
22 circumstances exist through CSX medical
23 department.
24             And then we reserve the right to
25 assess points under the policy for any absences

**Page 107**

1  accumulated by the employee that were not approved
2  as a job accommodation unless otherwise prohibited
3  by law.
4      Q      So does that mean that if the job
5  accommodation is approved, then they are still
6  eligible for good attendance credit?  That's how I
7  read that.
8      A      And I still go back to how I answered
9  it, is it depends on if the employee, what status
10 the employee was put in to.
11     Q      This says that any absence accumulated
12 by an employee that was not approved as a job
13 accommodation can get points, right?
14     A      That's correct.
15     Q      Okay.  So does that indicate to you
16 that if it is approved as a job accommodation,
17 then you don't get points?  Why would they say
18 that otherwise?  Do you understand the question?
19     A      I do understand the question.  But it
20 says that that would reserve the right to assess
21 points for an employee that were not approved for
22 the job accommodation.
23             But it still doesn't state, like, what
24 status that the employee would be put into if the
25 employee was off.  Would the employee be off

**Page 108**

1  long-term medical?  Would they be out-of-service
2  medical for those days?
3      Q      Are you able to answer the following
4  question on behalf of the company:  If someone has
5  a job, an approved job accommodation, can they be
6  assessed points under the CAPS policy?  Is that a
7  possibility?  Can you answer that question on
8  behalf of the company?  Yes or no.
9      A      I would need to -- to find that answer
10 out.
11     Q      So the answer is, no, you cannot
12 answer that right now on behalf of the company,
13 correct?
14     A      At this time, no.
15     Q      And are you able to answer the
16 following question on behalf of the company:  If
17 you are absent due to an approved job
18 accommodation, does that preclude you from getting
19 a good attendance credit?  Are you able to answer
20 that question on behalf of the company right now?
21 Yes or no.
22     A      No.
23     Q      All right.  I have just a little bit
24 more, and then we can break for lunch.
25             The next section is called initial

**Page 109**

1  point assessed and placed in an attendance
2  handling process.
3             So it looks like when this policy was
4  implemented that some people already had some sort
5  of points assessed as part of the prior policy.
6  Is that correct?
7      A      No, we did not have a point policy
8  before.
9      Q      Okay.
10     A      No.
11     Q      Okay.  But they had been assessed some
12 sort of discipline under the prior policy, right?
13     A      They would have been in steps, yes.
14     Q      Okay.  And so steps 1 and 2 were
15 essentially erased, correct?  Those folks went
16 back to zero, no steps, right?
17     A      Correct.
18     Q      All right.  And -- okay.  All right.
19 That's all the questions.
20             MS. TUCK:  If you will pull up the
21 Q & A for 2015, please, Micaela.  It's Bates
22 number 1261 I think.  There we go.  Okay.
23 Hopefully these questions will go a little
24 quicker.
25

---

**SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
**Anita Tingley on 10/28/2021**                    Pages 110..113

Page 110

1  BY MS. TUCK:
2      Q    Okay.  Question one answer one.  "are
3  points assessed per incident per day?"
4          I think we already talked about how
5  you get points for each calendar on availability
6  as defined by policy, right?
7      A    Yes.
8      Q    And then it says, "Unless the employee
9  also has a start within the same calendar day."
10         What does "start" refer to?
11     A    When they went to work.
12     Q    Okay.  So in a train and engine, if
13  somebody is on guarantee extra board, they get
14  called up and they go, right?
15     A    Yes.
16     Q    So if you end up going to work during
17  the second day of unavailability, you do not get
18  points for that day, right?
19     A    So it would be in the same day that
20  you marked off.
21     Q    So this says, "Points are assessed for
22  each calendar day of unavailability."
23         So if I mark off -- so say I mark off
24  at 11:30 p.m. on Monday, okay, and it's not -- and
25  I am unavailable however as the policy defines it,

Page 111

1  I get points -- I get points assessed for that
2  day, depending on why I'm unavailable, right?
3      A    Yes.
4      Q    Okay.  And at 12:05, if I haven't
5  marked back up, I get another three points, right?
6  Or another set of -- let's use -- let's use the
7  example of unauthorized time absent, right, as a
8  4 point if it's a Monday, right?  Yes?
9      A    Yes.
10     Q    Okay.  So I get four points at
11  11:30 p.m., and then at 12:05 on Tuesday,
12  12:05 a.m. on Tuesday, I get another four points,
13  right?
14     A    Yes.
15     Q    Then if I mark back up at let's say
16  4:00 on Tuesday and I go to work, I don't get the
17  second four points.  Is that how that works?
18     A    No.  The number one is if I marked off
19  at 11:30 on Monday night, and I marked up before
20  midnight and I went to work, I had a start on the
21  same day, then I would not receive those points.
22     Q    Okay.  That's not the scenario that we
23  are talking about.
24         So if I mark off at 11:30 p.m. on
25  Monday, all right, just before midnight, just

Page 112

1  before Monday ends, I get four points for Monday,
2  right?
3      A    Yes.
4      Q    Okay.  And then I don't mark back up
5  on Monday, it then becomes Tuesday, at that point
6  I get another four points, right?
7      A    Yes.
8      Q    Okay.  If I mark back up on Tuesday,
9  at some point on Tuesday, I do get the Tuesday
10  points?
11     A    Yes.
12     Q    Or do those go away?
13     A    No.
14     Q    I still get the Tuesday points?
15     A    Yes.
16     Q    Okay.  So I would have to mark back up
17  between 11:30 p.m. and, you know, basically
18  11:59 p.m. on Monday to avoid those points.  Is
19  that correct?
20     A    It isn't just marking up, it is going
21  to work in the same day.
22     Q    And work.  Okay.
23         So I can mark up, but if I don't
24  actually get called up, I still get the points?
25     A    Yes.

Page 113

1      Q    Okay.  And, again, I have to lose work
2  to get the points in the first place, right?
3      A    You have to lose points on the first
4  day, yes.
5      Q    I have to lose work to get the points,
6  right?
7      A    I'm sorry.  You lose work on the first
8  day, yes.
9      Q    Okay.  Because if I mark off and then
10  I mark back up but I never would have gotten
11  called, that's fine, right?
12     A    Yes.
13     Q    Okay.  But that's a calendar day.
14  That's not a midnight to midnight day?
15     A    This is midnight to 23:59.
16     Q    Okay.  So if I straddle -- okay.  Got
17  it.
18         And then under question four it gives
19  an example.  So that basically the good attendance
20  credit is awarded on the first day of each month
21  following at the mark offs for the previous
22  calendar month.
23         So if I have an unexcused absence on
24  January 2 or January 1, I would have to have
25  perfect attendance or good attendance as the

**SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Anita Tingley on 10/28/2021 Pages 114..117

---

Page 114

1 policy defines it, until March 1st. So basically
2 two months, right?
3     A     You would have to go through
4 February 28.
5     Q     Right. Okay. So basically two
6 months, right, shy a day?
7     A     In that scenario.
8     Q     In that scenario, okay. And it
9 doesn't really matter when I have my unexcused
10 absence in January, I still have to wait until
11 March 1st to get that credit, right?
12     A     You still have to go through the
13 month, yes, through February.
14     Q     Okay. Now, we talked about whether
15 hospitalization can be excused under the CAPS
16 system, right, and that the medical department has
17 to review the documentation that we talked about
18 in order to make that determination. Would you
19 agree with that?
20     A     Yes.
21     Q     Okay. Now, if somebody has
22 intermittent FMLA leave and they go to the
23 emergency room or are hospitalized for their
24 medical condition for which they have FMLA, do
25 they still have to go through that process to get

Page 115

1 the points excused?
2     A     The employee doesn't have points for
3 FMLA.
4     Q     Okay. What is a red block mark off?
5     A     It is where the employee, if they are
6 being called to work, they can mark off red block
7 if they feel that they cannot perform their duties
8 dealing with drink.
9     Q     Wait. What?
10     A     So if you weren't -- so if the
11 scenario if an employee did not think they would
12 be called to work and they had an alcoholic
13 beverage, then they would be able to, if they got
14 caught off guard and they got called to work, they
15 would be able to mark off red block. It is -- it
16 is a protected program through the -- with the
17 union and the company. The day is marked as sick.
18 Nobody knows about it. And then the committee
19 would contact the employee and if that day is
20 covered under the red block, then those points
21 would be removed for that day through this policy
22 or, yeah, policy or program.
23     Q     Okay. So, basically, you know, I
24 didn't think I was going to get called up and I
25 went to, you know, like a barbecue and had a

Page 116

1 couple of beers, and I get a called up and I'm
2 like, I can't drive a train, right, I had three
3 beers, right, that kind of scenario?
4     A     Right.
5     Q     And that you said, I believe you said
6 is coded as sick in terms of availability?
7     A     Correct.
8     Q     Okay. But they don't get assessed
9 points?
10     A     They are assessed points, but only if
11 the employee goes through a -- there is a whole
12 process where they have to go through the red
13 block committee, and then we would be told
14 eventually, right, to remove those points for that
15 day. It's only a 24-hour, up to a 24-hour mark
16 off that it could be handled under.
17     Q     Okay. So it is kind of like the sick
18 with medical documentation, where initially you're
19 just marked as sick, and then -- actually, would
20 it be more akin to hospitalization, where I'm in
21 the hospital, right, initially I get assessed
22 points, but then the medical department reviews my
23 documentation and if they approve my
24 documentation, then the points get removed. Is it
25 that kind of a process?

Page 117

1     A     It is like that, yes.
2     Q     Okay.
3     A     Where the employee receives the
4 points, and then later on -- I mean, and that's
5 only if the employee chooses to go through that
6 program and through that route.
7     Q     Well, sure. And an employee in a
8 hospitalization scenario, they choose to go
9 through the process of documenting their
10 hospitalization, right?
11     A     I was talking about the red block.
12     Q     Sure. I understand. But I'm just
13 saying, you know, if you are making a comparison,
14 the employee in the hospitalization scenario also
15 have to make that choice whether or not to submit
16 all of that, right? Different process but they do
17 make the choice?
18     A     Yes.
19     Q     Okay. Now, if you have a red block
20 mark off during a good attendance credit period,
21 does that -- can you still get a good attendance
22 credit if you have a red block mark off that gets
23 approved later?
24     A     So those points are removed, but the
25 employee was still unavailable for that.

**SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Anita Tingley on 10/28/2021                    Pages 118..121

Page 118

1  Q    So the answer to that question is?
2  A    No.
3  Q    No.  Okay.  They do not get a good
4  attendance credit even if it gets approved, right?
5  A    Correct.
6       MS. TUCK: Okay.  Okay.  Let's take a
7  break for lunch.  I really only need until about
8  1:30 unless anybody else needs more time.  I
9  probably have like another hour, well, maybe an
10 hour and a half.
11      Everybody okay with 1:30?
12      MR CHIAVETTA: That work for you,
13 Anita?
14      THE WITNESS: Yes.
15      MR CHIAVETTA: That works for us.
16      MS. TUCK: All right.  Thank you.
17            - - -
18      Thereupon, at 12:57 p.m. on Thursday,
19 October 23, 2021, a luncheon recess was taken.
20            - - -
21
22
23
24
25

Page 119

1             Thursday afternoon session,
2             October 28, 2021.
3            - - -
4  BY MS. TUCK:
5  Q    Okay.  So I'm going to go ahead and
6  share my screen.  Okay.  All right.
7       So are you seeing business
8  requirements document?
9  A    Yes.
10 Q    You are.  Okay.  And that's all you're
11 seeing, right?  I can't see what you are seeing.
12 It says my screen sharing is paused.  Let me try
13 that again.
14      All right.  Are you seeing business
15 requirements document CAPS?
16 A    Yes.
17 Q    Okay.  Now this is the document that
18 we discussed earlier that was provided to your
19 counsel last night, correct?
20 A    Yes.
21 Q    Okay.  What does this document -- what
22 is this document for?
23 A    It is building the CAPS system.
24 Q    When was this document first created?
25 It's got a last updated date of 10/27/21, but when

Page 120

1  was this document started?
2       A    That was like auto populated on there,
3  but it's in 2014 is when the document was made.
4       Q    Okay.  Were there changes to the
5  document since 2014?
6       A    From this document?  This is the
7  original business requirement document.
8       Q    Okay.  So there have not been changes
9  to this document since the implementation of the
10 2015 CAPS policy, correct?
11      A    Yes.
12      Q    Okay.  Was a similar document created
13 for the changes to the 2019 policy?
14      A    We do not have documents like that
15 because we did not build a whole new system, we
16 just made changes to our original system.
17      Q    I'm sorry.  Go ahead.
18      A    So there is a document that shows the
19 changes that we wanted.
20      Q    So there is another document that
21 shows the changes to the CAPS system in 2019,
22 correct?
23      A    Yes.
24      Q    Have you provided that document to
25 your attorney?

Page 121

1       A    The 2019, there is not a document like
2  this.  There is just the changes.
3       Q    I understand it's not like this, but
4  there is a document.  You said there is a
5  document, right?
6       A    Yes.
7       Q    Okay.  Have you given that document to
8  your lawyer?
9       A    Yes.
10      MS. TUCK: Tom, have we been provided
11 with that?
12      MR CHIAVETTA: I have not.  So the
13 2019 version that I received last night is not
14 legible.  There is some formatting issues in it,
15 so I have not been able to review it.  I think one
16 of the columns collapsed.  It almost looks like
17 large portions are like Excel spreadsheet when you
18 print to PDF, and it has gotten smooshed, so you
19 can't read the text.  So I need to talk to CSX and
20 see if we can get a legible version.
21      MS. TUCK: Okay.  And when were we
22 going to be provided with that in a legible
23 version?
24      MR CHIAVETTA: Well, I need to review
25 it first.  I haven't had a chance to review it.

**SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
**Anita Tingley on 10/28/2021**                    Pages 122..125

---

Page 122

1          MS. TUCK: Okay. Well, that's fair
2  because you did just get it.
3  BY MS. TUCK:
4          Q     Okay. Ms. Tingley, you testified
5  earlier that the only change to the CAPS system
6  between the two policy changes was this 2018 FMLA
7  change. Do you recall that?
8          A     Yes.
9          Q     Okay. Was there a document created to
10 reflect those changes?
11         A     I did not see a document like this
12 with those changes.
13         Q     Well, you are here to testify on
14 behalf of the company with respect to these
15 policies. So are you able to answer that question
16 on behalf of the company whether there was a
17 document created for that change? As you sit here
18 today, are you able to answer that question for
19 the company?
20         A     I do not know if there is a
21 requirements document just like this for those
22 changes.
23         Q     Okay. So you are not able to answer
24 that question for the company, right, because you
25 don't know, right?

---

Page 123

1          A     The information is in the technology
2  system, but I do not know where the requirement
3  document is for that.
4          Q     Do you know whether it exists or not,
5  the requirement document?
6          A     I do not know if there is a business
7  requirement document for that part of it.
8          Q     Okay. So you cannot answer that
9  question today on behalf of the company because
10 you do not know if that document exists, right?
11         A     That's correct.
12         Q     Okay. Are there any other, other than
13 the 2018 requirement document that we're not able
14 to ascertain whether that is a thing or not, are
15 there any other requirements documents that you
16 have not told me about or, I'm sorry, that you
17 have not provided, that have not been provided to
18 your lawyer?
19         A     No.
20         Q     You said you provided this one and the
21 2019. There are no others unless there is a 2018,
22 right?
23         A     Correct.
24         Q     Okay.
25               MS. TUCK: Okay. So, Tom, I mean, I

---

Page 124

1  tried to take a look at this during the break.
2  There is no way that I can read this and analyze
3  this. It's very substantive. It is 72 pages.
4          I'm requesting that we -- I can get
5  through my other questions, but we are going to
6  have to reconvene Ms. Tingley to go over this
7  document. I presume the 2019 document if after
8  you review it you believe that it is something
9  that needs to be produced and that would also give
10 her time to determine that there is a 2018
11 document.
12         Is that agreeable to you because it
13 seems fair to me?
14         MR CHIAVETTA: Well, I guess, frankly,
15 I think it would probably depend on what's in the
16 2019 document.
17         MS. TUCK: I can't -- I can't ask her
18 about this document because I haven't had
19 sufficient time to review it. I mean, I got it
20 while the deposition -- after the deposition had
21 started.
22         MR CHIAVETTA: Well, if we -- if we
23 agree to reconvene just with respect to, you know,
24 the certain limited documents, I think we could do
25 that.

---

Page 125

1          MR. ALBRECHTA: That sounds
2  reasonable.
3          MR CHIAVETTA: With the understanding
4  it is not going to be another, you know,
5  seven-hour deposition plowing through everything.
6  But if we limit it to simply these business
7  requirements documents, you know, I think that is
8  reasonable.
9          MS. TUCK: Right. Because the other
10 one, I mean, the other one was just a one pager.
11 I mean, that's no big deal.
12         Okay. Yeah, I think that's fine. So,
13 good, I'm glad we're agreeing to that.
14         Should we go off the record and figure
15 out whether or not we can do that next week or do
16 you want to do that?
17         MR CHIAVETTA: Why don't I -- I'll
18 consult off line with Anita and I can get you
19 dates.
20         MS. TUCK: Okay. Okay. All right.
21 Sounds good. So we'll go back on the record.
22         Okay. So based on that agreement, I
23 am going to reserve my questions relating to this
24 document for the second portion of Ms. Tingley's
25 deposition whenever that is.

---

Page 126

1          Is that okay, Tom?
2          MR. ALBRECHTA:  And in addition to the
3   review of the document that may be produced
4   subsequently.
5          MS. TUCK:  Well, sure, and any other
6   subsequent documents that maybe produced that is
7   related to the topics that Ms. Tingley is here to
8   talk about today.
9          Is that acceptable, Tom?
10         MR CHIAVETTA:  Yeah, with the caveat,
11  I am just repeating it because I don't know if it
12  was on the record or not, with the caveat that the
13  deposition just be limited to these particular
14  documents, the business requirement document
15  produced today and any produced subsequently as
16  Joe noted.
17         MR. ALBRECHTA:  Okay.  Thank you.
18         MS. TUCK:  Okay.  Let's see.  All
19  right.  So let's take a look at the new policy.
20  That is, Micaela -- oh, I got to stop sharing.
21  Okay.  Micaela, that's Bates number 4933.
22         MS. EBERHARD:  I'm sorry.  Could you
23  repeat the Bates number again?
24         MS. TUCK:  Sure.  It's 4933.  But you
25  know what, it might not say Bates number.  It

Page 127

1   might just say CAPS policy 2019 maybe.
2          MS. EBERHARD:  Okay.  Here it is.
3          MS. TUCK:  Yeah.  Okay.
4          Here we go.  Okay.
5   BY MS. TUCK:
6      Q     Okay.  So, Ms. Tingley, I'm just going
7   to have Micaela just kind of scroll through this
8   at a moderate speed.  A little faster.  Okay.
9   Great.
10         So, Ms. Tingley, is this the CAPS
11  policy that you were testifying about previously
12  that came into effect June 1, 2019?
13     A     Yes.
14     Q     And this resides on the Gateway as
15  well?
16     A     Yes.
17     Q     Okay.  I should be clear.  Is the old
18  policy still on the Gateway or was that taken off
19  when the new policy went on?
20     A     It would be removed when the new
21  policy came into effect.
22     Q     Yeah.  I just said as well, so I just
23  wanted to -- I didn't think that was what you
24  meant, so my question was poorly worded.
25         So I'm going to walk through some of

Page 128

1   the changes that I identified, and then I'm going
2   to give you an opportunity to let me know any
3   changes that were not identified, okay, just to
4   make sure I got it right.  I think that's maybe
5   the fastest way to go about this.
6          So this has a policy owner as head of
7   labor relations.  Who is head of labor relations?
8      A     That would be our VP, Jeff Wall.
9      Q     And do you have an understanding as to
10  what policy owner means in this context?
11     A     That the policy is in effect from
12  labor relations.
13     Q     Okay.  So this is a labors relations
14  policy, is that what you mean?
15     A     Yes.
16     Q     Okay.  And, obviously, it's effective
17  on June 1, that's 2019, that's a difference,
18  right?
19     A     Yes.
20     Q     And it says that this relates to the
21  handling of attendance previously handled under
22  the 2015 CAPS system, right?
23     A     Yes.
24     Q     Okay.  And it looked that everything
25  is essentially the same up until we hit 1B.  Would

Page 129

1   you agree with that about what points accumulate?
2      A     Yes.
3      Q     All right.  And instead of the
4   handling under the old policy, you would get
5   handled -- that sounds kind of -- you would get
6   handled.  If your point total got to 20, and under
7   the new policy they've changed it so the points
8   continue to accumulate and you get progressive
9   discipline, more progressive discipline as the
10  points reach those thresholds.  Would you agree
11  with that?
12     A     Yes.
13     Q     Okay.  And the thresholds are 20, 40
14  and 60, right?
15     A     Yes.
16     Q     All right.  And then we get to the
17  attendance point schedule and there are some
18  changes here.  So for Ms. -- there is a new
19  category -- so under the old policy you had missed
20  call, and that would be ten points regardless of
21  when you took it.  This one you got miss call but
22  also failure to report when marking off after
23  accepting call.
24         Is that a different thing than missed
25  call in the last policy?  What would that have

**SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
**Anita Tingley on 10/28/2021**                    Pages 130..133

Page 130

1  been considered under the 2015 policy?
2      A      It would have been considered under
3  the ten point, the missed call.
4      Q      Okay.  So that's just sort of another
5  version of the 2015 missed call?
6      A      Yes.
7      Q      Yeah.  Okay.  And then we have missed
8  call, which is sort of the rest of the missed call
9  category in 2015, right?
10     A      Yes.
11     Q      And then we got unauthorized time
12 absent.  The old policy it says, "unauthorized and
13 unavailable full or partial day."
14            So has that -- has that changed so
15 that all it has to be is unauthorized?
16     A      We just simplified the wording for the
17 same mark offs that we spoke about earlier in the
18 2015.
19     Q      Okay.  But they still have to be
20 unavailable under the 2019 policy as we had
21 discussed?
22     A      Yes.
23     Q      Okay.  So even though it doesn't say
24 unavailable anymore, they still have to be
25 unavailable?

Page 131

1      A      Yes.
2      Q      And still full or partial day, right?
3      A      Yes.
4      Q      So that stays -- that's the same.
5            And then we have the two, six in
6  hospitalization, the categories are still the same
7  but the points have changed.  Is that correct?
8      A      The sick without valid medical
9  documentation stayed the same, but with admittable
10 documentation changed.
11     Q      Okay.  So without medical
12 documentation, you are still getting more points
13 on the weekends, sick without medical
14 documentation, you have reduced the point value,
15 and hospitalization still remains zero, right?
16     A      Correct.
17     Q      Okay.  Now unauthorized, we -- we'll
18 call it unauthorized.  Let's see where are we.
19 Okay.  An unauthorized time is still more heavily
20 taxed on the -- more heavily assessed on the
21 weekends as well.  It is penalized more on the
22 weekends, right?
23     A      Yes.
24     Q      Okay.  And FMLA under the good
25 attendance credit, you can still -- your FMLA

Page 132

1  leave still prevents you from getting a good
2  attendance credit as long as you are not paid for
3  it, right?
4      A      You are not eligible for the good
5  attendance credit if you do not have an
6  entitlement attached to that day.
7      Q      Okay.  Is that just a different way of
8  saying what I just said that basically if you are
9  not paid for that day, that you are not eligible
10 for a credit?
11     A      Yes.
12     Q      Okay.  Except now the good attendance
13 credit earning period, instead of it being a
14 calendar month, it's six-calendar months.  That's
15 a change, right?
16     A      Yes.
17     Q      Okay.  So in the scenario we talked
18 about earlier where we anticipated to take two
19 days FMLA leave per month, then we determined that
20 if, in fact, you did that, you would never receive
21 a good attendance credit, now he really can't get
22 one, right, because if he takes FMLA just once
23 unpaid in six months, no good attendance credit,
24 right?
25     A      That's correct.

Page 133

1      Q      And the other difference is that the
2  good attendance credit is bigger, so you get ten
3  points as opposed to three points?
4      A      Yes.
5      Q      Why did the company decide to make
6  this change?
7      A      It was decided that we wanted to go to
8  a six-month time period, that if an employee went
9  six months, then they would be eligible for the
10 ten-point reduction instead of doing it monthly.
11     Q      I understand that.  We already talked
12 about that.  I asked you why did the company make
13 this decision?
14     A      We were in there and were changing the
15 thresholds, and so it was decided to -- that
16 monthly was -- one month was too -- too small of a
17 time period, so we decided on a six-month time
18 period for the good attendance credit for the
19 employees to have to be available.
20     Q      Why was it too small?  Too small for
21 what?
22     A      That if the employee marked off, that
23 it only took them one month to get all of their
24 points off or two months if it was a four point or
25 six point.  So to drive the availability up,

Page 134

1  right, then it was decided to do a six-month time
2  period.
3      Q      And you said this was discussed.  Was
4  this discussed in meetings or emails?
5      A      It was discussed in meetings.
6      Q      What about emails?
7      A      No.
8      Q      Okay.  Instant messaging, was this
9  discussed at all in instant messaging?
10     A      No, this was in meetings.
11     Q      Okay.  Were there drafts of this
12  policy that went back and forth?
13     A      There may be drafts of the different
14  wording.
15     Q      And -- okay.  So this is that, this
16  draft that we're looking at now is not the only
17  draft that existed, right?
18     A      The only thing that changed was the
19  wording, right, changing some of the wording.
20     Q      Right.  So there are -- there were
21  versions of this document where the words were
22  different, right?
23     A      Yes.
24     Q      Some of them.  Okay.
25            Do you have access to those in your

Page 135

1  email?
2      A      Yes.
3            MS. TUCK:  Tom, do you have any
4  objection to getting those to us?
5            MR CHIAVETTA:  Yeah, I do, because I
6  don't understand how they are relevant.
7            MS. TUCK:  Well, she is not really
8  able to -- we're having a hard time getting her to
9  testify as to why this company made those changes,
10  so I would say that those would reflect the
11  purposes behind those changes or at least be
12  relevant to the purposes behind those changes.
13            MR CHIAVETTA:  You have filed a FMLA
14  interference claim, and intent is not an element
15  of the claim.  Obviously it is lawful or it is
16  not.  This is not a discrimination claim where the
17  intent is at issue.
18            MS. TUCK:  Actually, we have a
19  retaliation claim as well in this case.
20            So are you saying they are not
21  relevant or they are not discoverable?
22            MR CHIAVETTA:  I'm saying they are not
23  relevant.
24            MS. TUCK:  Okay.  Well, I think they
25  are discoverable.  So would you say they are not

Page 136

1  discoverable?
2            MR CHIAVETTA:  If it is relevant, then
3  it's discoverable.
4            MS. TUCK:  Sure.  But if it's not --
5  if it is potentially relevant and proportional,
6  then it's discoverable.  So are you refusing to
7  produce these?
8            MR CHIAVETTA:  I'm objecting on
9  relevance grounds.
10            MS. TUCK:  Are you going to produce
11  them?
12            MR CHIAVETTA:  I will review the
13  documents, and we'll reserve our objections.
14            MS. TUCK:  Okay.  Will you let me know
15  after you have reviewed the documents?
16            MR CHIAVETTA:  Yes.
17            MS. TUCK:  Okay.
18  BY MS. TUCK:
19     Q      Okay.  So and are those essentially
20  all of the changes up until the medical review
21  process to the policy?  Have we talked about all
22  of the changes?
23     A      On this page.
24     Q      Okay.  All right.  Up through good
25  attendance credit, right?

Page 137

1      A      Yes.
2      Q      Okay.  Now we get to the medical
3  review process.  The only change that I saw was
4  that -- whoops -- under A, originally the medical
5  department advised CMC.  Is that management?
6      A      CMC is management.
7      Q      Okay.  CMC, does that refer to
8  individual, like people in the department or is
9  CMC some system?  What does CMC stand for?
10     A      CMC is Crew Management.
11     Q      Okay.  So the Crew Management
12  Department or I thought there was a Crew
13  Management Computer System?
14     A      That's Crew Web, and then there is a
15  the mainframe TECS.
16     Q      Okay.  Well, some people have referred
17  to the mainframe as Crew Management, too.  So when
18  you say Crew Management, you're talking about?
19     A      Department.
20     Q      The department.  Okay.  Okay.  And
21  TECS is the mainframe, right?
22     A      Yes.
23     Q      All right.  So the changes that now
24  the medical department advises the availability
25  department.  Are you the availability department

**SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Anita Tingley on 10/28/2021                    Pages 138..141

Page 138

1 or is that a different department?
2      A      I am the availability department, my
3 team is.
4      Q      Okay.  So before they would let Crew
5 Management know, now they let basically you and
6 your staff know?
7      A      I was at Crew Management before, and
8 that's the reason it is stated CMC.  So it's
9 always been handled by the availability
10 department, but it was housed at Crew Management
11 at one time.  We are now.
12     Q      Okay.
13     A      Okay.
14     Q      Okay.  All right.  That makes sense.
15 So basically the process stayed the same, it's
16 just you resided in a different place at that
17 point?
18     A      Yes.
19     Q      Okay.  And that's the only change that
20 I saw to the medical review.  Would you agree with
21 that?
22     A      Yes.
23     Q      Okay.  And so would the reasons why
24 the company had this medical review process also
25 remains the same after 2019, right, same purpose

Page 139

1 is served by this process?
2      A      Yes.
3      Q      All right.  Then we get to attendance
4 handling schedule.  Okay.  That's Section 4.
5            So this has changed to reflect that
6 now the handling level or the handling step
7 increases with each 20-point increment.  Would you
8 agree with that?
9      A      Yes.
10     Q      Okay.  And now there are only three
11 steps, whereas before there are four?
12     A      Yes.
13     Q      And instead of counseling letters --
14 well, I don't understand some of this stuff.
15 Under Option A for Step 1, it says, "Waiver for
16 formal reprimand."  What does that mean?
17     A      It means instead of going to the
18 investigation, the hearing, the employee can sign
19 a waiver for a formal reprimand so it would just
20 be that they accept the Step 1 under the
21 attendance policy.
22     Q      Oh, okay.
23            So the second option would be to have
24 a disciplinary charge under the collective
25 bargaining agreement and then face a one-day

Page 140

1 suspension or they can waive it and just get a
2 formal reprimand, right?
3      A      Yes.
4      Q      Okay.  The formal reprimand, is that
5 more helpful to an employee because if they have
6 other discipline not related to CAPS, does that
7 help them out somehow to start off on a lower
8 step?  Why give them the option?
9      A      It's the same level the employee would
10 be at if he chose to sign a waiver or if he went
11 to the investigation.  It's just that the employee
12 if found guilty, went to the investigation and
13 found guilty, he would then be off one day actual
14 suspension.  Instead of the formal reprimand be a
15 piece of paper saying that they agree that, you
16 know, that they were off and that that goes into
17 their file for the Step 1.  And they would not be
18 off for one-day suspension.
19     Q      Okay.  So this waiver for formal
20 reprimand, a formal reprimand is Step 1 under the
21 union, under the CBA progressive discipline
22 policy, correct?
23     A      No.
24     Q      No.
25     A      It is Step 1 under the CAPS attendance

Page 141

1 policy.
2      Q      Right.  But so is Option B, right?
3      A      Yes.
4      Q      Okay.  Is a formal reprimand something
5 that the collective bargaining agreements provide
6 for?
7      A      That the employee can waive and do a
8 informal reprimand instead of going to an
9 investigation.
10     Q      Is that spelled out in the collective
11 bargaining agreements?
12     A      Yes.
13     Q      Do you know what step that is the
14 collective bargaining agreement disciplinary
15 process, formal reprimand?
16     A      What step in the collective bargaining
17 agreement?
18     Q      Uh-hum.
19     A      So the collective bargaining agreement
20 states that they can choose to go to a formal
21 hearing, and we have to abide by time limits, et
22 cetera, hold a fair and impartial hearing, and
23 then give discipline in a timely manner.
24     Q      Are you able to tell me whether or not
25 if someone chooses a formal reprimand under this

**SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Anita Tingley on 10/28/2021     Pages 142..145

---

Page 142

1 policy, whether that also counts as some sort of
2 discipline under the collective bargaining
3 agreements, are you able to tell me that today?
4      A     I'm confused with your question.
5      Q     What is confusing about my question?
6 What part of my question is confusing?
7      A     So the Step 1, when they sign a waiver
8 is still a Step 1 under the absenteeism policy.
9      Q     All right. I know that. Do you
10 understand that the collective bargaining
11 agreements for the train and engine employees
12 provide for progressive discipline?
13      A     In how that we need to handle the
14 investigation.
15      Q     I'm not asking you about anything that
16 has do with CAPS necessarily. Do you have an
17 understanding that under the collective bargaining
18 agreement there is a progressive disciplinary
19 procedure as to how to discipline these union
20 employees?
21      MR CHIAVETTA: Object to form.
22      A     I have knowledge of the collective
23 bargaining agreement on the -- on how many days to
24 charge, the time limits, et cetera.
25      Q     Time limits. What do you mean by

Page 143

1 "time limits"?
2      A     That we only have so long to charge an
3 employee for -- to get the investigation notice
4 out, if we are going to charge them under a rule
5 violation or under the absenteeism policy.
6      Q     Okay. And then under Step 2, you can
7 also receive a formal reprimand or choose to go to
8 hearing and have a suspension, right?
9      A     Yes.
10      Q     And then for Step 3, there is no
11 waiver possible. You have to go to hearing,
12 right?
13      A     Under the Step 3, it can be as going
14 through the general manager out in the division
15 and through the arbin discipline side if they
16 choose, if they do ask for a waiver under the
17 Step 3.
18      MS. TUCK: Can you the court reporter
19 read back her answer, please.
20      - - -
21      Thereupon, the record was read back as
22 requested.
23      - - -
24 BY MS. TUCK:
25      Q     Okay. So are you telling me that they

Page 144

1 have two options at the stage Step 3?
2      A     That there are waivers that are
3 offered on the Step 3, not offered but if the
4 local chairman goes to the general manager
5 superintendents out into the field, and it's
6 agreed to, then there are waivers for the Step 3.
7      Q     Okay. And if there's a waiver, are
8 they still suspended or dismissed?
9      A     The waivers for the five-day actual
10 suspension.
11      Q     Okay. And then the next change is
12 that we've just added, we've just for the
13 seniority CAPS points, that has been adjusted to
14 reflect the new point thresholds, correct?
15      A     Yes.
16      Q     And then there is something about in
17 excess of five days in discipline, but I'm not
18 going over that.
19      All right. Then B, is that just --
20 that's also changed. Is that just to reflect the
21 change to the good attendance credit of being ten
22 points for six months?
23      A     Yes.
24      Q     And C has changed. So -- so
25 originally it said -- okay. Actually, C is the

Page 145

1 same, right? There were no changes to C here,
2 4C?
3      A     Can you bring up C from the other one?
4      Q     Yes.
5      MS. TUCK: Is it still there? Should
6 be that CAPS policy. There we go. Okay.
7 BY MS. TUCK:
8      Q     There is no changes to the first
9 paragraph, right, or the second part? We can go
10 back if you want.
11      A     Well, the first definitely is the
12 same. Okay. If we can go back to the other one.
13 And that's the second paragraph is the same.
14      Q     Okay. And then we've got initial
15 point assessment section 5.
16      Is that essentially retrofitting of
17 the folks with points under 2015's policy into the
18 new policy?
19      A     Right. So depending on what step they
20 were at is how we adjusted them under the new
21 policy.
22      Q     Okay. So just like before, if they
23 were at Step 1 or Step 2, they are -- their points
24 weren't erased, but they are no longer at Step 1
25 or Step 2?

**SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Anita Tingley on 10/28/2021                    Pages 146..149

Page 146

1    A    Correct.
2    Q    Okay.  Until they reach 20.  All
3  right.  All right.
4         Let's look at the Q & A for 2019.
5  That's Bates number 29149.  Okay.  So -- this
6  is changed.
7         Previously on question one it said
8  that points are assessed for unavailability as
9  defined by the policy, and this says, "has any
10  unauthorized time absent as defined by the
11  policy."
12         And it is your position that
13  unauthorized means the same thing as unavailable
14  under the last policy?
15    A    Yes.
16    Q    Okay.  Was that explained to the
17  employees in any way?
18    A    Well, in the policy it states
19  unauthorized.  I mean, so the wording for that,
20  what it said in the 2015 was just changed to the
21  unauthorized absent on the same line.  The policy
22  and the question and answers were sent out to all
23  of the employees address of record.
24    Q    Okay.  So is that supposed to just
25  reflect that you shortened unauthorized and

Page 147

1  unavailable to unauthorized?
2    A    Yes.
3    Q    Okay.  And they still have to be
4  unavailable, right, you are saying?
5    A    Yes.
6    Q    Okay.  And question 14, it's on page
7  3.
8         So previously we had talked about a
9  scenario where somebody marks off and then marks
10  back up before their turn is up and that is not
11  considered unauthorized under this policy.  Is
12  that because they are available?
13    A    The employee isn't in unavailable
14  status.  It's just that that employee didn't lose
15  work when they were off.
16    Q    Okay.  So we still have to lose work
17  to be unauthorized?
18    A    They have to lose work, yes, on the
19  initial day.
20    Q    Right.  All right.  Question 15.  That
21  has to do with pool.  I do not see a question and
22  answer, a Q & A specific to a minimum amount of
23  time that somebody can be off before that calendar
24  day is considered unavailable.  Is there a reason
25  that was omitted?

Page 148

1    A    Once the employee loses work, it
2  doesn't matter how long they were off, then that
3  is considered an unavailable day.
4    Q    Is that a change in 2019 or was that
5  always the case?
6    A    The lost work is what, once they have
7  lost work, that is what drives those points,
8  right.
9    Q    Okay.  But what I'm saying, was that
10  also true under in the 2015 policy?
11    A    Yes.
12    Q    Okay.  Okay.
13         MS. TUCK:  Can we pull up Bates number
14  1268.  Maybe you can zoom out.  There we go.  Can
15  you just scroll so she can see what this looks
16  like generally.
17  BY MS. TUCK:
18    Q    Now, we talked about something that
19  the employees can do in Crew Web I believe you
20  said --
21    A    Yeah.
22    Q    -- about what their points are and the
23  detail.
24         Is that what we're looking at now for
25  Mr. York?

Page 149

1    A    Yes.
2    Q    Are there views that you or other
3  managers have in Crew Web that provide information
4  that is not on this document?  Can you see more
5  information than Mr. York in Crew Web about his
6  CAPS points good attendance credits?
7    A    There is a different page of the dates
8  that the employee is unavailable, but it is the
9  same information.
10    Q    Okay.  So you cannot see anything more
11  about his CAPS history than he can?
12    A    I can see every day that comes into
13  the system.  So on Mr. York's, if the employee on
14  the date of 12/22 of 2017 when he missed a call,
15  it shows him ten point, if that missed call was
16  incorrect, on mine I would go in and if it was an
17  error, then he would not see that.  It would be
18  zero points on my side, and that date and that
19  line would be gone from his record because it is
20  not against him.
21    Q    Okay.  So any corrections you can see
22  but he cannot?
23    A    Correct.
24    Q    Does the CAPS system -- can you log
25  into the CAPS system and see what kind of absence

**SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Anita Tingley on 10/28/2021                    Pages 150..153

Page 150

1  disqualified him from good attendance on any of
2  these dates?
3      A     No.
4      Q     Who can see that?  Who has that
5  information?
6      A     Nobody can see that.
7      Q     Let me ask you this:  How does CAPS
8  know that his good attendance is disqualified?
9      A     It is reading the codes of the layout
10 codes out of the employee' work history.
11     Q     Okay.  Layoff codes that exist in
12 TECS?
13     A     Yes.
14     Q     So CAPS gets that information from
15 TECS?
16     A     Yes.
17     Q     All right.  So if we had an employee's
18 work history from TECS, you say it is a common
19 work history.  What is that called exactly?
20     A     The employee's work history.
21     Q     So if we had the employee's work
22 history and we put that side-by-side with their --
23 what do we call this document?  Do you have a name
24 for it?
25     A     It is an employee's detail page.

Page 151

1      Q     Employee's detail page in CAPS -- and
2  put it next to the employee detail page, we should
3  be able to figure out what kind of absence
4  disqualified Mr. York from a good attendance
5  credit for each of these indicated dates, right?
6      A     Those months, yes.
7      Q     I didn't hear you.  Those what?
8      A     For the months, yes.
9      Q     For the months.  Okay.  Well, on this
10 report it has dates next to these good attendance
11 disqualified.  So these dates just reflect that
12 that is when -- do these dates reflect that's when
13 he would have been eligible had he not had a
14 disqualifying absence?
15     A     So that event time under good
16 attendance disqualified will always be a first of
17 a month.  So that 12-1 of 2018 was for
18 January 2018.  The January 2018 is for December of
19 2018.
20     Q     Okay.
21     A     Or December 2017.  So the January 1,
22 2018, is actually for December of 2017 for that
23 month.
24     Q     Okay.  So if he is -- so we'll just
25 take the last one on this list.  Well, actually,

Page 152

1  let's -- all right.  We'll take -- yeah.  Let's go
2  to the last one on this list, I mean on this page.
3  All right.
4             So he is disqualified on October 1,
5  2016.  Does that mean that he had a disqualifying
6  absence in September?
7      A     Yes.
8      Q     Okay.  Now if -- so in this scenario,
9  he has been -- he was assessed, it looks like at
10 the bottom of the page, bottom of next page.  So
11 in this circumstance he was assessed at some point
12 in 2015 ten points in the month of April 2015,
13 right?
14     A     Yes.
15     Q     All right.  And then if we scroll up,
16 he gets -- he gets three good attendance credits
17 such that he goes down to one as of September 1,
18 2016, right?
19     A     Yes.
20     Q     Okay.  And then he finally loses that
21 point in February, on February 1 of 2017.
22     A     Yes.
23     Q     Right?  And then he's assessed 12 more
24 points -- well, he's assessed 18 more points
25 between the end of September, between

Page 153

1  September 2017 and December of 2017, right?
2      A     Correct.
3      Q     Okay.  And when it says "medically not
4  supported," does that mean that he did not satisfy
5  whatever requirements there were in that medical
6  review process for one reason or another?
7      A     He did not send in any documentation
8  for those days.
9      Q     Okay.  So that shows that he didn't
10 even try to provide medical documentation?
11     A     Correct.
12     Q     If he tried to provide medical
13 documentation and it was rejected by the
14 department, what would it say there?  Would it
15 still say medically not supported?
16     A     Well, if the employee sent in
17 documentation for those days, then it would say
18 nonmedical emergency, and then the employee would
19 have the reduced points if he had sent in
20 documentation.
21     Q     But if that's only if the medical
22 department approves it, right?
23     A     So if the employee sent in medical
24 documentation for that date --
25     Q     Yeah.

**SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Anita Tingley on 10/28/2021

Pages 154..157

Page 154

1      A      -- then he will get the reduced
2  points.
3      Q      Regardless, I thought the medical
4  department had to review it under the process, the
5  documentation they provided?
6      A      So they are reviewing the medical
7  information to deem it either an emergency or a
8  hospitalization for the zero points.  But if the
9  employee sends the documentation for the dates in
10  question, the employee would get the reduced
11  points.
12     Q      Okay.  So if they provide some kind of
13  medical, if they provide some sort of medical
14  documentation for the absence but it's not enough
15  to be considered an emergency or a
16  hospitalization, then it becomes sick with valid
17  medical documentation?
18     A      Yes.
19     Q      Okay.  Got it.  And then the current
20  steps at the top, these reflect the steps under
21  the 2015 policy, right?
22     A      Yes.
23     Q      All right.  And the little, I don't
24  know, clock or gauge or whatever it is on the side
25  there, is that supposed to reflect what step you

Page 155

1  are in, that needle?
2      A      I'm sorry.  That's just the current
3  points.  So that would be 18, and that's the
4  current points that he has on the document.
5      Q      Oh, okay.  So that's how far you have
6  to go until 20?
7      A      Yes.
8      Q      Okay.  And so in the case of Mr. York,
9  as of this document, he's close to getting to a
10  disciplinary stage, right?  He's two points away.
11     A      Yes.
12     Q      And if those good attendance
13  disqualifications are related to his FMLA usage,
14  then him taking FMLA leave impacted his point
15  total, right?
16     A      It does not reduce the point total.
17     Q      Well, sure, but he would have had his
18  point total reduced by good attendance credits if
19  FMLA wasn't a disqualifying absence, right?
20     MR CHIAVETTA:  Objection.  Lack of
21  foundation.
22     You can answer.
23     THE WITNESS:  If that, if the FMLA
24  mark offs are the only absence within that time
25  period, then the employee would not receive the

Page 156

1  good attendance credit.
2  BY MS. TUCK:
3      Q      And if that happened repeatedly in
4  each one of these months, but for his FMLA leave,
5  he would have no points, right?
6      A      Well, depends on how many months that
7  the employee would be available.
8      Q      Okay.  Well, he's disqualified --
9  let's see.  He has got a zero balance as of
10  March 1, 2017, and then he has, one, two, three,
11  four, five, six consecutive months of
12  disqualification, right?  That's correct, right?
13     A      Could you go down.
14     Q      Okay.  Actually, let's start at
15  September.  So on September 12, 2017, he gets a
16  point for sick without medical support, without
17  medical documentation, right, he gets four points?
18     A      Yes.
19     Q      Okay.  And then for two months in a
20  row, he has -- he is disqualified for good
21  attendance.  So if he had qualified for good
22  attendance, he would have had zero, he would have
23  gone back to zero, right?
24     A      At that point, yes.
25     Q      Okay.  And then he would have had --

Page 157

1  so then he has another sick and he gets assessed
2  another four points.  Now if he had gotten those
3  good attendance credits, his total would have been
4  four at that point and not eight, right?
5      A      Right.
6      Q      And then he has another good
7  attendance disqualification.  So if he had not
8  been disqualified at that point, he would have had
9  one point, right?
10     A      Incorrect.
11     Q      Okay.
12     A      And actually, if we can go back.  I'm
13  sorry.
14     So October 1 the employee would be
15  disqualified because in September because
16  October 1st is for September.  So the employee --
17  so let's go back to there and start over if we
18  can, please.
19     Q      Oh, I see.  So you're saying that
20  because he also -- because he had this sick time,
21  he would have been disqualified anyway?
22     A      Yeah.  So that October 1st --
23     Q      Okay.
24     A      -- yeah, is not there.
25     Q      All right.  But then he would have had

**SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
**Anita Tingley on 10/28/2021**   Pages 158..161

Page 158

1 another point.  So he would have been at one in
2 November?
3     A     Yes.
4     Q     Okay.  Which means that when he had
5 another sick, he would have been at five instead
6 of eight, right?
7     A     Yes.
8     Q     Okay.  And then he is disqualified
9 again.  So if he would have not been disqualified,
10 he would have gone down to two, right?
11     A     Well, he was disqualified for that
12 sick day of November 22.
13     Q     I see.  Okay.  He would still be at
14 five.  All right.
15         Under this scenario, if he had not,
16 other than the sick disqualifications, he would be
17 at, what, 15 as opposed to 18?
18     A     Yes.
19     Q     Okay.  So he would have had at least
20 another sick opportunity before he got
21 disciplined, right, sick with no documentation?
22     A     Yes.
23     Q     All right.  Any other information that
24 you can see in CAPS about Mr. York that he can't?
25     A     No.

Page 159

1     Q     All right.  Let's take a look at Bates
2 number 3991.
3         Okay.  Now you mentioned something
4 about an employee work history.  That is not what
5 we're looking at, right?
6     A     It is not.
7     Q     Okay.  What are we looking at here?
8     A     This is in the employee's discipline
9 history in FACTS.
10     Q     Okay.  Do you know what FACTS stands
11 for?
12     A     Field administration, and I don't know
13 what the other, the CTS is.  But it is where all
14 of the IDPAP and absenteeism writeups and all the
15 files and documents are held.
16     Q     Okay.  And as of today, it holds all
17 of those documents today?
18     A     Yes.
19     Q     All right.  So here's my question.
20 All right.  Well, let's -- so if you look at
21 employee information, there is IDPAP incidents,
22 those were the things that you were talking about
23 earlier, those rules violations, right?
24     A     Yes.
25     Q     All right.  So let's keep going down

Page 160

1 to the bottom of the next page.  And so now we've
2 got a new category here that says "absenteeism."
3 Do you see that at the very bottom here?
4     A     Yes.
5         MS. TUCK:  And then scroll down a
6 little bit, Micaela.  Okay.  Right there.
7 BY MS. TUCK:
8     Q     So you can see that that is the most
9 recent absenteeism incident reflected, right,
10 because then it goes to July, then it goes to May.
11     A     Yes.
12     Q     So why is nothing after 2013
13 reflected?
14     A     The employee hasn't hit the threshold
15 for a step under the absenteeism policy.
16     Q     So this reflects that he reached that
17 step, reached a step in December of 2013, right?
18     A     Right.  This is a different attendance
19 policy.
20     Q     This is a different attendance policy?
21 This is not CAPS?
22     A     No.  This was minimum availability in
23 2013.
24     Q     So did CAPS replace that or is this a
25 whole other absenteeism system?

Page 161

1     A     No.  So this was a different
2 attendance policy before we went into CAPS or went
3 into a points system.  We had minimum
4 availability.
5     Q     I see.  So when we were looking at in
6 the 2015 policy and it said that it supersedes the
7 CSX Transportation Absenteeism Policy for T&E
8 employees, that's what these disciplinary actions
9 were under, right?
10     A     This was under the absenteeism minimum
11 availability policy, yes.
12     Q     Okay.  So if there was any discipline
13 of the type that we have been discussing and you
14 described today under CAPS, that would not be
15 reflected here, right?
16     A     For the employee that we were looking
17 at, the employee has never been -- hit a step
18 under the 2015 absenteeism policy, so it would not
19 be reflected here.
20     Q     If he had then reached a step, would
21 it be reflected here?
22     A     Yes.
23     Q     Okay.  So if I reached Step 1 in 2016,
24 that would be on this report?
25     A     Yes.

**SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
**Anita Tingley on 10/28/2021**                    Pages 162..165

---

Page 162

1    Q    Okay.  Does the TECS system make any
2 decision about whether or not somebody is
3 disqualified from the good attendance policy?
4    A    No.
5    Q    All right.  There is some sort of an
6 algorithm that in between the two systems where
7 CAPS says, okay, if there is this code, then we're
8 going to assess points.  If it is this code, then
9 we're not.
10    A    Yes.
11    Q    All right.  Have you ever heard a term
12 algorithm or logic used to described that
13 interaction at CSX between the two systems?
14    A    No, not algorithm.
15    Q    What about logic?
16    A    Right.  There is logic, yes.
17    Q    There is logic.  Okay.
18         Is that logic described or set forth
19 in this, this business requirements document that
20 you gave Mr. Chiavetta last night?
21    A    That's the original document, and I
22 would have to read all of it to see, to make sure,
23 to answer your question fully.  But the
24 requirements were put in there of what was in the
25 policy and what the system needed to do.

---

Page 163

1    Q    Okay.  So back when CAPS was brought
2 online, those logic requirements were set forth in
3 this document, but you just can't tell me what
4 they were without looking at them; is that
5 accurate?
6    A    I have not read it, the full 72 pages,
7 recently.
8    Q    Okay.  So you don't remember whether
9 or not that logic was described in this document;
10 is that right?
11    A    No, that's not what I said.  I said
12 that, that is the requirement.  We took the
13 policy, what the policy states, and we put it into
14 the requirement pages.
15    Q    Is logic the same thing as requirement
16 when you are using those terms?
17    A    So the requirements are -- no, I am
18 not.  So we took the policy, the written policy
19 and then put it into what we needed the system to
20 do.  So for them to code it correctly.
21    Q    And that's how you, the company, labor
22 relations, whatever, communicated to technology
23 what you needed assistance to do?
24    A    Yes.
25    Q    Okay.  Have you ever seen a document

---

Page 164

1 that actually spells out that logic in sort of
2 technology terms?
3    A    All of the code?
4    Q    Yes.  Well, let me -- let me just do
5 it a different way.  Let's look at -- let's see.
6 So, actually, I can just share this.  Whoops, no,
7 I can't because it's sideways.  Hold on.  Let me
8 try this.  All right.  I'm going to go ahead and
9 share my screen here.  Okay.
10         Are you seeing something that says
11 "business rule report"?
12    A    Yes.
13    Q    Okay.  This was previously marked
14 yesterday in Mr. Nose or Naze, I knew I would
15 screw up that eventually, her deposition number --
16 okay.  But at any rate, have you ever -- this is
17 something that she identified in terms of logic
18 that was created so that payroll could accurately
19 calculate guaranteed pay.  So is there, to your
20 knowledge, is there something like this that
21 exists for CAPS so that you can assess CAPS points
22 accurately in the CAPS system?
23    A    We have the business requirement.
24    Q    Okay.  Other than that document that
25 you gave to Mr. Chiavetta last night, have you

---

Page 165

1 ever seen anything like this?
2    A    Looks like no.
3    Q    Okay.  Do you know whether this exists
4 for CAPS?
5    A    No.
6    Q    No, you don't know?
7    A    Correct.
8         MS. TUCK:  All right.  Okay.  Let's do
9 this.  Okay.  Let's take a short break, and then
10 I'll figure out if I have any questions left.
11         So do like ten minutes, at 3:05.  Is
12 that okay?
13         MR CHIAVETTA:  That works.  That works
14 for us.
15              - - -
16         Thereupon, a recess was taken.
17              - - -
18         MS. TUCK:  All right.  Let's go back
19 on the record.
20 BY MS. TUCK:
21    Q    So, Ms. Tingley, I have a few, a few
22 more questions.
23         MS. TUCK:  Micaela, can you pull up
24 the John Johnson declaration.
25

---

**SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
**Anita Tingley on 10/28/2021**                    Pages 166..169

Page 166

1  BY MS. TUCK:
2      Q      All right.  So, Ms. Tingley, do you
3  know who John Johnson is?
4      A      Yes.
5      Q      Who is John Johnson?
6      A      He is the HDO for the BLET.
7      Q      HDO is -- tell me what that is again?
8      A      It's the highest designated officer
9  for the BLET agreement.
10     Q      And in this document he states that he
11 is, he was head of labor relations transportation.
12 Is that the same position or did he have a
13 different position?  Does he have a different
14 position now?
15     A      He has a different title.
16     Q      Okay.  So head of labor relations
17 transportation, were there different heads of
18 labor relations transportation for different
19 unions at this time, this would be May of 2019?
20     A      So there are -- there's HDOs of the
21 different agreements, and there would have been at
22 that time, yes.
23     Q      So in May of 2019, he is head of labor
24 relations transportation but only with respect to
25 BLE or are you not sure?

Page 167

1      A      May of 2019?
2      Q      Yeah.  It's one month before the CAPS,
3  the new CAPS went into effect.
4      A      He did not become the HDO of the BLET
5  until 2020, last year.
6      Q      Okay.  So head of labor relations
7  transportation is a different position than the
8  one he holds now?
9      A      Yes.
10     Q      Okay.  Now was he, as head of labor
11 relations transportation, was he involved at all
12 in the decision or process to implement changes to
13 the CAPS policy?  Any involvement in the decision
14 or process?
15     A      Yes.
16     Q      Okay.  So in May of 2019, he would
17 have -- on May 1, 2019, he would have known that
18 the CAPS policy was going to undergo some changes
19 right --
20     A      Yes.
21     Q      -- a month before?
22     A      Yes.
23     Q      And at that point, a month before, had
24 the decision already been made to extend the good
25 attendance credit period from one month to six

Page 168

1  months?
2      A      In May of 2019?
3      Q      Right.  One month before it got rolled
4  out.
5      A      Yes.
6      Q      All right.  Was the policy, was the
7  new policy finalized by May 1, 2019, a month
8  before it was rolled out?
9      A      Yes.
10            MS. TUCK:  All right.  So can you
11 scroll down, Micaela, to top of page 4, 8143.
12 There we go.
13 BY MS. TUCK:
14     Q      So and if you could read paragraph 11
15 and let me know when you are finished reading
16 that.
17     A      "In general, the policy" --
18     Q      Oh, I'm sorry.  To yourself.  I should
19 have said.
20     A      Sorry.
21     Q      No worries.
22     A      Okay.
23     Q      Okay.  So now and he -- actually, he
24 signed this on April 21.  By April 21 was the new
25 policy finalized?  I know it was implemented, but

Page 169

1  was it finalized?
2      A      I do not know.
3      Q      Okay.  So that would have been, you
4  know, a month and maybe two weeks before it was
5  implemented.  Do you know whether the decision had
6  been made at that point to extend the good
7  attendance credit period from a month to six
8  months?
9      A      I do not know what the date was for
10 the last final draft of the new attendance policy.
11     Q      That's not what I asked.  I asked
12 about the decision to change.  I understand the
13 drafts might have changed and the wording might
14 have changed, but as of February -- as of
15 April 21, 2019, was the change from one month to
16 six months made in a draft?
17     A      I do not know unless I look at the
18 drafts of the dates.
19     Q      How long did the process take to
20 revise the policy from beginning to
21 implementation?
22     A      It was a couple months.
23     Q      It was a couple of months?
24     A      Yeah.
25     Q      Okay.  But you would agree with me

**SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
**Anita Tingley on 10/28/2021**                    Pages 170..173

Page 170

1  that as of the date that this was filed,
2  Mr. Johnson knew that in a month this statement
3  would no longer be true, that you would receive
4  three months if you had good attendance for one
5  month?
6              MR CHIAVETTA:  Object to form.
7  Outside the scope of 30(b)(6), but go ahead,
8  Anita.
9              THE WITNESS:  This is stating the
10 policy that was in effect.
11 BY MS. TUCK:
12     Q     Right.  But you would agree that as of
13 May 1, 2019, the company knew that was not going
14 to be in effect in one month, right?
15             MR CHIAVETTA:  Same objection.
16     A     Yes, we knew we were going to change
17 the policy.
18     Q     And you knew it was going to change as
19 of June 1st?
20     A     That was the date that we were given,
21 yes.
22     Q     Okay.  So do you think that this
23 company had a responsibility to inform the Court
24 that this statement was no longer true?
25             MR CHIAVETTA:  Object to form.

Page 171

1      Q     I understand you are not a lawyer, but
2  from the company's standpoint, did the company
3  feel like it had an obligation to inform the Court
4  that this was no longer true?
5              MR CHIAVETTA:  Object to form.  It
6  mischaracterizes the testimony.  It is also
7  outside the scope of the 30(b)(6) Notice.
8              Go ahead, Anita.
9              THE WITNESS:  I think this is correct
10 for the policy that was in effect.
11 BY MS. TUCK:
12     Q     Okay.  Do you think that the company
13 had an obligation to inform the Court that that
14 was no longer a true statement?
15             MR CHIAVETTA:  Same objection.
16     Q     If the Court had not made a decision
17 at that point.
18             MR CHIAVETTA:  Same objection and
19 asked and answered.
20             You can go ahead, Anita.
21             THE WITNESS:  I think this statement
22 is correct for the date that it was signed.  That
23 is the policy that we were under at that time.
24 BY MS. TUCK:
25     Q     Okay.  So are you unable to answer

Page 172

1  that question?
2              MR CHIAVETTA:  Objection.
3              It's already been answered.
4              You can answer, Anita.
5              THE WITNESS:  I feel I have answered
6  it.  This is the correct information for the
7  policy that was in effect at the time.
8              MS. TUCK:  Yeah, that's not what I
9  asked.
10             Can the court reporter read back the
11 question, please.
12                  - - -
13             Thereupon, the record was read back as
14 requested.
15                  - - -
16             MR CHIAVETTA:  Objection asked and
17 answered.
18             You can answer, Anita.
19 BY MS. TUCK:
20     Q     That's a yes or no question, ma'am.
21             MR CHIAVETTA:  No, it is not because
22 your question is premised on the fact that the
23 statement is false which she said it isn't, so
24 it's not a yes or no question.
25             MS. TUCK:  Tom, can you not give

Page 173

1  speaking objections?
2              MR CHIAVETTA:  You can't tell the
3  witness it is a yes or no answer when the question
4  is premised on something that she has testified is
5  her understanding.
6              MS. TUCK:  Can you please not do
7  speaking objections.
8              MR CHIAVETTA:  Can you please not tell
9  the witness that it is a yes or no when it is not
10 and it's a false premise that she has testified
11 to.  Those are not my words.  She said that --
12             MS. TUCK:  Well, actually, I'm asking
13 you a yes or no question.  So are you not able to
14 give a yes or no question, ma'am?
15             Okay.  So can the court reporter read
16 the question back, please.
17             You know what, I'll just ask it again.
18 BY MS. TUCK:
19     Q     Ms. Tingley, after this policy
20 changed, do you think the company had an
21 obligation to inform the Court about the policy
22 change if the Court was going to rely on that
23 statement to make any decision?
24             MR CHIAVETTA:  Objection.  Asked and
25 answered.

SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.
Anita Tingley on 10/28/2021                     Pages 174..177

Page 174

1     THE WITNESS:  The policy had not
2  changed at this time, so the information is
3  correct.
4  BY MS. TUCK:
5     Q     I understand that the information is
6  correct as of May 1, 2019.  I'm not asking you
7  about that.  I'm asking you, after June 1st of
8  2019, if the judge was going to rely on that
9  statement, which was no longer accurate as of
10 June 1, 2019, did the company have an obligation
11 to tell the Court?
12    MR CHIAVETTA:  Objection.  It calls
13 for a legal conclusion.  It's outside the scope of
14 the 30(b)(6) Notice.
15 BY MS. TUCK:
16    Q     I'm not asking you to answer as a
17 lawyer.  Please respond.
18    MR CHIAVETTA:  It's asking for a legal
19 conclusion.
20    MS. TUCK:  Tom.
21    MR CHIAVETTA:  And under what, Lisa?
22 BY MS. TUCK:
23    Q     Okay.  Ms. Tingley, do you understand
24 that I'm asking you -- do you understand that I
25 know that you are not a lawyer?  You are not a

Page 175

1  lawyer, right, Ms. Tingley?
2     A     No.
3     Q     Okay.  And I know that and I accept
4  that.  When I'm asking you a question, I'm not
5  asking you to answer as a lawyer.  I'm just asking
6  you to answer the question as a CSX employee.
7     Do you think that the company had an
8  obligation to tell the Court that that was no
9  longer a true statement after June 1, 2019, if the
10 judge was going to rely on that statement to make
11 decisions?
12    MR CHIAVETTA:  Objection.  It calls
13 for a legal conclusion.
14    Q     Do you understand that question?
15    A     I understand the question.
16    Q     Okay.  So what's the answer?  Were
17 they obligated or not?
18    MR CHIAVETTA:  Same objection.
19    THE WITNESS:  I don't feel I can
20 answer that question.
21 BY MS. TUCK:
22    Q     Why?
23    A     Because I don't know what has to be
24 given to the judge or not.
25    Q     Okay.  Thank you.  That's an answer.

Page 176

1     Q     All right.  Did you review any
2  documents to prepare for your deposition today?
3     A     Yes.
4     Q     Did you review documents that were not
5  provided to you by your attorney to prepare for
6  your deposition today?
7     A     No.
8     Q     Have you looked at any of those
9  documents today?
10    A     No.
11    Q     Not even during a break?
12    A     No.
13    Q     Was it a binder that was provided to
14 you by your counsel, and I'm not going to ask you
15 what was in the binder?
16    A     Yes.
17    Q     When was that provided to you?
18    A     I received it in the mail, I think it
19 was last week, I think, or maybe at the end of the
20 week before.
21    Q     Did you review it, without telling me
22 what was in the binder, did you review the
23 documents in the binder to refresh your
24 recollection so that you could testify today?
25    A     Yes.

Page 177

1     Q     And did the documents assist you in
2  refreshing your recollection for your testimony
3  today?
4     A     Yes.
5     Q     Have you communicated at all today,
6  verbally, text, in writing with any lawyer for the
7  company?
8     A     Yes.
9     Q     Without telling me who you
10 communicated with -- okay.  I understand that you
11 talked to Tom about the documents that you sent to
12 him, okay, or I assume that you did.
13    Other than with respect to the
14 documents that you sent him today and you looked
15 at today, did you have any other communication
16 today with a lawyer from the company?
17    A     I have had conversation with Thomas.
18    Q     Okay.  About something other than the
19 documents that you sent him today?  Don't tell me
20 what but it was not related to that?
21    A     It was before the deposition.
22    Q     Okay.  But since the deposition
23 started, you have had no other communication with
24 Tom other than regarding those documents?
25    A     Right.  I have had conversation about

**SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
**Anita Tingley on 10/28/2021**                    Pages 178..181

Page 178

1  the documents, yes.
2      Q      Okay.  But that's it?
3      A      Yes.
4      Q      All right.  Have you spoken to any
5  other witnesses in this case?
6      A      No.
7      Q      That you know of?
8      A      No.
9      Q      Is there a way for -- if someone
10 wanted to determine whether a T&E employee used a
11 personal day to be compensated or a vacation
12 day -- let me rephrase.
13             If a T&E employee used an entitlement
14 to get compensated for a FMLA absence, how would
15 you go about determining that?  Is that
16 information in the system somewhere?
17     A      It is in the payroll system.
18     Q      It's in the payroll system, okay.
19             Do you have access to that information
20 or would you have to contact payroll?
21     A      I have access to screens where I can
22 see different codes and the date that the employee
23 was paid.
24     Q      Okay.  So you -- so if I,
25 hypothetically, if you wanted to figure out

Page 179

1  whether or not a T&E employee used a personal day
2  to pay or to be compensated for a FMLA absence,
3  you could find that out on your own without
4  talking to anybody else, right?
5      A      Yes.
6      Q      And you say you have access.  You have
7  access to that in the payroll system or in the
8  CAPS system?
9      A      It's in the mainframe.  It's a payroll
10 page.
11     Q      Okay.  So that information does not
12 reside in CAPS?
13     A      No.
14             MS. TUCK:  Okay.  All right.
15             Those are all the questions that I
16 have today.  We'll be reconvened subject to the
17 agreement on the record earlier today.
18             THE REPORTER:  Do you need this
19 transcribed at this point?
20             MR. ALBRECHTA:  On the issue of
21 signature?
22             MR CHIAVETTA:  Yeah, we reserve
23 signature.
24             MR. ALBRECHTA:  And then Joe Albrechta
25 will take a digital copy.

Page 180

1             MR CHIAVETTA:  And we'll order an
2  electronic copy only, please, as well.
3             THE REPORTER:  Okay.  Thank you.
4             Regular delivery?
5             MR. ALBRECHTA:  Regular is fine.
6             Tom, are you okay with regular?
7             MR CHIAVETTA:  Yeah.
8             MR. ALBRECHTA:  Okay.
9             MS. TUCK:  All right.  Thank you
10 everybody.
11                    - - -
12             (Signature not waived.)
13                    - - -
14             Thereupon, at 3:26 p.m., on Thursday,
15 October 28, 2021, the deposition was concluded.
16                    - - -
17
18
19
20
21
22
23
24
25

Page 181

1             I, ANITA TINGLEY, do hereby certify
2  that the foregoing is a true and accurate
3  transcription of my testimony.
4
5             _____
6
7             Dated    _____
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
**Anita Tingley on 10/28/2021**                    Pages 182..183

**Page 182**

```
 1                    CERTIFICATE
 2  STATE OF OHIO       :
                               SS:
 3  COUNTY OF FRANKLIN  :
 4          I, Nancy J. Rodriguez, a Professional
    Reporter and Notary Public in and for the State of
 5  Ohio, duly commissioned and qualified, do hereby
    certify that the within-named ANITA TINGLEY, by me
 6  first duly sworn to testify to the truth, the whole
    truth, and nothing but the truth in this cause
 7  aforesaid; that the deposition then given by her was
    by me reduced to stenotype in the presence of said
 8  witness; that the foregoing is a true and correct
    transcript of the deposition so given by her; that
 9  the deposition was taken at the time and place in the
    caption specified; and that I am in no way related to
10  or employed by any attorney or party hereto or
    financially interested in the action; and I am not,
11  nor is the court reporting firm with which I am
    affiliated, under a contract as defined in Civil Rule
12  28(D).
            IN WITNESS WHEREOF, I have hereunto set my
13  hand and affixed my seal of office at Columbus, Ohio
    on this 18th day of November, 2021.
14
15
16
17
18
19          _____
20                     Nancy J. Rodriguez,
                       Notary Public -
                       State of Ohio
21
22
23  My Commission Expires:  August 7, 2024.
24                     - - -
25
```

**Page 183**

```
 1               CHANGES AND SIGNATURE
 2  WITNESS NAME: Anita Tingley, 10/28/2021
 3  PAGE   LINE    CHANGE          REASON
 4         _____
 5         _____
 6         _____
 7         _____
 8         _____
 9         _____
10         _____
11         _____
12         _____
13         _____
14         _____
15         _____
16      I, Anita Tingley, have read the foregoing
17  transcript and hereby affix my signature that same is
18  true and correct, except as noted above.
19
20          _____
21                     Anita Tingley
22      Sworn to and Subscribed before me
23      _____, Notary Public.
24  This_____day of _____, 20____.
25  My Commission Expires:
```

SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.
Anita Tingley on 10/28/2021                    Index: $100..2016

**Exhibits**

TingleyA XX-OCR  4:9

TingleyA YY-OCR  4:10

TingleyA ZZ-OCR  4:11

_____

**$**

$100  32:8,9

$200  32:4, 7,18

_____

**1**

1  11:11,20 15:9,10 52:1,4,8 59:16 60:25 62:16 109:14 113:24 127:12 128:17 139:15,20 140:17,20, 25 142:7,8 145:23,24 151:21 152:4,17, 21 156:10 157:14 161:23 167:17

168:7 170:13 174:6,10 175:9

1-A  63:8

10  90:15, 18,21

10/27/21 119:25

11  168:14

11:30  110:24 111:11,19, 24 112:17

11:59  112:18

12  152:23 156:15

12-1  151:17

12/22  149:14

1261  109:22

1268  148:14

12:00  75:4

12:05  111:4, 11,12

12:57  118:18

13  33:17

14  147:6

15  31:5,10, 13,19 32:1 38:10,15, 18 39:8 40:11,22 41:9 42:1,

8  147:20 158:17

15-day  31:23

18  53:6 152:24 155:3 158:17

1968  9:17

1:30  118:8, 11

1B  128:25

1st  11:16 114:1,11 157:16,22 170:19 174:7

_____

**2**

2  90:22 109:14 113:24 143:6 145:23,25

20  67:24 90:8,17 129:6,13 146:2 155:6

20-point 86:11 139:7

2000  14:1

2001  8:24

2009  11:10, 12 13:20, 25 14:7

2013 160:12,17, 23

2014  120:3, 5

2015  15:3 19:15 20:2,3 40:14 41:6 51:18 52:1,8 59:17 60:25 62:16 78:23 97:3 109:21 120:10 128:22 130:1,5,9, 18 146:20 148:10 152:12 154:21 161:6,18

2015's 145:17

2016  14:15 15:16 16:12 40:13 63:25 152:5,18 161:23

SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.
Anita Tingley on 10/28/2021
Index: 2017..absence

**2017** 149:14
151:21,22
152:21
153:1
156:10,15

**2018** 52:17,
18,20
53:11,15,
25 56:3
58:4,11
78:1 96:12
122:6
123:13,21
124:10
151:17,18,
19,22

**2019** 11:11,
16,20
14:15
15:4,6,9,
10,16,17,
23 16:12
20:1 52:4,
8 60:25
75:11 97:4
120:13,21
121:1,13
123:21
124:7,16
127:1,12
128:17
130:20
138:25
146:4
148:4
166:19,23
167:1,16,

**17** 168:2,7
169:15
170:13
174:6,8,10
175:9

**2020** 167:5

**2021** 15:14
16:3 21:9
118:19
119:2
180:15

**21** 33:17
168:24
169:15

**22** 14:2
158:12

**23** 118:19

**23:59** 75:5,
8,19
113:15

**24-hour**
72:10
116:15

**2760** 8:14

**28** 114:4
119:2
180:15

**29149** 146:5

**29262** 48:23

**29335** 61:23

─────────
**3**
─────────

**3** 143:10,

13,17
144:1,3,6
147:7

**30** 39:1,3

**30(b)(6)**
99:4,9
170:7
171:7
174:14

**32205** 8:15

**32211** 8:22

**3991** 159:2

**3:05** 165:11

**3:26** 180:14

─────────
**4**
─────────

**4** 111:8
139:4
168:11

**40** 129:13

**48** 96:1

**4933**
126:21,24

**4:00** 111:16

**4C** 145:2

─────────
**5**
─────────

**5** 29:2
145:15

**56** 26:3

─────────
**6**
─────────

**6** 29:1

**60** 129:14

**6945** 8:21

─────────
**7**
─────────

**72** 49:18
124:3
163:6

─────────
**8**
─────────

**8/26/20** 26:4

**800** 45:10

**8143** 168:11

─────────
**9**
─────────

**904-422-1362**
9:6

**9:47** 48:22

─────────
**A**
─────────

**A-1** 62:2,3

**A-N-I-T-A**
8:9

**a.m.** 75:4
111:12

**abide** 141:21

**absence** 58:6
66:8,13,
18,23 67:3

SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.
Anita Tingley on 10/28/2021          Index: absences..agree

70:16
75:24,25
76:23
77:12
78:8,15
79:9,13
80:2 82:18
88:11,16
93:25
106:21
107:11
113:23
114:10
149:25
151:3,14
152:6
154:14
155:19,24
178:14
179:2

absences
  66:6 68:7
  76:10,16
  81:6 92:5
  93:2 98:1
  106:25

absent
  78:19,24
  80:10
  91:15,20,
  24 92:5
  93:3,6,22
  96:6
  97:11,24
  106:10,18
  108:17
  111:7

130:12
146:10,21

absenteeism
  17:16
  85:22
  142:8
  143:5
  159:14
  160:2,9,
  15,25
  161:7,10,
  18

abusive  83:7

accept
  139:20
  175:3

acceptable
  126:9

accepting
  129:23

access
  43:22,24,
  25 134:25
  178:19,21
  179:6,7

accommodation
  97:12,13,
  15,25
  98:8,9,18,
  21 99:20
  100:1,11,
  13,24
  101:18,24
  102:13
  103:3

106:10,19,
20 107:2,
5,13,16,22
108:5,18

accommodations
  99:2,16
  100:15

accomodate
  6:19

accumulate
  67:22
  129:1,8

accumulated
  107:1,11

accumulates
  77:23

accurate
  37:6 69:10
  163:5
  174:9

accurately
  58:8
  164:18,22

acronym  13:5
  97:15

actions
  161:8

actual
  140:13
  144:9

add  87:12

added  16:1,4
  37:1 75:13
  144:12

addition
  126:2

additional
  89:17

address
  8:13,17,
  20,23
  45:11,22
  146:23

adequate
  23:13

adjusted
  144:13
  145:20

administration
  13:23
  17:14
  159:12

administrator
  33:9

admittable
  131:9

admitted
  88:22

advised
  137:5

advises
  137:24

affects
  72:16

afternoon
  119:1

agree   73:15

SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.
Anita Tingley on 10/28/2021        Index: agreeable..assessed

89:11
96:18
99:5,13
114:19
124:23
129:1,10
138:20
139:8
140:15
169:25
170:12

agreeable
124:12

agreed  144:6

agreeing
74:19
125:13

agreement
12:9,25
17:11,12
69:2 70:20
79:18
85:19
125:22
139:25
141:14,17,
19 142:18,
23 166:9
179:17

agreements
17:13
69:25
70:21,23
141:5,11
142:3,11
166:21

ahead  6:18
7:14 8:1
95:9 119:5
120:17
164:8
170:7
171:8,20

akin  116:20

Albrechta
25:12
125:1
126:2,17
179:20,24
180:5,8

alcoholic
115:12

algorithm
162:6,12,
14

amend  33:17

amended
28:17,18
30:11
33:16 34:6

amount  69:6
76:22
147:22

analyze
124:2

Andy  5:11

Anita  5:3
8:9 28:2
35:5 48:15
50:20

54:16
68:20 73:3
81:22
82:15
96:20
118:13
125:18
170:8
171:8,20
172:4,18

answering
83:19

answers
24:21 27:8
28:19
34:22 37:6
45:4 46:1
50:15
146:22

anticipated
132:18

anymore
130:24

APA  100:19

appeared
30:10

applicable
67:19
68:14,17

applied
10:21

applies
62:20 71:2

appointment

93:10,16

approve
116:23

approved
98:1
100:23
107:1,5,
12,16,21
108:5,17
117:23
118:4

approves
153:22

April  152:12
168:24
169:15

arbin  143:15

area  17:4
46:7

areas  45:20

Argumentative
81:21

ascertain
123:14

assess  72:7
106:25
107:20
162:8
164:21

assessed
63:9 67:12
89:13
101:1
108:6

SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.
Anita Tingley on 10/28/2021                    Index: assessing..back

109:1,5,11
110:3,21
111:1
116:8,10,
21 131:20
146:8
152:9,11,
23,24
157:1

assessing
85:8

assessment
63:7 67:4,
7,16 88:17
145:15

assignment
66:10

assist 36:6
177:1

assistance
163:23

assisted
27:7

assume
177:12

assuming
80:14

assumption
8:2

attached
132:6

attend 80:1

attendance
10:1,2,5

12:3,4
13:10,12,
20 14:2,3,
16,24
15:5,18
16:11
17:17
39:13,14,
20 40:3,4,
6,9,17,18
41:11,13,
23 42:5,8
45:11,12
46:7,12
47:20,22
48:4 52:14
58:7,16,25
59:3 61:13
68:5
77:18,22
78:2,12,
18,24
79:10
80:3,11
90:7,8
91:12,14,
23 92:15
94:13,19,
21 96:16,
23 97:3
98:2 99:23
100:3,8
101:2,18,
22 102:8,
11 107:6
108:19
109:1
113:19,25

117:20,21
118:4
128:21
129:17
131:25
132:2,5,
12,21,23
133:2,18
136:25
139:3,21
140:25
144:21
149:6
150:1,8
151:4,10,
16 152:16
155:12,18
156:1,21,
22 157:3,7
160:18,20
161:2
162:3
167:25
169:7,10
170:4

attention
27:16,18,
19,20,22

attorney 5:9
7:11 50:21
120:25
176:5

audio 7:1

August 9:17

authorized
71:19

auto 120:2

availability
12:11
63:21
72:16,24
106:2
110:5
116:6
133:25
137:24,25
138:2,9
160:22
161:4,11

avoid 112:18

award 20:25

awarded
113:20

aware 40:20
42:14
102:2,3,5

───────────

        B
───────────

back 13:14
16:6 23:17
34:11
36:21 42:5
48:19
53:14
55:21 61:9
62:7 77:10
90:18,20
93:4 97:8
101:3,5
107:8
109:16

111:5,15
112:4,8,16
113:10
125:21
134:12
143:19,21
145:10,12
147:10
156:23
157:12,17
163:1
165:18
172:10,13
173:16

balance
  156:9

barbecue
  115:25

bargaining
  69:2 79:17
  139:25
  141:5,11,
  14,16,19
  142:2,10,
  17,23

based  47:16
  50:20,24
  54:16,20
  70:14
  96:21
  125:22

basically
  26:16
  71:10 75:1
  112:17
  113:19

114:1,5
115:23
132:8
138:5,15

Bates  47:14
  48:22
  61:23
  109:21
  126:21,23,
  25  146:5
  148:13
  159:1

beers  116:1,
  3

begin  90:8

beginning
  169:20

behalf  5:25
  24:10,14,
  18,22
  25:15
  52:22
  99:1,10,15
  108:4,8,
  12,16,20
  122:14,16
  123:9

bell  21:20,
  22

benefit
  79:23

bereavement
  78:21
  92:23

beverage

115:13

bid  69:8,
  11,18
  70:1,7

bids  70:3

big  51:20
  125:11

bigger  79:5
  133:2

binder
  176:13,15,
  22,23

birth  9:15

bit  22:14
  26:8,23
  33:22 34:1
  79:5
  108:23
  160:6

BLE  166:25

BLET  69:17
  70:24
  166:6,9
  167:4

block  115:4,
  6,15,20
  116:13
  117:11,19,
  22

BMWE  12:24

board  110:13

bonuses
  15:20

bother  84:21

bottom
  152:10
  160:1,3

break  6:10,
  14,18
  46:25
  48:13
  61:19
  108:24
  118:7
  124:1
  165:9
  176:11

breaks  6:16
  18:12
  19:17 94:6

briefly  10:3
  11:24

bring  27:13
  97:18
  145:3

brought
  27:16,18,
  19,20,22
  163:1

build  120:15

building
  119:23

bumped  68:25

bunch  93:1

business
  27:10
  30:10,16

SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.
Anita Tingley on 10/28/2021          Index: busy..category

37:16
49:12
50:16
70:17
79:4,8,9,
21 80:2
93:5
105:12
119:7,14
120:7
123:6
125:6
126:14
162:19
164:11,23

busy  20:11

buying  13:14
16:6

_____

C

C-R-A-F-T
10:9

calculate
164:19

calculated
91:4

calendar
91:13 95:3
110:5,9,22
113:13,22
132:14
147:23

call  17:4
63:18
64:14,16,

17,18
65:18,19
68:5 94:5,
10,12,17
98:22,23
100:7
129:20,21,
23,25
130:3,5,8
131:18
149:14,15
150:23

called  15:2
21:20 26:3
33:16
42:22,24
64:19
108:25
110:14
112:24
113:11
115:6,12,
14,24
116:1
150:19

calling
65:22

calls  174:12
175:12

cancels  7:3

capacity
24:23

CAPS  5:19
9:20,22,24
10:17,19,
21 11:9

15:16
18:19
19:2,4,6,
12,20 22:3
26:17
28:23 40:1
42:21,23,
25 43:1
44:2,7,15,
25 45:3,14
47:12 48:6
49:13
50:10,14
51:4,5,15,
18,25
52:23 58:4
59:16
60:8,13,24
67:18
70:15 71:6
75:2 93:17
104:13,15,
21,22
105:1,3,
14,15,19,
24 108:6
114:15
119:15,23
120:10,21
122:5
127:1,10
128:22
140:6,25
142:16
144:13
145:6
149:6,11,
24,25

150:7,14
151:1
158:24
160:21,24
161:2,14
162:7
163:1
164:21,22
165:4
167:2,3,
13,18
179:8,12

car  94:6

card  69:18

care  90:4

carrier  9:7

case  18:21
19:8 20:4
21:19
22:1,3
39:24
95:15
135:19
148:5
155:8
178:5

cases  19:10
20:7,8

categories
72:7 75:22
106:2
131:6

category
29:15,17
70:16 72:2

129:19
130:9
160:2

caught
115:14

caveat
126:10,12

CBA  79:13
85:18
140:21

cell  8:25
9:2

certification
95:16,18,
23

certified
5:5

cetera  52:23
141:22
142:24

chairman
17:12
79:20
80:10
144:4

chairmen
79:22

chance
121:25

change
28:16,21,
22 34:21
52:9
53:10,11,

15 54:7,
11,12,15
55:1,4,15,
17,20,25
56:7 57:25
58:11,12,
13,14,21
59:5,8,12,
20,21,22
60:1,2,3,
4,12,18
75:18
78:1,5
87:18
96:15
122:5,7,17
132:15
133:6
137:3
138:19
144:11,21
148:4
169:12,15
170:16,18
173:22

changed
11:10,15
13:20
15:16
26:25
30:11
34:20
52:4,13,
16,17 53:4
58:4 75:11
77:16
129:7
130:14

131:7,10
134:18
139:5
144:20,24
146:6,20
169:13,14
173:20
174:2

changing
27:1
133:14
134:19

charge
139:24
142:24
143:2,4

charges
19:10,14

chart  29:1
30:6,7
34:12,14,
16,19,25
35:13
36:22 37:1
92:1,4,9,
12,20,23
106:2,6

check  55:21
57:4

Chiavetta
7:11 18:24
24:24 25:4
28:1 35:5
38:3,7
41:4 47:1,
6 48:14

50:20 53:5
54:16 73:2
80:4 81:20
82:5,8,11
83:2,6,9,
13,18,21
84:2 95:20
96:19 97:6
99:3,7
118:12,15
121:12,24
124:14,22
125:3,17
126:10
135:5,13,
22 136:2,
8,12,16
142:21
155:20
162:20
164:25
165:13
170:6,15,
25 171:5,
15,18
172:2,16,
21 173:2,
8,24
174:12,18,
21 175:12,
18 179:22
180:1,7

choice
117:15,17

choose  86:9
117:8
141:20

SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.
Anita Tingley on 10/28/2021          Index: chooses..computer

143:7,16

chooses
81:24
82:16
117:5
141:25

chose 140:10

circumstance
40:21
64:23
74:24
101:8,13,
23 102:12
103:2,6
152:11

circumstances
59:2 85:1
101:16
106:22

claim
135:14,15,
16,19

clarification
69:12

clarify
13:17
15:20 99:6

clarifying
99:8

clear 58:3
127:17

click 44:14,
15

clock 154:24

close 155:9

CMC 137:5,
6,7,9,10
138:8

co-counsel
25:12

coaching
82:9

code 162:7,
8 163:20
164:3

coded 77:4
116:6

codes 71:15
92:13
105:8
150:9,10,
11 178:22

coffee 11:14

collapsed
121:16

collective
69:1 79:17
139:24
141:5,10,
14,16,19
142:2,10,
17,22

column 36:1

columns
121:16

comments
83:7

committee
115:18
116:13

common
150:18

communicated
54:8 57:25
163:22
177:5,10

communication
55:3,5,7
177:15,23

communications
25:11 28:6
35:11,14
55:9,22,23

company
18:12
24:10,14,
19,22
25:16
41:22
52:22
59:21 60:4
72:14
73:21
85:24
86:1,4,22
87:2,7,8
91:8 99:1,
10,15
102:4,5
108:4,8,
12,16,20
115:17
122:14,16,

19,24
123:9
133:5,12
135:9
138:24
163:21
170:13,23
171:2,12
173:20
174:10
175:7
177:7,16

company's
44:18
59:23,25
171:2

compared
30:9

comparing
71:4

comparison
117:13

compensated
178:11,14
179:2

completed
66:11,20,
25

completely
33:2

complicated
32:6

computer
42:21
137:13

SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.
Anita Tingley on 10/28/2021      Index: computerized..counted

computerized
  42:19,24

concluded
  180:15

conclusion
  174:13,19
  175:13

condition
  114:24

conductors
  15:1,13,21
  16:2,5,12,
  13 70:1

conference
  22:18

confused
  142:4

confusing
  142:5,6

consecutive
  156:11

consent
  89:19

considered
  64:24
  65:11
  66:18,23
  71:19
  76:22
  77:12,15
  93:2,17,21
  101:25
  103:7
  130:1,2

147:11,24
148:3
154:15

consult   28:4
  125:18

consultation
  88:5

contact
  45:19,22
  47:21 48:9
  89:4
  115:19
  178:20

context   21:2
  59:14
  128:10

continue
  82:13
  83:14
  129:8

contract
  70:14

conversation
  27:24
  50:24
  177:17,25

conversations
  54:21,23
  56:5

copy   22:6
  23:24
  179:25
  180:2

correct

10:10
11:9,20,21
15:22,24
19:21,23,
24 27:3,8
28:12
29:5,11,12
31:12
34:23 36:2
37:18
40:19
41:14,19
57:20,23
59:4,19
60:5,15,
18,21
61:15 66:4
70:11
74:3,15
80:12,13
87:22
88:11,17
89:7,14,24
90:4,10
91:10,17,
24 94:2
96:1,13
97:5 99:17
107:14
108:13
109:6,15,
17 112:19
116:7
118:5
119:19
120:10,22
123:11,23
131:7,16

132:25
140:22
144:14
146:1
149:23
153:2,11
156:12
165:7
171:9,22
172:6
174:3,6

corrections
  149:21

correctly
  163:20

counsel
  35:6,7,12,
  14 50:25
  54:17,21,
  23,24,25
  55:3,9,25
  56:6,11,19
  61:19
  119:19
  176:14

counsel's
  51:9

counseling
  11:6
  90:12,15,
  17,21
  139:13

count   58:6

counted
  66:16

SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.
Anita Tingley on 10/28/2021          Index: counts..date

counts   142:1

couple
  100:25
  116:1
  169:22,23

court   8:21
  143:18
  170:2
  171:3,13,
  16 172:10
  173:15,21,
  22 174:11
  175:8

cover   45:15

covered
  85:15
  91:14
  115:20

covers   96:9

craft   10:5,
  7,15 12:4,
  16,19,20,
  23,24,25
  13:1,2
  17:20
  62:21

created
  119:24
  120:12
  122:9,17
  164:18

credit
  39:13,14,
  20 40:3,4,
  6,9,17,18

41:11,13,
23 42:5,8
48:4 52:14
58:7,16,25
59:3 60:14
77:22
78:2,3,6,
12,18,24
79:11
80:3,11,17
92:15
94:14,19
96:17,23
97:3 99:23
100:3,8
101:2,18,
22 102:8,
11 107:6
108:19
113:20
114:11
117:20,22
118:4
131:25
132:2,5,
10,13,21,
23 133:2,
18 136:25
144:21
151:5
156:1
167:25
169:7

credits
  91:12
  94:21 98:2
  149:6
  152:16

155:18
157:3

Crew   10:1,2
  16:24
  43:4,5,6,
  7,10,11,
  16,17,18,
  22,23,25
  44:6,8,10,
  11 137:10,
  11,12,14,
  17,18
  138:4,7,10
  148:19
  149:3,5

CROSS-
EXAMINATION
  5:6

CSRI   69:16

CSX   5:10,
  12,17,25
  6:4 9:20
  10:14
  13:13
  14:17 17:7
  18:18
  20:16
  21:20
  28:22
  30:1,2,18,
  24 31:21,
  22 32:8,19
  36:16,17
  37:17
  38:14 41:3
  43:12 54:8
  82:3 83:25

84:12
85:16
88:15
97:12 98:1
103:13
105:15,21
106:19,22
121:19
161:7
162:13
175:6

CSX's   26:15

CTS   159:13

current   5:10
  8:13
  11:22,25
  16:16
  154:19
  155:2,4

cut   83:6

────────────
        D
────────────

daily   16:7

date   9:16
  14:20
  52:18,19
  53:8,9
  54:2 87:23
  88:1
  119:25
  149:14,18
  153:24
  169:9
  170:1,20
  171:22

178:22

dated  33:17

dates  15:19
  88:4
  125:19
  149:7
  150:2
  151:5,10,
  11,12
  154:9
  169:18

day  25:13
  29:22,23
  32:5,7,8,
  19 35:19
  39:19
  52:11
  58:23
  65:2,4
  66:6,7,8,
  11,13,18,
  23 67:3
  68:7,23
  71:25
  72:12,19,
  20 73:5
  75:24
  76:15,17,
  23 77:3,4,
  18 78:19
  85:6 92:21
  93:23,24
  94:8 96:6
  110:3,9,
  17,18,19,
  22 111:2,
  21 112:21

113:4,8,
13,14,20
114:6
115:17,19,
21 116:15
130:13
131:2
132:6,9
140:13
147:19,24
148:3
149:12
158:12
178:11,12
179:1

day's  77:12

days  16:7
  31:6,10,
  13,19 32:1
  35:16,17
  38:10,15,
  18 39:2,3,
  8 40:11,22
  41:9 42:1,
  9 68:12,13
  70:8 72:1
  73:13,19
  74:1,3
  75:13
  82:19
  87:22,23
  96:9,10
  100:25
  104:1
  105:12
  108:2
  132:19

142:23
144:17
153:8,17

deal  17:11
  125:11

dealing
  12:10
  115:8

deals  43:18

dealt  22:15

December
  151:18,21,
  22 153:1
  160:17

decide  50:18
  133:5

decided  41:3
  133:7,15,
  17 134:1

decides
  86:17,19

decision
  39:24
  41:22
  42:20
  56:8,9,11,
  19,24
  133:13
  162:2
  167:12,13,
  24 169:5,
  12 171:16
  173:23

decisions

175:11

declaration
  165:24

deducted
  90:16
  91:13

deduction
  93:14

deem  85:4
  154:7

deemed  71:23
  74:8 81:12
  85:5 86:14

deems  89:11

Defendant
  26:4

define  104:1

defined  66:8
  103:20,25
  104:2,8,20
  105:20
  110:6
  146:9,10

defines
  104:22
  105:16
  110:25
  114:1

defining
  59:14

delivery
  180:4

demand  14:20

15:19
78:19
92:21
93:23,24

**department**
13:22 14:2
17:4,5,7,
18 33:6,8,
11 45:6,
16,20,21
46:1,15
48:7 63:22
71:22
81:10
82:21
84:13,15,
19,21,23,
25 86:18
87:22
89:10,20
98:11,13,
15,16,18,
22,24
106:23
114:16
116:22
137:5,8,
12,19,20,
24,25
138:1,2,10
153:14,22
154:4

**departments**
10:24

**depend** 100:1
124:15

depending
69:9,20
70:6 111:2
145:19

depends
66:24
81:25
82:21
107:9
156:6

deployed
38:20 39:6
40:23
41:10

deployment
38:25

deposed 5:20
18:17
20:14,16,
25

deposition
6:9 22:12,
22 23:23
95:12
124:20
125:5,25
126:13
164:15
176:2,6
177:21,22
180:15

depositions
5:23 20:4,
20,21
21:4,10,13
22:16

describes
68:2

describing
29:17

description
13:6 47:16

designated
17:11
166:8

desk 33:17

detail 44:2,
7,9,16
45:1 46:9,
10,23,24
47:24,25
48:1,3
148:23
150:25
151:1,2

detailed
80:24

determination
63:22
103:13
114:18

determine
35:1 57:6
74:11 85:2
88:16 90:1
124:10
178:10

determined
132:19

determines

describes 63:20 86:2

determining
178:15

development
17:24

dictionary
103:15

difference
32:1,21
43:9 70:10
71:1 75:12
128:17
133:1

differences
70:13,22
71:3

differential
30:24
31:4,20,24
32:10,12,
17,23,24
37:23
38:13,18,
21 39:12
40:16
41:10

differently
27:11

difficult
6:24

digital
179:25

director
16:19

SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.
Anita Tingley on 10/28/2021   Index: disabilities..documentation

disabilities
 100:16

disability
 100:13,19,
 21

disagree
 33:23

disciplinary
 11:4 19:22
 68:1
 139:24
 141:14
 142:18
 155:10
 161:8

discipline
 17:19 91:7
 109:12
 129:9
 140:6,21
 141:23
 142:2,12,
 19 143:15
 144:17
 159:8
 161:12

disciplined
 158:21

discourage
 72:22

discoverable
 135:21,25
 136:1,3,6

discrimination
 135:16

discussed
 37:19
 48:25 49:6
 61:1 68:6
 90:10
 119:18
 130:21
 134:3,4,5,
 9

discussing
 71:10
 161:13

discussion
 25:25
 37:20

discussions
 35:6,8
 50:21,23
 54:17,19
 55:24

dismissal
 91:1,2,4

dismissed
 90:25
 144:8

displaced
 63:18

displacement
 68:12,13,
 23,24
 69:24
 70:2,8,15
 71:17 72:1

disqualificati
on  156:12

157:7

disqualificati
ons  155:13
 158:16

disqualified
 150:1,8
 151:4,11,
 16 152:4
 156:8,20
 157:8,15,
 21 158:8,
 9,11 162:3

disqualifying
 151:14
 152:5
 155:19

disrespecting
 83:14,16

division
 143:14

doctor   77:10
 81:11 95:4

doctor's
 78:21
 86:14
 93:10,16
 96:17

document
 23:4,8,14,
 21,25
 24:2,18,22
 26:13
 27:21
 30:13 34:4
 39:17 45:4

46:18,19
 48:21
 49:11,14,
 16 50:13
 57:5,19
 61:21 62:6
 103:21,25
 104:8,11,
 14,18
 105:8,9,16
 106:5
 119:8,15,
 17,21,22,
 24 120:1,
 3,5,6,7,9,
 12,18,20,
 24 121:1,
 4,5,7
 122:9,11,
 17,21
 123:3,5,7,
 10,13
 124:7,11,
 16,18
 125:24
 126:3,14
 134:21
 149:4
 150:23
 155:4,9
 162:19,21
 163:3,9,25
 164:24
 166:10

documentation
 12:7 56:13
 71:22 72:4
 74:14,17

76:6,11
77:3,6,13,
14,15,19
81:5,25
82:17,20
84:8,14
85:1,25
87:21
88:21
89:21 90:3
93:12,18
114:17
116:18,23,
24 131:9,
10,12,14
153:7,10,
13,17,20,
24 154:5,
9,14,17
156:17
158:21

**documenting**
117:9

**documents**
18:16
22:10,19
23:2 50:4,
5,14 51:3,
8 57:17
77:17
81:13
104:19
105:21
120:14
123:15
124:24
125:7

126:6,14
136:13,15
159:15,17
176:2,4,9,
23 177:1,
11,14,19,
24 178:1

**Dongalla**
8:21

**Dork** 5:11

**double** 62:3

**draft**
134:16,17
169:10,16

**drafts**
134:11,13
169:13,18

**drink** 115:8

**drive** 13:3
16:9 116:2
133:25

**drives** 100:8
148:7

**driving**
64:11

**due** 108:17

**duly** 5:4

**duties** 115:7

**duty** 36:12
78:20
92:22

—————————
**E**
—————————

**earlier**
61:13
71:10
76:14
90:10 92:1
119:18
122:5
130:17
132:18
159:23
179:17

**early** 66:10,
23 68:12
71:17 72:1

**earn** 58:15,
17 80:17
94:13
101:1,18

**earning**
132:13

**easily** 47:1

**easy** 8:5
32:4

**EBERHARD**
62:9
126:22
127:2

**EBS** 69:13,
14,15

**effect** 52:1,
3 54:4
62:15
80:22

127:12,21
128:11
167:3
170:10,14
171:10
172:7

**effective**
59:16
128:16

**electronic**
180:2

**element**
135:14

**eligible**
38:13
39:13,14
40:2,4,5,
8,16 41:12
79:9 80:11
98:1 100:3
102:10,17,
21 107:6
132:4,9
133:9
151:13

**Elizabeth**
5:9

**else's** 6:9
27:19

**email** 45:11,
21 54:5,10
55:2 135:1

**emails**
53:15,25
54:13

56:13,14,
17 134:4,6

**emergency**
71:23
74:7,8
75:22
81:12
85:5,12,20
86:15
88:25 90:4
114:23
153:18
154:7,15

**employee**
5:10 12:23
13:15 18:9
31:15
35:16
40:10
42:6,7
44:2,7,16
46:9,10,22
52:10,12,
13 58:1,5,
21,24
62:16
63:12,17,
18 64:4,16
65:1,2,13,
24 66:9
67:5,9
68:24
69:1,5
71:20,21
73:18
74:16 76:3
79:25

81:5,24
82:1,16,
19,22
84:8,10,16
85:6 86:7,
9,12 88:1
89:9,23
94:1 98:5
100:2,7
101:6,20,
21 102:6,
10 103:22
104:3
107:1,9,
10,12,21,
24,25
110:8
115:2,5,
11,19
116:11
117:3,5,7,
14,25
133:8,22
139:18
140:5,9,11
141:7
143:3
147:13,14
148:1
149:8,13
151:2
153:16,18,
23 154:9,
10 155:25
156:7
157:14,16
159:4,21
160:14

161:16,17
175:6
178:10,13,
22 179:1

**employee'**
150:10

**employee's**
17:16
60:8,13
84:17
89:19
150:17,20,
21,25
151:1
159:8

**employees**
10:6,7,12,
13,14,15,
16,19,22,
25 12:4,6,
7,11,12,
16,17,21
17:20 18:5
38:12
40:2,3
43:11,16,
19,20,21
44:25
45:4,10
46:21
58:18
60:17
62:21,22,
24 63:2
69:4,8
70:11 71:2
72:10,13

73:10,13
85:11,21
97:10 98:3
106:17
133:19
142:11,20
146:17,23
148:19
161:8

**employer**
89:18

**employment**
6:3

**encompass**
18:4

**end** 55:14
110:16
152:25
176:19

**ends** 112:1

**engine**
10:18,25
12:13,23
44:25
60:8,13
62:22,23
63:2 69:8
79:25
98:3,5
110:12
142:11

**engineer**
85:18

**Engineering**
12:24

SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.
Anita Tingley on 10/28/2021                    Index: engineers..faster

engineers
  14:19,21
  15:19
  16:12
  30:23
  69:17,21,
  25
entire  31:23
  36:1
entitled
  58:24 59:2
entitlement
  16:7 52:10
  58:5,19,22
  78:6 96:15
  102:22,25
  103:23
  132:6
  178:13
entitlements
  13:15
  35:18
  96:10 97:5
  105:7
enumerated
  14:6
equal  67:23
erased
  109:15
  145:24
error  149:17
essentially
  14:4 18:13
  36:1 37:21
  38:25

  44:18
  64:15,20
  67:25
  109:15
  128:25
  136:19
  145:16
event  151:15
eventually
  90:25
  94:14
  116:14
  164:15
exact  52:19
  53:9
examination
  88:5
examples
  72:2 78:25
  79:2 88:19
Excel  121:17
exception
  93:24
exceptions
  78:22
  80:20,22
  92:6,7,20,
  25
excess
  144:17
excuse  68:16
  84:22
excused
  84:12

  88:16
  114:15
  115:1
exhaust  41:9
exhibits
  22:14,15
exist  61:13
  106:22
  150:11
existed
  134:17
exists
  123:4,10
  164:21
  165:3
explain  31:1
  37:13
explained
  45:2 55:1
  93:8
  146:16
explaining
  37:22
explanation
  92:4
explanatory
  37:1
extend
  167:24
  169:6
extra  32:9
  91:3,8
  110:13

extraordinary
  106:21
extremely
  32:6
eyes  60:4

_____

        F

face  139:25
fact  39:18
  132:20
  172:22
FACTS  159:9,
  10
failure
  129:22
fair  13:6
  14:10 37:3
  45:20
  122:1
  124:13
  141:22
fairly  80:24
fake  32:3
fall  17:17
  91:19
  98:10
falls  17:14
false  172:23
  173:10
family  93:16
fast  23:9
faster  33:22

SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.
Anita Tingley on 10/28/2021          Index: fastest..Gateway

81:15
127:8

fastest
128:5

fax  45:4,15
46:2 48:7

February
114:4,13
152:21
169:14

feel  6:17
7:5 115:7
171:3
172:5
175:19

field  13:23
17:14 18:6
19:18
67:8,15
144:5
159:12

figure
28:10,12
32:25 64:1
86:21
125:14
151:3
165:10
178:25

file  140:17

filed  135:13
170:1

files  159:15

fill  35:25

filled  95:18

final  169:10

finalized
168:7,25
169:1

finally
152:20

find  47:1
48:13
108:9
179:3

finding
53:12

fine  97:21
113:11
125:12
180:5

finished  7:7
168:15

five-day
144:9

Florida  8:15

FMLA  5:14
19:3,5
21:11,14
22:3 45:8,
23,25
46:3,11,
13,15,20
48:8 52:10
58:5,15,22
61:15 64:9
65:5,6,7,
10,14

77:24
78:1,11
91:18,19
93:3 94:3
95:1,16,
18,25
96:22
114:22,24
115:3
122:6
131:24,25
132:19,22
135:13
155:13,14,
19,23
156:4
178:14
179:2

folks  32:5
74:14
109:15
145:17

follow  18:7
97:12
106:19

footnote
30:21,23

forget  7:22

form  24:24
41:4 45:9,
17 48:8
80:4 95:18
96:19 99:3
142:21
170:6,25
171:5

formal
139:16,19
140:2,4,
14,19,20
141:4,15,
20,25
143:7

formatting
121:14

forward  20:1

found
140:12,13

foundation
155:21

frankly  47:8
124:14

Friday  68:9
73:8 74:22
75:7,8,16

full  38:4
66:6 68:6
71:25
75:23,24
94:8 98:4
130:13
131:2
163:6

fully  162:23

fun  21:23

———————————
G
———————————

Gateway  33:5
44:13,18,
23,24 46:4

47:19
61:14
62:16,18
127:14,18

**gathering**
50:4

**gauge**   154:24

**gave**   162:20
164:25

**general**
17:12
143:14
144:4
168:17

**generally**
17:2,6
18:3 65:7
148:16

**generate**
76:1,11,16

**get all**
133:23

**give** 53:8
88:1,4
89:3 124:9
128:2
140:8
141:23
172:25
173:14

**glad** 125:13

**glasses**   18:7

**good**   5:8
39:13,14,

20 40:3,4,
6,8,16,18
41:11,12,
23 42:5,8
48:3 52:14
58:7,16,24
59:3 77:21
78:2,18,24
79:10
80:3,11
91:11
92:14
94:13,19,
20 96:16,
22 97:2
98:2 99:22
100:3,8
101:1,18,
21 102:8,
11 107:6
108:19
113:19,25
117:20,21
118:3
125:13,21
131:24
132:1,4,
12,21,23
133:2,18
136:24
144:21
149:6
150:1,8
151:4,10,
15 152:16
155:12,18
156:1,20,
21 157:3,6

162:3
167:24
169:6
170:4

**goodness**
21:2

**granted**
89:24

**great** 33:18
84:24
127:9

**greater**
67:23

**grounds**
136:9

**guarantee**
64:7 74:23
110:13

**guaranteed**
164:19

**guard**   115:14

**guess** 18:3
61:24 87:8
124:14

**guilty**
140:12,13

─────────────

────── **H** ──────

**half** 118:10

**hand** 62:2

**handle** 12:3,
13,15
142:13

**handled** 18:9
86:8,10
90:9
116:16
128:21
129:5,6
138:9

**handles**
33:7,8
98:17

**handling**
14:5 55:12
67:22,25
90:7,9,10
109:2
128:21
129:4
139:4,6

**happen** 42:16
59:7 63:16

**happened**
37:3 41:18
156:3

**happening**
42:14

**hard**   135:8

**HDO** 166:6,7
167:4

**HDOS** 17:10
166:20

**head** 128:6,
7 166:11,
16,23
167:6,10

heads   166:17

healthcare
  88:10,15,
  21 89:3,6,
  18,23
  95:24 96:5

hear   7:23
  151:7

heard   8:3
  43:6 44:22
  69:7
  162:11

hearing
  80:1,9
  139:18
  141:21,22
  143:8,11

heavily
  131:19,20

held   85:21
  86:10
  159:15

helpful
  140:5

hereinafter
  5:4

higher   72:25
  73:1 75:14

highest
  17:10
  166:8

history
  17:16 64:5
  149:11

150:10,18,
  19,20,22
  159:4,9

hit   86:8,11
  128:25
  160:14
  161:17

hold   28:1
  141:22
  164:7

holding
  68:25 69:4

holds   159:16
  167:8

holidays
  75:13

home   8:13
  66:12

hoping   6:14

hospital
  85:9 88:22
  116:21

hospitalizatio
  n   71:19,23
  74:9 75:22
  81:12
  85:5,12,20
  86:15
  88:13
  114:15
  116:20
  117:8,10,
  14 131:6,
  15 154:8,
  16

hospitalized
  74:5 90:4
  114:23

hour   118:9,
  10

hours   44:4
  96:1

house   43:19

housed
  138:10

houses   10:4

HR   33:12,13
  98:19,20,
  23

hurts   72:11,
  14

hypothetical
  32:7 41:2

hypothetically
  178:25

─────────────

        I
─────────────

identified
  62:14
  128:1,3
  164:17

identifies
  88:24

identify
  23:3 26:7
  36:7 49:16

IDPAP   17:17,
  21,22

18:11
  19:13,16,
  20 159:14,
  21

illness
  45:9,16
  48:8 78:20
  88:2,6
  92:22

impact   60:7,
  12

impacted
  5:16
  155:14

impartial
  94:8
  141:22

implement
  167:12

implementation
  120:9
  169:21

implemented
  79:8 109:4
  168:25
  169:5

important
  6:21 72:17

incentive
  12:12
  13:9,10,12
  14:16,17,
  20,24
  15:5,18
  16:8,11

SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.
Anita Tingley on 10/28/2021          Index: incident..involved

incident
  77:19
  91:24 96:1
  110:3
  160:9

incidents
  63:9 71:11
  91:14
  95:25
  159:21

include
  52:25
  88:20

includes
  106:20

including
  11:6 15:23
  66:5 90:15
  93:3

incorrect
  27:17,21,
  25 149:16
  157:10

increases
  139:7

increment
  66:16
  139:7

individual
  137:8

ineligible
  39:15,20
  41:11
  52:13 94:1
  102:23

inform
  170:23
  171:3,13
  173:21

informal
  141:8

information
  45:2,5,6,
  10,12,19
  46:8,13,17
  47:21,23
  48:9 81:9
  84:16,17,
  18 88:9,
  14,20
  89:4,10,17
  93:4 96:21
  123:1
  149:3,5,9
  150:5,14
  154:7
  158:23
  159:21
  172:6
  174:2,5
  178:16,19
  179:11

informational
  47:19

informed
  60:17,22

initial
  48:24
  108:25
  145:14
  147:19

initially
  50:9
  116:18,21

initiate
  6:16

injury  36:12
  45:9,16
  48:7 78:20
  88:2 92:22

inside
  54:24,25

instant
  134:8,9

intent
  135:14,17

intention
  81:7,17,19
  82:2 83:24

interact
  5:15

interacted
  22:4

interaction
  162:13

interacts
  19:20

interference
  135:14

intermingled
  19:13

intermittent
  65:6,7,10
  94:25

114:22

internally
  54:8

Internet
  44:12

interpretation
  17:13

interrogatorie
s  26:2,16
  27:7 29:15
  34:7 48:24
  49:5

interrogatory
  29:4

intranet
  44:18

investigate
  84:21

investigation
  139:18
  140:11,12
  141:9
  142:14
  143:3

involuntarily
  39:8

involuntary
  38:16,22,
  24 39:4,5

involved
  27:1 55:8,
  15 56:10,
  19,24
  57:3,7,10,

12,21
167:11

**involvement**
98:17
167:13

**involves**
35:6

**issue** 6:3
88:11
135:17
179:20

**issues** 12:15
121:14

**items** 30:5
61:13

---

**J**

**Jacksonville**
8:15,22

**January**
33:17 37:7
113:24
114:10
151:18,21

**Jeff** 16:21
128:8

**Jennifer**
74:23

**job** 13:25
69:13
70:5,6
97:11,12,
15,25
98:8,9,17,

21 99:2,
15,19,25
100:11,14,
24 101:24
102:13,24
103:3,24
106:9,18,
19 107:2,
4,12,16,22
108:5,17

**jobs** 69:9

**Joe** 126:16
179:24

**John** 165:24
166:3,5

**Johnson**
20:24
165:24
166:3,5
170:2

**Johnson's**
95:12

**Jolanda**
20:24
95:12

**judge** 174:8
175:10,24

**July** 52:20
53:5 97:4
160:10

**June** 11:11,
15,16,20
15:4,9,10,
17,23
52:4,8,20

53:5 60:25
97:4
127:12
128:17
170:19
174:7,10
175:9

**junior** 69:4

**jury** 78:20
92:21

---

**K**

**kind** 6:6,11
13:3 23:4,
5,16 26:7
46:12,13,
17 51:21
56:7 61:17
64:10 80:1
93:12 97:1
101:5,17
102:13
116:3,17,
25 127:7
129:5
149:25
151:3
154:12

**kinds** 44:23
68:7

**knew** 164:14
170:2,13,
16,18

**knowledge**
36:19

40:24
41:17
99:11
142:22
164:20

---

**L**

**labor** 11:23
13:22,24
16:19,23,
24 17:3,7,
10,14,18,
20 33:10
55:15,19,
23 63:21
98:10,11
128:7,12
163:21
166:11,16,
18,23
167:6,10

**labors**
128:13

**Lack** 155:20

**large** 121:17

**late** 50:2
66:9 67:2,
5,10,12,14
68:11
71:17 72:1
76:24
77:1,2,5,
7,9,16

**law** 107:3

**lawful**

135:15

lawsuit  5:12
 49:21 50:5
 51:4

lawyer  19:1
 20:6,8,9
 35:22
 121:8
 123:18
 171:1
 174:17,25
 175:1,5
 177:6,16

lawyers
 20:11

layer  43:18

Layoff
 150:11

layout  150:9

leave  5:14
 16:7
 21:11,14
 29:18 30:7
 35:2 36:7
 38:9,13
 39:7 40:5,
 22 42:2,3
 58:6,15
 64:9 65:6,
 7,10
 66:10,16,
 22 76:24
 78:1,7,11,
 20 92:21
 95:1,25

100:12
114:22
132:1,19
155:14
156:4

leaves  37:2

leaving
 68:12
 71:8,16
 72:1

left  165:10

legal  56:11
 174:13,18
 175:13

legible
 121:14,20,
 22

leisure
 22:20

lesser  93:13

letter
 90:13,17,
 22

letters  11:6
 12:6 90:15
 139:13

letting
 47:14

level  139:6
 140:9

Life  43:6,
 7,10,11,
 16,17
 44:1,6,8

limit  125:6

limited
 124:24
 126:13

limits
 141:21
 142:24,25
 143:1

Lisa  28:3
 83:3,6,9
 174:21

list  100:9
 151:25
 152:2

listed  14:7
 24:11
 80:21
 89:10

local  79:20,
 22 80:9
 144:4

log  149:24

logic
 162:12,15,
 16,17,18
 163:2,9,15
 164:1,17

long  5:22
 6:15 8:16,
 23 9:9
 13:17
 21:16 69:2
 78:13
 79:12 91:7
 96:25

132:2
143:2
148:2
169:19

long-term
 12:5 37:25
 38:2 39:6
 108:1

longer
 145:24
 170:3,24
 171:4,14
 174:9
 175:9

looked  34:8
 92:1
 104:19
 128:24
 176:8
 177:14

lose  64:10,
 13,24
 65:1,10,
 19,24 66:2
 113:1,3,5,
 7 147:14,
 16,18

loses  148:1
 152:20

lost  148:6,
 7

lot  7:20
 22:16
 81:15

lower  91:6

140:7

lunch  108:24
 118:7

luncheon
 118:19

————————
————————
       M

M-A-R-I-E
 8:12

M-Y-R-A  8:14

made  27:15
 52:12
 53:10,11,
 15  54:11,
 15  55:17
 60:12
 120:3,16
 135:9
 167:24
 169:6,16
 171:16

mail  176:18

mainframe
 137:15,17,
 21  179:9

maintains
 10:5

major  18:8

make  7:4
 23:12  28:4
 32:4  39:24
 41:22
 42:20
 52:11

55:17
59:6,7,23
63:21
69:2,5
79:5  92:14
94:1,7
106:16
114:18
117:15,17
128:4
133:5,12
162:1,22
173:23
175:10

makes  32:8
 138:14

making  82:11
 106:20
 117:13

management
 16:25
 43:21
 137:5,6,
 10,11,13,
 17,18
 138:5,7,10

manager
 11:23
 13:19,21,
 23,24
 56:2,21,
 22,24
 57:2,7,11
 67:8,15
 143:14
 144:4

manager's
 57:7,11

managers
 149:3

manner
 141:23

March  51:18
 52:1,7,8
 59:16
 60:25
 62:16
 114:1,11
 156:10

Marie  8:12

mark  29:23
 35:15
 43:16
 64:18
 72:13,15
 82:1,23
 86:7
 104:16
 105:13
 110:23
 111:15,24
 112:4,8,
 16,23
 113:9,10,
 21  115:4,
 6,15
 116:15
 117:20,22
 130:17
 155:24

marked  49:1
 64:9,13

65:11
87:24
95:12
102:6,20,
22  103:18,
19,24
104:3,6
105:6
110:20
111:5,18,
19  115:17
116:19
133:22
164:13

marking
 64:13
 65:5,9
 72:22
 73:13,16
 112:20
 129:22

marks  63:14,
 17  64:23
 147:9

markup  16:8

match  36:10

math  32:4,
 19

matter  91:7
 114:9
 148:2

matters
 12:18

meaning
 30:10

SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.
Anita Tingley on 10/28/2021          Index: means..mobilized

| | | | |
|---|---|---|---|
| means 29:21, 22 35:16 105:24 128:10 139:17 146:13 158:4 | 131:8,11, 13 136:20 137:2,4,24 138:20,24 153:5,10, 12,21,23 154:3,6, 13,17 156:16,17 | 127:7 160:6 165:23 168:11 | 160:22 161:3,10 |
| meant 103:10,13 127:24 | | Micaela's 33:17 | minor 18:8 |
| medical 12:5 45:5,15 46:1 48:7 71:22 74:14,16 77:6,15 80:25 81:4,7,10, 17,23 82:4,17,21 84:13,15, 19,20,22, 23,25 85:24 86:17 87:20,22 88:11,14, 19 89:10, 20 90:2 93:11 98:12,15, 18,24 101:10 106:22 108:1,2 114:16,24 116:18,22 | medically 153:3,15 | middle 8:11 52:20 53:10 | minute 66:17,22 67:2,14 77:1 |
| | medium 23:5, 16 26:6 33:19 | midnight 75:1,3,8, 17,19 111:20,25 113:14,15 | minutes 76:25 77:7,9 165:11 |
| | meetings 134:4,5,10 | | mischaracteriz es 171:6 |
| | memo 55:1 | military 30:10,20, 24 31:4,8, 12,17,21, 25 32:8 33:9 34:17 36:25 37:19,21 38:9,11, 13,14 39:7 40:5,11,22 42:2,3 79:3 92:4 93:8 | mischaracteriz ing 37:14 95:21 |
| | memory 35:20,23, 24 36:2,4, 10 87:17 | | missed 64:16 94:10,12, 17 129:19, 24 130:3, 5,7,8 149:14,15 |
| | mentioned 9:18 159:3 | | misses 63:18 |
| | messaging 134:8,9 | | missing 64:14 |
| | Micaela 22:11 23:4,15 24:7 26:1, 23 38:3 48:21 51:17 61:7 106:13 109:21 126:20,21 | mind 47:14 | mistake 27:15 |
| | | mine 6:9 149:16 | mobilization 38:22,25 39:4,5 |
| | | minimum 66:15 67:11 76:21 147:22 | mobilizations 38:12,16 |
| | | | mobilized 39:9 |

moderate
  127:8

moment    34:25

Monday    68:8
  73:9,11
  74:21,25
  75:3,4,16
  110:24
  111:8,19,
  25  112:1,
  5,18

month    9:15
  91:13
  94:23
  95:3,4,25
  96:6
  113:20,22
  114:13
  132:14,19
  133:16,23
  151:17,23
  152:12
  167:2,21,
  23,25
  168:3,7
  169:4,7,15
  170:2,5,14

monthly
  133:10,16

months
  94:20,23
  114:2,6
  132:14,23
  133:9,24
  144:22
  151:6,8,9

156:4,6,
11,19
168:1
169:8,16,
22,23
170:4

morning    5:8
48:22
49:10
77:9,11

move    33:14
69:3,5

moving    72:12

Myra    8:14

_____

N

Nancy    6:22
7:8  48:24
95:14

nature    19:8
54:12
88:24

Naze    164:14

necessarily
142:16

needed
162:25
163:19,23

needle    155:1

night    50:2
111:19
119:19
121:13
162:20

164:25

non-
hospitalizatio
n  88:8

nonattendance
63:10,11
65:21
71:11

nonmedical
153:18

normal    32:7,
16,17

northern
68:21,22
70:10 71:2

Nose    164:14

note    78:21
84:11,12

noted    126:16

notes    86:14

notice    22:12
23:23
27:10
143:3
171:7
174:14

November
158:2,12

number    9:5,
12  45:8,
11,23
47:15
48:7,22
61:23

109:22
111:18
126:21,23,
25  146:5
148:13
159:2
164:15

numbers    32:3
45:22
46:1,2

nurses    81:11

_____

O

Object    41:4
80:4 96:19
99:3
142:21
170:6,25
171:5

objected
25:4

objecting
136:8

objection
24:24 47:5
81:20
82:11,14
97:6 135:4
155:20
170:15
171:15,18
172:2,16
173:24
174:12
175:12,18

SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.
Anita Tingley on 10/28/2021          Index: objections..pay

objections
 7:12
 136:13
 173:1,7
obligated
 175:17
obligation
 171:3,13
 173:21
 174:10
 175:8
observed
 67:9
October
 118:19
 119:2
 152:4
 157:14,16,
 22 180:15
offered
 144:3
officer
 166:8
officers
 17:11
official
 103:13
offs 82:23
 104:16
 105:13
 113:21
 130:17
 155:24
omitted

147:25
one-day
 139:25
 140:18
ongoing 45:9
online 163:2
onset 88:2
open 69:3
operated
 60:24
operates
 51:5
operation
 72:10
operations
 67:8
opportunity
 23:13 95:5
 128:2
 158:20
opposed 72:8
 133:3
 158:17
ops 67:15
option
 139:15,23
 140:8
 141:2
options
 144:1
order 114:18
 180:1

original
 120:7,16
 162:21
originally
 137:4
 144:25
out-of-service
 108:1
owner 128:6,
 10

─────────
    P
─────────

p.m. 110:24
 111:11,24
 112:17,18
 118:18
 180:14
pace 22:20
 23:5,10
pager 125:10
pages 49:18
 124:3
 163:6,14
paid 29:17,
 19,21,23,
 24 30:1,2,
 16 32:1
 35:2,13,
 17,18
 36:1,8,18
 37:16,17
 40:10 42:1
 96:10
 132:2,9
 178:23

paper 140:15
paragraph
 106:15
 145:9,13
 168:14
paragraphs
 37:2
part 14:14
 26:16
 28:11 31:2
 33:10 35:4
 46:6 79:14
 97:11,25
 98:10
 106:18
 109:5
 123:7
 142:6
 145:9
partial
 66:6,7,8,
 13,18,23
 67:3 68:7
 71:25
 75:23,25
 76:3,10,23
 77:3,12,18
 130:13
 131:2
parts 17:9
past 23:8
 42:3
paused
 119:12
pay 30:23,

24,25
31:4,5,17,
20,21,23,
24,25
32:5,7,8,
10,11,15,
17 37:20,
21 38:13,
14 39:12
40:15
41:10 64:7
74:23
164:19
179:2

payroll  44:4
164:18
178:17,18,
20 179:7,9

pays  31:22
37:15

PDF  121:18

penalized
73:16
74:2,15
131:21

penalty
73:20,21,
22,24

pending  6:12

people  5:14
7:2 20:25
47:21 55:8
58:14,17
72:15,22
100:15
109:4

137:8,16

perfect  29:9
113:25

perform
115:7

performance
17:24

period
14:13,18
15:21
31:23
39:9,19
42:4 52:7,
15 58:23
66:21
67:11
78:2,9
99:21
117:20
132:13
133:8,17,
18 134:2
155:25
167:25
169:7

periods  32:2

permission
89:23

person  7:3,4
14:5 55:15
57:21
83:11
84:19

personal  6:3
9:2 16:7

78:19
92:21 93:5
99:11
178:11
179:1

phone  8:25
9:2 45:8,
22,23 46:1

piece  140:15

pinpoint
21:7

place  11:19
14:17
20:21 21:4
39:18 82:4
83:1 84:1,
5 85:17
113:2
138:16

Plaintiffs
95:15

pleasure
21:1

plowing
125:5

point  10:1,
2,16,24
11:10 24:3
27:14
28:17 45:1
50:4 51:23
61:25 64:3
67:23 68:5
72:25 73:1
74:17

75:14,25
81:25
82:22
86:3,6
88:17
90:16
93:14
94:17
95:2,10
103:14
109:1,7
111:8
112:5,9
129:6,17
130:3
131:14
133:24,25
138:17
144:14
145:15
149:15
152:11,21
155:14,16,
18 156:16,
24 157:4,
8,9 158:1
167:23
169:6
171:17
179:19

points  10:23
11:2 44:8
48:1 60:8,
13 63:7,9
65:4,13
66:3 67:6,
19,21
70:19 72:7

SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.
Anita Tingley on 10/28/2021          Index: policies..portion

| | | | |
|---|---|---|---|
| 73:18,25 | 152:12,24 | 60:2,4,10 | 19,25 |
| 74:6 76:1, | 153:19 | 62:7,15,20 | 130:1,12, |
| 4,5,7,12, | 154:2,8,11 | 65:12,20 | 20 134:12 |
| 15,17 | 155:3,4,10 | 67:19 68:1 | 136:21 |
| 77:23,25 | 156:5,17 | 74:3,6 | 139:21 |
| 84:9 85:6, | 157:2 | 75:11,13 | 140:22 |
| 8,13,14 | 161:3 | 76:9 78:23 | 141:1 |
| 86:13,15 | 162:8 | 79:8,15 | 142:1,8 |
| 89:13 | 164:21 | 80:21 82:3 | 143:5 |
| 90:8,15,17 | **policies** | 85:25 | 145:6,17, |
| 91:3,9,13 | 5:15,16 | 86:2,5,6, | 18,21 |
| 94:18,22 | 9:20 51:15 | 23,24,25 | 146:9,11, |
| 95:5 96:7, | 52:23 53:1 | 87:1,3 | 14,18,21 |
| 8 106:25 | 122:15 | 88:17,20 | 147:11 |
| 107:13,17, | | 89:12 | 148:10 |
| 21 108:6 | **policy** 10:5 | 90:18 | 154:21 |
| 109:5 | 11:7,10, | 91:12,15, | 160:15,19, |
| 110:3,5, | 18,19 12:5 | 19 92:6 | 20 161:2, |
| 18,21 | 17:17,21, | 93:3,17 | 6,7,11,18 |
| 111:1,5, | 23 18:4,9, | 97:3,8 | 162:3,25 |
| 10,12,17, | 19 19:4,6, | 104:14,15, | 163:13,18 |
| 21 112:1, | 11,12,13, | 21,22 | 167:13,18 |
| 6,10,14, | 15,16 | 105:1,3, | 168:6,7, |
| 18,24 | 20:2,3 | 14,15,19 | 17,25 |
| 113:2,3,5 | 26:17 | 106:1,8,25 | 169:10,20 |
| 115:1,2,20 | 28:16,21 | 108:6 | 170:10,17 |
| 116:9,10, | 39:17 40:1 | 109:3,5,7, | 171:10,23 |
| 14,22,24 | 42:11,15, | 12 110:6, | 172:7 |
| 117:4,24 | 17 45:3,14 | 25 114:1 | 173:19,21 |
| 129:1,7, | 48:6 | 115:21,22 | 174:1 |
| 10,20 | 50:10,15, | 120:10,13 | **pool** 147:21 |
| 131:7,12 | 17 51:18 | 122:6 | |
| 133:3,24 | 52:1,3,7 | 126:19 | **poorly** |
| 144:13,22 | 58:4,13 | 127:1,11, | 127:24 |
| 145:17,23 | 59:5,8,10, | 18,19,21 | **populated** |
| 146:8 | 12,13,14, | 128:6,10, | 120:2 |
| 148:7,22 | 15,16,18, | 11,14 | **portion** |
| 149:6,18 | 21,22,25 | 129:4,7, | 125:24 |

portions
  121:17

position
  11:22,25
  13:18
  59:22
  68:25
  69:3,19,20
  146:12
  166:12,13,
  14 167:7

positions
  69:4 98:7

possibility
  101:19
  108:7

post-15
  39:19

posting  55:2

potentially
  60:12,16
  76:1 136:5

PP  49:1

practice
  40:12

pre  70:18

pre-authorized
  70:18

preclude
  108:18

precludes
  99:22

premise

173:10

premised
  172:22
  173:4

prenotified
  79:12

prepare
  35:12
  176:2,5

prepared
  24:9 25:15

present
  18:24
  56:1,6

president
  16:23

presume
  124:7

prevent
  79:10 80:2

prevents
  99:20
  132:1

previous
  113:21

previously
  49:1 58:15
  59:1 95:12
  127:11
  128:21
  146:7
  147:8
  164:13

primarily
  5:13,19
  9:19

print  121:18

prior  7:21
  8:20 11:20
  20:1,20
  22:16
  24:21 50:5
  96:15
  106:21
  109:5,12

private
  84:17

privileged
  28:5

pro  5:24

procedure
  28:22
  142:19

procedures
  5:16 52:23
  74:10

process  11:4
  12:7 28:14
  80:25
  81:1,4,8,
  18,24
  82:4,18
  83:1,25
  84:1,5
  86:23
  87:2,3,21
  97:13,15
  98:8,10

106:20
109:2
114:25
116:12,25
117:9,16
136:21
137:3
138:15,24
139:1
141:15
153:6
154:4
167:12,14
169:19

processes
  9:20 12:9
  19:23
  85:17

produce
  50:9,12
  136:7,10

produced
  47:8,11,
  12,13
  49:10
  124:9
  126:3,6,15

product
  72:12

program  5:19
  14:20,24
  15:5 16:8,
  9 43:1,2
  49:13
  115:16,22
  117:6

SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.
Anita Tingley on 10/28/2021          Index: programs..quicker

programs
  12:12
  13:9,10,13
  14:16,17
  15:18
  16:11

progressive
  68:1 90:9
  129:8,9
  140:21
  142:12,18

prohibited
  107:2

proper   82:12

proportional
  136:5

protect
  102:24

protected
  115:16

provide   46:7
  49:23
  50:12,18
  51:8 88:9,
  14 141:5
  142:12
  149:3
  153:10,12
  154:12,13

provided
  49:20 51:3
  71:22 92:2
  119:18
  120:24
  121:10,22

123:17,20
154:5
176:5,13,
17

provider
  88:10,15,
  21 89:6,
  18,23
  95:24 96:5

provider's
  89:3

pull   48:21
  51:17
  56:12,16
  95:7
  109:20
  148:13
  165:23

punchy   21:25

purpose   85:7
  138:25

purposes
  35:3 97:23
  135:11,12

put   12:1
  22:11 26:1
  36:9 46:16
  51:12 54:5
  67:4,15
  69:18,19
  94:5
  107:10,24
  150:22
  151:2
  162:24

163:13,19

puts   50:17
  67:7

putting   70:3

_____

Q

_____

qualified
  100:19
  156:21

question
  6:12,13
  7:5,6,8,
  14,16,21,
  22,23,25
  8:2,3 28:8
  29:14,16
  30:9,16
  33:3 35:3,
  4 36:6,7
  41:7 45:3
  46:20
  53:3,13
  54:1 60:11
  63:24
  74:20
  81:21
  83:3,5,20
  84:5,6,14
  87:4,5,6,
  9,13 92:19
  94:16
  98:20
  99:24
  103:1
  107:18,19
  108:4,7,

16,20
110:2
113:18
118:1
122:15,18,
24 123:9
127:24
142:4,5,6
146:7,22
147:6,20,
21 154:10
159:19
162:23
172:1,11,
20,22,24
173:3,13,
14,16
175:4,6,
14,15,20

questions
  5:12,19
  7:12,15,
  19,20
  19:2,12
  23:2 45:25
  50:15 62:6
  80:15
  81:16
  89:21
  109:19,23
  124:5
  125:23
  165:10,22
  179:15

quick   61:9

quicker
  109:24

quickly   6:7
  61:18

_____

_____

          R

_____

rate  164:16

reach   129:10
  146:2

reached
  160:16,17
  161:20,23

read   17:22
  22:6,19
  24:2 82:25
  107:7
  121:19
  124:2
  143:19,21
  162:22
  163:6
  168:14
  172:10,13
  173:15

reading
  25:17
  106:15
  150:9
  168:15

real  61:9

realize
  27:14

reask  7:25

reason  6:10
  7:20 42:6
  50:8,11

53:17,20
138:8
147:24
153:6

reasonable
69:5
97:11,25
98:17,21
99:2,15,19
100:11,13,
14,24
101:24
102:13
103:3
106:9,18
125:2,8

reasons   40:2
138:23

recall   122:7

recalled
12:8

receive   11:1
30:23
31:20 42:7
65:4,13
67:5,18
70:19 74:6
76:3,5
82:1,22
85:6 86:13
96:22
101:21
102:7
111:21
132:20
143:7

155:25
170:3

received
  23:24 24:3
  121:13
  176:18

receives
  117:3

receiving
  39:11
  73:18,25

recent   160:9

recently
  163:7

recess   48:18
  118:19
  165:16

recognize
  23:20
  26:13
  33:24 34:3

recollection
  30:12
  56:15,18
  176:24
  177:2

recommendation
s  96:17

reconvene
  124:6,23

reconvened
  179:16

record  7:9
  8:8 25:24,

25 48:15,
17,20
83:11
125:14,21
126:12
143:21
146:23
149:19
165:19
172:13
179:17

red  115:4,
6,15,20
116:12
117:11,19,
22

reduce
  155:16

reduced  84:9
  94:14,18
  131:14
  153:19
  154:1,10
  155:18

reduces
  72:24

reduction
  133:10

refer  15:18
  110:10
  137:7

referred
  137:16

referring
  12:20

104:14
105:9

reflect
122:10
135:10
139:5
144:14,20
146:25
151:11,12
154:20,25

reflected
36:10
160:9,13
161:15,19,
21

reflects
160:16

refresh
87:17
176:23

refreshing
177:2

refusing
136:6

regard   61:2
70:22,25

regular
180:4,5,6

rejected
153:13

relate   51:4

related   5:13
47:12
88:11

126:7
140:6
155:13
177:20

relates
128:20

relating
5:12
125:23

relations
11:23
13:22,24
16:19,23,
24 17:3,7,
10,14,18,
20 33:11
55:15,19,
23 63:21
98:10,11
128:7,12,
13 163:22
166:11,16,
18,24
167:6,11

relevance
136:9

relevant
135:6,12,
21,23
136:2,5

rely   106:5
173:22
174:8
175:10

remain   52:3

remains
80:11
131:15
138:25

remember
18:21
21:4,14,19
41:8 47:15
56:2,4
163:8

remotely
6:20

remove   12:10
116:14

removed
34:19
115:21
116:24
117:24
127:20

repeat   25:1
58:9 82:10
126:23

repeatedly
156:3

repeating
126:11

rephrase
178:12

replace
160:24

report   16:15
68:11
129:22

151:10
161:24
164:11

reporter
49:3 68:16
83:10
143:18
172:10
173:15
179:18
180:3

reports
16:20

reprimand
139:16,19
140:2,4,
14,20
141:4,8,
15,25
143:7

reprint
46:12

request
97:11
106:18,21

requested
85:25
143:22
172:14

requesting
124:4

requests
50:5

require
84:13

required
    89:2,7

requirement
    50:16
    120:7
    123:2,5,7,
    13 126:14
    163:12,14,
    15 164:23

requirements
    49:12
    119:8,15
    122:21
    123:15
    125:7
    153:5
    162:19,24
    163:2,17

research
    53:14

reserve
    89:16
    106:24
    107:20
    125:23
    136:13
    179:22

reside
    179:12

resided
    61:15
    138:16

resides   43:2
    127:14

resist   21:22

respect
    19:25
    24:10
    28:23 30:5
    37:20
    44:24
    47:20
    55:19
    122:14
    124:23
    166:24
    177:13

respond   36:5
    50:4
    174:17

responded
    34:7 86:21

responding
    36:6

response
    29:8 39:18
    68:20

responses
    26:2,4,15
    27:2,6
    28:11 29:4
    30:4,11
    33:16 34:6
    37:13

responsibiliti
es   11:25
    14:6

responsibility
    51:8
    170:23

responsible
    14:5 17:7
    50:3

rest   130:8

restate   7:25

result   67:22

resume   12:2

retaliation
    135:19

retrofitting
    145:16

revealing
    28:5

review   46:18
    51:9 80:25
    81:1,4,8,
    18,23 82:4
    84:13,25
    87:20
    114:17
    121:15,24,
    25 124:8,
    19 126:3
    136:12,20
    137:3
    138:20,24
    153:6
    154:4
    176:1,4,
    21,22

reviewed
    81:10
    82:20
    136:15

reviewing
    154:6

reviews
    84:15
    85:24
    116:22

revise   7:25
    169:20

rid   96:7,8

Rings   21:22

role   16:16

rolled
    168:3,8

room   6:25
    22:18
    71:23
    114:23

roughly   9:10
    21:5

route   117:6

row   156:20

rubber   84:24

rule   18:6,
    12 19:17
    26:2 143:4
    164:11

rules   6:5
    18:8
    159:23

run   72:18,
    19,20
    73:4,8

---
**s**
---

safety  13:21
  18:7,8
salary
  32:16,17
sat  36:5
satisfy
  153:4
Saturday
  69:19
scenario
  65:22 67:2
  75:17
  111:22
  114:7,8
  115:11
  116:3
  117:8,14
  132:17
  147:9
  152:8
  158:15
schedule
  68:5 90:6,
  7 129:17
  139:4
scheduling
  12:13
Schobert
  5:11
scope  99:4
  170:7
  171:7

174:13
Scott  16:17
screen  22:21
  51:20,22
  61:8 62:10
  95:10
  119:6,12
  164:9
screens
  178:21
screw  164:15
scroll  23:5,
  8,16 24:6
  25:10
  26:6,22
  29:7 30:21
  33:19 38:4
  49:17
  61:18
  106:14
  127:7
  148:15
  152:15
  160:5
  168:11
section
  108:25
  139:4
  145:15
seek  89:17
seeking
  106:17
semi-
discussing
  51:16

send  12:5,7
  45:5 47:1
  81:5,24
  82:17,19
  84:8,22
  153:7
sending  12:5
sends  74:16
  154:9
senior  11:23
  13:23,24
  16:19 69:1
seniority
  12:10
  69:3,9,20
  70:7 91:3
  144:13
sense  13:2
  138:14
sentence
  91:20
separate
  64:22
September
  152:6,17,
  25 153:1
  156:15
  157:15,16
served  139:1
service  44:4
session
  119:1
set  41:15
  42:18

111:6
162:18
163:2
seven-day-a-
week  72:9
seven-hour
  125:5
Shannon
  16:17
share  22:21
  61:8 95:9
  119:6
  164:6,9
sharing
  25:24
  62:10
  119:12
  126:20
shift  66:17,
  19
short  48:12
  97:14,22
  99:21
  165:9
short-term
  40:11 42:2
  79:3
shortened
  146:25
show  30:8,
  13 48:3
  64:15,20
  84:11
  106:8,11

SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.
Anita Tingley on 10/28/2021          Index: showed..spelled

showed   24:17
  37:12
showing
  18:15 23:1
  24:21
  71:25
  95:11
shown   36:3,
  11
shows   17:15
  120:18,21
  149:15
  153:9
shy   114:6
sick   65:18,
  19,22,23
  66:12
  71:18,20,
  21 72:4
  74:13
  75:21
  76:1,2,6,
  10,22
  77:2,8,13,
  15,16,19
  81:12
  86:12 90:3
  93:10,11,
  13,15,16,
  17 100:6
  101:11
  115:17
  116:6,17,
  19 131:8,
  13 154:16
  156:16

157:1,20
158:5,12,
  16,20,21
side   20:9
  143:15
  149:18
  154:24
side-by-side
  150:22
sideways
  164:7
sign   43:17
  89:7
  139:18
  140:10
  142:7
signature
  26:10,18
  29:3 37:9
  179:21,23
  180:12
signed   27:5,
  9,12,14
  28:18
  29:25
  92:10,13
  105:11
  168:24
  171:22
similar   23:1
  74:24
  76:23
  120:12
simple   103:1
simplified

130:16
simply   125:6
sit   37:5
  122:17
situation
  40:25
six-calendar
  132:14
six-month
  42:4
  133:8,17
  134:1
skip   26:9
slow   23:9
  26:8
small   70:9
  133:16,20
smooshed
  121:18
somebody's
  85:8
someone's
  105:17
sort   5:15
  14:7 22:19
  26:6 30:20
  33:19 45:1
  47:18,20
  51:15
  66:15
  74:24
  76:18 91:3
  92:3
  100:20

109:4,12
130:4,8
142:1
154:13
162:5
164:1
sounds   47:13
  125:1,21
  129:5
south   69:16,
  22 70:1,24
space   47:19
  48:9 61:14
speak   6:10
  23:10
speaking
  7:18 17:2,
  6 18:4
  173:1,7
specialist
  14:1
specific
  46:11 54:2
  147:22
specifically
  23:7
speed   26:6
  127:8
spell   8:7
spelled
  39:16,21
  79:15,16
  141:10

spells   164:1

spoke   74:22
  130:17

spoken   178:4

spreadsheet
  121:17

staff   138:6

stage   144:1
  155:10

stages   91:7

stamp   84:24

stand   10:11
  137:9

standing
  43:14

standpoint
  171:2

stands   12:19
  159:10

start   8:5
  15:15
  33:24 62:2
  110:9,10
  111:20
  140:7
  156:14
  157:17

started
  83:12
  120:1
  124:21
  177:23

state   8:7

17:13
107:23

stated   27:11
  29:3 33:1
  138:8

statement
  78:11
  170:2,24
  171:14,21
  172:23
  173:23
  174:9
  175:9,10

states
  141:20
  146:18
  163:13
  166:10

stating
  170:9

status   42:2
  63:19,21
  71:21
  86:10,13
  100:1,4
  101:5,7,
  10,12,21,
  25 102:14
  103:4,11,
  12 104:4,
  5,25
  105:6,17,
  24 107:9,
  24 147:14

statuses
  43:15

64:2,4
100:7
102:9
103:23
105:18

stay   70:6
  95:5

stayed   131:9
  138:15

stays   131:4

step   90:12,
  22 139:6,
  15,20
  140:8,17,
  20,25
  141:13,16
  142:7,8
  143:6,10,
  13,17
  144:1,3,6
  145:19,23,
  24,25
  154:25
  160:15,17
  161:17,20,
  23

steps   68:1
  90:15
  109:13,14,
  16 139:11
  154:20

stick   13:17

stock   14:20
  15:20

stomach   77:8

stop   12:8
  25:23
  32:20 33:1
  34:14 62:9
  82:9 83:14
  126:20

straddle
  113:16

Street   8:14

strictly
  14:13

stuff   8:6
  139:14

subject
  10:19 51:9
  90:9
  179:16

submit   87:21
  117:15

subsequent
  92:3 126:6

subsequently
  126:4,15

substance
  35:8 50:22
  54:18

substantive
  124:3

success   16:9

sufficient
  88:9,14
  89:11
  124:19

summarizing
 58:8

summary   37:3

summer   58:11

Sunday   68:10
 72:18
 74:22
 75:8,16

superintendents   144:5

supersedes
 161:6

supervisor
 55:25 56:6

support
 88:10
 156:16

supported
 153:4,15

supposed
 146:24
 154:25

surround
 22:3

suspended
 144:8

suspension
 140:1,14,
 18 143:8
 144:10

sworn   5:4

system   10:1,
 3,4,16,24

17:15
42:12,18,
20,21,22,
24 43:3,18
50:17
51:4,5
55:13
67:16
77:23
114:16
119:23
120:15,16,
21 122:5
123:2
128:22
137:9,13
149:13,24,
25 160:25
161:3
162:1,25
163:19
164:22
178:16,17,
18 179:7,8

systems
 162:6,13

---

**T**

---

T&e   43:19,
20,21
102:6
103:17
161:7
178:10,13
179:1

T-I-N-G-L-E-Y

8:10

table   92:8

takes   50:16
 132:22

taking   6:23
 74:2
 155:14

talk   6:21
 21:11
 35:21
 89:22
 99:24
 121:19
 126:8

talked   35:7
 110:4
 114:14,17
 132:17
 133:11
 136:21
 147:8
 148:18
 177:11

talking   7:2,
 4 9:19
 13:9 14:13
 21:1,14
 23:6 25:12
 28:13
 29:24
 32:12
 47:25
 61:12
 69:12
 75:4,15
 76:1 80:16

83:12 92:9
103:15
104:13,17,
18 111:23
117:11
137:18
159:22
179:4

taxed   131:20

team   138:3

technological
 59:6

technology
 54:9 55:4,
 5,6,8,16,
 17 58:12
 60:3,18
 61:4 123:1
 163:22
 164:2

TECS   43:17
 137:15,21
 150:12,15,
 18 162:1

telling
 143:25
 176:21
 177:9

tells   7:15

ten   94:16
 129:20
 130:3
 133:2
 144:21
 149:15

152:12
165:11

ten-point
133:10

term  103:21
162:11

terms  12:2,
20 15:17
29:17
105:17
116:6
163:16
164:2,17

terribly
6:14

testified
122:4
173:4,10

testifies
5:5

testify  24:9
25:15
52:22
99:1,10,
11,14
122:13
135:9
176:24

testifying
102:4
127:11

testimony
22:2,7
24:13,18
44:22 58:3

59:24,25
64:6 69:7
171:6
177:2

text  121:19
177:6

theoretically
60:9

thing  7:10
13:3 29:8
56:7 70:9
93:12
123:14
129:24
134:18
146:13
163:15

things  43:23
44:6,17,23
47:21
159:22

thinks  95:20
99:8

Thomas
177:17

thought
103:12
137:12
154:3

three-and-a-
half  8:19

threshold
86:8,11
160:14

thresholds
129:10,13
133:15
144:14

threw  77:8

throwing
77:11

thumb  6:12

Thursday
68:9 73:11
74:22,25
75:4,5,16
118:18
119:1
180:14

till  15:6

time  6:17,
22 7:1,10
14:13,18
15:21 27:5
29:14,19
30:3 31:3
37:15 39:9
42:3,4
52:7,14
53:18
56:22
58:23
62:17
65:3,19,
22,25
66:20
67:12,23
69:6 76:22
78:9 80:16
83:11

87:14
95:1,2
98:4 99:21
108:14
111:7
118:8
124:10,19
130:11
131:19
133:8,17
134:1
135:8
138:11
141:21
142:24,25
143:1
146:10
147:23
151:15
155:24
157:20
166:19,22
171:23
172:7
174:2

timeframe
14:22

timely
141:23

times  20:13,
18,21,23
22:16,17

Tingley  5:3,
8 8:9
23:20
25:2,16
26:12

28:10
33:22 34:3
49:9 61:12
82:25
83:24 84:4
99:14
122:4
124:6
126:7
127:6,10
165:21
166:2
173:19
174:23
175:1

Tingley's
  26:10
  125:24

title 13:20
  14:8
  16:18,22
  166:15

titles 13:25

today 5:17
  7:20 9:19
  14:13
  18:16
  23:24
  24:3,9,13,
  18 25:16
  37:5 49:21
  52:22
  53:17
  97:23
  99:24
  102:4
  122:18

123:9
126:8,15
142:3
159:16,17
161:14
176:2,6,9,
  24 177:3,
  5,14,15,
  16,19
179:16,17

told 16:10
  116:13
  123:16

Tom 47:4
  49:25
  121:10
  123:25
  126:1,9
  135:3
  172:25
  174:20
  177:11,24
  180:6

Tony 5:10

tools 44:14,
  24

top 23:18
  62:17 97:9
  154:20
  168:11

topic 99:9

topics 24:10
  126:7

total 67:23
  90:16

129:6
155:15,16,
  18 157:3

traditional
  13:2

train 10:18,
  25 12:13,
  22 13:3
  44:25
  60:7,13
  62:22,23
  63:2 69:8
  72:18,19,
  20 73:8
  79:25
  98:3,5
  110:12
  116:2
  142:11

training
  30:25
  31:5,6,13,
  14,19
  32:2,15,
  18,23
  38:15,18

trainmen
  15:2,3

trains 43:14
  73:5

transcribed
  179:19

transcript
  22:7

transportation

5:13 161:7
166:11,17,
  18,24
167:7,11

treating
  88:10,15

treatment
  74:7 75:23
  88:5 95:4

trick 30:9

triple 61:24

true 27:8
  37:6 75:2
  76:16
  77:25
  78:3,4,7,
  10 148:10
  170:3,24
  171:4,14
  175:9

truthful
  30:4

Tuck 5:7,9
  22:11,13
  23:15,19
  24:6,8
  25:7,23
  26:1,11,
  22,24
  28:7,9
  29:7,10
  33:15
  34:2,10,15
  35:10
  36:21,24

SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.
Anita Tingley on 10/28/2021     Index: Tuesday..understanding

38:6,8
47:4,10,17
48:12,16,
19 49:4,8
51:1,12,
13,17,19
53:7 54:22
61:7,11
62:1,4,11,
13 68:18,
19 73:6
80:7 82:6,
9,24 83:4,
8,12,16,
19,22,23
84:3 96:24
99:5,12
109:20
110:1
118:6,16
119:4
121:10,21
122:1,3
123:25
124:17
125:9,20
126:5,18,
24 127:3,5
135:3,7,
18,24
136:4,10,
14,17,18
143:18,24
145:5,7
148:13,17
156:2
160:5,7
165:8,18,

20,23
166:1
168:10,13
170:11
171:11,24
172:8,19,
25 173:6,
12,18
174:4,15,
20,22
175:21
179:14
180:9

Tuesday
111:11,12,
16 112:5,
8,9,14

turn   147:10

type   100:11
161:13

types   35:2
36:7 92:5

U

Uh-hum
141:18

unable
171:25

unauthorized
68:6 71:9,
12,16,24
94:8 111:7
130:11,12,
15 131:17,
18,19

146:10,13,
19,21,25
147:1,11,
17

unavailability
66:1
104:21
105:25
110:17,22
146:8

unavailable
35:16
63:12,15,
19 64:1,2,
25 65:3,
12,20 68:6
71:9,12,
15,16,25
76:15,18,
19 86:9
94:8
101:20
102:9
103:23
104:1,4,7,
9,20,23
105:1,17,
18,24
106:11
110:25
111:2
117:25
130:13,20,
24,25
146:13
147:1,4,
13,24

148:3
149:8

undergo
167:18

understand
7:21 8:1
9:21,24
11:19
15:16 19:9
24:13
26:25
29:14,16
31:8 44:19
51:7
52:21,25
55:18
56:16
64:14 73:7
77:24
78:16 92:7
100:14,17,
21 107:18,
19 117:12
121:3
133:11
135:6
139:14
142:10
169:12
171:1
174:5,23,
24 175:14,
15 177:10

understanding
17:3 24:17
29:18,25
42:15

57:24 72:6
125:3
128:9
142:17
173:5

understood
8:3 30:18
80:15

undertaken
81:2

unexcused
113:23
114:9

uniformly
10:21

union 10:12,
13,16,22
11:1
12:17,21
27:10
30:16
34:17
36:25
37:15,16,
17 62:25
63:1,4
70:14,17
79:4,8,9,
21 80:1
105:11
115:17
140:21
142:19

unions 71:4
166:19

unique 70:9,
10

unpaid
29:18,19,
22 30:17,
18,22
31:3,8,9,
10 34:21
35:2,14
36:1,8,13,
15,16,17
37:25
38:10
39:9,12
132:23

unwell 81:3
85:2,9

updated
119:25

usage 155:13

UTU 68:14,
18 69:16,
22 70:1,
10,24

---
V
---

vacation
12:13
13:15
16:6,7
78:19
92:21
100:9
102:18,23
104:16

105:12
178:11

valid 74:13
84:22 90:2
93:11
131:8
154:16

values 64:4

variety 92:2

verbal 56:1

verbally
60:20
177:6

verification
27:6

verifications
37:10

verified
29:4 30:3
37:7

verify 81:2

Verizon 9:8,
10

version 27:2
34:8 37:21
48:25 49:5
103:15
121:13,20,
23 130:5

versions
134:21

versus 21:20
72:18

Vice 16:23

views 149:2

violation
18:6 76:18
143:5

violations
159:23

VP 128:8

---
W
---

wait 7:7
114:10
115:9

waited 50:12

waive 140:1
141:7

waived
180:12

waiver
139:15,19
140:10,19
142:7
143:11,16
144:7

waivers
144:2,6,9

walk 127:25

Wall 16:21
128:8

wanted
106:16
120:19
127:23

SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.
Anita Tingley on 10/28/2021          Index: wear..yesterday

133:7
178:10,25

wear  18:7

Weather  93:8

web  43:4,5,
  10,12,18,
  22,23,25
  44:10,11
  137:14
  148:19
  149:3,5

Wednesday
  72:18

week  21:25
  69:17 72:8
  73:17
  125:15
  176:19,20

weekday  72:5

weekend
  72:5,8,22,
  25 73:11,
  17 74:15

weekends
  70:20
  72:11,13,
  15 131:13,
  21,22

weeks  169:4

whatsoever
  56:16

whoops  137:4
  164:6

window  75:1
  80:15,16

witnesses
  178:5

woman  51:21

wondering
  97:21

word  12:20
  13:2 59:10
  104:23

worded
  127:24

wording
  130:16
  134:14,19
  146:19
  169:13

words  134:21
  173:11

work  9:1,3
  12:9,12
  19:17,23
  43:17
  55:18
  63:13
  64:5,10,
  13,15,17,
  24 65:1,
  10,20,22,
  24 66:2,9,
  20,24
  67:10 69:6
  76:25
  77:1,2
  81:3 85:3,

10 94:7
98:4
100:25
101:25
102:7,17,
22 103:4,
9,16,19,24
104:6
110:11,16
111:16,20
112:21,22
113:1,5,7
115:6,12,
14 118:12
147:15,16,
18 148:1,
6,7
150:10,18,
19,20,21
159:4

work-related
  78:20
  92:22

worked  55:16
  81:18

working  98:5
  99:20

works  19:6
  42:12
  111:17
  118:15
  165:13

world  103:17

worries
  168:21

writeups
  159:14

writing  56:1
  60:20
  177:6

written
  41:16
  59:14,18
  105:16
  163:18

www.crewlife.
com  43:12

_____

Y

year  5:23
  9:15 12:14
  16:1,4
  18:18 21:5
  32:2 37:7
  38:15
  40:11
  167:5

years  8:19
  9:11,13
  14:2,15
  15:16
  21:7,9,18
  38:12,16,
  23

yesterday
  12:1 49:24
  50:1,6,12,
  19 51:21
  64:7 69:7
  74:23

**SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Anita Tingley on 10/28/2021                    Index: York..ZZ

164:14

**York** 95:14,
  24 96:4
  148:25
  149:5
  151:4
  155:8
  158:24

**York's**
  149:13

**YY** 33:21
  49:2,6

─────────────────

        **Z**
─────────────────

**zoom** 22:22
  51:22
  148:14

**zz** 49:6