**ANTHONY SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Jennifer Gorneault on 10/27/2021

```
 1              IN THE UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF OHIO
 2                    WESTERN DIVISION

 3                      - - -

 4   ANTHONY SCHOBERT, ET AL., :
                               :
 5          Plaintiffs,        :
                               :
 6      vs.                    : Case No.
                               : 1:19-cv-00076
 7                             : J. Douglas R. Cole
     CSX TRANSPORTATION, INC., :
 8                             :
                               :
 9          Defendant.         :

10                      - - -

11                  Deposition of

12                JENNIFER GORNEAULT

13

14              Via Zoom Videoconference

15               on October 27, 2021

16         at 9:30 a.m.(EST) - 4:23 p.m.(EST)

17

18

19

20          Reported by:  Sandra D. Kin, RPR

21

22                      - - -

23

24

25
```

**ANTHONY SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Jennifer Gorneault on 10/27/2021                                    **Pages 2..5**

---

**Page 2**

```
 1   APPEARANCES:
 2          ELIZABETH S. TUCK, Esquire
            The Tuck Firm, LLC
 3          810 Sycamore Street, 4th Floor
            Cincinnati, Ohio  45202
 4          513.545.6781
            lisa@tuckfirm.com
 5          and
 6
 7          JOSEPH F. ALBRECHTA, Esquire
            Albrechta & Coble, Ltd.
 8          2228 Hayes Avenue, Suite A
            Fremont, Ohio  43420
 9          419.332.9999
            Jalbrechta@lawyer-ac.com
10
11              On behalf of the Plaintiffs.
12
            THOMAS R. CHIAVETTA, Esquire
13          Jones Day
            51 Louisiana Avenue, N.W.
14          Washington, D.C.  20001-2113
            202.879.3939
15          tchiavetta@jonesday.com
16              on behalf of the Defendant.
17
                    - - -
18
19
20
21
22
23
24
25
```

---

**Page 4**

```
 1                  INDEX OF EXAMINATION
 2                    - - -
 3   WITNESS                                    PAGE
 4   JENNIFER GORNEAULT
 5   by Ms. Tuck - Cross-Examination              05
 6                    - - -
 7
 8                INDEX OF EXHIBITS
 9   NUMBER                                     PAGE
10   KK - Notice of Deposition                   29
     LL - Spreadsheet (Bates 4169)              38
11   MM - Business Rule Report (Bates 4620)     65
     NN - Guarantee Deductions (Bates 4932)     87
12   OO - Defendant CSX Transportation, Inc.'s
          Responses to Plaintiffs' Rule 56(D)
13        Discovery Requests                   101
     PP - Employee ID Work History
14        (Bates 1258)                         126
     QQ - Brotherhood of Locomotive Engineers
15        and Trainmen System Agreement
          (Bates 204)                          128
16   RR - Consolidated Southern Region
          Agreement (Bates 28935)              130
17   SS - Agreement between CSX and UTU
          (Bates 452)                          162
18   TT - Crew Web Employee Extraboard
          Guarantee View (Bates 29249)          81
19   UU - T&E Employee Status Codes            163
     VV - BLE Guarantee Extraboard Rates
20        (Bates 29259)                        166
     WW - UTU Guaranteed Extraboard Rates
21        (Bates 29254)                        166
22
23                    - - -
24
25
```

---

**Page 3**

```
 1              Wednesday Morning Session,
                October 27, 2021,
 2              9:30 a.m.(EST)
 3                    - - -
 4            STIPULATIONS
 5        It is stipulated by and between counsel
 6   for the respective parties herein that this
 7   deposition of JENNIFER GORNEAULT, may be taken
 8   at this time in stenotype by the Notary; that
 9   said deposition may be reduced to writing in
10   stenotype by the Notary, whose notes may
11   thereafter be transcribed out of the presence
12   of the witness; and that proof of the official
13   character and qualification of the Notary and
14   the time and place of the taking of said
15   deposition are hereby waived.
16
17                    - - -
18
19
20
21
22
23
24
25
```

---

**Page 5**

```
 1          P R O C E E D I N G S
 2                    - - -
 3          JENNIFER GORNEAULT
 4   being first duly sworn, as prescribed by law,
 5   was examined and testified as follows:
 6                    - - -
 7          CROSS-EXAMINATION
 8   BY MS. TUCK:
 9      Q.  All right.  Good morning,
10   Ms. Gorneault.  Am I pronouncing that
11   correctly?
12      A.  It's Americanized.  You can call it
13   Gorneault.
14      Q.  Okay.  Sure.  Got it.  Well, you've
15   seen all the French I know, as of right now.
16   So yeah, Gorneault.  I'll do my best.  It's
17   been Gorneault in my head, so if I screw it
18   up, forgive me.
19      A.  I'm used to it, not a problem.
20      Q.  I'm Elizabeth Tuck.  I'm an
21   attorney for Anthony Schobert and John York in
22   their individual actions against CSX
23   Transportation, as well as potential class
24   action related to primarily the company's
25   policies and practices regarding FMLA use.
```

---

**ANTHONY SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Jennifer Gorneault on 10/27/2021                    Pages 6..9

Page 6

1   And I'm going to be asking you some questions
2   today in that regard, primarily surrounding
3   Guarantee Pay, so that's why we're here today.
4         So, have you been deposed before?
5         A.  I have not.
6         Q.  Okay.  So, just a couple of ground
7   rules to make things go a little easier, and
8   we're doing this all remotely so that also has
9   an added layer of stuff to it.
10        The first thing is that, you know,
11  this is your deposition.  It's not mine.  So
12  if you need to take a break for any reason,
13  you can do that, just speak up and let us
14  know.  The only kind of rule is that if I have
15  a question pending, I don't think
16  Mr. Albrechta, who is also present on behalf
17  of the Plaintiffs, is going to have any
18  questions, but if he does, but at any rate if
19  there's a question pending, you have to answer
20  the question before you take the break.
21        We've got a Court Reporter here.
22  It looks like her name is Sandra.  Sorry,
23  forgot to introduce myself.  Okay.  And she's
24  going to be taking down everything that
25  everybody is saying on the record today,

Page 7

1   including yourself and me and your attorney,
2   Mr. Chiavetta.  So because of that it's very
3   important that we take turns speaking, not
4   speaking over each other.  So if I'm asking a
5   question and you think you know the answer --
6   you think you know what I'm asking and you
7   think you know the answer, just wait until the
8   question is done since she can't get two of us
9   going at once.  I'm usually the worst offender
10  of that, so I'll do my best, but I'm sure
11  Sandra will let me know if I'm making her job
12  hard.  Please do.
13        Mr. Chiavetta may from time to
14  time have objections to my questions.  Again,
15  let him say whatever he's got to say before
16  you go ahead and answer.  You do have to
17  answer the questions unless he specifically
18  tells you don't answer the question.
19        Let's see, we are on video so that
20  makes things a little easier, but it's
21  important that your testimony on the
22  transcript is clear.  So if you mean yes or
23  no, it's helpful to say yes or no, as opposed
24  to uh-huh or huh-uh, gestures, nods of the
25  head, that kind of thing because that's more

Page 8

1   difficult for Sandra to get on the record
2   accurately.  So if I feel like you're trying
3   to say yes or no, but I'm not sure, I may
4   prompt you, like, do you mean yes.  That's not
5   me putting words in your mouth, that's me
6   thinking, you know, that's what you mean to
7   say and making sure that what you need to say
8   is on the record.  But if I'm wrong, feel free
9   to correct me.
10        Like I said, I will be asking a
11  series of questions.  And it's important that
12  you understand the questions, so if you don't
13  understand the questions or you don't hear the
14  question or you forgot a question and you
15  don't understand something, a piece of what
16  I'm asking you, you're confused or whatever,
17  please just speak up right away and let me
18  know.  I'll do my best to rephrase the
19  question or repeat the question so that you
20  can answer it.  Is all of that acceptable?
21        A.  It's acceptable.  It makes sense.
22  I do want to apologize up front.  There is
23  some construction happening right outside of
24  my office window of all days.  So if you can't
25  hear me or if you need to repeat something

Page 9

1   because of that, just please let me know.
2         Q.  Okay.  Well, I can hear you just
3   fine and if you have any problems at all
4   technologically during our time together, then
5   you know, we've all done this few times before
6   except for you, so we'll find a way to make it
7   work, so I appreciate that.
8         MR. CHIAVETTA:  Lisa, can I just
9   ask one question.  Are we intending to record
10  this?
11        MS. TUCK:  I typically do record
12  them, yeah.
13        MR. CHIAVETTA:  Okay.  And what
14  happens with the file after?  I mean, do we
15  get a video file?  I guess I've just never had
16  a Zoom recorded.
17        MS. TUCK:  Oh, well, we have no --
18  I mean, I would say it's like a -- okay.  I
19  didn't start the Zoom, so I don't know who
20  holds the Zoom.  I assume Joe's office holds
21  the Zoom.  Is Joe --
22        MR. ALBRECHTA:  Hoe is here, and I
23  know I'm the host of the Zoom, but I don't --
24  at this point I wasn't doing anything with it
25  except wherever it is, it's out there.

**ANTHONY SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Jennifer Gorneault on 10/27/2021                              Pages 10..13

---

**Page 10**

1    MS. TUCK: Okay. Well, put it this
2  way, we'll make an every after the deposition
3  to try to find where that file is and we have
4  no problem sending it to you.
5    MR. CHIAVETTA: Okay.
6    MR. ALBRECHTA: Tom, we know we
7  have the transcript version that we all
8  requested yesterday. And it may be that
9  that's needed for purposes of reserved
10  signature any way. And we understand that.
11  So we'll work with the Court Reporter and
12  figure that out, or the Zoom supplier.
13    MR. CHIAVETTA: Yeah, I just didn't
14  think yesterday's was recorded.
15    MR. ALBRECHTA: I didn't think it
16  was either, but I would not know that. I can
17  ask Christy.
18    MS. TUCK: I prefer to have it
19  recorded.
20    MR. ALBRECHTA: Any objection, Tom?
21    MR. CHIAVETTA: No, it's fine.
22    MS. TUCK: If there's ever any
23  dispute about using it or whatever down the
24  road, we can always talk about it. Okay.
25

---

**Page 11**

1    Q.  (By Ms. Tuck) All right. So, let's
2  start with some questions. Let's start with
3  hopefully the easier one. Can you state and
4  spell your full name for the record?
5    A.  Yes. My name is Jennifer
6  Gorneault. First name is J-E-N-N-I-F-E-R.
7  Last name is G-O-R-N-E-A-U-L-T.
8    Q.  Okay. And do you have a middle
9  name, and if so, what it is?
10    A.  I do have a middle name. It is my
11  previous maiden name, Forkum, F-O-R-K-U-M.
12    Q.  Okay. And how long have you gone
13  by that name with the Forkum in it?
14    A.  Sixteen years.
15    Q.  Okay. Can you please give us your
16  home address?
17    A.  It is 1332 Long Meadow Trail,
18  Middleburg, Florida 32068 zip code. Do you
19  need me to spell out the street address?
20    Q.  I don't think so, but if Sandra --
21  so Sandra from time to time may ask you to
22  spell certain trickier words, so unless we ask
23  you to spell it, no, you don't have to worry
24  about it. Thank you.
25    A.  Okay.

---

**Page 12**

1    Q.  Have you been at that address?
2    A.  I have been at this address for two
3  years and two months.
4    Q.  Okay. What was your address before
5  that?
6    A.  1938 Leap Frog Lane, Middleburg,
7  Florida 32068.
8    Q.  And how long were you there?
9    A.  I was at that address for ten
10  years.
11    Q.  Do you have a cell phone that you
12  ever use for work in any way?
13    A.  I have my person cell phone and
14  yes, I do use it for work.
15    Q.  Okay. What's that number?
16    A.  It is area code 904-502 --
17    Q.  Did you say 904?
18    A.  Yes.  904-502-3142.
19    Q.  And I can hear the trucks backing
20  up in the distance so. I think the truck is
21  sort of interfering a little bit, but it's not
22  too bad. And also, your month and year of
23  birth, not the day?
24    A.  February, 1982.
25    Q.  Okay. How long had you had that

---

**Page 13**

1  cell phone number?
2    A.  As long as I've had a cell phone,
3  for 20 years.
4    Q.  Okay. And who is your carrier?
5    A.  AT&T.
6    Q.  How long have they been your
7  carrier?
8    A.  The entire time.
9    Q.  Okay. There should give you some
10  sort of customer loyalty reward. (Laughter.)
11  Yolanda yesterday indicated that she finally
12  switched from Sprint to AT&T. I said, oh,
13  you're their other customer, you're the other
14  Sprint customer that they had. (Laughter.)
15  Anyway, all right. That's neither here or
16  there.
17    So, you've indicated that you have
18  not been deposed before. Have you ever given
19  any kind of sworn testimony -- you work for
20  CSX Transportation, correct?
21    A.  Correct.
22    Q.  How long have you worked for them?
23    A.  I have worked for CSX for 17 years.
24    Q.  Okay. And what is your current
25  position?

---

**ANTHONY SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Jennifer Gorneault on 10/27/2021                                     Pages 14..17

Page 14

1    A.  My current position is Director of
2  Train and Engine Payroll.
3    Q.  And from testimony yesterday, we
4  understand train and engine -- Ms. Johnson
5  indicated that when she says train and engine,
6  she's referring to engineers and conductors,
7  is that the case for you as well?
8    A.  That is correct, yes.
9    Q.  Okay.  How long have you held that
10 position?
11   A.  I have held this position for eight
12 years now.
13   Q.  Have your responsibilities -- well,
14 let's start with, can you give me a brief
15 description of your responsibilities today in
16 that role, just you know, sort of top bullet
17 points?
18   A.  Absolutely.
19   Q.  What you would put on your resume.
20   A.  So, to summarize this position,
21 myself and my team are responsible for the
22 time-to-gross pay calculations, so taking
23 their time and grossing it up for the union
24 workforce of the engineers and conductors who
25 are represented by the BLET and BTU.

Page 15

1    Q.  You say you take their time and
2  gross it up.
3    A.  Correct.  So we have another group
4  within payroll that does takes the gross
5  amount and they perform the net calculations.
6    Q.  So when you say --
7    A.  So --
8    Q.  Go ahead.
9    A.  So I was just going to say, so
10 they'll submit their time and their claims and
11 we will gross up what their pay will be and we
12 take that gross amount and we pass it to
13 another group within payroll and they perform
14 the taxes, garnishments, type of deduction to
15 actually calculate the net pay and issue the
16 paychecks.
17   Q.  Okay.  It's basically your
18 department that calculates how much they make?
19   A.  Correct.  We calculate the gross
20 earnings, yes.
21   Q.  Okay.  Now, do you do calculate any
22 gross income that is not wage related, which
23 is to say for, you know, work?  Other than --
24 as opposed to like a stock bonus?
25   A.  We do not do that, not within my

Page 16

1  group, no.
2    Q.  Okay.  Are there other kinds of
3  compensation that you can think of that your
4  department is not responsible for for train
5  and engine employees?  I'm talking about stock
6  bonus.
7    A.  So, stock bonus, anything with
8  stock options we do not handle.  Relocation,
9  we do not handle that as well.  I think that's
10 it from the gross side.
11   Q.  Okay.  And when you say time -- you
12 said that you take their time and their
13 claims.
14   A.  Yes.
15   Q.  Let's talk about those two phrases.
16 What do you mean when you say time versus
17 claims?
18   A.  So, when I say time I'm mainly
19 referring to their working tickets.  So when
20 they actually work an assignment, they will be
21 issued a ticket by the time and attendance
22 group who calls them to work and they will
23 report that for their time for working.  Now
24 because we do represent their union workforce,
25 they have Collective Bargaining Agreements, so

Page 17

1  when I say claims, there could be other things
2  like for instance penalty claims.  So if we
3  violate their agreement, we ask them to do
4  anything something that is not part of their
5  normal assignment, then they can submit a
6  penalty claim as well.
7    Q.  Okay.  So claims, that is
8  restricted to any claims that the CBA has
9  violated, right?
10   A.  Correct.
11   Q.  Okay.  And obviously
12 compensation-related claims, right?
13   A.  Correct.
14   Q.  Okay.  All right.  Now, when you
15 say time, when they work an assignment and
16 they get a ticket, is that the only kind of
17 time that you calculate?  What about things
18 like vacation or sick -- well, I guess train
19 and engine employees don't have sick time.
20   A.  We do not have sick entitlements.
21   Q.  Okay.  But they do have personal
22 days, right?
23   A.  Yes.  Yes.  So we have what we
24 consider entitlements that they do have under
25 the collective bargaining agreement, so they

**ANTHONY SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Jennifer Gorneault on 10/27/2021                    Pages 18..21

Page 18

1  do vacation time and personal leave days.
2       Q.  And are you responsible for
3  calculating those as well?
4       A.  Yes.
5       Q.  Okay.  And where do you get that --
6  you say you get the working ticket from time
7  and attendance, where do you get the personal
8  days and vacation days data from?
9       A.  There's also from the time and
10  attendance system, as well.
11       Q.  Okay.
12       A.  They will schedule it with them and
13  the time and attendance group will mark them
14  off for that entitlement and feed it over to
15  the payroll system to let us know to pay that
16  entitlement.
17       Q.  Okay.  Now, the time and attendance
18  group, that's what they're called, the NCSX?
19       A.  It's the Crew Management Center is
20  the department who handles the time and
21  attendance for engineer and conductors.
22       Q.  Okay.  So when we hear other
23  witnesses or yourself talking about crew
24  management, it's the same --
25       A.  Yes.

Page 19

1       Q.  -- group, time and attendance or
2  the time and attendance system?
3       A.  Yes.
4       Q.  So time and attendance system would
5  also be the Crew Management System?
6       A.  That is correct.
7       Q.  And the working tickets and the
8  assignments, is that also through the Crew
9  Management System?
10       A.  That is correct.  When Crew
11  Management calls the employees to work, they
12  will issue the ticket for the employee to
13  report at the end of their shift, end of their
14  duty.
15       Q.  Okay.  And is that also called the
16  mainframe?
17       A.  That's another word for it.  That
18  is the system.  It is a mainframe system that
19  they use, yes.
20       Q.  Okay.
21       A.  And we use a mainframe system as
22  well in our payroll group.
23       Q.  Okay.  So there's two mainframe
24  systems, there's the Crew Management Mainframe
25  and then you have a mainframe?

Page 20

1       A.  That is correct.  They are
2  constantly interfacing.
3       Q.  And what's your mainframe called;
4  if you know?
5       A.  We just call it legacy mainframe.
6  We don't have a fancy name for it.
7       Q.  Did you say legacy?
8       A.  Yeah.  It's called the Legacy
9  Mainframe System.
10       Q.  Okay.  So is it all just one
11  system, you guys are just in different parts
12  of it?
13       A.  We are different sessions, yes.
14       Q.  Okay.
15       A.  I will log into one mainframe
16  session and I can access the crew screens and
17  I can access the payroll screens being logged
18  into one mainframe session.
19       Q.  Okay.  So payroll and crew
20  management is basically part of the same
21  system, it's just two different silos?
22       A.  Just two different environments,
23  yes.
24       Q.  Okay.
25       A.  Or two different areas, yes.

Page 21

1       Q.  Silos is not a right -- yeah.  I
2  understand what you're saying.
3       A.  Yeah.
4       Q.  So now like I said we're going
5  toking talking about Guarantee Pay today.  I
6  started this off this by asking you about
7  sworn testimony.  In the 17, I think you said,
8  years -- let's just start with in your current
9  role.  In the eight years that you've been
10  director of train and engine payroll, have you
11  given any sworn testimony, including something
12  that you might have signed like an affidavit
13  about the guarantee board or how it works?
14       A.  No, I have not.
15       Q.  You have not.  Okay.  All right.
16  Now, we've heard about another system called
17  TECS.  Are you aware of TECS?
18       A.  So, TECS, T-E-C-S, is the Crew
19  Management Mainframe System for calling the
20  crews.
21       Q.  For what?
22       A.  T-E-C-S, it actually stands for T&E
23  Calling System.
24       Q.  Okay.
25       A.  Which is the Crew Management

**ANTHONY SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Jennifer Gorneault on 10/27/2021                    Pages 22..25

Page 22

1  Mainframe System that we were referring to
2  just a second ago that they use to call
3  employees to work.
4       Q.  So is that also the guarantee where
5  they mark up and mark off the guarantee board?
6       A.  Yes.
7       Q.  Okay.  So when someone marks up,
8  and it's my understanding that -- well, let's
9  just start with marking off.  So it's my
10 understanding that there is a guarantee extra
11 board.
12      A.  (Nods head up and down.)
13      Q.  And that that exists -- it's
14 essentially the employees are on call on that
15 list.
16      A.  (Nods head up and down.)
17      Q.  And that if for whatever reason
18 they are unable to work or chose not to work,
19 that they have to mark off on that board to be
20 taken off the list; is that correct?
21      A.  That is correct.
22      Q.  Okay.  And then when they're ready
23 to work again for whatever reason, they mark
24 back up and they go back on the list; is that
25 right?

Page 23

1       A.  That is correct.  Yes.
2       Q.  Now when they go back up on the
3  list, do they start at the bottom of the list?
4       A.  That is something that is actually
5  done within the Time and Attendance Group.  I
6  cannot tell you the placement of the
7  employees.  I believe by union agreement how
8  they marked off, what they marked on and off
9  depends on, will drive where they go in the
10 board, but I can't speak to that.  That would
11 have to be the Crew Management Department.
12      Q.  Is Anita Tingly in the Crew
13 Management Department?  Do you know who Anita
14 Tingly is?
15      A.  Not currently, but she spent a good
16 amount of time in the Crew Management
17 Department, prior to her current role.
18      Q.  Okay.  Do you have an understanding
19 as to who in the Time and Attendance Group
20 would be best suited to explain how different
21 types of marking off affect the placement on
22 the board?
23      A.  I'm sorry --
24      Q.  So I asked you if you mark off, you
25 know, do you go back -- sorry, you're cutting

Page 24

1  out a little bit.  I think it's because we're
2  talking at the same time.  Okay.
3           So I asked you if when somebody
4  marks back up, I said do they start at the
5  bottom of the list or where are we placed.
6  And you said that that would be a Time and
7  Attendance Group question, right?
8       A.  Correct.  Yes.
9       Q.  Do you an idea as to whom in the
10 Time and Attendance Group would be best suited
11 to answer that question?
12      A.  I would say one of the directors at
13 Crew Management would be best to answer that
14 question.
15      Q.  Okay.  And do you know which
16 director?
17      A.  I would say Don Munley.
18      Q.  Okay.  All right.  So, but at any
19 rate, at some point they mark back up and they
20 go back on the Guarantee X Report, right?
21      A.  Correct, yes.
22      Q.  So the T&E calling system, that's
23 where they mark off and mark up, if somebody
24 is going out on intermittent FMLA leave,
25 that's the system they would mark up and mark

Page 25

1  off, right?
2       A.  Yes.
3       Q.  Does the T&E calling system perform
4  any other function with respect to FMLA leave
5  other than just marking up and marking off --
6  or making off and marking up?
7       A.  I can't speak to that with what
8  their other responsibilities might be.
9       Q.  Okay.  Well, with respect to their
10 pay, can you think of any other functions that
11 that system is involved in?
12      A.  Can you repeat the question?  Can
13 you repeat the original question?  I thought
14 the question was around other FMLA --
15      Q.  So --
16      A.  I need you to clarify the question.
17 I'm sorry.
18      Q.  No, that's fine.  I think it's sort
19 of -- I think I need to clarify the question.
20           So you said that when somebody
21 marks off for FMLA leave and then marks back
22 up, they use that T&E calling system.  From a
23 payroll perspective in terms of grossing
24 somebody's wages, is there any other
25 information that that T&E calling system

**ANTHONY SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Jennifer Gorneault on 10/27/2021
Pages 26..29

Page 26

1 collects that you use in your department,
2 other than when they mark off and when they
3 mark up?
4     A.  For the guarantee piece, we -- for
5 the -- marking up, marking off, whether it's
6 FMLA, vacation --
7     Q.  Hey, Jennifer.
8     A.  Yes.  I'm sorry.
9     Q.  We're probably going to go back
10 over -- are you able --
11     A.  I am trying something different.  I
12 am trying something different.
13     Q.  Can't hear you.
14     MR. CHIAVETTA:  I'm getting a
15 message saying your network bandwidth is low.
16     MS. TUCK:  Yes.
17     THE WITNESS:  I need to get into
18 the ethernet directly into my laptop.
19     MR. CHIAVETTA:  Okay.  Do you want
20 to try doing that, Jennifer?
21     THE WITNESS:  Say that again.
22     MR. CHIAVETTA:  Did you say you
23 were going to plug the ethernet directly into
24 your laptop?  Is that an option opposed to --
25     THE WITNESS:  I had it plugged in.

Page 27

1 It's not any better?
2     MR. CHIAVETTA:  It keeps saying
3 network bandwidth is low on my end.  Is there
4 a conference anywhere where you might have a
5 internet connection?
6     THE WITNESS:  Okay.  Give me one
7 second.
8     MS. TUCK:  Are you at CSX?
9     THE WITNESS:  Give me one second.
10 I'm sorry.
11     MS. TUCK:  Let's just take a
12 five-minute break and reconvene at like 10:10.
13     MR. CHIAVETTA:  That's fine.
14     THE WITNESS:  Sounds good.
15     MS. TUCK:  Then you can do what you
16 need to do, hopefully.  All right.
17     (Recess taken.)
18     MS. TUCK:  We can go back on the
19 record.
20     Q.  (By Ms. Tuck) Okay.  So we were
21 talking about the TECS System, the T-E-C-X
22 System, and if I understand you correctly,
23 that is just another part of the
24 Mainframe/Crew Management System, right?
25     A.  Yes.

Page 28

1     Q.  Okay.  Have you ever heard of a
2 system called FACS?
3     A.  Yes, I have heard of that one.
4     Q.  Okay.  What's your understanding of
5 that of what that is?
6     A.  I understand it does house several
7 different types of records for employees.
8     Q.  Okay.  And what kinds of records?
9     A.  I'm not familiar with everything
10 that it has because access is limited to
11 people.  I have access to view any
12 discipline-related issues for T&E employees,
13 as well as online courses they have taken, so
14 I make sure that I pay them correctly for
15 those courses.
16     Q.  Okay.  So you understand that to be
17 where the electronic records regarding T&E
18 discipline reside?
19     A.  Yes.
20     Q.  Okay.  And you have access to that
21 piece of it?
22     A.  I do, but I do not access it unless
23 we have a claim for an employee related to the
24 discipline.
25     Q.  So you look at that when someone

Page 29

1 says I was, you know, somebody violated the
2 CBA and the company has to compensate them in
3 some way?
4     A.  Yes.
5     Q.  Yes, okay.
6     A.  Yes.
7     Q.  Okay.  Now, Makala, can you pull --
8 I'm just going to call you Jennifer so I don't
9 mispronounce your name.  Is that okay?
10     A.  That's fine, yes.
11     Q.  Okay.  And you can call me Lisa,
12 because that's only fair.  I also go by Lisa.
13 I have a lot of names.  I too have a middle
14 name that is another last name, so you and I
15 could probably have a good conversation about
16 that.  What women have to do, but at any rate.
17 So Makala, can you pull up Jennifer's Notice
18 of Deposition.
19     (EXHIBIT KK MARKED.)
20     So Jennifer, from time to time, I'm
21 going to be showing you documents.  We're
22 going to be doing this as part of the screen
23 share function of the video conference.  If
24 you for whatever reason can't see because of
25 technological issues or anything like that

**ANTHONY SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Jennifer Gorneault on 10/27/2021
Pages 30..33

Page 30

1  just let us know.  Because we're doing this
2  remotely, we're going to be scrolling through
3  these documents hopefully at a pace that makes
4  sense for you, but you need to just let us
5  know when to scroll sometimes or when to go
6  back.  You can ask us to go to any page of
7  these documents, you can go back to other
8  documents, if you want to look at them,
9  because if you were in a real setting, you
10  would be able to, you know, flip through
11  things and read things and go back and look at
12  things.  So, just because we're doing it
13  remotely, you're sort of in charge of telling
14  us what you need there.  Okay.
15      A.  Okay.
16      Q.  I want you to feel to do that.
17      A.  Okay.
18      Q.  And then if I start launching into
19  questions before you feel like you have had
20  adequate time to read the document, make sure
21  you let me know that.  If I start asking
22  questions and if you want to look at the
23  document again or you want to look at
24  different parts, let us know.  Okay?
25      A.  Okay.  Thank you.

Page 31

1      Q.  All right.  Makala, can you just
2  scroll through this slowly so she can take a
3  look.  Keep going.  You can go all the way
4  through, just not too fast.  Okay.  Let's go
5  back to the top.
6          So, Jennifer, did you receive a
7  copy of this Notice prior to your deposition
8  today?
9      A.  Yes, I did.
10      Q.  Okay.  Let's scroll down to the
11  part where it says Guarantee Pay.  Is there
12  anything on the second page on that?  No.
13  Okay.  Let's go back up.  Okay.
14          And did you have an opportunity to
15  read and review this?
16      A.  Yes, I did.
17      Q.  Okay.  And are you prepared to
18  testify on behalf of the company with respect
19  to all of the topics listed under Guarantee
20  Pay?
21      A.  Yes, I am.
22      Q.  And you understand that your
23  testimony today is on behalf of the company
24  not on behalf of yourself, correct?
25      A.  Yes.

Page 32

1      Q.  Now, when I was asking you
2  questions earlier, you were here under this
3  Notice of Deposition, but did you understand
4  at that point that you were testifying on
5  behalf of the company as opposed to yourself?
6          MR. CHIAVETTA:  Objection, form.
7  You can answer.
8      Q.  Did you have that understanding?
9      A.  Did I have the understanding that I
10  was going to be deposed on behalf of CSX not
11  myself?
12      Q.  Yes.
13      A.  If I understand the question
14  correctly, yes.
15      Q.  Okay.  And you understood that with
16  respect to the questions that I've asked
17  previously, other than where you live and who
18  you are?
19          MR. CHIAVETTA:  Object to form.
20      A.  Yes.
21      Q.  Okay.  Thank you.  And again, if
22  you're confused by any question, you let me
23  know and I'm happy to, you know, rephrase or
24  repeat or whatever we need.
25          Okay.  Thank you, Makala, you can put

Page 33

1  that down.
2          All right.  Do you have any other
3  interaction with FACS, other than what you've
4  described in your area for payroll?
5      A.  No, I do not.  No, I do not.
6      Q.  Are you familiar with Gateway?
7      A.  When you say Gateway, to clarify,
8  the CSX Gateway Internal Page?
9      Q.  Well, yes.  There's been some
10  testimony that there is a system, perhaps in
11  intranet, called Gateway where policies,
12  resources, links to employees reside.
13      A.  Yes, I am familiar with the CSX
14  Gateway.  Yes.
15      Q.  Okay.  Are there resources for
16  train and engine employees on the Gateway with
17  respect to Guarantee Pay and how it is
18  calculated?
19      A.  Yes, there are.
20      Q.  What are they?
21      A.  One of the first ones would be the
22  Collective Bargaining Agreement.
23      Q.  Okay.
24      A.  And then in addition to that, we do
25  have documents that explain how to read your

**ANTHONY SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Jennifer Gorneault on 10/27/2021
Pages 34..37

Page 34

1 guarantee information, what we call a
2 Guarantee Statement.
3        Q.  What is a Guarantee Statement?
4        A.  That provides the day-by-day
5 details to the employees of how their
6 guarantee is calculated.  And it includes
7 their time and attendance records related to
8 that time period on the extra board guarantee.
9        Q.  Okay.  So it's essentially the
10 information that you use to calculate
11 guarantee pay, right?
12       A.  That is correct.
13       Q.  And how do they receive these
14 Guarantee Statements?
15       A.  The employees must log onto the
16 Guarantee System to print them themselves.
17       Q.  How far back can the employee go?
18       A.  Currently the system goes back to
19 as long as the current web system has been in
20 place, which is July of 2014.
21       Q.  Okay.  And you say that there are
22 documents on the Gateway that help people
23 understand that calculation and help them
24 understand that statement, right?
25       A.  I stated that --

Page 35

1        Q.  Or there's information -- sorry, go
2 ahead.
3        A.  I was going to say, the Guarantee
4 Statement lays out how to read the statement
5 and you can see the dollars involved.  The
6 explanation more of the how the guarantee is
7 calculated, that would fall within the
8 Collective Bargaining Agreement.
9        Q.  Okay.  So I'm going to show you a
10 couple of documents and I'd like you -- I'm
11 not sure whether we have these or not.
12       MS. TUCK:  Tom, do you know whether
13 they have these before I start slowing her
14 things?
15       MR. CHIAVETTA:  You have the CBA's
16 -- you have the guarantee pay records.
17       MS. TUCK:  No, I know that.
18       MR. CHIAVETTA:  There's
19 spreadsheets that the guarantee pay details.
20 I don't know if that's what Jennifer is
21 referring to or not.
22       MS. TUCK:  I have those
23 spreadsheets, but they don't have any
24 instructions about how to read it.  So do you
25 know whether we have anything like that?

Page 36

1        MR. CHIAVETTA:  Lisa, let me ask
2 Jennifer.
3        MS. TUCK:  I'm sorry.
4        MR. CHIAVETTA:  Jennifer, is the
5 spreadsheet --
6        THE WITNESS:  The spreadsheet that
7 I provided is the payroll data for the
8 guarantee.  The view that we -- the structural
9 view that we have for the T&E employees, I did
10 not provide that to you.  I'm sorry.
11       MR. CHIAVETTA:  Okay.
12       Q.  Is that something that you could
13 get during a break and provide to your counsel
14 via e-mail today?
15       A.  Yes.
16       MS. TUCK:  Tom, do you have any
17 objection to that?
18       MR. CHIAVETTA:  No.  I assume you
19 want it for Mr. Schobert or Mr. York?
20       MS. TUCK:  No, I want to ask her
21 about it.
22       MR. CHIAVETTA:  No, I'm saying --
23 well, I understand that.  I'm saying, she's
24 got to pull it for a specific employee, as far
25 as I understand her testimony.

Page 37

1        THE WITNESS:  The document that I'm
2 referring to for the employees is just an
3 instruction on how to read the guarantee
4 statement.
5        MR. CHIAVETTA:  Okay.
6        THE WITNESS:  It does go into full
7 details on how to calculate every possible
8 mark up, layoff.  That information is housed
9 within the Collective Bargaining Agreements.
10       Q.  Okay.  So that instructional sheet
11 is something that is common to all train and
12 engine employees, right?
13       A.  Yes.
14       Q.  Okay.  So anybody who is a train
15 and engine employee has access to that
16 information to try to figure out their own
17 individual statement, right?
18       A.  Yes.
19       Q.  Okay.  So maybe -- let's see.  It's
20 10:28.  I can go on a little bit, you know
21 without a break, but maybe we can figure that
22 out.
23        I'm going to put a couple of
24 spreadsheets up and tell me whether these are
25 the spreadsheets that you were referring to.

**ANTHONY SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Jennifer Gorneault on 10/27/2021          Pages 38..41

Page 38

1  So let's see, Makala, can you pull up -- oh,
2  Sandra -- let's go off the record for a
3  minute.
4          (Recess taken.)
5          MS. TUCK:  Let's go back on the
6  record.
7            Makala, can you pull up Bates No.
8  4169 Schobert.  Makala, it's called 4169
9  Schobert Guar.
10          (EXHIBIT LL MARKED.)
11      Q.  (By Ms. Tuck) Okay.  So Jennifer,
12  we just talked about spreadsheets that you
13  provided to your counsel in response to
14  requests that we made for documents with
15  respect to Guarantee Pay.  Is this one of the
16  spreadsheets?
17      A.  This is part of it, yes.  It looks
18  like it's cut off.
19      Q.  Okay.  What part is cut off?  You
20  mean there's stuff cut off to the right?
21      A.  Okay.  Yes, I did provide this.
22  Yes, I did.
23      Q.  Okay.  So do you think there's
24  something missing from this copy?  You know
25  what, Makala, why don't you take this down and

Page 39

1  stop screen sharing and I'll share the actual
2  file.
3      A.  And Lisa, as information, while we
4  were on break, I actually tried to reach out
5  to one of our IT guys at CSX.  He said he can
6  come help me with my connection, if that's
7  okay.
8      Q.  Okay.  Yeah, sure.  That's great.
9  I mean, why don't you just let us know when
10  you need to do that.
11      A.  Okay.  Thank you.
12      Q.  Okay.  If he's going to show up or
13  something.  Okay.
14        So I'm going to go ahead and share
15  my screen here.  Okay.  Are you seeing this
16  now?
17      A.  Yes.
18      Q.  Okay.  And is this the spreadsheet
19  -- I know it's sort of spread out, but is this
20  the spreadsheet you are referring to?  Does it
21  seem to have all of the categories on it?
22      A.  Yes.
23      Q.  Okay.  All right.  So it's -- now,
24  what I did is it seemed like some of this
25  information -- let's go through this.  So,

Page 40

1  Employee ID, that is whoever the employee,
2  right, is in this case, it would be Tony
3  Schobert, right?
4      A.  Correct.
5      Q.  What does period end date mean?
6      A.  When an employee is assigned to a
7  guarantee extra board, the guarantee extra
8  board time frame is normally a two-week
9  period, so the period end date is the last
10  Friday in that two-week period.
11      Q.  Okay, the last Friday.  So it runs
12  Thursday to Friday.
13      A.  It runs from -- so for instance,
14  period end date 2/12/16 would go to two
15  Saturdays prior.  It's from a Saturday two
16  weeks out to the following Friday.  That's the
17  period that they are assigned to a guaranteed
18  extra board.  It's usually Saturday to Friday,
19  Saturday to Friday.
20      Q.  Okay.  Saturday to Friday, and does
21  it start at midnight on Saturday?
22      A.  Yes, it does.
23      Q.  Okay.  So let's just take the
24  current, you know, week.  So, this week
25  Saturday is October 30th.  So, assuming that

Page 41

1  that's a two-week -- you know, that's when the
2  two weeks would start and end.  I know that it
3  might be on the 23rd or the 6th.  The new
4  guarantee pay period is going to start on
5  midnight Saturday, October 30th, right?
6      A.  That is correct.
7      Q.  And then it would end -- so the
8  following -- so then the following Saturday is
9  the 6th and the next Saturday is the 13th, it
10  would end at essentially right before midnight
11  on Friday the 12th, right?
12      A.  Yes.
13      Q.  Okay.  So this period end date,
14  does that reflect the Saturday or the Friday?
15      A.  The period end date will always be
16  the Friday date.
17      Q.  Okay.  Okay.  And so if I'm reading
18  this correctly, he had no guarantee -- he was
19  not -- so if this is the period end date and
20  then he doesn't have another until June of
21  2016, what does that tell you about his work
22  history, if anything?
23      A.  The only thing that I can say for
24  sure is that he was not assigned to a
25  guarantee extra board between those two pay

**ANTHONY SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Jennifer Gorneault on 10/27/2021

Pages 42..45

Page 42

1    period end dates.
2         Q.  Because there was nothing to
3    report, that's why there's nothing there?
4         A.  Correct.
5         Q.  What system did you take this from,
6    this spreadsheet?
7         A.  This is our Crew Web Guarantee
8    System.
9         Q.  Okay.  Is that different than the
10   other systems that we've been talking about?
11        A.  Yes, it is.  This is a separate
12   system.  It is a web-based system and it
13   receives information from the crew and payroll
14   systems, from the TECS Systems and the Payroll
15   Systems to perform the calculations.
16        Q.  Okay.  So is this basically what
17   you use to calculate the gross pay?
18        A.  Yes.
19        Q.  When it comes to guarantee pay?
20        A.  This is what we use to calculate
21   the gross pay for the guarantee extra boards.
22        Q.  Okay.  And is this the same system
23   that generates the information that we were
24   talking about that the employees can view on
25   the Gateway?

Page 43

1         A.  Yes.
2         Q.  Okay.  So when Tony Schobert logs
3    in, is this all of the information that he can
4    see or -- can he see all of this?
5         A.  I believe his view has all of these
6    fields as well, yes.
7         Q.  Okay.  So -- well, I want to make
8    sure that you can answer the question, so do
9    you need time to look at it.
10        A.  Technical difficulties.  Let me
11   just refresh really quick and make sure --
12   it's freezing on me.  Okay.  There might be --
13   let's see here.  The only thing that might not
14   be on here is the version and week because of
15   how it's displayed, this is basically a
16   printout of the data.  Where in their view
17   when there's changed to their guarantee,
18   there's an expand and contract box that they
19   can open and close to see the changes.
20        Q.  Uh-huh.
21        A.  But as far as -- but everything
22   else, yes, they can see here.  I think the
23   only other thing that maybe is the very last
24   column, it just says 14 days, but again, it's
25   just the way the view is laid out for their

Page 44

1    information.  That's more at the top.
2         Q.  Okay.  But this is the --
3         A.  This is all the information they
4    have, yes.
5         Q.  Okay.  So they have all this
6    information, it just looks a little different?
7         A.  Yes, that's correct.  Yes.
8         Q.  All right.  And what does agreement
9    code mean, does that refer to what collective
10   bargaining agreement they're under?
11        A.  It refers to the bi-weekly rate of
12   pay.  So we kind of have a many to one ratio.
13   We have multiple guarantee extra boards across
14   the system and many of them can have the same
15   rate, so the rate is tied to the agreement
16   code.
17        Q.  Okay.  So this reflects a rate of
18   pay?
19        A.  That is correct.
20        Q.  So $200, $150, whatever that is?
21        A.  It's referring to the -- yeah, the
22   bi-weekly guaranteed rate, yes.
23        Q.  Is this is the guaranteed bi-weekly
24   rate governed by the Collective Bargaining
25   Agreement?

Page 45

1         A.  It can be governed by the
2    Collective Bargaining Agreements, or if there
3    are any side letter agreements that are
4    established, yes, but it is by agreement.
5         Q.  If there are any side what
6    agreements?  I didn't hear you.
7         A.  Any side letter agreements, but we
8    don't have those on the BLE side.  But this is
9    governed by the agreement, yes.
10        Q.  Okay.  So, if they are a BLE
11   member, then that rate is governed by the
12   Collective Bargaining Agreement?
13        A.  Yes.
14        Q.  And side letter agreements, does
15   that refer to the UTU employees or is that a
16   different union?
17        A.  Yes.  We have side letters on the
18   UTE side, yes.
19        Q.  What is a side letter?
20        A.  It might take a specific territory
21   or group of individuals if their work is a
22   little different and it might tweak -- it
23   might change the number of days required to be
24   assigned or it could change the rate of pay.
25        Q.  Okay.  Does whether or not you are

**ANTHONY SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Jennifer Gorneault on 10/27/2021                    Pages 46..49

Page 46

1  a BLE or a UTU member affect, other than the
2  rate of pay, does it affect the calculation of
3  someone's gross pay if they take FMLA leave?
4      A.  The -- it's all based on the
5  Collective Bargaining Agreement.  So there is
6  one agreement for the BLE and there is one
7  agreement for the UTU.
8      Q.  And in the case of somebody who is
9  on the guarantee board and marking off for
10 FMLA, if I understand you correctly, you're
11 saying that the CBA governs parts of that
12 other than just the rate of pay, it governs
13 other aspects?
14     A.  The Collective Bargaining Agreement
15 does drive the mark off and how they are
16 handled in the guarantee calculation.
17     Q.  Okay.  And that would be common --
18 so are there differences between the UTU and
19 the BLE contracts with respect to that, those
20 calculations that you just described?
21     A.  Yes, there are.
22     Q.  What are the differences?
23     A.  Are you referring to the FMLA
24 markoff specifically?
25     Q.  Correct.  Yes.

Page 47

1      A.  So for the UTU agreement, any mark
2  off for non-compensated, automatically results
3  in a deduction or a reduction of the guarantee
4  by one day.
5      Q.  Okay.
6      A.  On the BLE side, if employee marks
7  off FMLA and does not request compensation for
8  the day by using an entitlement and they do
9  not lose work, meaning that their turn on the
10 board does not get called while they are
11 marked off, then no penalty is addressed with
12 their guarantee, there is no effect to their
13 guarantee.
14     Q.  Okay.
15     A.  If -- okay.
16     Q.  Are there other differences?
17     A.  There are other differences within
18 the BLE.
19     Q.  Okay.  Can you tell me more about
20 those differences?
21     A.  Also on the BLE, if they mark off
22 FMLA and they request to use a personal leave
23 day for the FMLA markoff, it now is
24 considered a compensated markoff so therefor,
25 his guarantee will not be reduced for the day,

Page 48

1  only the earnings for the day will be included
2  in the earnings for the bi-weekly period.
3      Q.  You said their guarantee will not
4  be reduced, just the earnings.  How are the
5  earnings impacted?
6      A.  Right.  So normally you have, your
7  guarantee starts off with how many days are
8  you available, right.  And if you are
9  unavailable, then that can reduce your
10 beginning guarantee amount and then your
11 guarantee minus your earnings for the period
12 would result in the guarantee that you will be
13 paid.  So, if you have -- if I am an employee
14 who marks off FMLA and is compensated, I'm
15 still considered available, so my beginning
16 guarantee calculation will not be negatively
17 impacted.
18     Q.  Okay.  Then how are the earnings
19 impacted if you're considered available?
20     A.  The compensated earnings for the
21 day will get include with your regular
22 earnings for that pay period to offset the
23 guarantee payment.
24     Q.  I don't understand.  So is that a
25 different -- are you saying it's reflected

Page 49

1  elsewhere on their paycheck?
2      A.  Well, they are paid it on their
3  paycheck, yes, but then it's also considered
4  here on their statement under their earnings.
5  And their earnings for the bi-weekly pay
6  period will offset the guarantee that they
7  will be paid.
8      Q.  Okay.  Well, maybe we need to sort
9  of start at the beginning.
10     A.  Okay.
11     Q.  So the guarantee extra board,
12 explain that to me, what that is.
13     A.  Okay.  The guaranteed extra board
14 again for remaining available for the entire
15 period and not having any markoffs, you will
16 be guaranteed a certain amount of pay.  Any --
17 well not any.  Depending on the Collective
18 Bargaining Agreement, certain markoffs could
19 reduce that guaranteed amount.  It can limit
20 you.
21     Q.  Okay.  Let's start there.
22     A.  Okay.  I'm going to make up
23 numbers.  Let's say the bi-weekly guarantee is
24 $2,000.  I have a certain markoff that says
25 that I am not to be considered available for

**ANTHONY SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Jennifer Gorneault on 10/27/2021                          Pages 50..53

**Page 50**

1  the day, so now that one day will reduce that
2  $2,000 guarantee.
3         Q.  Okay.  And is the $2,000 typically
4  will he for the two week period that we've
5  discussed, the guarantee period?
6         A.  That is correct, yes.
7         Q.  Okay.  Now, is the $2,000 -- so say
8  somebody is unavailable, do you how -- let's
9  say that somebody is unavailable for a 24-hour
10  period.  They've marked off for a 24-hour
11  period.  Do you deduct an entire day of the
12  guarantee pay, so 2,000 divided by 14?
13         A.  Yes.
14         Q.  Okay.
15         A.  If they lost work.  If they marked
16  off for a 24-hour period and their turn in the
17  board was not called, their $2,000 stays
18  $2,000.  It does not get reduced.
19         Q.  If you're a BLE employee?
20         A.  If you're a BLE employee, that is
21  correct.
22         Q.  So actually, I think it would be
23  easier of -- can we just make $2,000, $1,400?
24         A.  Sure, exactly.  Yes.
25         Q.  Okay.  Because your math is

**Page 51**

1  probably better than mine and I don't want to
2  have to screen share my calculator.  Okay.  So
3  in that scenario if I'm UTU and I mark off for
4  24 hours, I lose $100, right?
5         A.  Correct.
6         Q.  Okay.  If I'm BLE and I'm marked as
7  unavailable for whatever reason, then I only
8  lose the $100 if I actually would have been
9  called up?
10         A.  If you would have been called up or
11  you chose not to be compensated for the
12  markoff.
13         Q.  Okay.  So in order for me -- okay.
14  Because CSX permits -- well, because BLE
15  employees can use personal or vacation time to
16  compensate themselves for FMLA time, if they
17  choose?
18         A.  Yes.
19         Q.  Okay.  Let's stop there in the
20  process.  If they decide to do that, okay, I'm
21  going to mark off for FMLA.  I've got to go to
22  a doctor.  I don't want to lose way.
23         A.  Okay.
24         Q.  How do I go about doing that?
25         A.  So the way that the employees, that

**Page 52**

1  the T&E employees request payment for markoff,
2  they submit a claim and they will submit this
3  claim and they will tell us which entitlement
4  they would like to use.  And then we will go
5  in there and we will adjust their entitlements
6  accordingly and pay the day based on how that
7  normal entitlement would be paid, vacation or
8  personal leave day.
9         Q.  Okay.  And they do that claim
10  through what system, the system that you've
11  been talking about where this spreadsheet
12  comes from?
13         A.  So everything that my team does is
14  in the mainframe.  The T&E employees, when
15  they report their pay, we created a web front
16  end that feeds everything to the mainframe.
17         Q.  Is that that system that they can
18  use to call up or to mark on -- mark off, mark
19  up?
20         A.  Mark off and mark up, yes.
21         Q.  They can put it on their phone,
22  they can do it on their computer?
23         A.  That is correct, yes.
24         Q.  So, when they mark off for FMLA,
25  they're in that system and they can then chose

**Page 53**

1  to make a claim for the entitlement?
2         A.  That is correct.  That is correct.
3         Q.  Okay.  There's no extra log in or
4  step or system or phone call or anything else
5  that they have to go through?
6         A.  No.  They will submit a claim.  We
7  ever specific questions asked of them that
8  they will answer, saying, would you like to
9  use vacation, would you like to use person
10  leave, would you like to use current year,
11  carry over, so we ask those questions to make
12  sure that we adjust their entitlements
13  accordingly as we make the payment.
14         Q.  Okay.  But that's all automated in
15  this system that they're using to mark off in
16  the first place?
17         A.  That is correct.
18         Q.  As long as they're marking off
19  through that system?
20         A.  Correct.
21         Q.  Okay.  Now, what if somebody marks
22  off through their supervisor, they call their,
23  you know, Train Master.  Can they do that or
24  do they still have to do it through this web
25  front system?

**ANTHONY SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Jennifer Gorneault on 10/27/2021                    Pages 54..57

Page 54

1      A.  I cannot answer that piece
2  unfortunately.
3      Q.  Okay.  You're not sure.  All you
4  know is if they do it through the web front
5  system, then you get that information?
6      A.  (Nods head up and down.)
7      Q.  Are there any other ways that you
8  know that they can mark off and communicate
9  that they want to use an entitlement towards
10  the FMLA leave, other than this web front
11  system?
12      A.  The only way that we allow them to
13  do it is by submitting the claim.
14      Q.  Okay.  What is that system called?
15  I should know this by now.
16      A.  No, you're fine.  It's called Crew
17  Life.
18      Q.  Crew Life, okay.  This is why I
19  sometimes can't remember my own phone number.
20  (Laughter.)  I will say, your knowledge of the
21  Collective Bargaining Agreement seems very
22  impressive.  All right.  So that's what they
23  do, they do that through Crew Life.  All
24  right.
25              Now, you said that for BLE, if

Page 55

1  they claim to use an entitlement and they do
2  not lose -- and they lost work, then that is
3  when the Guarantee Pay is reduced by the
4  amount that they're getting the entitlement;
5  is that correct, or no?
6      A.  The only time that we will reduce
7  the $1,400 is if they are non-compensated for
8  the markoff, meaning they do not request an
9  entitlement, and they lose work.  If they
10  request compensation for the day, it changes
11  it to, it is now a compensated markoff.  So
12  the lost work record would not impact if they
13  requested to use an entitlement for the day.
14      Q.  Okay.  So let's take the scenario
15  of I call off for -- I mark off for 24 hours
16  for FMLA leave to go see my doctor or
17  whatever, and when I do that, I say I want to
18  use a personal day.
19      A.  Okay.
20      Q.  But for whatever reason, I don't
21  lose any work.  What happens then?
22      A.  So if you're bi-weekly guarantee is
23  $1,400, your bi-weekly guarantee is still
24  going to be $1,400.
25      Q.  Do they get docked a personal day?

Page 56

1      A.  So what happens -- so we have, you
2  kind of have like deductions that happen on
3  one side for the actual guarantee amount.  And
4  then you have, okay, this is what you're
5  eligible for guarantee, now let's see what
6  earnings you had during that period.  So it
7  would be reduced, the $1,400 would be reduced
8  by what we paid you under the entitlement.
9      Q.  Okay.  So let's just say my
10  personal day is worth $200.
11      A.  Uh-huh.
12      Q.  How much does that -- and I take
13  the personal day and I don't lose work, how
14  much does the guarantee pay get offset by, the
15  200 or 100?
16      A.  So, the $200 that we paid you, will
17  offset your guarantee.  So again, you are
18  guaranteed x amount of dollars, but any
19  earnings that you have during that period,
20  will offset your guarantee.
21      Q.  Okay.  So any earnings of any kind
22  get offset by the guarantee pay?
23      A.  Oh, my IT guy is here.  Again, it's
24  by Collective Bargaining Agreement.  I can't
25  say any.  There are certain penalty codes that

Page 57

1  are paid above guaranteed, but earnings and
2  entitlements, yes.
3      Q.  So earnings and entitlements, those
4  are offset.  So, if I receive any earnings or
5  entitlements during the guaranteed period, the
6  amount of whatever I receive is offset against
7  the Guarantee Pay?
8      A.  That is correct, yes.
9      Q.  Okay.  So if I get $500 in earnings
10  and entitlements, then I only get the $900 in
11  guarantee pay?
12      A.  That is correct, yes.
13      Q.  Okay.  See, aren't we glad we did
14  1400.  All right.  So your IT guy is there.
15  Do you think it's possibly --
16      A.  He's pacing by my door.
17      Q.  Yes, I know how that is.  Yesterday
18  I had to call Dell to find out how to use my
19  web camera.  I didn't realize there was a
20  little slide thing right there so that was
21  fun.  So, do you think during this period of
22  time you might be able to find that document
23  and send it to your counsel?
24      A.  Yes, I can do that.
25      Q.  Okay.  How much time do you and the

**ANTHONY SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Jennifer Gorneault on 10/27/2021
Pages 58..61

Page 58

1   IT guy need to do this; do you think?
2      A.  It will be 15-20 minutes tops, he
3   said.
4          MS. TUCK:  Okay.  Why don't we
5   agree to reconvene at 11:20.
6      A.  That's good for me.  Thank you.
7          MS. TUCK:  Thank you.
8          (Recess taken.)
9      Q.  (By Ms. Tuck) Okay.  I'm going to
10  show you a different version.  Makala, I'll do
11  this share screen for now just so we can mark
12  this as an exhibit.
13         Jennifer, do you recognize this as
14  say more readable version of the spread sheet
15  we were looking at earlier, this just has all
16  the different categories on one page?
17     A.  Yes.
18     Q.  Makala, do you see the file name at
19  the top so that you can keep track of that?
20  So this is LL.  So we were going through these
21  categories and we talked about -- we got off
22  track and we started talking about
23  availability and how your Guarantee Pay gets
24  calculated.  So we'll come back to you that.
25  I'd like to go back into the spreadsheet to

Page 59

1   take a look at a couple of things so you can
2   walk me through what it means.
3      A.  Okay.
4      Q.  All right.  After period end date
5   we have dates.  What does that reflect?
6      A.  So that is the actual activity date
7   and time.
8      Q.  Okay.  And in this case, what does
9   it show, this date?
10     A.  So for instance, if we look at row
11  1, so the date shows February 6th, 2016 0000,
12  right, so this is a seniority move that
13  occurred on at midnight is February 6th.
14     Q.  On this first page can you see an
15  example of him marking off and marking up?
16     A.  Yes.  So if we were to look at
17  February 9th date.
18     Q.  Uh-huh.
19     A.  You actually have two that occur on
20  that date, so you have where it says action
21  reason, lay for layoff and then the next row
22  that has MRK, that is your mark up record.
23  And the times within that box, within the date
24  box, they're telling you the effective dates
25  of that layoff and mark up.  So, that actually

Page 60

1   occurred within one second of each other.  I'm
2   not sure why.  But again, that came from the
3   crew side.  That did not impact him.  But the
4   next record at 1931 was a layoff for FMLA.
5      Q.  Okay.  And these are -- and this is
6   the progression of this spread sheet is oldest
7   to most recent, so top is oldest and most
8   recent going down, right?
9      A.  That is correct, yes.
10     Q.  Okay.  So you're looking at
11  February 9 at 12:58 p.m. on Tuesday?
12     A.  That is correct, yes.
13     Q.  And he is, you say, marking off for
14  -- do we know what reason?
15     A.  So that was more -- again, I can't
16  guess.  This is a Crew Management maneuver
17  that they did with a layoff mark up adjusting
18  turns.  They were probably correcting his turn
19  but I can't be for certain, so that wasn't
20  really a true layoff mark up by the employee.
21     Q.  Okay.  What does DT mean?
22     A.  Drop turn.
23     Q.  Drop turn?
24     A.  Yes.
25     Q.  Okay.  All right.  But then at 1931

Page 61

1   on Tuesday the 9th, it looks like he does mark
2   off for FMLA, it's FP?
3      A.  Yes, that is correct.
4      Q.  Okay.  And FP stands for what?
5      A.  That is marking off FMLA for self.
6      Q.  And then the next entry is the
7   following -- well, basically, midnight on
8   Wednesday and it says RPT, what does RPT mean?
9      A.  So RPT is again just kind of a
10  placement letting you know, keeping everything
11  in date order, so it's kind of starting you
12  off for the day of where you are on that date.
13     Q.  Okay.  So that doesn't indicate
14  that he did anything, it's just the system
15  saying today is Wednesday?
16     A.  That is correct.  Let me look at
17  everything in this 24-hour period, that is
18  correct.
19     Q.  And then the next entry we have is
20  at 330 on Tuesday, and it says lost work under
21  action reason.  What does that tell you?
22     A.  So that is telling me that while he
23  was marked off on FMLA, his turn was up to be
24  called for the J 98310, and since he was not
25  available to work, they placed a lost work

**ANTHONY SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Jennifer Gorneault on 10/27/2021                                    Pages 62..65

Page 62

1   record next to him and went on to the next
2   employee who was available for call.
3           Q.  Where are you getting the J --
4           A.  To the left of the lost work record
5   is job and that will actually tell you the job
6   that they attempt to call him for -- or they
7   were going to attempt to call him for.
8           Q.  Okay.  All right.  So, you know, we
9   want to send you to, you know, Tennessee, you
10  know, whatever.  Okay.
11          A.  Yes.
12          Q.  Does lost work indicate when they
13  would have called him up, the time that they
14  would have called him up?
15          A.  Yes, that is correct.  The
16  effective time of 0330 is when they were going
17  to attempt to call him for work.
18          Q.  Okay.  But it doesn't indicate
19  necessarily when he would have started the job
20  if he hadn't marked off, it says, okay, this
21  is when he would have been called up?
22          A.  That is correct.
23          Q.  All right.  Got it.  And then we
24  have another RPT, which is just saying today
25  is Thursday.  And then we have MRK, does that

Page 63

1   mean mark up?
2           A.  That is correct.  That is when he
3   marked back up.
4           Q.  So he marked back up at 8:07 a.m.
5   on Thursday?
6           A.  Yes.
7           Q.  Okay.  Now, to the right of this,
8   all the way it says penalties deductions.
9           A.  Yes.
10          Q.  And then if we look at that
11  sequence, right, so he lays off at 1931 on
12  Tuesday on FMLA and then he marks back up on
13  Wednesday, there's a penalty deduction of
14  $214.99; is that right?
15          A.  Yes.
16          Q.  Is that because he marked off -- is
17  that a penalty from his Guarantee Pay?
18          A.  That is a penalty from his
19  Guarantee Pay, yes.
20          Q.  Okay.  So by marking off in that
21  example, he lost $214 -- roughly $215 of
22  Guarantee Pay, right?
23          A.  That is correct, yes.
24          Q.  Okay.  Now -- and that was assessed
25  at midnight on Wednesday, the day that, you

Page 64

1   know, on the Wednesday, like today is
2   Wednesday, one item?
3           A.  That is not how the data displays.
4   The system will actually review the entire day
5   overall and then any penalties of deductions,
6   it will be placed on that first record of the
7   day.
8           Q.  Okay.  So the penalty would have
9   been assessed actually the day before.  This
10  is just reflecting the penalty that was
11  assessed on Tuesday?
12          A.  Yes.
13          Q.  Okay.  All right.
14          A.  Yes.
15          Q.  Okay.  So this is saying today is
16  Wednesday and yesterday you lost $215?
17          A.  Yes.
18          Q.  Okay.  Now, if he had not lost work
19  -- he's a BLE employee.  Can you tell that
20  from this spread sheet because it says
21  agreement type, right?
22          A.  Agreement type, yes.
23          Q.  Okay.  So he's a BLE employee and
24  he was assessed that penalty as of Tuesday,
25  yet -- and he lost work.  So, is there any way

Page 65

1   to tell on this whether or not he chose to use
2   a personal day to pay for his FMLA leave?
3           A.  If he did, it would actually be in
4   the earnings field.  Because as soon as we
5   submit those payments for them, it will grab
6   those specific pay codes and pull the earnings
7   in to correspond, yes.
8           Q.  Okay.  So can you -- okay.  So I'm
9   just going to try to highlight these right
10  here.  So in this circumstance that we were
11  just -- oh, this is a different one.  All
12  right.  Oh no it's not.  So in the example
13  that we were just looking at here, he had no
14  earnings.  That means he did not elect a
15  personal day or vacation to be paid for that,
16  right?
17          A.  That is correct.
18          Q.  Okay.  All right.  Let's look at
19  something else.  Makala, can you put up 4620
20  and 4931, and this will be I guess MM.
21          (EXHIBIT MM MARKED.)
22          Okay.  So, this is something that
23  was produced to us in discovery.  Do you
24  recognize this document at all?  It's 312
25  pages.  Can you just scroll through it a

**ANTHONY SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Jennifer Gorneault on 10/27/2021
Pages 66..69

Page 66

1 little bit, Makala. Slow down, slow down.
2     A. Yes, I do recognize it.
3     Q. Okay. What is this document?
4     A. So this is actually the programming
5 logic that is in our Crew Web Guarantee
6 System.
7     Q. Okay. So when you say logic, what
8 do you mean by logic?
9     A. So these are the actual rules that
10 are built within the Crew Web Guarantee System
11 to take into account all the scenarios of
12 layoffs, markups, looking for earnings to
13 perform the actual calculations for the
14 employee's guarantee.
15     Q. Okay. And this is in what system?
16     A. It's the Crew Web Guarantee System.
17     Q. Crew Web. Okay. Let's see. Okay.
18 So does this document help you -- is there a
19 list of all of the -- let's go back to --
20 Makala, you can stop sharing. Can you put up
21 Schobert 4169 -- actually, I think I got it
22 here. Okay.
23     So, all of these codes under Action
24 Reason, is there some key that exists to let us know
25 what these things mean? I saw that that logic that

Page 67

1 we looked at referenced some of these, but it was
2 fairly complicated. Is there some place where these
3 Action Reasons and Reason Codes reside to help us
4 interpret what they mean?
5     A. So the Action Reason, Reason Codes,
6 they come from the TECS System.
7     Q. Do you have a document or does your
8 staff have a document or anything that you can
9 access that tells you what these things mean?
10     A. Yes, we can get access.
11     Q. Okay. If you were going to tell
12 your staff to, you know, if you were training
13 somebody in this information, what would
14 provide to them or tell them to do so that
15 they could know what these codes mean?
16     A. So we actually use the TECS System
17 directly for most of our payroll handling, so
18 we actually refer to spread sheets provided by
19 the Crew Management Department for the
20 description of each status reason code.
21     Q. Okay. And so would you agree with
22 me that if we had that document, we could skip
23 asking you -- skip a lot of questions to you
24 about what some of these codes mean?
25     A. Probably.

Page 68

1     Q. Okay. All right. Let's look
2 these. Let's look at the Reason Codes. What
3 does R2 mean?
4     A. Two rest days, two consecutive rest
5 days.
6     Q. Okay. So how would other
7 increments of rest be noted on this?
8     A. It could be just one rest day
9 meaning R1. Depending on something else,
10 hours of service, there could be an R3 but
11 that is usually a max, and that one does not
12 happen as often from what I have seen and data
13 that I have reviewed.
14     Q. Okay. And what is a drop turn?
15 You say DT is a drop turn.
16     A. It's a Crew Management term for
17 adjusting people's board. It could be they
18 are reducing the number of turns on there or
19 increasing the number of turns and they have
20 to adjust people as they add and delete.
21     Q. What is a turn?
22     A. So again, when employees are on an
23 extra board, they are assigned to different
24 turns. So when they are assigned a turn, they
25 can actually go into the extra broad to see

Page 69

1 when their turn should get called out, or
2 roughly give an estimate of when their turn
3 will get called out, based on who is in front
4 of them with their turns.
5     Q. Okay. So turn as in like it's my
6 turn?
7     A. It's my turn, right.
8     Q. It's my turn next, I mean, just in
9 that very basic meaning of the word.
10     A. Yes.
11     Q. All right. So that's them doing
12 something with the extra board so that people
13 move up or down?
14     A. Correct.
15     Q. Okay. PB is what?
16     A. PB is personal business.
17     Q. Okay. So is that a personal day?
18     A. It is not a personal leave day.
19 Personal leave days are considered
20 entitlements. When an employee marks off
21 person business with Crew Management, that is
22 a non-compensated markoff.
23     Q. Okay. So let's look at PB. Is
24 that why Tony lost $215 on the next report
25 day?

**ANTHONY SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Jennifer Gorneault on 10/27/2021                    Pages 70..73

Page 70

1    A. No. I'm sorry. So, that money is
2  on -- that deduction is on June 7th, so we
3  have to look at all of June 7th. So there was
4  -- so for -- I'm sorry. I'm going to have to
5  move this to my bigger monitor.
6    Q. Let me just sort of highlight this
7  a little bit. We can zoom in. So if we're
8  looking at -- here we go. All right. So if
9  we're looking at this example right here, it
10  looks like he lays off and marks up for
11  personal for about -- so between whatever
12  4:00 and 10:00 roughly, right?
13    A. Uh-huh.
14    Q. And then he's assessed a penalty of
15  $214 -- or $215 on Tuesday. What's he getting
16  assessed that for?
17    A. The $215 is for what occurred on
18  activity date June 7th, so if we actually --
19  the June 6th markoff did not reduce his
20  guarantee. It's actually if you -- the record
21  above, the RPT record above that has the zero
22  dollar penalty, that corresponds with the
23  June 6th date and what occurred on June 6th.
24    Q. So the $215 that's assessed to him
25  on midnight on Tuesday reflects something that

Page 71

1  happened on Tuesday?
2    A. Correct.
3    Q. How can it assess a penalty ahead
4  of time?
5    A. So that zero record -- the RPT
6  record, again, it's not doing it ahead of
7  time. It's just placing it on the first
8  record of the day. Instead of putting it next
9  to the layoff, the -- it's just the way the
10  program uses it and expels it in the data.
11  It's not saying that as of midnight it knew
12  ahead of time that he was going to be laid off
13  marked off. It's applying the penalty
14  deduction on the first activity record for
15  that day. That's all it's doing.
16    Q. Okay. So going back to the FMLA
17  record that we were looking at before. Right.
18    A. Yes.
19    Q. So that $214 that's assessed
20  on Wednesday is because of what happened on
21  Wednesday not Tuesday?
22    A. Correct. Yes.
23    Q. Okay. All right. Now, going back
24  to this scenario. Now he has -- all right.
25  So now in this scenario he lays off for a

Page 72

1  personal business, so he marks off a personal
2  business at 4:00 and then he marks back up at
3  around 10:00. That's about six hours, right.
4  And he's not assessed any time for that --
5  he's not assessed any penalty for that. Why
6  is that?
7    A. Correct. He had no lost work
8  record occur on that date, during that markoff
9  period.
10    Q. Okay. Now, on the next one, he's
11  got -- he does FMLA, so --
12    A. Yeah. So on June 7th -- so he was
13  called to work at 12:30 a.m. He tied up at
14  6:15 a.m. Laid off FMLA.
15    Q. What is tie up mean?
16    A. That is when they complete their
17  shift, their work.
18    Q. Okay.
19    A. So he tied up his ticket and he
20  tied up for rest and went on rest.
21    Q. Okay.
22    A. And then at 6:51 a.m. marked off
23  FMLA, and then later that evening at is 1840
24  we were going to attempt to call him to work
25  for the J 98707 train.

Page 73

1    Q. Uh-huh.
2    A. So then there's a lost work record
3  for that FMLA markoff.
4    Q. Right.
5    A. So that's why the 214.99 penalty
6  was put on the first record of the day.
7    Q. Okay. And then on that day he
8  marks up just before midnight?
9    A. Correct.
10    Q. Okay. Now, when he marks up --
11  when they mark up, does it repeat the same
12  reason codes? If I mark off, if I layoff, lay
13  myself off for personal business, then it
14  shows, you know, personal business as a mark
15  back up, same thing for FMLA, right?
16    A. Correct. Yes. I am marking up
17  from this status, yes.
18    Q. Okay. And then we've also got this
19  Earnings column, or Guarantee Pay. All right.
20  So let's take a look at this. Let's take a
21  look at the example we were just looking at.
22  So it looks like -- so this is the guarantee
23  -- would the 1,254 essentially be the
24  Guarantee Pay that he would have gotten if he
25  had no deductions?

**ANTHONY SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Jennifer Gorneault on 10/27/2021                    Pages 74..77

Page 74

1    A.  And no earnings, yes.
2    Q.  And no earnings.
3    A.  Yeah.  So that Guarantee --
4    Q.  So you deduct earnings?
5    A.  I'm sorry?
6    Q.  Because you deduct earnings?
7    A.  Correct.  So that amount in the
8  Guarantee is giving the employee kind of a
9  running total at that time, letting them know
10 where they stand with what guarantee is to be
11 paid, based on availability and deductions and
12 if he received any earnings for the period of
13 time.
14   Q.  Okay.  And so he gets some earnings
15 because he got called up and he worked so he
16 earned $329 so that gets deducted from his
17 Guarantee Pay, that's what's happening there?
18   A.  Correct.  Yes.
19   Q.  And then we have the -- okay.  Now
20 why is he getting assessed?
21   A.  So here he dropped his turn.
22   Q.  Okay.
23   A.  So basically saying I'm not ready
24 to go to work, skip me and go to the next guy,
25 is kind of what that means.

Page 75

1    Q.  Where do you see that?
2    A.  The WODT, the DT, he dropped his
3  turn.
4    Q.  Okay.  So WODT means he voluntarily
5  lost his place?
6    A.  Correct.  Yes.
7    Q.  Okay.
8    A.  So it's not necessarily saying I
9  need to mark off for a full day or I need to
10 mark off for this, but I'm just not kind of
11 ready to be called.  I need to drop my turn.
12 Please go to the next turn for call.
13   Q.  Okay.  Well, earlier when we talked
14 about this DT, you seemed to think that that
15 might have been an adjustment in Crew
16 Management, is that --
17   A.  I'm sorry, I was not clear.  It was
18 Crew Management adjusting that the only way he
19 can drop his turn is by calling Crew
20 Management to have it dropped.
21   Q.  Okay.  So how do you know that he
22 made this decision rather than someone else by
23 looking at this, or do you?
24   A.  If it was -- I'm sorry.  I was not
25 clear on that.  If it was something that was

Page 76

1  initiated by Crew Management, it would not be
2  a layoff and a markup.  It would have been
3  like an adjustment record, but not necessarily
4  have the Action Reason Codes of laying off and
5  marking up.
6    Q.  Okay.  What's the code for
7  adjustment?
8    A.  I do not know that one off the top
9  of my head.
10   Q.  All right.  Okay.  Okay.  But WO,
11 do you know what that stands for, or it's just
12 some numerical code that has some meaning to
13 somebody?
14   A.  It has a meaning to it.  I can't
15 tell you exactly what it is.  I believe it's
16 layoff, but I -- actually it is layoff.  And
17 the reason behind it is layoff or drop turn.
18   Q.  Are those codes on these
19 spreadsheets that you said Crew Management
20 has?
21   A.  Yes, they are.
22   Q.  Okay.  So again, that would help
23 us, right?
24   A.  Yes.
25   Q.  Okay.  All right.  Okay.  Here

Page 77

1  we've got something that says SMB.  What does
2  this mean?
3    A.  So that is a seniority move.
4    Q.  So does that --
5    A.  So that is when he bid on a job and
6  was awarded the job, so he bid and was awarded
7  this extra work position, so he made --
8  basically a seniority move is moving them to
9  this assigned job.
10   Q.  Okay.
11   A.  And that usually does occur for BLE
12 employees at midnight on Saturday morning.
13   Q.  Because they bid on the better jobs
14 at the beginning of the week, that's what they
15 did?
16   A.  Correct.  Yeah, they'll bid on
17 multiple jobs in hopes to get the best job for
18 them.
19   Q.  The ones they want.
20   A.  Yes.
21   Q.  And the best job for them could
22 include, you know, things that are going on in
23 their personal life like having to go to the
24 doctor or go to their child's doctor, that
25 kind of thing, right?

**ANTHONY SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Jennifer Gorneault on 10/27/2021     Pages 78..81

Page 78

1      A. Correct. They will put their bids
2 in in their own personal order.
3      Q. Okay. So depending on whether they
4 get these bids or not, they might be able to
5 avoid having to use other kinds of time off,
6 right?
7      A. Correct.
8      Q. If that's within their plan?
9      A. Depending on the type of
10 assignment, yes, it could. Yes.
11      Q. Sure. I'll put it another way.
12 That's another way that somebody with FMLA --
13 intermittent FMLA leave could use to manage
14 their time?
15      A. Yes. They could try again. It's
16 based on seniority, too, so yes.
17      Q. Right. If it works out?
18      A. Yes. Yes, that is correct.
19      Q. All right. Now, here I'm going --
20 let's go back to this part that I was looking
21 at. Why on this date is his -- this Guarantee
22 Pay period is his guarantee pay it looks to be
23 almost three times?
24      A. Right. So if you look at the time
25 frame of how long he's assigned to the board,

Page 79

1 so again that number is again taking into
2 consideration the entire two-week period, was
3 he assigned to the board the entire two-week
4 period, was he available the entire two-week
5 period and that's where that starting number,
6 you know, comes from.
7      Q. So is the starting number
8 calculated after he makes himself available --
9 at the end of the period?
10      A. Correct.
11      Q. So that this easier to figure out
12 this is when you were available and that is
13 when you weren't available?
14      A. That is correct. And I will point
15 out, too, that our Guarantee Pay system, if we
16 are in a current period, it will not even
17 display any information, any estimates to us,
18 until after the two-week period has ended,
19 until that following Monday.
20      Q. Okay.
21      A. So these reports that we see, we
22 don't even see them until the period has ended
23 because it is taking into account the entire
24 two-week period.
25      Q. Okay. So what we're looking at is

Page 80

1 not a real-time view, it is after everything
2 has been input for that Guarantee Pay period?
3      A. Correct.
4      Q. Is there anything on this
5 spreadsheet that you can see that helps you
6 calculate what that Guarantee Pay -- how their
7 initial Guarantee Pay, that 3000 number or the
8 1200 number, how that is calculated?
9      A. On this sheet, no. I would have to
10 go back to the left for the Agreement Code and
11 refer back to the rate related to the
12 Agreement Code. But again, this is a download
13 of the data. This is not the employee's view.
14 The employee's view does give them more
15 information. It will show what we verify as
16 their numbers of days assigned to the board,
17 number of days available on the board. Again,
18 it's that employee guarantee view we created
19 for them with the instructions that I believe
20 Tom was talking about we were going to add
21 here, that does have better information than
22 this spreadsheet that is literally a dump of
23 our data.
24      Q. Okay. So the employee view of this
25 information provides the information that

Page 81

1 you're talking about, which is when they were
2 available, when they were not available and
3 how that initial Guarantee Pay balance was
4 calculated, correct?
5      A. Correct.
6      Q. Okay. And you said that there's
7 something in the document that Tom provided
8 that helps us with that, or that you sent to
9 Tom?
10      A. Yes. Yes. The one that I sent to
11 Tom today, yes.
12      Q. Okay. Makala, can you put that up,
13 please. I've got to stop sharing. Okay. All
14 right. Can we scroll down.
15      (EXHIBIT TT MARKED.)
16      Q. And you just let her know to stop
17 whenever we get to the part that you're
18 talking about that helps us figure out what
19 the initial guarantee balance is.
20      A. Sure. Right here.
21      Q. Okay. Stop.
22      A. So --
23      Q. Do you need her to zoom in a little
24 bit?
25      A. I'm okay. I move the Zoom call to

**ANTHONY SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Jennifer Gorneault on 10/27/2021                        Pages 82..85

Page 82

1  my bigger screen so I don't have lean in as
2  much.
3          Q.  Okay.
4          A.  The bottom data is more that
5  reflects the data provided in the spreadsheet.
6  What we do, the employees pull it up pay
7  period by pay period.  So, you can see at the
8  top it's pulled up by employee id by, which
9  they don't have that view.  This is our view,
10 but they do have the pay period.  They'll plug
11 in the pay period end date that they want to
12 review and hit search.
13         Q.  Okay.  And so right now we're
14 talking about the pay period of July 1st,
15 2016?
16         A.  Correct.  Yes, in this example that
17 we created for this instructional document for
18 the employees.  Yes.
19         Q.  Okay.  Does the pay period run the
20 same simultaneously as the Guarantee Pay
21 period?
22         A.  Yes.  Yes, it does.
23         Q.  Okay.  So the guarantee pay period
24 is Saturday to Saturday, also pay period is
25 also that same Saturday to Saturday?

Page 83

1          A.  Yeah, Saturday to two Fridays
2  later.  Yes.
3          Q.  Okay.  Got it.  All right.  And
4  then you said --
5          A.  So above the raw data you can kind
6  of see summaries.  So you can see the
7  Agreement Code so the employee knows the
8  Agreement Code.
9          Q.  I see.
10         A.  There's the bi-weekly rate, the
11 daily rate on the board.  And then again, for
12 this example it would actually show, okay, the
13 days assigned.  You were assigned 14 days.  We
14 reflected that you were available 14 days.  If
15 they are a step rate applied, so again, if
16 they are a new hire employee and they have a
17 rate progression, that would be reflected
18 there.  And then it will kind of break it
19 down.
20             So what's our guarantee liability
21 to pay them, how much earnings did they have
22 during that actual period, if we had any
23 penalties or deductions and then we'll
24 actually show them what the Guarantee Pay is
25 at the end.  So for this employee, this

Page 84

1  example is $718.76.
2          Q.  And these Reason Codes and Status
3  Codes are the same as in the spreadsheet that
4  we were looking -- in fact, all of the
5  categories that are the same, it's the same
6  data, right?
7          A.  Correct.
8          Q.  So when we talk about date, that's
9  going to be date, day of the week, job, Action
10 Reason.  Except in Action Reason, they
11 actually spell it out a little bit more.
12 Extra board is the same.  Status Code is the
13 same, Reason Code is the same.  Yes, that
14 would be the same data?
15         A.  (Nods head up and down.)
16         Q.  Are you there?
17         A.  Yes.  I'm so sorry.  Yes, that is
18 correct.  I thought you were going to keep
19 going.  I didn't want to interrupt.
20         Q.  Okay.  No, that's fine.  Okay.
21 Let's stop sharing.  Well, actually, no, go
22 back to this, please.
23             Is there a report or spreadsheet
24 that can we run that provides these summaries
25 at the top or do you just have to figure it

Page 85

1  out from looking at the spreadsheet?  So from
2  looking at the spreadsheet that we've been
3  looking at, in order to figure out how many
4  days somebody was assigned and available, we
5  would have to do that sort of by hand by
6  looking at the, you know, when they worked,
7  whether there was a yes in the available
8  column?
9          A.  Yeah, I am not sure about that, if
10 those fields are actually available.  I would
11 have to check with technology on that,
12 honestly.
13         Q.  Okay.  Okay.  And is this for
14 somebody in particular -- oh, this is just an
15 example that you provide to the employee?
16         A.  That is correct, yes.
17         Q.  Okay.  All right.  Okay.  I think
18 that is it for the spreadsheet for now.  Can
19 you stop sharing for a moment, please.
20             So going back to this one, you said
21 that BLE employees, that they only get reduced
22 if they don't ask for a personal day
23 entitlement and if they lost work.  So that is
24 something that you can figure out from this
25 spreadsheet, right, at any given time?

**ANTHONY SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Jennifer Gorneault on 10/27/2021                              Pages 86..89

Page 86

1     A.  Yes, that is correct, if they have
2  the FMLA markoff with earnings next to it.
3     Q.  So we can both figure out when
4  somebody was considered available and whether
5  or not they used personal time for FMLA leave
6  based on this spreadsheet?
7     A.  That is correct, yes.
8     Q.  Okay.  And we can also determine
9  whether or not they lost work because if they
10  lose work, that's indicated there, right?
11     A.  Yes.  Yes.
12     Q.  Now, is that true of any time they
13  lose work regardless of why they mark off, so
14  will that appear if they mark off for other
15  reasons?
16     A.  That is correct, yes, it will.
17     Q.  Okay.  And is there any other
18  circumstance that you're aware of that an
19  employee can use other types of time off, paid
20  time off to compensate them for a markoff,
21  BLE, like an FMLA?
22     A.  No.  The only time that we will
23  actually provide compensation is for an FMLA
24  markoff.
25     Q.  Okay.

Page 87

1     A.  Unless it's -- a vacation or
2  personal leave they mark off would be
3  considered an entitlement so that would
4  automatically generate.  But any
5  non-compensated markoff, no, FMLA is the only
6  one that we do this for.
7     Q.  Okay.  And if we were looking at
8  this same spreadsheet but only for someone who
9  didn't have FMLA leave, had never taken FMLA
10  leave, would it have the exact same types of
11  data in it, the spreadsheet would look the
12  same, there just wouldn't be any FP?
13     A.  Yes, that is correct.
14     Q.  And FF is the code for if it's a
15  family member, right?
16     A.  FM, as in Mary.
17     Q.  Oh, like family member?
18     A.  Yes, that is correct.
19     Q.  So FP is I'm taking FMLA for myself
20  and FM is like if I'm taking it for my kid?
21     A.  Yes, that is correct.
22     Q.  All right.  Okay.
23     MS. TUCK:  So, Makala, can you pull
24  up the document, let's see, it is Bates No.
25  4932.  Okay.  So let's look at Guarantee

Page 88

1  Reductions.
2     (EXHIBIT NN MARKED.)
3     Q.  (By Ms. Tuck)  All right.  Now,
4  Guarantee Pay -- FMLA is not the only
5  circumstance under which an employee can
6  potentially lose Guarantee Pay; is that true?
7     A.  That is true, yes.
8     Q.  Okay.  Does this spreadsheet
9  reflect all of the categories of types of time
10  off where your Guarantee Pay could be reduced?
11     A.  Yes.
12     Q.  All right.  Now you see there's --
13  so is this the case today -- so when I say
14  does this reflect all the categories of time
15  off where you could lose Guarantee Pay, are
16  you speaking as of today or are you limiting
17  that to any time frame?
18     A.  So this is our current Guarantee
19  Deductions Summary Table that we have within
20  the Payroll Department to summarize the
21  different agreements that we have in place
22  with the non-compensated markoffs.
23     Q.  Okay.  Have you had a document like
24  this since 2016 in your department?
25     A.  Yes.

Page 89

1     Q.  Has it changed at all?
2     A.  No.
3     Q.  Okay.  So I'm just going to walk
4  through this.  There's some categories at the
5  top.  It says BLE, UTU and then there's three
6  different types of UTU's.  Are there -- are
7  those three different types of agreements that
8  you have with UTU?
9     A.  We do have three different types of
10  agreements for UTU.  It's based on territory
11  location.
12     Q.  What's this CSRA territory?
13     A.  That is our Consolidated Southern
14  Region Agreement, so that covers Florida up
15  through Kentucky area.
16     Q.  All right.  And then B&O?
17     A.  B&O is our Northern territory, so
18  it covers -- so basically our UTU is broken
19  down into the north and the south.  The CSRA
20  covers our southern area.  The B&O covers our
21  northern area.  The UTU Conrail, that one has
22  been transitioned into the B&O Agreement as of
23  2011.  However anybody hired and working prior
24  to 2011, they were able to remain under these
25  deductions.

**ANTHONY SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Jennifer Gorneault on 10/27/2021                    Pages 90..93

Page 90

1      Q.  Okay.  So this is like
2  grandfathered --
3      A.  Yes.
4      Q.  People who were grandfathered in
5  from B&O prior to 2011?
6      A.  Yes.  Yes.
7      Q.  Okay.  So primarily you're dealing
8  with the first three categories of employees?
9      A.  That is correct, yes.
10      Q.  All right.  And so, if I'm reading
11  this correctly, how much time you lose from
12  your Guarantee Pay for any given reason
13  differs based on what union you're in and with
14  UTU what part of the country you're in, right?
15      A.  That is correct.
16      Q.  Okay.  So for BLE, what is a demand
17  day?  Let's just talk about what these are.
18      A.  So demand day is an employee who
19  has a time frame that they have no absentee
20  issues, they were allowed to schedule and take
21  a demand day.  It is very similar -- well it's
22  really, it's a non-compensated markoff day
23  where they will not have attendance issues
24  reflected, like no points assessed.
25      Q.  Okay.  So it looks to me like UTU

Page 91

1  doesn't do that, right -- the UTU North
2  doesn't have that as part of their employment?
3      A.  That is correct.  They do not have
4  demand day in their Collective Bargaining
5  Agreement, yes.
6      Q.  But UTU South and BLE do?
7      A.  Yes.
8      Q.  And that is earned with no
9  absenteeism.  For what period of time do you
10  have to have of perfect attendance to do that?
11      A.  Unfortunately, I'm not as familiar
12  with that part of the agreement.
13      Q.  Okay.
14      A.  Crew Management does know that
15  piece because of having to manage the demand
16  day markoff, but I'm not familiar with that in
17  the Payroll Group.  I'm sorry.
18      Q.  All right.  So Crew Management
19  knows how you can get a demand day?
20      A.  Yes.
21      Q.  Or they can explain that?
22      A.  Yes, that is correct.
23      Q.  Okay.  Do you know whether or not
24  someone can earn demand days if they take FMLA
25  leave but have perfect attendance otherwise?

Page 92

1      A.  I do not know that answer.
2      Q.  Okay.  And a demand day means I can
3  -- demand day means I can take this demand day
4  and yeah I'm not going to get paid for it but
5  I'm not going to get dinged for it either?
6      A.  Correct.
7      Q.  Okay.  I don't have to take
8  personal time.  I don't have to take vacation
9  time.  I don't have to take FMLA leave.  I can
10  just take the day off and nobody is going to
11  get me for it?
12      A.  Correct.
13      Q.  Okay.  Do you know whether or not
14  they have to ask for those days ahead of time
15  or can they just mark up for those whenever
16  they want to?
17      A.  I do not know the time frame in
18  advance.  I do know they can't do it
19  immediately, but I don't know how much time --
20  how much notice they have to request it.
21      Q.  Do you know whether or not they
22  have to ask their Train Master or anybody in
23  Crew Management, you know, and call them?
24      A.  It would be Crew Management.
25      Q.  So they have to talk to crew

Page 93

1  management to take one of those?
2      A.  That is correct.  It's based on
3  availability in the area.
4      Q.  Okay.  And drop turn, we've talked
5  about.  Now, you said sometimes they use a
6  drop turn as an adjustment.  Is this
7  referenced drop turn just when they
8  voluntarily drop or do --
9      A.  Yes, this is just when the employee
10  drops their turn, yes.
11      Q.  Okay.  So that's a WODT?
12      A.  Yes, it is.
13      Q.  I know, right.  Again, this is why
14  I can't remember my own phone number some
15  days.  I'm sure it's going to get worse as
16  this goes on.
17          All right.  So personal business,
18  is that basically -- that's not a personal
19  day.  How does somebody -- personal business
20  is something they call Crew Management for,
21  right?
22      A.  That is correct.  They just say,
23  hey, I need to take a personal business day.
24  Again, I don't know the full details, but I do
25  know that personal business, it can impact

**ANTHONY SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Jennifer Gorneault on 10/27/2021                    Pages 94..97

Page 94

1  their attendance points.
2        Q. Okay. And then we have FMLA. And
3  there's an asterisk. It says, "if it's
4  compensated, earnings will be charged and
5  there will be deduction for all contracts."
6  But that's not entirely accurate. I think
7  what you said was that there is a deduction
8  from the Guarantee Pay, but you also earn the
9  entitlement, right?
10        MR. CHIAVETTA: Objection. Go
11  ahead, Jennifer.
12        A. When this refers to deduction, it
13  refers to the Deduction Penalty column. When
14  they are compensated for the day, it would
15  fall under the regular earnings and just
16  offset the Guarantee, just like the regular
17  earnings would.
18        Q. Okay. So this asterisk is
19  referring to the Penalty column?
20        A. That is correct.
21        Q. Okay. And then we have Military,
22  that's when somebody goes on military duty?
23        A. Yes.
24        Q. Union, is that -- Union, they're
25  doing something on Union business?

Page 95

1        A. That is correct, yes.
2        Q. As defined by the CBA, I take it?
3        A. Yes.
4        Q. Okay. What is Weather?
5        A. That would be like inclement
6  weather.
7        Q. So inclement weather, like, I can't
8  get to work because I can't drive in the snow
9  or we're not running the trains because of the
10  snow?
11        A. I can't drive because of the snow.
12        Q. Okay. What is a Miss Call?
13        A. A Miss Call is that we are still
14  showing you available to work. We attempt to
15  call you multiple times. You do not answer
16  the phone. So now it's a -- so now that's
17  considered a Miss Call.
18        Q. Okay. So basically, I'm on the
19  board. I get called to work and I just don't
20  show up.
21        A. I don't answer the call at all,
22  yeah, so I don't show up to work.
23        Q. So kind of like a no-show from the
24  board, if they get called up?
25        A. Yes.

Page 96

1        Q. Okay. Sick, is that -- what does
2  that reflect?
3        A. That's the employee literally
4  marking off sick with Crew Management. And
5  again, we don't have sick entitlement, so any
6  kind of sick markoff would be a considered a
7  non-compensated markoff.
8        Q. Okay. And Sickness and Family same
9  thing?
10        A. Same thing.
11        Q. And Sick Dr's Appt, same thing?
12        A. Same thing, yes.
13        Q. Okay. Now, next it has the
14  deductions, I take it, right, Monday through
15  Thursday, Friday to Sunday?
16        A. Yes.
17        Q. All right. So 1/14th is what, 1 of
18  the 14 days, right? That's how you calculate
19  it.
20        A. Correct.
21        Q. So in our $1,400 example, it's
22  $100?
23        A. Correct.
24        Q. So let's just do the math here. So
25  let's just say my Guarantee Pay is $1,400 for

Page 97

1  two weeks. 1/14th would be 100, right?
2        A. Correct. Yeah.
3        Q. Half would be, what, 700?
4        A. That's correct, yes.
5        Q. And that seems to be -- and over
6  here under UTU one day is 100 or what?
7        A. So if that's what -- if you notice
8  underneath the actual agreement name it says
9  Guarantee is bi-weekly, guarantee is weekly,
10  guarantee is bi-weekly.
11        Q. Oh, I see. Okay.
12        A. So I mean, it could be $100 if
13  their weekly guarantee is $700.
14        Q. So in our example their Guarantee
15  Pay is weekly, so it would be $700, so one day
16  would still be $100?
17        A. Correct.
18        Q. All right. And under UTU for where
19  it says "full weekly guarantee of lost work,"
20  that's you lose all $700 in our example?
21        A. Correct.
22        Q. Under UTU for Union, it says -- can
23  you explain this note to me? It says, "1 day
24  Tues thru Thurs if lost work, 1/2 --
25        A. Yes.

**ANTHONY SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Jennifer Gorneault on 10/27/2021                    Pages 98..101

1      Q.  What does that say?
2      A.  Yes.  So, what this is saying is if
3   I'm an Union official and I mark off Union
4   business, Tuesday, Wednesday or Thursday, and
5   I don't lose work, nothing happens, no
6   deduction to my Guarantee.  If I mark off one
7   day, Tuesday, Wednesday or Thursday and I do
8   lose work, then my Guarantee will be deducted
9   by one day.  Now, if I'm marking off Union
10  business on Friday, Saturday, Sunday or Monday
11  doesn't matter lost work or not, automatically
12  half of the bi-weekly Guarantee is deducted.
13     Q.  Okay.  So in our example that would
14  be $450, right?
15     A.  We put him on --
16     Q.  It's $700 for a week.
17     A.  It would be 700.
18     Q.  Oh, his would be 700.
19     A.  It would be 700.
20     Q.  So it would basically the whole
21  week.
22     A.  It would be the whole week, yeah.
23  We calculate the Guarantee weekly, but the
24  language says half of the bi-weekly Guarantee,
25  but yes, it would be the $700.

1      Q.  Now, I note that in the BLE
2   section, it indicates that in some
3   circumstances you lose more depending on when
4   the -- what would you call this category over
5   to the left, Demand Day Drop Turn, etc.,
6   markoff reason?
7      A.  A reason.
8      Q.  Markoff reason?
9      A.  Yes.
10     Q.  Okay.  So for some markoff reasons
11  if you mark off or you marked off Monday
12  through Thursday, you lose less than Friday
13  through Sunday, correct?
14     A.  That is correct.
15     Q.  And that would be true of Personal
16  Business and FMLA, right?
17     A.  Yes.
18     Q.  Also Weather and all of -- let's
19  see.  Weather, Miss Call -- so the only ones
20  really where you don't lose more would be
21  Demand, Drop Turn, Military and Union, right?
22     A.  That is correct.
23     Q.  Okay.  The Monday through Thursday
24  time frame, when does Monday start, when does
25  Thursday end?  Is that a midnight to midnight

1   scenario?
2      A.  That is correct, yes.
3      Q.  Okay.  So that starts -- so Monday
4   is what midnight Sunday, like in the middle of
5   the night Sunday to Monday?
6      A.  That is correct, yes.
7      Q.  All right.  So 12:00 a.m. Monday
8   through --
9      A.  What we call 2359.
10     Q.  2359 on Thursday?
11     A.  That is correct, yes.
12     Q.  Okay.  So as of 12:00 a.m. Friday
13  through midnight on Sunday, that's when you
14  would be assessed these higher penalties?
15     A.  If lost work, yes, for the FMLA.
16  And then for the ones that don't say it, yes.
17  Like, for instance, if you have a miss call on
18  the weekend, then yes, that's automatically
19  half of your Guarantee.
20     Q.  Okay.  Because you just didn't
21  bother to show up.
22     A.  Right.
23     Q.  Okay.  Do you have an understanding
24  as to why the company structures it -- why the
25  company negotiated it in that way?

1      A.  I do not.  I was not part of the
2   negotiations.
3      Q.  Okay.  You've not had an
4   understanding based on anything else, like,
5   conversation or documents?
6      A.  No.  We don't interpret the
7   agreement.  I have Labor Relations interpret
8   the agreement for me.
9      Q.  Okay.  So, let's see if there's
10  anything else I want to ask you about this.
11     Can we take a look at, Makala, the
12  responses to MSJ Interrogatories.  Let me see
13  what they're called.  So it would be Defendant
14  Response Interrogatories MSJ 8/26/20.  If you
15  could just scroll through, Makala, just you
16  know just enough so that you can identify --
17  just to confirm that you sort of recognize
18  this, Jennifer, and we'll get to the end.  And
19  if you need us to go back, we can.
20     A.  Okay.
21     Q.  You can go a little faster through
22  this part because I'm not going to ask her
23  about this part.  If you can get down to her
24  signature, which is the first signature.  Keep
25  going, keep going.  There, okay.

**ANTHONY SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Jennifer Gorneault on 10/27/2021                    Pages 102..105

Page 102

1      (EXHIBIT OO MARKED.)
2           So, do you recognize this document?
3  Have you seen this document before?
4      A.  Yes.
5      Q.  All right.  And is that your
6  signature that we're looking at right there?
7      A.  Yes, it is.
8      Q.  All right.  And you understand that
9  you -- can you scroll up a little bit so we
10 can see verification.  Okay.  And so you
11 verified Responses to Interrogatories Nos. 1
12 and 3 in this document, correct?
13     A.  Correct.
14     Q.  And you actually reviewed them
15 before you signed this, right?
16     A.  Correct.
17     Q.  Okay.  Let's go to the first chart
18 on page 4.  And we can reduce it maybe
19 a little bit.  If we reduce this to
20 100 percent, can you still read that?
21     A.  I can read it, yes.
22     Q.  Okay.  So is this a list of the
23 categories of paid or unpaid leave or time off
24 that BLE employees can take?
25     A.  Yes.

Page 103

1      Q.  All right.  And there are a couple
2  on here that weren't on the other document
3  that I just want to ask you about.
4      A.  Okay.
5      Q.  All right.  So we have Military,
6  Short-Term and Long-Term.  Can you explain the
7  difference between Military, Short-Term and
8  Long-Term?
9      A.  Absolutely.  So Military
10 Short-Term, it's usually things like weekend
11 duty, where they're only going to be off of
12 work with CSX for a few days or maybe a week.
13 Military Long-Term is usually something that's
14 going to be more than a week or two, more like
15 deployments.  So an employee in Military
16 Long-Term, they would not be considered active
17 at that time with CSX, so they would not be
18 assigned to an extra board guarantee at that
19 time.
20     Q.  Okay.  And then we have the three
21 sicks that we discussed already.  And then we
22 have hospitalization.  Is there a particular
23 code for hospitalization?  Why is that --
24 first of all, did you help make this chart?
25     A.  I do not believe I made this chart,

Page 104

1  no.
2      Q.  Okay.  Do you know where -- is
3  hospitalization a different code?  Why would
4  hospitalization be on this chart but not on
5  the Guarantee Deductions that we were looking
6  at before?
7      A.  I do not believe that there is a
8  specific hospitalization markoff.
9      Q.  So you don't know why -- do you
10 know why this is on this chart as a separate
11 category?
12     A.  I do not know why this is on the
13 chart as a separate category.  The employee
14 would be marked off sick still with Crew
15 Management and that's why I'm assuming it's
16 coded the same way with the chart, but I did
17 not add the Hospitalization to it.
18     Q.  Okay.  So you don't know why that's
19 a separate category, that's not something
20 you've heard of before?
21     A.  That is not something that we would
22 code differently.  It would not be come over
23 differently into the crew web date from Crew
24 Management.
25     Q.  Can you think of any reason why

Page 105

1  this would be a separate category on this
2  chart?
3      A.  No.
4      Q.  Okay.  So you don't now where that
5  came from?  You have no idea about where that
6  came from?
7      A.  No.
8      Q.  All right.  Okay.  And then can we
9  go to the next page.  All right.  Let's focus
10 on the other two unpaid leaves.  So we've got
11 Injury On Duty.  I guess same question as
12 Hospitalization.  Is that a separate code that
13 you're aware of, do you know where that's --
14     A.  There is a separate markoff code
15 for Injured On Duty.
16     Q.  Okay.  And what about Leave of
17 Absence, is there a markoff code for that?
18     A.  There is a separate Leave of
19 Absence -- there are several separate Leave of
20 Absence markoffs, yes.
21     Q.  Okay.  So there's various types?
22     A.  Yes.
23     Q.  Are any of them FMLA related?
24     A.  No.
25     Q.  And Injury On Duty, do you know

**ANTHONY SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Jennifer Gorneault on 10/27/2021
Pages 106..109

Page 106

1  what the code is for that?
2      A.  Not off the top of my head, no.
3  I'm sorry.
4      Q.  Okay.  And there's only one type of
5  code for that?
6      A.  Yes, there is.
7      Q.  Okay.  And then we have three paid
8  leaves, Vacation, Personal and Bereavement.
9  Are those markup codes that show up on --
10     A.  Yes, they are.
11     Q.  Okay.  So if someone takes a
12  personal day, that's different than personal
13  business?
14     A.  Correct.
15     Q.  Vacation or Bereavement, that will
16  be coded on the information that we already
17  looked at?
18     A.  Yes, that's correct.
19     Q.  Okay.  And they do not receive any
20  loss of Guarantee Pay for those types of --
21     A.  That is correct.  We do not deduct
22  the Guarantee for these compensated markoffs,
23  that is correct.
24     Q.  Okay.  And same for Jury Duty,
25  there is no Guarantee loss for Jury Duty?

Page 107

1      A.  Yes.  Correct.
2      Q.  If Jury Duty exceeds 60 days, are
3  they taken off the board?
4      A.  They would be taken off the board
5  by then, yes.
6      Q.  Okay.  God bless them.  That's
7  quite a Jury Duty, if that's the case.  And
8  the category that says Paid or Unpaid, do you
9  know whether or not any of these other types
10  of categories are paid or unpaid?  I mean, did
11  you -- or did that come from somewhere else,
12  or do you just know that?
13     A.  I mean, they are correct, but I
14  don't remember putting this together, but the
15  fields are correct.
16     Q.  Okay.  Can we take a look at page 3
17  at the bottom.  All right.  I'm looking at the
18  last paragraph here.  "Engineers, on other
19  than a scheduled rest day who miss a call, or
20  are unavailable to protect their turn."
21  Unavailable to protect their turn, does that
22  correspond with available, yes, in the
23  spreadsheet we were looking at?  What do they
24  mean by "unavailable to protect their turn"?
25     A.  That is a lost work record is what

Page 108

1  that means.
2      Q.  "Unavailable to protect your turn"
3  is a lost work?
4      A.  Yes.
5      Q.  Or does it also have to be combined
6  with missing a call?
7      A.  It is non-compensated markoff lost
8  work is what that equates to.
9      Q.  I guess what I'm trying to say it
10  says "if they miss a call or they're
11  unavailable to protect their turn," my
12  understanding from your previous testimony is
13  they have to be unavailable and miss a call?
14     A.  Yes.  I'm sorry.  Yes, it is a
15  combo, unavailable and -- yes, I'm sorry.
16  That is correct.
17     Q.  Okay.  All right.  But "unavailable
18  to protect their turn," that just means -- is
19  that just another way of saying unavailable?
20     A.  Yes.
21     Q.  The way we've been discussing it.
22  Because on that big spreadsheet we were
23  looking at it has a column that says
24  unavailable and then there's whys under the
25  column.

Page 109

1      A.  The unavailable to protect your
2  turn is the lost work record, meaning, your
3  turn was called, you were available to protect
4  it so now we have a lost work record.
5      Q.  Okay.  All right.  So let's go back
6  to 4169 real quick.  All right.  And let's
7  zoom in a little bit.  Under the Available
8  column, like fifth from the right, zoom in a
9  little bit.  Why don't you stop sharing and
10  I'll share it.  Okay.
11         So, here we've got this Available
12  column.  Does Y mean that they were available
13  to work and N mean they were unavailable to
14  work?
15     A.  So that Available column is more
16  for the high level Guarantee calculation of
17  the number of days available and the number of
18  days unavailable, so really as far as not
19  being available, that falls more on the, we
20  already know you're going to have two rest
21  days, so we are going to consider you
22  unavailable for those days.
23     Q.  Okay.  So this right here when you
24  say -- to make sure I understand what you're
25  saying.  When it says N here in the Available

**ANTHONY SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Jennifer Gorneault on 10/27/2021                Pages 110..113

Page 110

1  column, that just means that you're going to
2  get a rest day?
3       A.  That's -- well, the R2 means you're
4  going to make it a rest day.
5       Q.  Okay.
6       A.  So when we know that you're going
7  to be marked off the entire day for like a
8  rest day, that's when that Available column
9  will show N.
10      Q.  Are you ever marked off for less
11 than a day for rest?
12      A.  No.  Your rest day will be 24
13 hours.
14      Q.  Okay.  Midnight to midnight?
15      A.  Midnight to midnight.
16      Q.  Okay.  Don't get dizzy here, I'm
17 just going to look for more N's.  Okay.  All
18 right.  Got it.
19      A.  We wouldn't put an Y there for a
20 FMLA markoff because we don't know how long
21 you're going to be marked off.  So we're not
22 going to necessarily say, you will not be
23 unavailable that day.  It's only instances
24 where we know you will not be available, like
25 an assigned rest day.

Page 111

1       Q.  Okay.  But not pre-approved
2  vacation or anything like that, as far as you
3  know it's just rest days?
4       A.  Correct.
5       Q.  All right.  Can you put the
6  Interrogatories back up again, Makala, please.
7  All right.
8            So, but now would you agree that
9  there are -- are people considered available
10 or unavailable in any other context based on
11 the type of leave that they take?  Does
12 availability have any other meaning within
13 your --
14      A.  Not that column that we were
15 referring to, no.
16      Q.  Okay.  Outside of that column, can
17 people be considered unavailable in other
18 context based on marking off?
19      A.  What markoffs are you referring to?
20      Q.  Well --
21      A.  Because again, if you're on
22 vacation, we know you're not going to be
23 available to work so that would not be
24 considered -- anything that is unplanned
25 markoffs, let's say, right, FMLA, things like

Page 112

1  that, you know, we were expecting you to work
2  and that's when the lost work record occurs
3  and that's where the unavailable to protect
4  your turn comes in.
5       Q.  Okay.  Now, on this paragraph it
6  says, "The Guarantee is only reduced one time
7  for each 24-hour period."  And I think we
8  talked about, you know, how the first 24-hour
9  period commences with the first missed call,
10 so we looked at that in the spreadsheet.  And
11 then it says, "If the engineer marks up before
12 his turn is called in the second 24-hour
13 period, there is no additional reduction to
14 his guarantee."  Can you explain what that
15 means, please.
16      A.  Okay.  "Engineer marks up before
17 his turn," so what that can mean is he had a
18 loss work record on the first day, the first
19 24 hours so now we're going to have a
20 guarantee deduction for that.  The next 24
21 hours he marks up before his turn gets called
22 and does not have a loss work record,
23 therefor, there will not be deductions applied
24 for that second 24-hour period.
25      Q.  Okay.  So let's just say I mark off

Page 113

1  Monday for FMLA and I lose work because of it.
2  I get a deduction, right?  Yes?
3       A.  Yes.
4       Q.  Okay.  If I mark off at, you know,
5  11:59 for Tuesday for the whole day, I will
6  not lose work, so I do not get a deduction?
7       A.  As long as -- you have to be called
8  to work.
9       Q.  Okay.  Can you be called to work if
10 you are marked off?
11      A.  No.  So if you --
12      Q.  Okay.
13      A.  So it could be like you marked up
14 and then your turn doesn't get called for the
15 day so that could still be a consideration.
16      Q.  Okay.  So if I mark off on Monday
17 and I'm, you know, feeling poorly and I'm
18 still not feeling good on Tuesday, do I have
19 to mark off again or do I just stay marked
20 off?
21      A.  You would stay marked off.
22      Q.  Okay.  And can I in that scenario
23 lose work more than one time?
24      A.  You could, yes.
25      Q.  Okay.  And in that case, I would

**ANTHONY SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Jennifer Gorneault on 10/27/2021                    Pages 114..117

Page 114

1  get another deduction?
2      A.  Yes, you could.
3      Q.  Because really -- so it sounds to
4  me like if you mark off, you're still on the
5  board?
6      A.  Correct.  You're still assigned to
7  that position.
8      Q.  And you continue to move up until
9  you get called and if you still stay on FMLA
10  leave or bereavement or whatever it is, you
11  miss work and then you go back to the bottom
12  and then it's possible if work permits and
13  you're still off, that you can make it to the
14  top again?
15      A.  Correct.
16      Q.  And lose more guarantee pay in that
17  two-week period?
18      A.  Correct.  Yes.
19      Q.  Okay.  And then it continues,
20  "Engineers are not considered unavailable to
21  protect their turn for guarantee purposes when
22  marked off for any reason for which they
23  receive compensation."  Okay.  You would agree
24  with that statement?  I think you said
25  something similar earlier.

Page 115

1      A.  Yes, I agree with that statement.
2      Q.  All right.  And vacation is
3  considered an entitlement, right?
4      A.  That is correct, yes.
5      Q.  As is -- is a personal leave day an
6  entitlement?
7      A.  Yes, it is.
8      Q.  Is bereavement leave an
9  entitlement?
10      A.  Yes, it is.
11      Q.  Is Jury Duty an entitlement?
12      A.  Yes, it is.
13      Q.  Okay.
14          MS. TUCK:  Let's see, what time is
15  it? It's 1:00.  I think now is a good time for
16  me to take a little break and get something to
17  eat, hopefully you all agree.  Are you fine
18  with that, Jennifer?
19          THE WITNESS:  Yes, I am.
20          MS. TUCK:  Okay.  I don't need very
21  long.  Is 1:30 okay with everybody?
22          THE WITNESS:  That's fine with me.
23          MR. CHIAVETTA:  Sounds good.
24          MS. TUCK:  All right.  We'll meet
25  back here at 1:30.  Thank you.

Page 116

1          (Luncheon recess taken.)
2          MS. TUCK:  All right.  So let's go
3  back on the record.  I want to back up over a
4  couple of things.  Makala, can you put the
5  Interrogatories back up, that same page number
6  3.
7      Q.  (By Ms. Tuck) So we talked about
8  this paragraph.  Now, the sentence that begins
9  "The first 24-hour period commences with the
10  first missed call," do you see that?
11      A.  Yes.
12      Q.  Okay.  So beginning with "The first
13  24-hour period commences with the first missed
14  call," and ending with the sentence "Engineers
15  are no considered -- well, let's just break it
16  down.  That first sentence, is that true of
17  non-grandfathered UTU employees?  I know the
18  deduction might be different, but is that
19  statement true for UTU?
20      A.  UTU?
21      Q.  Yeah, non Conrail.
22      A.  So, missed call, I mean, yes, for
23  UTU.
24      Q.  Conductors?
25      A.  Yes.  That's why I'm getting

Page 117

1  confused, so yes, this would be the BLE.
2      Q.  Okay.  I see.  All right.  So is
3  that true also for conductors under UTU?
4      A.  Any unavailability on their part is
5  a deduction of one day on the UTU side.
6      Q.  Right, I understand that.  But
7  under UTU, is that statement true, let's
8  assume we're talking about a UTU employee,
9  "The first 24-hour period commences with the
10  first missed call," is that true for UTU?
11      A.  That is true.
12      Q.  Okay.  And then the second
13  sentence, "If the engineer marks up," let's
14  just change that to conductor, if that was for
15  a conductor under UTU, would that statement
16  also be true?
17      A.  That is true.  The UTU language
18  basically says, "any part of the day that they
19  are unavailable will result in a one-day
20  deduction."
21      Q.  Okay.  So that statement is true as
22  well for conductors under UTU, right?
23      A.  Yes.  Yes.
24      Q.  They're just not engineers, right?
25      A.  Correct.

**ANTHONY SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Jennifer Gorneault on 10/27/2021                    Pages 118..121

Page 118

1    Q.  And then the third sentence,
2    "Engineers are not considered unavailable to
3    protect their turn for guarantee purposes when
4    marked off for any reason for which they
5    receive compensation," is that also true for
6    conductors under UTU?
7        A.  No.
8        Q.  Okay.  What is different?
9        A.  So any markoff, whether compensated
10   for or not, whether they request to have
11   compensation for that, they are still
12   considered unavailable and have a one-day
13   deduction.
14       Q.  Okay.  So they would be in the same
15   boat as BLE engineers, who choose to not be
16   compensated?
17       A.  Yes.
18       Q.  Okay.  So I am an engineer, I don't
19   take a personal day for the purposes of being
20   considered available?
21       A.  That is correct.
22       Q.  Same for conductors under UTU?
23       A.  That is correct, yes.
24       Q.  All right.  Thank you.  We also
25   looked at -- you can stop sharing.  We also

Page 119

1    looked at that -- the Employee Extraboard
2    Guarantee View.  I don't think we have to pull
3    it back up, but that's the document that you
4    e-mailed to Tom earlier today.
5        A.  Yes.
6        Q.  Do UTU employees see the same
7    information?
8        A.  Yes.  All T&E employees who have
9    been assigned to an extra board, since we've
10   had this Crew Web Guarantee System in place in
11   2014, they can log in any time and pull up the
12   pay period that they were assigned to the
13   extra board and see the details.
14       Q.  Okay.  So this document is
15   available to all T&E employees?
16       A.  That is correct, yes.
17       Q.  All right.  Can we go back to the
18   Business Rule Report.  And Sandra, it's this
19   looking thing without my notes on it.  Can we
20   go back to that as a view?
21           I want to ask you about some of
22   these codes.  Let's talk about this first
23   under Project Guarantee Rules and then there's
24   a category that says Guarantee Availability.
25   Are these logic rules that result in someone

Page 120

1    being marked as a Y on that spreadsheet that
2    we were looking at?
3        A.  Yes.
4        Q.  Okay.  So these had to do with rest
5    days available for rest or not available?
6        A.  Yes, that is correct.  Yes.
7        Q.  Okay.  All right.  So that's
8    Guarantee Availability.  All right.  Stop.
9    Now we have Guarantee Earnings.  Are these
10   rules that logic results that result in
11   someone earning guarantee pay?  Describe to me
12   this subset called Guarantee Earnings, what do
13   these rules generally --
14       A.  Can we go to that section the
15   details and I can review it better?
16       Q.  The details talk about all of them.
17       A.  Yeah, these first few pages are
18   just the summary.  I know this looks very
19   cryptic.
20       Q.  Yeah.  Sure.  Hold on.  Let me see
21   if I can find out what page that's on.
22       A.  Okay.  I just saw earnings.  That
23   is one of them because it has the earnings at
24   the beginning of it, but that is Conrail UTU.
25   But this is referring to -- yeah, so this is

Page 121

1    referring to busted call and how that will
2    impact their guarantee.
3        Q.  All right.  So the category of
4    Guarantee Earnings, are you able to tell me
5    what that means when you see earnings, what
6    does that mean?
7        A.  So, this is -- so what the earnings
8    sections are saying are really about are
9    determining whether are the earnings for the
10   day under these codes for these assignments
11   are they chargeable against the guarantee,
12   meaning can they offset the guarantee to be
13   paid.
14       Q.  Okay.  So like personal leave, this
15   rule determines whether or not you can offset
16   personal leave against the guarantee?
17       A.  Correct.
18       Q.  All right.  Cool.  Can we go back
19   to the top of the second page, Makala.  All
20   the way back to the beginning.
21           And then we have Guarantee
22   Penalties.  So, Are these logic rules that
23   determine whether or not somebody is penalized
24   from their guarantee pay as reflected in the
25   Penalty Reduction column that we were looking

**ANTHONY SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Jennifer Gorneault on 10/27/2021                    Pages 122..125

Page 122

1  at for Mr. Schobert?
2      A.  Yes, that is correct.
3      Q.  So we see a number of BLE logic
4  here, right?
5      A.  Yes.
6      Q.  Okay.  Keep going down.  And then
7  keep going, next page.  And then we have ERB
8  Layoff, what does ERB mean?
9      A.  ERB was -- os related to Covid last
10  year, a special agreement that we did with the
11  UTU.  Emergency Reserve Board, it's not
12  related to this by any means.
13      Q.  Okay.  And then Layoff All.  Now,
14  is that a rule that would apply to all T&E
15  employees?
16      A.  So within the layoff rules, this
17  would have your non-compensated layoff,
18  compensated layoff.  So the rules around the
19  BLE layoffs would be I believe in this
20  section.
21      Q.  When it says Layoff All, that
22  applies to all T&E employees, right?  See how
23  it says Layoff_All?
24      A.  It could be -- not necessarily
25  because if you look down a little bit, it says

Page 123

1  Layoff All Company Required BLE Available.
2      Q.  I see.  Okay.  So if it doesn't
3  indicate a particular union, then it applies
4  to all T&E employees?
5      A.  I cannot say that for sure by just
6  by reading the summary.  I'd have to actually
7  look at the details of the logic.
8      Q.  Would you have to look at the
9  details of the logic for all of them to do
10  that?
11      A.  I'd have to look at them to see if
12  it's board specific.  If it lists out, for
13  instance, only BLE boards or only UTU boards,
14  that's where I'd have to review each one.  I
15  can't say for certain just by looking at the
16  summary.
17      Q.  Okay.  But if it says BLE, then we
18  know it's specific to BLE?
19      A.  Yes, that is correct.
20      Q.  And if it says, what about
21  Layoff_BO, would that refer to a UTU board?
22      A.  Yes, that is correct.
23      Q.  Okay.  And then would Layoff_CR be
24  for Conrail?
25      A.  Yes, it would be for Conrail.

Page 124

1      Q.  So those are the grandfathered
2  people we were talking about?
3      A.  Yes.  Yes.
4      Q.  Okay.  And then CSRE, that would be
5  UTU sub?
6      A.  That is correct, yes.
7      Q.  Okay.  But if none of those rules
8  -- if the rules don't have any of those Union
9  specific terms, you would have to look at the
10  actual rule to know whether or not it was
11  specific to a Union, am I understanding you
12  correctly?
13      A.  Yes, that's correct.  This is
14  simply a description in the summary, so I'd
15  have to look at the details to know for sure.
16      Q.  Okay.  All right.  I'm going to
17  save this for later.  Can we go back to 1469
18  -- or actually, that's one that I shared so
19  why don't you stop, Makala, and I'll go get
20  it.  That's fine.  I have to decide what I
21  want to do, right.
22          Okay.  Now, we've talked about this
23  spreadsheet quite a bit.  This is, I think,
24  MM, Mary, Mary.  Does the same type of
25  information appear regardless of whether

Page 125

1  you're looking up a BLE or a UTU person?
2      A.  Yes.
3      Q.  Okay.  And I know that the values
4  might be different?
5      A.  Correct.
6      Q.  But the same types of information
7  --
8      A.  Yes, that is correct.
9      Q.  -- are -- okay.  Is there any
10  difference for a UTU person with respect to
11  any of the dates and times -- we were talking
12  about sort of 24 hours and how you calculate
13  these things, are those -- the timelines of
14  how things are calculated, are those the same
15  for UTU employees?  So is it the same Saturday
16  to Saturday time frame?
17      A.  Yes, it is.  That was -- yes, all
18  that would be the same.  Uh-huh.
19      Q.  Okay.  And Action Reasons, are
20  those the same for UTU employees?
21      A.  Yes, it would be.  So the Action
22  Reason, the Status, the Reason Code, those all
23  come from the Crew Management System for both
24  engineers and conductors.
25      Q.  Okay.  And the Crew Management

**ANTHONY SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Jennifer Gorneault on 10/27/2021                    Pages 126..129

Page 126

1  System, that is for all T&E employees
2  regardless of Union?
3       A.  That is correct, yes.
4       Q.  Okay.  So when we're talking about
5  how Crew Management System operates, that's
6  the same regardless of what Union you're in?
7       A.  Correct.
8       Q.  All right.  Okay.  All right.  Let
9  me stop sharing.  Makala, can you pull up
10 1258.
11          (EXHIBIT PP MARKED.)
12          Okay.  Have you ever seen a
13 spreadsheet like this before?
14      A.  Yes.
15      Q.  Okay.  What system is this coming
16 from?
17      A.  This is coming from -- this is
18 payroll data that is being pulled out of the
19 data warehouse.
20      Q.  I'm sorry, can you repeat that,
21 please?
22      A.  Sure.  So this is T&E payroll data
23 that does come from the mainframe.  The data
24 for longer term, you know, it gets stored in
25 the data warehouse so I can tell from looking

Page 127

1  at this that this data came from the payroll
2  data warehouse.
3       Q.  Okay.  So this would be the --
4  correct me if I'm misstating this.  The big
5  spreadsheet that we were looking at just now,
6  this is essentially the archived version of
7  that data?
8       A.  This is all payroll data.  The
9  other spreadsheet that we were looking at
10 before was just related to their time on the
11 guarantee extra board, and basically using
12 their work history to determine availability.
13 Where this is simply just the pay records for
14 that employee during this time frame.
15      Q.  Okay.  So is there any information
16 related to guarantee pay and how it's
17 calculated or paid on this?
18      A.  The pay record --
19      Q.  That would not appear on the
20 spreadsheet that we saw?
21      A.  No.  The spreadsheet prior had the
22 day-for-day details that calculated the
23 guarantee and then the payment actually gets
24 created under Payroll Code 57 in this data.
25      Q.  Where is payroll code in this

Page 128

1  report?
2       A.  So on the screen that we were
3  looking at, it's the second to last column,
4  it's your Constructive Code.
5       Q.  Are you talking about the original
6  spreadsheet, the big spreadsheet?
7       A.  The one we are looking at right
8  now, yes.
9       Q.  What I'm asking, is there anything
10 on the one that we are looking at now that
11 relates to guarantee pay that is not on MM,
12 the one that we've been mostly looking at?
13      A.  No, there is not.
14      Q.  Okay.  So this does not add
15 anything to our understanding of guarantee
16 pay, how it is calculated or paid, correct?
17      A.  Correct.
18      Q.  Okay.  Give me just a moment,
19 please.
20          Now I'm going to take you through
21 some portions of the Collective Bargaining
22 Agreements for the two Unions that we've been
23 talking about and their Guarantee Pay
24 Provisions.  Let's see if there's anything
25 that you can do to explain some of that.

Page 129

1          Can you share 204 to 451 BLE
2  Agreement, Makala, please.
3          (EXHIBIT QQ MARKED.)
4       Q.  I think you said you have access to
5  this agreement.  Do you recognize this
6  document?
7       A.  Yes.
8       Q.  Okay.  And scroll down to the
9  bottom of this page, please, Makala.  Okay.
10 Just so you know, the number at the bottom of
11 this, the CSXT and there's a number, that
12 indicates to you that CSX produced this
13 document, so to the extent that you need any
14 reassurance that this is in fact what it is
15 and it's complete, that's where we got it.
16 So the date on this is Codified February 2016.
17          Is this the Collective Bargaining
18 Agreement that is still in place today?
19      A.  Yes.
20      Q.  Okay.  And I understand that it's
21 amended from time to time, but this is the
22 CBA?
23      A.  That is correct, yes.
24      Q.  Okay.  Now, do you recall when the
25 last time UTU had a new contract, was that

**ANTHONY SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Jennifer Gorneault on 10/27/2021                 Pages 130..133

Page 130

```
1   recent?
2        A.  No.  Unfortunately, not.  The last
3   agreement that we really had on the UTU side
4   for especially the northern employees here was
5   the merging of the B&O and the Conrail in
6   2011.
7        Q.  Okay.  Makala, can you pull up
8   CSX28935 real quick.  We're going to come back
9   to this.  Now, this is also was produced to us
10  by CSX as a Collective Bargaining Agreement
11  that governs guarantee pay.
12           (EXHIBIT RR MARKED.)
13           Is this agreement just for the
14  Southern Region that you were talking about
15  earlier?
16       A.  Yes.  Yes, it is.
17       Q.  Okay.  I think I asked you this
18  question already, but for UTU Northern
19  employees, if they are compensated for a
20  markoff, their Guarantee Pay is not penalized,
21  correct?
22       A.  If they are compensated.
23       Q.  Right.  So if for some reason they
24  get compensation for that day, then they are
25  not personalized, just like the other Union
```

Page 131

```
1   folks?
2        A.  Correct.
3        Q.  That's true across the board, if
4   you're getting compensated in another way, you
5   don't get penalized on your Guarantee Pay,
6   right?
7        A.  Correct.  Correct.
8        Q.  Okay.  What kinds of paid leave do
9   UTU employees have?
10       A.  Paid leave is actually the same as
11  BLE, as far as they do have the vacation.
12       Q.  Okay.
13       A.  They have Personal Leave days and
14  they do -- they are able to be compensated for
15  jury duty and bereavement leave as well.
16       Q.  Okay.  So with respect to whether
17  somebody is able to use paid leave -- do you
18  know whether UTU employees are able to use any
19  kind of paid leave for FMLA?
20       A.  Yes.  All T&E employees are able to
21  use personal leave days or vacation days for
22  FMLA markoff.
23       Q.  So to that extent BLE and UTU,
24  regardless of north or south, they're all in
25  the same boat, right?
```

Page 132

```
1        A.  Yes.
2        Q.  Okay.  Now, so would we then need
3   to look at the Collective Bargaining
4   Agreements for the B&O then northern employees
5   to determine how FMLA leave -- how the
6   Collective Bargaining Agreement governs
7   Guarantee Pay and FMLA leave, do we need that
8   agreement?
9        A.  If we are going to review northern
10  territory employees, yes.
11           MS. TUCK:  Tom, I don't believe
12  we've been provided with that.  Does that ring
13  a bell?
14           MR. CHIAVETTA:  No, that's not
15  correct.  That was part of our initial
16  document production, I believe.
17           MS. TUCK:  Well, I have the
18  southern.
19           MR. CHIAVETTA:  It's not going to
20  say northern.  Jennifer can correct me, but I
21  don't believe it says northern region on it.
22  I think it say Former B&O.
23           THE WITNESS:  Correct.
24           MS. TUCK:  Okay.  Well, we can go
25  back and look at that.  So let's take a look
```

Page 133

```
1   at the Table of Contents here -- or the Index.
2   Page III.  Oh, I'm sorry.  Let's go back to
3   BLE.  Sorry.  BLE.  There we go.  That was
4   quick.  Go down to III, so it's the third
5   page.  Keep going.  You're right.
6           Article 82 indicates Guarantee
7   Extra Boards, so that's how the guarantee
8   extra boards is set forth?
9        A.  Correct.
10       Q.  Okay.  Can you get to that page
11  Makala, please.  Okay.  So in Article 82 A
12  they're talking guarantee and managed on a
13  bi-weekly basis, that bi-weekly basis, we've
14  already discussed that, right?
15       A.  Right.
16       Q.  And how that's calculated.  Okay.
17  Paragraph 4, does that explain how rest days
18  are administered in terms of -- when we were
19  talking about whether somebody is available or
20  not because of a rest day, does this describe
21  how the rest days work in that system?
22       A.  Yes.
23       Q.  Okay.  Now, it says, "Note 2:
24  special circumstances may apply at certain
25  locations on a specific day of the week the
```

**ANTHONY SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Jennifer Gorneault on 10/27/2021                    Pages 134..137

Page 134

1  parties will cooperate and make arrangements
2  to handle the needs of service on such days."
3  Do you have an understanding of as to how that
4  operates with rest days?
5          A.  That part is really managed with
6  the Crew Management System, but as long as
7  they're still marking them off for the rest
8  days, it will still be handled accordingly
9  with the Guarantee Extra Board.
10         Q.  Okay.  All right.  Can you go down
11 to page 130, paragraph B.  Does paragraph B
12 indicate that the guarantee rates are
13 increased if wages or cost of living increases
14 are applied to regular earnings; am I
15 interpreting that correctly?
16         A.  Yes.  Yes.
17         Q.  Okay.  And then on page 131 A-1 --
18 or Q-1.  It's talking about "all earnings
19 (exclusive of penalty time claims) will be
20 included when making the adjustments."  So the
21 penalty time claims, is that what you were
22 referring to in terms of claims -- or what is
23 meant by penalty time claims here?
24         A.  That is correct.  So that goes back
25 to when an employee is assigned to a job and

Page 135

1  we ask them to do something that is not in
2  accordance with their regular terms of that
3  job, so we're ultimately violating their
4  agreement, they will submit penalty claims on
5  top of their working time.  And so if these
6  codes are deemed penalty-type codes, that are
7  not held against the guarantee, so they do not
8  even get pulled into the guarantee extra board
9  system to count as earnings.
10         Q.  Okay.  So if you're getting
11 reimbursed for a violation of the Collective
12 Bargaining Agreement, that does not count as
13 earnings that are offset against the guarantee
14 pay?
15         A.  Correct.
16         Q.  Is that another way of saying that?
17         A.  Correct.
18         Q.  Okay.  Can you go to page 14 at the
19 top paragraph 3.  Sorry, page 16.  Okay.
20 Looking at paragraph 3, are you able to
21 interpret that paragraph for me.
22         A.  Let me read it really quick here.
23 Okay.  So this paragraph is referring to days
24 available on the board where they do not
25 receive compensation.  What we actually do at

Page 136

1  the end of the year for those employees who
2  did not meet the number of qualifying days to
3  be eligible for next year's entitlements, we
4  actually perform an audit.  So if they were
5  assigned to the extra board guarantees during
6  the year, we will compare the guarantee
7  payments, right, what we paid them for these
8  bi-weeklys and the days available and we will
9  provide them additional vacation qualifying
10 days to hopefully qualify for next year's
11 vacation and personal leave days.
12         Q.  Okay.  So it sounds to me like a
13 BLE employee can train and -- BLE can earn
14 extra vacation days in some way?
15         A.  So, for instance, if they're
16 working jobs that are high-earning jobs while
17 on the extra board guarantee and make more
18 than their guarantee, there's still a
19 possibility of having available days that they
20 didn't get credit for as far as vacation
21 qualifying goes, so to speak.  We will do an
22 offset of what based on they earned on the
23 extra board guarantee and available days and
24 give them additional days towards their
25 vacation qualifying time.

Page 137

1          Q.  Okay.  So the more someone is
2  available, the more likely it is they will
3  receive those extra vacation days?
4          A.  That is correct, yes.
5          Q.  And you said that's an end of the
6  year calculation?
7          A.  Yes.  We perform that audit
8  internally here in payroll.
9          Q.  And how does the employee receive
10 the -- doe the employee receive the extra
11 vacation days at the beginning of the calendar
12 year or how does that happen?
13         A.  Yes.  We usually have the audit
14 performed and have it completed by mid
15 January, is our plan.  That way they can use
16 those entitlements, if we're able to give them
17 enough to actually earn vacation and personal
18 leave, yes.
19         Q.  Is that in the Collective
20 Bargaining Agreement somewhere, that
21 calculation or the fact that you can get that
22 back?  Is that what this is talking about it,
23 this is saying --
24         A.  Yes.
25         Q.  Okay.  So that's what this says.

**ANTHONY SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Jennifer Gorneault on 10/27/2021                    Pages 138..141

Page 138

1  And is it a straight calculation, day for day?
2       A.  So this part of it where we add on
3  is straight day for day available days that
4  offset their vacation qualifying calculation.
5  Unfortunately nothing is ever easy with T&E,
6  it seems like sometimes.  There are rules
7  multipliers that are used to normally
8  calculate their vacation qualifying time.  So
9  it's normally their compensated miles that we
10 convert and apply a multiplier to.
11      Q.  Okay.  So, you're using the term
12 vacation qualifying calculation.  Can I
13 understand that to mean that they -- so
14 engineers just don't have a set number of
15 vacation days per year, they have to sort of
16 earn it in some way?
17      A.  They have to earn their time, yeah,
18 they have to earn their time for the next
19 year's entitlements.  So, basically the magic
20 number is 234 days.  An employee has to earn
21 234 qualifying days in 2021 to be eligible for
22 2022 vacation and personal leave days.
23      Q.  Okay.  Is it prorated based on how
24 many qualifying days they have or is it just,
25 you know, you get two weeks kind of thing?

Page 139

1       A.  Right.  So if you do qualify,
2  right, the first step is if you do actually
3  hit the 234 or more, then it says okay you are
4  entitled.  So now we go back to the chart
5  that's actually within this agreement that
6  says, based on your years service, you will
7  have X number of vacation weeks and X number
8  of PL days.
9       Q.  Okay.  And is a qualifying days a
10 day on which you are -- if you're taking FMLA
11 leave, is that a qualifying day?
12      MR. CHIAVETTA:  Hold on, Jennifer.
13 I just enter an objection.  Just a standing
14 objection to the vacation qualification
15 questions.  It's outside the scope of the
16 30(b)(6) deposition, but with that, Jennifer,
17 you can answer.
18      A.  Okay.  So repeat the question,
19 again.  Sorry.
20      Q.  Sure.  Yeah.  Okay.  You said
21 qualifying days, what determines whether a day
22 is qualifying or not?
23      A.  Okay.  So it's really based off of
24 compensated pay, so for instance, if an
25 employee were to mark off FMLA for the

Page 140

1  purposes of the normal calculation of vacation
2  qualifying, it would not be included.
3  However, if when we go back to do the audit of
4  the guarantee time and we see that there is no
5  lost work and they remained technically
6  available, so to speak, we well give them days
7  for that extra board time.  But while they are
8  marked off FMLA and that would not be
9  considered vacation qualifying time.
10      Q.  Okay.  So the two exceptions to --
11 all right.  So FMLA can be -- a FMLA day can
12 be a qualifying day if A, they were
13 compensated, right?
14      A.  Correct.
15      Q.  Or B, they didn't lose any work?
16      A.  Correct.
17      Q.  Okay.  Now, is that true for the
18 other kinds of unpaid leave as well, so for
19 instance, for say a demand day, is that a
20 qualifying day?
21      A.  A demand day is not a qualifying
22 day for vacation.
23      Q.  Okay.  What about a drop turn?
24      A.  A drop turn would not be either.
25      Q.  Personal business?

Page 141

1       A.  Personal business would not be
2  considered, no.
3       Q.  Okay.  So does it generally follow
4  the rule that as long as you got -- if you get
5  paid, it's a qualifying day?
6       A.  Correct.  Yes.
7       Q.  Okay.  And the lost work -- the no
8  lost work requirement, is that applicable to
9  the other kinds of leave or is that specific
10 to FMLA?  So for instance, if I mark off on
11 Personal business and I don't get called up
12 before I mark back up, is that a qualifying
13 day?
14      A.  We -- depending on how long they're
15 marked off, we could consider that as a
16 qualifying day, yes.
17      Q.  Okay.  So that's similar to FMLA,
18 in that if I'm not loosing work.
19      A.  Yes.
20      Q.  Even though I'm uncompensated, it's
21 a qualifying day?
22      A.  Yes, that is correct.
23      Q.  Okay.  Let's see, military, is that
24 a qualifying day?
25      A.  Yes, it can be.

**ANTHONY SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Jennifer Gorneault on 10/27/2021      Pages 142..145

Page 142

1      Q. Okay. What would determine whether
2 they're paid or not?
3      A. Well, I'll back up. Military is a
4 little bit different, too, because a lot of
5 times when they are off military, we'll get
6 their DD2 14 Orders, so that normally will
7 already count towards their vacation
8 qualifying days.
9      Q. Okay. We won't pick on military.
10 Union, is that a qualifying day?
11      A. Marking off Union business, yes, we
12 could consider that a day.
13      Q. Okay. Even if they lose work?
14      A. If they lose work, no.
15      Q. Okay. So that's like FMLA as well?
16      A. Right. Normally we do not have to
17 perform audits on the local chair. Most of
18 the time they qualify without us having to do
19 the additional audit.
20      Q. Okay. And weather, is that a
21 qualifying day if they do not lose work?
22      A. If they do not lose work, yes.
23      Q. Okay. But if they do, it is not a
24 qualifying day?
25      A. Correct.

Page 143

1      Q. Okay. Miss call, is that ever a
2 qualifying day?
3      A. Missed call would not be a
4 qualifying day, no.
5      Q. Because we at least want people to
6 tell you what's happened?
7      A. Exactly.
8      Q. Theoretically.
9      A. That's right.
10      Q. Okay. Sick, sick and family, sick,
11 doctor's appointment, in the hospital, is that
12 qualifying if they don't lose work?
13      A. That would not be qualifying,
14 marking off sick.
15      Q. Those are never qualifying, even if
16 you don't lose work?
17      A. Correct.
18      Q. Okay. And so for those types of
19 time off, are there similar provisions in the
20 Collective Bargaining Agreement to the one we
21 just looked at for Vacation that explains what
22 we just sort of went through, so you know,
23 somewhere in this Collective Bargaining
24 Agreement it says that if you're off on Union
25 leave and you don't lose work, it's an

Page 144

1 available day?
2      A. No, that's not spelled out in the
3 Collective Bargaining Agreement under the
4 Vacation day qualifying.
5      Q. Is there anyplace where that these
6 qualifying days is spelled out to sort of this
7 is qualifying, this is not, or is that the
8 logic you're talking about?
9      A. For this part of it, it's more of a
10 manual review, where we're trying to help an
11 employee get there if they have not already
12 hit that 234 qualifying day number on their
13 own.
14      Q. Is it a payroll function to
15 determine -- is it a function in your
16 department to determine whether something is a
17 qualifying day for vacation?
18      A. It is not determined by us, but it
19 is managed by us. Labor Relations determines
20 whether certain pay codes, pay elements are
21 considered for vacation qualifying. We apply
22 that logic.
23      Q. Okay. To come up with the number
24 of qualifying days, right?
25      A. Correct, yes.

Page 145

1      Q. And then the audit is a second
2 level to that?
3      A. Correct. So if the employees are
4 close and they have not quite gotten there, we
5 will perform manual audits to help them out.
6      Q. But if it's a clear-cut case,
7 there's no audit?
8      A. There's no audit, that's right.
9      Q. Okay. All right. Do you know what
10 a PLD is?
11      A. That's the Personal Leave Day
12 entitlement.
13      Q. Okay. Let's go to page 26 at the
14 bottom. It says Q-7, "May an engineer who is
15 otherwise unavailable for service (i.e.,
16 marked off sick, sickness in family, weather,
17 etc.) utilize a personal leave day for
18 guarantee purposes." First of all, when it
19 says unavailable for service, is that the same
20 type of availability that we've been
21 discussing in that spreadsheet where -- what
22 does that mean, unavailable for service?
23      A. That is what we've been talking
24 about, yes.
25      Q. Okay. So when you say unavailable,

**ANTHONY SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Jennifer Gorneault on 10/27/2021                    Pages 146..149

Page 146

1  that just means you're not on a rest day,
2  right?
3       A.  Correct, yes.
4       Q.  For this question?
5       A.  Yes.
6       Q.  And that would also include FMLA,
7  right, unavailable for service?
8       A.  Yes.
9       Q.  Okay.
10      A.  It would be, but not in this
11  perspective, honestly.
12      Q.  You mean in this context it would
13  not be --
14      A.  In this context, it would not,
15  right.
16      Q.  Okay.  Is that because -- why do
17  you say that?
18      A.  Because actually, we received
19  information from the Federal Government before
20  that we should allow the employees to request
21  to use an entitlement for the FMLA markoff
22  day.  That was years ago and that's what we
23  have applied.
24      Q.  Okay.  So when it says yes, however
25  the day must be approved by the engineer's

Page 147

1  local supervisor, I think what, correct me if
2  I'm misstating what you mean by this, but are
3  you saying that they don't have to ask for
4  permission as this answer indicates, they can
5  just take it?
6       A.  That is correct.
7       Q.  Okay.
8       A.  We don't require them to go through
9  the supervisor for the FMLA, yes.  Those come
10  straight to us.
11      Q.  Okay.  All right.
12      A.  Thank you for restating.  Thank
13  you.  You said it much better.
14      Q.  Okay.  But if it's just a regular
15  personal day, you have to get it approved by
16  your supervisor?
17      A.  Correct if it was not already
18  scheduled prior to this, that's why where it's
19  saying if approved it will not count against
20  the caps meaning our limitation on how many
21  employees can be off that day.
22      Q.  Oh that's caps in terms of how many
23  people you need not caps the disciplinary
24  system?
25      A.  Correct.

Page 148

1       Q.  Or I should say the attendance
2  system?
3       A.  Correct yes.
4       Q.  All right.  That's another question
5  that I had.  Okay.  Can you go to page 28, at
6  the bottom.  So I'm looking at D.  It talks
7  about daily, weekly or monthly guarantees.  Is
8  that guarantee pay or is that a different kind
9  of guarantee?
10      A.  Let me read this paragraph really
11  quick to make sure I'm on the right page.
12      Q.  Sure.
13      A.  Yes.  That would be considered
14  here.  That would be considered for our
15  guarantee purposes.
16      Q.  Okay.  Did --
17      A.  So what that is saying is -- go
18  ahead.  I'm sorry.
19      Q.  Yeah, go ahead.
20      A.  What that is saying is that if an
21  employee does not work that day because it
22  falls on a holiday and he is paid what we call
23  like the holiday gift from his bank of
24  entitlements, the PL days, then that holiday
25  gift payment will not be counted against his

Page 149

1  extra board guarantee earnings.
2       Q.  So it's some kind of special, you
3  know, thing where if you work on a holiday,
4  you get extra pay?
5       A.  Yes.
6       Q.  And that extra pay does not offset
7  your guarantee pay?
8       A.  That holiday -- it's the --
9       Q.  You said gift?
10      A.  It's the gift, yes.  So it's
11  basically -- the holiday gift can be submitted
12  by the employee as a claim and it will pull
13  from their personal leave day entitlements and
14  so the guarantee program is programmed to say,
15  okay, if an employee is paid this holiday
16  gift, do not pull this in as part of his
17  earnings to offset the guarantee.
18      Q.  Okay.  So in this case, they get
19  the gift and the guarantee?
20      A.  Yes, that is correct.
21      Q.  Is the holiday gift set forth
22  somewhere in this agreement, that provision?
23  Is that a CBA thing; if you know?
24      A.  Yes, it is.
25      Q.  Okay.

**ANTHONY SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Jennifer Gorneault on 10/27/2021                    Pages 150..153

Page 150

1      A.   So you do have to qualify for the
2  holiday.  You have to work an assignment that
3  is eligible for it and you have to have the
4  correct available work time leading up to,
5  during and after the holiday itself.
6      Q.   Okay.
7      A.   So you can't work off sick on the
8  holiday and get the holiday gift.  You did not
9  remain available.
10     Q.   Okay.  Is there any type of markoff
11 that you can have where you still get that
12 holiday gift or do you have to work on the
13 holiday?
14     A.   You have to --
15          MR. CHIAVETTA:  Jennifer, hold on.
16 I just need to put another objection to the
17 scope -- I think this is outside the scope of
18 36(b) notice with respect to holiday pay, so
19 just a standing objection.  With that, you can
20 go ahead and answer.
21     A.   So for holiday gift eligibility,
22 you have to remain available, not mark off or
23 work the day preceding, day of, day after.
24 And that is spelled out in this CBA.
25     Q.   Okay.  So I can't take vacation and

Page 151

1  get my holiday pay?
2      A.   Vacation is already scheduled prior
3  to this and it's considered a neutral day, so
4  we would back up prior to that vacation day to
5  see what you did before that.
6      Q.   So there's a circumstance where I
7  could take a vacation day on Christmas and
8  still get holiday pay?
9      A.   Yes.
10     Q.   Okay.  Is that true of the other
11 types of paid leave as well?
12     A.   It is true -- yes, it is true for
13 the paid leave.
14     Q.   Okay.  So vacay, PLD's.
15     A.   If the court happens to do jury
16 duty, yes, that would be considered a neutral
17 day.
18     Q.   Okay.  And then bereavement, that's
19 also considered a neutral day?
20     A.   Yes, it is.
21     Q.   And is that the case regardless of
22 the Union that you're in?
23     A.   Yes, that's correct.
24     Q.   Okay.  Okay.  Let's go to the top
25 of page 34.  Scroll up a little bit so we can

Page 152

1  just see that there's nothing else in this
2  section.  A little more, a little more, there
3  we go.
4           Okay.  So Section 4, talking about
5  time off on account of vacation.  Does this
6  section provide what we were discussing
7  earlier, which is that if you were being paid
8  for a vacation day, you do not lose guarantee
9  pay, or it's offset -- all right.  What does
10 this paragraph mean?
11     A.   "Time off on account of vacation
12 will not be considered as time off."  They
13 will still be considered available.  "Own
14 accord under any guarantee rules and will not
15 be considered as breaking such guarantees or
16 for any other incentive or aware programs."
17 So, this kind of covers everything, but yes,
18 they're considered available still for the
19 extra board guarantee time.  Now, again, if
20 they're -- it depends on the time.  If there's
21 one day, then that would not count against
22 them, but -- or it is still compensated time
23 off so it would offset the guarantee
24 calculation.
25     Q.   Okay.  So does this essentially

Page 153

1  provide that vacation is not -- will not
2  interfere with someone's guarantee pay or any
3  other type of incentive or award program that
4  the company has?
5      A.   Correct.
6      Q.   And it is for that reason that they
7  can still get their holiday pay, for instance?
8      A.   Correct.
9      Q.   Okay.  What is an ETI; do you know?
10 Oh, I'm sorry.  That's an Engineer Training
11 Instructor, never mind.
12     A.   Oh, okay.
13     Q.   Okay.  Can we take a look at page
14 69.  All right.  Somehow my highlights are
15 there.  Well, that's okay.  I guess I don't
16 really mind.  All right.  So let's take a look
17 at this highlighted section.  I'm not sure how
18 that happened.  My synching was not working
19 and I guess now it is, so this is my
20 highlight.  That's not in the original
21 document.
22          So if you take a look at E. let me
23 know when you're finished reading it.
24     A.   Okay.
25     Q.   Okay.  So, what does this paragraph

**ANTHONY SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Jennifer Gorneault on 10/27/2021                              Pages 154..157

Page 154

```
1   provide?
2        A.  So, what this is stating is that if
3   the employee is on a scheduled day off
4   beginning at midnight, you know, for rest day,
5   personal day, vacation, et cetera, they will
6   not be required to an accepted job that will
7   go on duty after 8:00 p.m. because that will
8   be cutting into their time off.
9        Q.  Oh, okay.  So in this circumstance,
10  if I -- take out rest day.  But for personal
11  day, vacation, if I take a personal day, and I
12  think you already said that personal days and
13  vacation it's the same midnight to midnight
14  calculation, right?
15       A.  Yes.
16       Q.  Okay.  And that's true for all of
17  these different time off, right?
18       A.  Yes.
19       Q.  Regardless of what Union you're in,
20  right?
21       A.  Correct.
22       Q.  So if I have a markup for a
23  personal day at midnight Tuesday or you know
24  12:00 a.m. Tuesday until, you know, 2459 on
25  Tuesday, in realty, I'm off from at least
```

Page 155

```
1   8:00 prior to that the night before?
2        A.  If you choose not to accept the
3   call, yes.  Now, if you choose to accept the
4   call, that's something else.  But yes, if you
5   choose to not accept the call, you will not
6   have a loss work applied and it will not
7   reduce your guarantee.
8        Q.  Okay.  So in that scenario, if my
9   vacation starts at midnight on Tuesday, really
10  I am, you know, in terms quote unquote safe, I
11  can go out to dinner at 8:00 on Monday night?
12       A.  Yes.  That's correct, yes.
13       Q.  Now is that true for people who
14  take FMLA leave, so for instance, if I mark
15  off on FMLA leave, I don't have that leeway
16  prior to me marking off to ensure that I don't
17  get called out on the road, right?
18       A.  That is correct.
19       Q.  Okay.  So let me ask this another
20  way.  If I have a doctor appointment at noon
21  on Tuesday, how soon would I have to mark off
22  for FMLA to make sure that I can make that
23  appointment?
24            MR. CHIAVETTA:  Object to form.
25  You can answer.
```

Page 156

```
1        Q.  Do you know?
2        A.  I cannot answer that question.
3   That would have to be answered by the Crew
4   Management Department for that specific
5   detail.
6        Q.  Okay.  But you would agree with me
7   that there is no sort of grace period for
8   FMLA markoffs the way there are for vacations
9   or personal days, right?
10       A.  I can't speak to that.  I'm not
11  sure.  That would have to be Crew Management
12  to answer that.
13       Q.  Well, you're not aware of anything
14  in the Collective Bargaining Agreement -- so
15  you're just saying that all of that is Crew
16  Management kind of territory?
17       A.  Yeah.  All the marking off and
18  marking up is handled at Crew Management so I
19  wouldn't be able to answer that,
20  unfortunately.
21       Q.  Okay.  Are you familiar with a pool
22  versus a guarantee board?  Is there some
23  differentiation at CSX in that regard?  Do you
24  know what it means to be in a pool for a T&E
25  employee?
```

Page 157

```
1        A.  A pool is very similar to a
2   guarantee extra board; however, a pool you
3   generally know what you'll be working and a
4   pool is not necessarily guaranteed.  You still
5   have to work to be compensated.
6        Q.  Okay.  So people who are in the
7   pool are necessarily not on the guarantee
8   board?
9        A.  Correct.
10       Q.  You cannot be the -- in both at the
11  same time?
12       A.  Correct.
13       Q.  All right.
14            MS. TUCK:  Let's take a break and
15  see what I have left.  I do have some things
16  left but I don't think it's a lot, so.  What
17  time is it?  2:42.  Why don't we do 3:05, is
18  that okay?  Everybody?
19            THE WITNESS:  That's fine for me.
20  Thank you.
21            MR. CHIAVETTA:  Yes.
22            (Recess taken.)
23            MS. TUCK:  Okay.  Makala, if we
24  could go back to MM, that's the business
25  rules.  Okay.
```

**ANTHONY SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Jennifer Gorneault on 10/27/2021                    Pages 158..161

Page 158

1  Q. (By Ms. Tuck) We made a version of
2  this that we can navigate a little better to
3  make this go faster. Okay. All right. So
4  let's take a look at page 3. And we've got
5  under ERB layoff we've got UTU, FMLA and Con
6  XX. Do you see that?
7  A. Yes. That's the Emergency Relieve
8  Board that we did with the UTU last year for
9  Covid pandemic.
10  Q. Okay. All right. So that's FMLA
11  during Covid?
12  A. Correct.
13  Q. And then if you go down to page 4
14  towards the bottom, Layoff All. Okay. Do you
15  see Layoff All, FMLA and Avail Not Con and
16  FMLA and Unavail Con Not. Does that tell you
17  that that rule applies to anyone who is not an
18  ex Conrail employee?
19  A. I'd have to review -- the
20  description is not giving me enough. I'd have
21  to see the details of the logic.
22  Q. Okay. I thought you would say
23  that. All right. Let's go to page 118.
24  There you go. So scroll down a little bit.
25  Now we see Layoff All, FMLA and Avail Not Con

Page 159

1  XX.
2  A. Okay. I can tell that this is not
3  BLE.
4  Q. Okay. How can you tell that it's
5  not BLE?
6  A. By the Agreement Codes.
7  Q. Where are the Agreement Codes on
8  this?
9  A. One, two, three, four, five, six,
10  line six there where it starts with "and the
11  agreement ID of the guarantee rate."
12  Q. Okay. So those are Agreement
13  Codes?
14  A. Yes.
15  Q. Okay. And what would say -- how
16  can you tell by looking at those that those
17  Agreement Codes are not the BLE Agreement
18  Codes, is there something about those?
19  A. Yeah. I just know the differences
20  between the BLE and the UTU Agreement Codes.
21  Q. Okay. Does BC or BTC or NM, LEH,
22  do anything of those things mean anything
23  having to do with Unions, is that a way to
24  figure it out or would you have to have a list
25  of these things?

Page 160

1  A. Well, if we're looking for like
2  Mr. Schobert's, like on his document, we have
3  the Agreement Code on there. It's the second
4  or third column.
5  Q. Okay. So, is there a way just by
6  looking at the Agreement Codes to know what
7  Union they belong to?
8  A. I can tell by looking at them just
9  because I know them from paying on the
10  guarantee extra boards that they are B&O UTU.
11  Q. If you were going to train someone
12  in your department to know which codes go with
13  BLE or UTU employees, how would go about doing
14  that?
15  A. I'd have to refer to our guarantee
16  spreadsheet of all of our rates that are go by
17  Agreement Codes.
18  Q. And that's the spreadsheet you were
19  referring to earlier, right, that has the
20  Reason Codes -- does the spreadsheet have all
21  the different kind of codes or are there
22  different spreadsheets for different kind of
23  codes?
24  A. Different spreadsheets.
25  Q. Okay. So you have different

Page 161

1  spreadsheets for the different codes or
2  contract, as well as Action Reason, Reason
3  Code, those are all separate spreadsheets?
4  A. Yes.
5  Q. Okay. Are those spreadsheets that
6  are available to you right now?
7  A. I don't have them up, no.
8  Q. How difficult would it be for you
9  to send them to Mr. Chiavetta?
10  A. I could send them to him.
11  Q. Would it take you a long time to
12  find them? Would it take you more than a half
13  an hour to find them?
14  A. No.
15  Q. Okay.
16  MS. TUCK: Tom, do you have any
17  objection to her sending us these spreadsheets
18  so I can avoid perhaps some of these
19  questions?
20  MR. CHIAVETTA: Jennifer, why don't
21  you send it to me and I'll take a look at it.
22  MS. TUCK: All right. So why don't
23  we take a break to do that and then once
24  you've sent them --
25  A. I can multi-task if you want to

**ANTHONY SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Jennifer Gorneault on 10/27/2021                     Pages 162..165

---

Page 162

1  keep asking questions.
2          MS. TUCK:  Well, that's up to Tom.
3  I don't know if he wants you to do that.
4          MR. CHIAVETTA:  Why don't we
5  regroup in five minutes and see where we are.
6          MS. TUCK:  Yeah, that sounds good.
7  Thank you.
8          (Recess taken.)
9          MS. TUCK:  Okay.  Let's go back on
10 the record.  Makala, can you pull up, it's an
11 agreement, Bates No. 452.
12         Q.  (By Mr. Tuck) We were talking
13 earlier about the agreements that govern a lot
14 of the things we were talking about today in
15 terms of guarantee pay.  Is this the agreement
16 that governs for the UTU North employees?
17         A.  Yes.
18         Q.  Okay.  And can you just scroll down
19 so she can see the date.  Okay.  And it's been
20 1994 and it's not been renegotiated since
21 then, correct?
22         A.  Correct.
23         Q.  Okay.
24         MS. TUCK:  So let's mark this as
25 SS.

---

Page 163

1          (EXHIBIT SS MARKED.)
2          MS. TUCK:  All right.  So let's
3  take a look at the documents that were just
4  sent to us from your counsel.  Makala, can you
5  pull up Status Layoff Reasons.  Okay.  You
6  probably need to magnify a little bit.  Okay.
7  And we'll mark this as UU.
8          (EXHIBIT UU MARKED.)
9          Q.  (By Ms. Tuck) Is this a spreadsheet
10 that indicates what the layoff reason codes
11 means on the spreadsheet that we were looking
12 for Mr. Schobert?
13         A.  Yes.
14         Q.  In LL or MM?
15         A.  Yes.
16         Q.  So where it says Reason Code, that
17 is layoff reason, right?
18         A.  Yes.
19         Q.  Reason Code is in the spreadsheet
20 that corresponds to layoff reason here, right?
21         A.  Let me double check because there's
22 three different fields in the guarantee data.
23 So, yeah, the status and the reason code.
24         Q.  Okay.
25         MS. TUCK:  Are you able to do a

---

Page 164

1  split screen, Makala, or do a side by side?
2  If not, I can probably figure it out.  Let me
3  see if I can do it.  We're going to have to
4  toggle back and forth, unfortunately.  See if
5  you can pull up 4169, Makala, please.  Zoom in
6  so she can see the categories.
7          Q.  So does this help you at all?
8          A.  Yeah.  So the list I was able to
9  find and provide is the Status and Reason Code
10 columns.
11         Q.  Okay.  So I'm looking -- so if I'm
12 looking at the status layoff reasons and there
13 are Status Codes as A, B, C, E, F, F, et
14 cetera, then that corresponds to Status,
15 right?
16         A.  Correct.
17         Q.  On this sheet.  And then for Reason
18 Code, for instance, DT or FP, that corresponds
19 to status layoff reasons, the category that
20 says Layoff Reason, CU, FR, RF?
21         A.  Correct.
22         Q.  All right.  That's helpful.  Can
23 you go back to Status Layoff Reasons, Makala.
24 Thank you.
25             Are there any of these codes that

---

Page 165

1  are specific to anyone in a particular Union
2  or are these applicable to --
3          A.  Not that I'm aware of.
4          Q.  Okay.  All right.  This is coming
5  from your system, right?
6          A.  This is coming from the Crew
7  Management System.
8          Q.  This is coming from the Crew
9  Management System, okay.  But as far as your
10 calculations are concerned, that would be
11 reflected -- your department's reflections,
12 sorry, calculations that aren't reflected in
13 the 4169 spreadsheet, the one that we've been
14 looking at for Mr. Schobert, all of that data
15 does appear for all Train and Engine
16 Employees, right, all those types of data do?
17         A.  Correct.
18         Q.  You just aren't sure whether or not
19 all of these apply to everybody in the Union?
20         A.  Correct.
21         Q.  Okay.  So you would agree with me
22 that there's nothing on this Layoff Reason
23 that indicates that it is specific to a Union,
24 for instance, there's no BLE or Con or any of
25 those indicators?

---

**ANTHONY SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Jennifer Gorneault on 10/27/2021                          Pages 166..169

Page 166

1      A.  Correct.
2      Q.  All right.  So looking at this, you
3  would have no reason to believe that any of
4  these are specific to any one Union, right?
5      A.  Correct.
6      Q.  Okay.  All right.  Let's look at
7  the next one.  BLE Extraboard Rates.  And this
8  will be VV.
9          (EXHIBIT VV MARKED.)
10     Q.  Can you tell me what this document
11 is?
12     A.  So this document is where we house
13 the bi-weekly rates for the Agreement Codes
14 under the BLE Agreement.
15     Q.  Okay.  So in this far left column
16 it says Agreement Code.  Those Agreement Codes
17 correspond to those rules that we were looking
18 at earlier that said you just kind of know
19 them, right?
20     A.  Yes, that is correct.
21     Q.  So if the Agreement Code is a BLE
22 Code, it's indicated here under this document?
23     A.  Correct.
24     Q.  Okay.  All right.  Let's look at
25 UTU Guaranteed Extra Board Rates.

Page 167

1          (EXHIBIT WW MARKED.)
2      Q.  Is this the same document,
3  essentially the same document, only specific
4  to UTU?
5      A.  Yes, that's correct.
6      Q.  All right.  And not UTU North or
7  South, just UTU generally?
8      A.  Correct.
9      Q.  Okay.  So this covers both regions?
10     A.  Yes.
11     Q.  If it's an Agreement Code reflected
12 on this document, then in the rules, it would
13 be referencing a UTU employee, right?
14     A.  Yes.  Yes.
15     Q.  Okay.  Got it.  Okay.  Let's look
16 at Business Rule Report Guarantee -- oh, no,
17 wait, sorry, that's something else.  Nope.
18 All right.  Let's take a look at SS, that's
19 the UTU Contract for the South, that's 28935.
20         So, is this the agreement that
21 governs the trainmen or the conductors in the
22 Southern Region in terms of their guarantee
23 pay to the extent that the Collective
24 Bargaining Agreement does govern it?
25     A.  Yes.

Page 168

1      Q.  Okay.  And, let's see, let's go to
2  page 49 at the top.  Actually, sorry, page 48
3  at the bottom.  Right there is good.
4          Now, this indicates -- it says "An
5  extra trainman granted permission to mark off,
6  et cetera, will retain his position on the
7  extra board if he reports back for duty before
8  his turn is called."  do you have any
9  knowledge as to -- put it this way.  Is it a
10 Crew Management question as to whether
11 somebody goes to the bottom of the list or not
12 and when?
13     A.  Yes.
14     Q.  Okay.  So you would just be using
15 your lay person interpretation of this
16 document to make that judgment?
17     A.  Correct.
18     Q.  Okay.  And then top of 49 under
19 note 3.  So if you could just read note 3 and
20 let me know when you're finished.
21     A.  Okay.
22     Q.  So, what does this mean?
23     A.  This is similar to the language
24 that we read prior on the BLE side where if
25 it's prior to the scheduled day off, they are

Page 169

1  not required to take a call after a certain
2  time and they will not be penalized in their
3  guarantee.
4      Q.  Okay.  And it's specific to this
5  section, rest days, personal days, vacation
6  days or demand days, they call them authorized
7  absences, right?
8      A.  Correct, that's what I'm reading
9  here.  Yes.
10     Q.  Okay.  And do you understand
11 authorized absence to include FMLA leave if
12 they miss work and it's unpaid?
13     A.  I can't speak to that.
14         MR. CHIAVETTA:  Hold on, Jennifer.
15 Hold on.  Just let me object, lack of
16 foundation, outside the scope of 30(b)6.  Go
17 ahead.
18     A.  I can't speak to that.
19     Q.  But a conductor would have their
20 guarantee pay affected if they took FMLA leave
21 and lost work and didn't use a personal day,
22 right?
23         MR. CHIAVETTA:  Same objections.
24         MS. TUCK:  I don't understand why
25 there's the objection.  That's what she's here

**ANTHONY SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Jennifer Gorneault on 10/27/2021                    Pages 170..173

Page 170

1  to testify here to today, guarantee pay.
2          MR. CHIAVETTA:  Right, the claim in
3  the CBA is that they're denied guarantee pay
4  by marking off FMLA leave.  This is a
5  different question.
6          MS. TUCK:  No, okay.
7      Q.  Does a trainman lose guarantee pay
8  if they miss work -- if they lose work and
9  mark off -- if they lose work because they
10 marked off FMLA leave and they don't choose to
11 use a personal day, do they lose guarantee
12 pay?
13     A.  They do; however, this is related
14 to Crew Management and how they handle and how
15 they handle their work history and their work
16 history is what feeds into the guaranteed
17 system, so I cannot answer this particular
18 question because it would depend -- this
19 question is related to time and attendance.
20     Q.  Note 3 or my question?
21     A.  Note 3.
22     Q.  Okay.  I'm not asking you what note
23 3 says anymore.  I'm just asking you,
24 generally speaking, isn't it true that if a
25 trainman, a UTU CSRA trainman, takes unpaid

Page 171

1  FMLA leave and they lose work, they lose a
2  full week's guarantee?  We talked about that.
3      A.  Full week's guarantee, yes.  That
4  part it correct, yes.
5      Q.  Okay.  Let's go to 50, D. 1.  So D.
6  1. that talks about dropping and where they
7  are on the board.  Would that be a Crew
8  Management question?
9      A.  Yes.  The positioning on the board,
10 yes, that would be.
11     Q.  Okay.  And the same thing for
12 Section 2. A., would those be questions for a
13 Crew Management person?
14     A.  Yes, it would be.
15     Q.  Okay.  You would agree with me,
16 however, that even though these provisions how
17 they are -- you know, how they operate would
18 be a Crew Management question; however, a
19 trainman marking off in this manner does
20 affect their guarantee pay, right?
21         MR. CHIAVETTA:  Object to form.
22     Q.  Or it can?
23         MR. CHIAVETTA:  Object to form.
24 You can answer, Jennifer.
25     A.  Yes.

Page 172

1      Q.  Okay.  So even though you are not
2  able to say, you know, when someone can drop
3  or when they can't drop, you can testify that
4  the drop, if it's voluntary, will affect their
5  guarantee pay, right?
6      A.  If the drop turn is loaded by Crew
7  Management in the system and that feeds over
8  to our guarantee system, then yes.
9      Q.  Right.  So all the stuff that
10 happens before that to get to that place, I
11 understand is not your job.  But once Crew
12 Management says, okay, here it is, then it
13 affects their guarantee pay, right?
14     A.  Yes.  Yes.
15     Q.  Okay.  And for whatever reason
16 these rules operate to affect the guarantee
17 pay for more than a day or more than one -- to
18 the extent -- let me rephrase that.
19         To the extent that these rules
20 operate to incur more than one penalty in a
21 guarantee period, that affects the guarantee
22 pay as well, right?
23     A.  Yes.
24     Q.  Okay.  So if, for instance, these
25 rules say, you know, I can repeatedly take,

Page 173

1  you know, personal business, that doesn't mean
2  I'm only going to get my guarantee pay docked
3  once, right?
4      A.  Correct.
5      Q.  But that's just a question of how
6  much money I'm losing, not why I'm losing the
7  money, right?
8      A.  Correct.
9      Q.  And just by way of example, let's
10 go to page 57 at the bottom, question 7.  This
11 is about being otherwise unavailable for
12 service and using a personal day.  This is
13 similar to the BLE provision that we looked at
14 earlier where using a personal leave day in
15 this circumstance has to be approved, but for
16 FMLA it does not, do you remember that
17 testimony?
18     A.  Yes.
19     Q.  Okay.  And this is essentially the
20 same provision, right?
21     A.  Yes.
22     Q.  Only for trainmen, okay.  Then page
23 75 at the top, Section 4 -- I mean, page 74 --
24 page 75 at the top, Section 4.  Sorry, long
25 day.  Okay.  And would you agree that this is

**ANTHONY SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Jennifer Gorneault on 10/27/2021                    Pages 174..177

Page 174

1  similar to the provision that we discussed
2  earlier in the BLE Collective Bargaining
3  Agreement where vacation does not affect
4  guarantee pay?
5       A.  Yes.
6       Q.  And same towards the bottom of 77,
7  paragraph 6 -- oh, actually, this is something
8  else.  Can employees carry vacation over from
9  one year to the next?
10      A.  Certain agreements, by agreement,
11 yes.
12      Q.  You mean by a Collective Bargaining
13 Agreement you mean?
14      A.  By a Collective Bargaining
15 Agreement, yes.
16      Q.  Okay.  So do BLE members have
17 vacation that carries over?
18      MR. CHIAVETTA:  Objection, outside
19 the scope of the 30(b)6.  You can answer,
20 Jennifer.
21      A.  No.
22      Q.  Do all UTU employees have
23 carryover?
24      A.  Yes.
25      Q.  And does it affect their -- this

Page 175

1  appears to say that this carryover will not
2  offset any guarantee pay, is that correct,
3  that carryovers do not affect guarantee pay?
4       A.  Yes.
5       Q.  Okay.  Let's go to page 90 at the
6  top.  So we've got here paragraph 2.  Is this
7  the section that provides for the guarantee
8  penalties for trainmen in the south?
9       A.  Yes.
10      Q.  Okay.  So in Note 1, this has that
11 they will be charged 1/6th of the full weekly
12 guarantee.  But we talked earlier about that
13 it would be one day.  So is that -- can you
14 help me understand the discrepancy?
15      A.  Their guarantees are calculated
16 differently on the UTU side.  They don't count
17 them as seven days.  They count them as six
18 days, then an unpaid rest day.
19      Q.  Oh, okay.
20      A.  So 1/6th is one day.  It's the
21 same.
22      Q.  Okay.  So 1/6th is a day, got it.
23 Okay.  Let's take a look at the top of page
24 91, paragraph 3.  This says, "Trainmen who
25 fail to report back before their turn is

Page 176

1  called will remain off for a minimum of 12
2  hours."  To me that sounds like if a trainman
3  marks off for FMLA and gets -- and loses work
4  and then marks back up within 12 hours, is
5  basically not on the board until that 12 hours
6  is expired; is that correct?
7       MR. CHIAVETTA:  Objection, beyond
8  the scope, lack of foundation.  Go ahead,
9  Jennifer.
10      A.  I can't answer that.
11      MS. TUCK:  Well, Tom, are we going
12 to produce somebody for these questions?
13      MR. CHIAVETTA:  This is not a
14 guarantee pay question, Lisa.  You're asking
15 questions about the operation of the extra
16 board.  It's not a question about guarantee
17 board.  There's a difference between the two.
18      MS. TUCK:  Okay.  Well, I'll lay
19 some foundation then.
20      MR. CHIAVETTA:  It's not a question
21 about foundation.  It's a question about the
22 difference of the two topics.
23      MS. TUCK:  Okay.  Uh-huh.
24      Q.  Are you able to -- well, just as a
25 lay person reading that, you know, not

Page 177

1  speaking on behalf of the company, is that how
2  you read that?
3       MR. CHIAVETTA:  Object to form.
4       A.  As long as I've worked here, I
5  wouldn't try to interpret an agreement,
6  honestly.
7       Q.  Without the help of counsel, right?
8       A.  I would rely on my Labor Relations
9  Department for the interpretation.
10      Q.  Okay.  Is Nathan Jones in the Labor
11 Relations Department?
12      A.  He is.
13      Q.  And then would your answer be the
14 same for 5 and 6?
15      A.  Yes.  I'm not able to answer those
16 either.
17      Q.  Okay.  But it does say that
18 "Trainmen marking off for any non-compensated
19 reason," in 6, "will hold their turn on the
20 board and will not have their guarantee
21 reduced if marked up before their turn is
22 called."  So, does that part of it refer to
23 basically you have to lose work in order to
24 have your guarantee reduced for a
25 non-compensated agreement?

**ANTHONY SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Jennifer Gorneault on 10/27/2021                          Pages 178..181

Page 178

1    A.  Yes, that's correct.
2    Q.  So you are able to talk about that?
3    A.  I'm able to talk about that piece
4    of it, yes.
5    Q.  Okay.  Okay.  I don't have anymore
6    questions about that.
7         Now, if somebody -- if a trainman
8    or an engineer calls off, marks off on FMLA
9    leave and guarantee pay is deducted, so
10   they've satisfied the conditions, they're
11   some getting penalized.  Is it possible for them to
12   get penalized more than once in a guarantee
13   pay period?
14   A.  Yes.
15   Q.  Now, if you were losing let's say
16   -- I think we've established that engineers,
17   the BLE's, if they mark off for FMLA in the
18   weekend period, they lose a week's guarantee
19   pay, we established that, right?
20   A.  Yes.
21   Q.  Even if they mark back up and
22   continue to remain on call during that
23   following week, correct?
24   A.  Correct.
25   Q.  All right.  Now, I am aware that

Page 179

1    there are some engineers who are members of
2    UTU, is that something that you're aware of as
3    well?
4    A.  I am aware that there are BLE
5    members who pay their Union dues to UTU also,
6    yes.
7    Q.  Okay.  Are those engineers who are
8    paying UTU dues, is there guarantee pay
9    governed by the UTU contract or the BLE
10   contract?
11   A.  It's governed by the BLE contract.
12   Q.  Okay.  So if I'm BLE and I want to
13   pay UTU, my guarantee pay is still according
14   to the BLE contract?
15   A.  Correct.
16   Q.  Okay.  And I don't even know if
17   this is a thing, but is the reverse also true?
18   A.  Yes.
19   Q.  Okay.  So as far as guarantee pay,
20   it's based on what you are, as opposed to who
21   you are paying dues to?
22   A.  Correct.
23   Q.  All right.  Have you reviewed any
24   documents today, other than the ones that
25   we've shown you, to help you testify?

Page 180

1    A.  No.
2    Q.  Okay.  No notes or binders or
3    anything, anything you've looked at today?
4    A.  No.
5    Q.  Were you provided with documents
6    from Mr. Chiavetta to prepare you for your
7    deposition?
8    A.  We reviewed my documents that I
9    provided.
10   Q.  Okay.  All right.  So did you get
11   some sort of a binder from Mr. Chiavetta that
12   had some documents in it that you reviewed?
13   A.  I received copies of like the, what
14   am I trying to say, the interrogatory, so I
15   made sure I had copies of those.
16   Q.  Okay.  But no packet of materials
17   from your attorney?
18   A.  Yes.
19   Q.  Ms. Johnson yesterday had a binder
20   and there's some dispute as to whether we can
21   find out what's in the binder or not.  But
22   setting that aside, I think you can at least
23   respond, right Tom, that did she receive one
24   of those or not, right?
25   MR. CHIAVETTA:  Yeah, I don't have

Page 181

1    a problem with her answering that.
2    A.  Yeah.  Yeah.
3    Q.  Okay.  All right.  Okay.  And did
4    you review that binder to prepare for your
5    deposition?
6    A.  Yes.
7    Q.  Okay.  And did the review of that
8    binder assist you in your recollection or your
9    testimony today?
10   A.  No, it didn't -- it was more of an
11   explanatory for Tom to understand what --
12   basically the information that I had sent like
13   we had done today.
14   Q.  Stop there.  I don't want you to
15   talk about anything having to do with you
16   working with Tom or anything like that.
17   A.  Okay.  Okay.
18   Q.  It's not on you.  I'm just, you
19   know, Tom doesn't want that either.  Nobody
20   wants that.  We don't want to violate any
21   privileges here.  Okay.  Good.
22        Have you reviewed any written
23   communications today during your testimony
24   regarding anything that you testified about?
25   A.  No.

**ANTHONY SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Jennifer Gorneault on 10/27/2021                 Pages 182..185

Page 182

1    Q.  Texts, e-mails, nothing like that?
2    A.  No.
3    Q.  Okay.  Even from a lawyer for the
4  company?
5    A.  No, none.
6    Q.  Okay.  You've testified today with
7  respect to a lot about guarantee pay.  Have
8  there been any changes to the guarantee pay
9  and how it's calculated or paid since 2016
10 that would be relevant to your testimony
11 today?
12   A.  No.
13   Q.  You haven't had new Collective
14 Bargaining Agreements, right?
15   A.  That's correct.
16   Q.  Okay.  Are there any documents that
17 you haven't seen today that you believe would
18 assist you -- actually, strike that question.
19      MS. TUCK:  Okay.  I don't think I
20 have any questions.  Joe, do you have any
21 questions?  I think I'm done.
22      MR. ALBRECHTA:  I have no
23 questions.  You are more thorough than I
24 expected.
25      MS. TUCK:  Well, nobody ever said I

Page 183

1  wasn't thorough in a deposition.  Sorry.
2  Okay.  Well, I guess we are done for today
3  then.
4       MR. ALBRECHTA:  Tom, are you
5  reserving again?
6       MR. CHIAVETTA:  Yes, we reserve
7  signature.
8       MS. TUCK:  Joe, do you want to
9  order this?
10      MR. ALBRECHTA:  Yes, Joe Albrechta
11 will order it.  We'll take the digital
12 version.
13      MR. CHIAVETTA:  Just one
14 housekeeping.  So exhibits, Lisa, will you be
15 emailing them to the Court Reporter.
16      MR. ALBRECHTA:  My office will be
17 doing that, Joe.
18      MR. CHIAVETTA:  Okay.  Do you want
19 to wait until we get the Bates stamped
20 versions of the last ones?  I should have
21 those today, I'm thinking.
22      MR. ALBRECHTA:  Yeah.  We'll do the
23 same thing.  I think Christy forwarded the
24 ones from yesterday already.  So we'll wait
25 for the Bates stamps and then probably

Page 184

1  tomorrow she'll send those out to the court
2  reporter and copy everybody.  For purposes of
3  the rest of the week, we'll just do the same
4  thing each day, if that's okay with everybody.
5       MR. CHIAVETTA:  Yes.
6       MS. TUCK:  Yes.
7       (Thereupon, the deposition
8  concluded at 4:23 p.m.)
9             - - -
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 185

1             - - -
2
3       I, JENNIFER GORNEAULT, do hereby certify
4  that the foregoing transcript is a true and accurate
5  transcription of my testimony.
6
7
8  _____
9  JENNIFER GORNEAULT
10
11 _____, _____.
12 DATED
13
14
15            - - -
16
17
18
19
20
21
22
23
24
25

**ANTHONY SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Jennifer Gorneault on 10/27/2021                Pages 186..187

**Page 186**

```
1                    - - -
2                  CERTIFICATE
3   State of Ohio          :
                           :SS:
4   County of Franklin     :
5
6         I, Sandra D. Kin, a Registered
    Professional Reporter and Notary Public in and
7   for the State of Ohio, duly commissioned and
    qualified, do hereby certify that the within
8   named JENNIFER GORNEAULT was by me first duly
    sworn to testify to the truth, the whole
9   truth, and nothing but the truth in the cause
    aforesaid; that the deposition then given by
10  her was by me reduced to stenotype in the
    presence of said witness; that the foregoing
11  is a true and correct transcript of the
    deposition so given by her; that the
12  deposition was taken at the time and place in
    the caption specified; and that I am in no way
13  related to or employed by any attorney or
    party hereto, or financially interested in the
14  action, and I am not, nor is the court
    reporting firm with which I am affiliated,
15  under a contract as defined in Civil Rule
    28(D).
16
17        IN WITNESS WHEREOF, I have hereunto
    set my hand and affixed my seal of office at
18  Columbus, Ohio, on this 23rd day of November,
    2021.
19
20
21
22
23        _____
          Sandra D. Kin, RPR
24        Notary Public-State of Ohio
          My Commission Expires:  May 14, 2022.
25                   - - -
```

**Page 187**

```
1                E R R A T A
2      I, Jennifer Gorneault, have read the entire
    transcript of my deposition taken on October
3   27, 2021, or the same has been read to me.  I
    request that the following changes be entered
4   upon the record for the reasons indicated.  I
    have signed my name to the signature page and
5   authorize you to attached the same to the
    original transcript.
6   PAGE   LINE    CORRECTION OR CHANGE AND REASON
7   ____   ____    _____
8   ____   ____    _____
9   ____   ____    _____
10  ____   ____    _____
11  ____   ____    _____
12  ____   ____    _____
13  ____   ____    _____
14  ____   ____    _____
15  ____   ____    _____
16  ____   ____    _____
17  ____   ____    _____
18  ____   ____    _____
19  ____   ____    _____
20  ____   ____    _____
21  ____   ____    _____
22  ____   ____    _____
23  ____   ____    _____
24  ____   ____    _____
25
```

**ANTHONY SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Jennifer Gorneault on 10/27/2021                    Index: $1,400..1:00

| Exhibits | $ | 0 |
|---|---|---|
| | | 1200  80:8 |
| | | 1258  126:10 |
| GorneaultJ KK | $1,400  50:23 | 0000  59:11 |
| 4:10 29:19 | 55:7,23,24 | 0330  62:16 |
| GorneaultJ LL | 56:7 | |
| 4:10 38:10 | 96:21,25 | 12:00  100:7, |
| | | 12 154:24 |
| GorneaultJ MM | $100  51:4,8 | 12:30  72:13 |
| 4:11 65:21 | 96:22 | 1 |
| | 97:12,16 | 12:58  60:11 |
| GorneaultJ NN | $150  44:20 | 1  59:11 |
| 4:11 88:2 | | 96:17 | 12th  41:11 |
| GorneaultJ OO | $2,000  49:24 | 97:23 | 130  134:11 |
| 4:12 102:1 | 50:2,3,7, | 102:11 | 131  134:17 |
| | 17,18,23 | 171:5,6 | |
| GorneaultJ PP | | 175:10 | 1332  11:17 |
| 4:13 | $200  44:20 | 1,254  73:23 | 13th  41:9 |
| 126:11 | 56:10,16 | | 14  43:24 |
| GorneaultJ QQ | $214  63:21 | 1/14th  96:17 | 50:12 |
| 4:14 129:3 | 70:15 | 97:1 | 83:13,14 |
| | 71:19 | 1/2  97:24 | 96:18 |
| GorneaultJ RR | | | 135:18 |
| 4:16 | $214.99 | 1/6th | 142:6 |
| 130:12 | 63:14 | 175:11,20, | |
| | | 22 | 1400  57:14 |
| GorneaultJ SS | $215  63:21 | | 1469  124:17 |
| 4:17 163:1 | 64:16 | 100  56:15 | 15-20  58:2 |
| | 69:24 | 97:1,6 | |
| GorneaultJ TT | 70:15,17, | 102:20 | 16  135:19 |
| 4:18 81:15 | 24 | 10:00  70:12 | 17  13:23 |
| GorneaultJ UU | | 72:3 | 21:7 |
| 4:19 163:8 | $329  74:16 | 10:10  27:12 | 1840  72:23 |
| | $450  98:14 | 10:28  37:20 | 1931  60:4, |
| GorneaultJ VV | $500  57:9 | 118  158:23 | 25 63:11 |
| 4:19 166:9 | | | 1938  12:6 |
| GorneaultJ WW | $700  97:13, | 11:20  58:5 | 1982  12:24 |
| 4:20 167:1 | 15,20 | 11:59  113:5 | 1994  162:20 |
| | 98:16,25 | 12  176:1,4, | 1:00  115:15 |
| | $718.76  84:1 | 5 | |
| | $900  57:10 | | |

**ANTHONY SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Jennifer Gorneault on 10/27/2021                    Index: 1:30..7th

**1:30**
  115:21,25

**1st**  82:14

_____

_____ **2** _____

**2**  133:23
  171:12
  175:6

**2,000**  50:12

**2/12/16**
  40:14

**20**  13:3

**200**  56:15

**2011**  89:23,
  24  90:5
  130:6

**2014**  34:20
  119:11

**2016**  41:21
  59:11
  82:15
  88:24
  129:16
  182:9

**2021**  138:21

**2022**  138:22

**204**  129:1

**214.99**  73:5

**234**  138:20,
  21  139:3
  144:12

**2359**  100:9,

**10**

**23rd**  41:3

**24**  51:4
  55:15
  110:12
  112:19,20
  125:12

**24-hour**
  50:9,10,16
  61:17
  112:7,8,
  12,24
  116:9,13
  117:9

**2459**  154:24

**26**  145:13

**28**  148:5

**28935**  167:19

**2:42**  157:17

_____ **3** _____

**3**  102:12
  107:16
  116:6
  135:19,20
  158:4
  168:19
  170:20,21,
  23  175:24

**30(b)(6)**
  139:16

**30(b)6**
  169:16
  174:19

**3000**  80:7

**30th**  40:25
  41:5

**312**  65:24

**32068**  11:18
  12:7

**330**  61:20

**34**  151:25

**36(b)**  150:18

**3:05**  157:17

_____ **4** _____

**4**  102:18
  133:17
  152:4
  158:13
  173:23,24

**4169**  38:8
  66:21
  109:6
  164:5
  165:13

**451**  129:1

**452**  162:11

**4620**  65:19

**48**  168:2

**49**  168:2,18

**4931**  65:20

**4932**  87:25

**4:00**  70:12
  72:2

**4:23**  184:8

_____

_____ **5** _____

**5**  177:14

**50**  171:5

**57**  127:24
  173:10

_____

_____ **6** _____

**6**  174:7
  177:14,19

**60**  107:2

**69**  153:14

**6:15**  72:14

**6:51**  72:22

**6th**  41:3,9
  59:11,13
  70:19,23

_____

_____ **7** _____

**7**  173:10

**700**  97:3
  98:17,18,
  19

**74**  173:23

**75**  173:23,
  24

**77**  174:6

**7th**  70:2,3,
  18  72:12

**ANTHONY SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Jennifer Gorneault on 10/27/2021              Index: 8/26/20..affects

**8**

8/26/20
 101:14

82  133:6,11

8:00  154:7
 155:1,11

8:07  63:4

**9**

9  60:11

90  175:5

904  12:17

904-502
 12:16

904-502-3142
 12:18

91  175:24

98310  61:24

98707  72:25

9th  59:17
 61:1

**A**

A-1  134:17

a.m.  63:4
 72:13,14,
 22 100:7,
 12 154:24

absence
 105:17,19,

20  169:11

absences
 169:7

absentee
 90:19

absenteeism
 91:9

Absolutely
 14:18
 103:9

accept
 155:2,3,5

acceptable
 8:20,21

accepted
 154:6

access
 20:16,17
 28:10,11,
 20,22
 37:15
 67:9,10
 129:4

accord
 152:14

accordance
 135:2

account
 66:11
 79:23
 152:5,11

accurate
 94:6

accurately
 8:2

action  5:24
 59:20
 61:21
 66:23
 67:3,5
 76:4 84:9,
 10 125:19,
 21 161:2

actions  5:22

active
 103:16

activity
 59:6 70:18
 71:14

actual  39:1
 56:3 59:6
 66:9,13
 83:22 97:8
 124:10

add  68:20
 80:20
 104:17
 128:14
 138:2

added  6:9

addition
 33:24

additional
 112:13
 136:9,24
 142:19

address

11:16,19
 12:1,2,4,9

addressed
 47:11

adequate
 30:20

adjust  52:5
 53:12
 68:20

adjusting
 60:17
 68:17
 75:18

adjustment
 75:15
 76:3,7
 93:6

adjustments
 134:20

administered
 133:18

advance
 92:18

affect  23:21
 46:1,2
 171:20
 172:4,16
 174:3,25
 175:3

affected
 169:20

affects
 172:13,21

**ANTHONY SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Jennifer Gorneault on 10/27/2021 Index: affidavit..arrangements

affidavit
  21:12

agree  58:5
  67:21
  111:8
  114:23
  115:1,17
  156:6
  165:21
  171:15
  173:25

agreement
  17:3,25
  23:7 33:22
  35:8 44:8,
  10,15,25
  45:4,9,12
  46:5,6,7,
  14 47:1
  49:18
  54:21
  56:24
  64:21,22
  80:10,12
  83:7,8
  89:14,22
  91:5,12
  97:8
  101:7,8
  122:10
  129:2,5,18
  130:3,10,
  13 132:6,8
  135:4,12
  137:20
  139:5
  143:20,24

144:3
149:22
156:14
159:6,7,
11,12,17,
20 160:3,
6,17
162:11,15
166:13,14,
16,21
167:11,20,
24 174:3,
10,13,15
177:5,25

agreements
  16:25 37:9
  45:2,3,6,
  7,14 88:21
  89:7,10
  128:22
  132:4
  162:13
  174:10
  182:14

ahead  7:16
  15:8 35:2
  39:14
  71:3,6,12
  92:14
  94:11
  148:18,19
  150:20
  169:17
  176:8

Albrechta
  6:16 9:22
  10:6,15,20

182:22
183:4,10,
16,22

allowed
  90:20

amended
  129:21

Americanized
  5:12

amount  15:5,
  12 23:16
  48:10
  49:16,19
  55:4 56:3,
  18 57:6
  74:7

Anita  23:12,
  13

answering
  181:1

Anthony  5:21

anymore
  170:23
  178:5

anyplace
  144:5

apologize
  8:22

appears
  175:1

applicable
  141:8
  165:2

applied
  83:15
  112:23
  134:14
  146:23
  155:6

applies
  122:22
  123:3
  158:17

apply  122:14
  133:24
  138:10
  144:21
  165:19

applying
  71:13

appointment
  143:11
  155:20,23

approved
  146:25
  147:15,19
  173:15

Appt  96:11

archived
  127:6

area  12:16
  33:4
  89:15,20,
  21 93:3

areas  20:25

arrangements
  134:1

**ANTHONY SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Jennifer Gorneault on 10/27/2021                Index: Article..back

Article
  133:6,11

aspects
  46:13

assess  71:3

assessed
  63:24
  64:9,11,24
  70:14,16,
  24 71:19
  72:4,5
  74:20
  90:24
  100:14

assigned
  40:6,17
  41:24
  45:24
  68:23,24
  77:9 78:25
  79:3 80:16
  83:13 85:4
  103:18
  110:25
  114:6
  119:9,12
  134:25
  136:5

assignment
  16:20
  17:5,15
  78:10
  150:2

assignments
  19:8
  121:10

assist  181:8
  182:18

assume  9:20
  36:18
  117:8

assuming
  40:25
  104:15

asterisk
  94:3,18

AT&T  13:5,
  12

attempt
  62:6,7,17
  72:24
  95:14

attendance
  16:21
  18:7,10,
  13,17,21
  19:1,2,4
  23:5,19
  24:7,10
  34:7 90:23
  91:10,25
  94:1 148:1
  170:19

attorney
  5:21 7:1
  180:17

audit  136:4
  137:7,13
  140:3
  142:19
  145:1,7,8

audits
  142:17
  145:5

authorized
  169:6,11

automated
  53:14

automatically
  47:2 87:4
  98:11
  100:18

Avail
  158:15,25

availability
  58:23
  74:11 93:3
  111:12
  119:24
  120:8
  127:12
  145:20

avoid  78:5
  161:18

award  153:3

awarded  77:6

aware  21:17
  86:18
  105:13
  152:16
  156:13
  165:3
  178:25
  179:2,4

                B

B&o  89:16,
  17,20,22
  90:5 130:5
  132:4,22
  160:10

back  22:24
  23:2,25
  24:4,19,20
  25:21 26:9
  27:18
  30:6,7,11
  31:5,13
  34:17,18
  38:5
  58:24,25
  63:3,4,12
  66:19
  71:16,23
  72:2 73:15
  78:20
  80:10,11
  84:22
  85:20
  101:19
  109:5
  111:6
  114:11
  115:25
  116:3,5
  119:3,17,
  20 121:18,
  20 124:17
  130:8
  132:25
  133:2

**ANTHONY SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Jennifer Gorneault on 10/27/2021          Index: backing..bit

134:24
137:22
139:4
140:3
141:12
142:3
151:4
157:24
162:9
164:4,23
168:7
175:25
176:4
178:21

backing
  12:19

bad   12:22

balance
  81:3,19

bandwidth
  26:15 27:3

bank   148:23

bargaining
  16:25
  17:25
  33:22 35:8
  37:9
  44:10,24
  45:2,12
  46:5,14
  49:18
  54:21
  56:24 91:4
  128:21
  129:17
  130:10

132:3,6
135:12
137:20
143:20,23
144:3
156:14
167:24
174:2,12,
  14 182:14

based   46:4
  52:6 69:3
  74:11
  78:16 86:6
  89:10
  90:13 93:2
  101:4
  111:10,18
  136:22
  138:23
  139:6,23
  179:20

basic   69:9

basically
  15:17
  20:20
  42:16
  43:15 61:7
  74:23 77:8
  89:18
  93:18
  95:18
  98:20
  117:18
  127:11
  138:19
  149:11
  176:5

177:23
181:12

basis   133:13

Bates   38:7
  87:24
  162:11
  183:19,25

BC   159:21

beginning
  48:10,15
  49:9 77:14
  116:12
  120:24
  121:20
  137:11
  154:4

begins   116:8

behalf   6:16
  31:18,23,
  24 32:5,10
  177:1

bell   132:13

belong   160:7

bereavement
  106:8,15
  114:10
  115:8
  131:15
  151:18

bi-weekly
  44:11,22,
  23 48:2
  49:5,23
  55:22,23

83:10
97:9,10
98:12,24
133:13
166:13

bi-weeklys
  136:8

bid   77:5,6,
  13,16

bids   78:1,4

big   108:22
  127:4
  128:6

bigger   70:5
  82:1

binder
  180:11,19,
  21 181:4,8

binders
  180:2

birth   12:23

bit   12:21
  24:1 37:20
  66:1 70:7
  81:24
  84:11
  102:9,19
  109:7,9
  122:25
  124:23
  142:4
  151:25
  158:24
  163:6

**ANTHONY SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Jennifer Gorneault on 10/27/2021          Index: BLE..calculate

BLE  45:8,10
46:1,6,19
47:6,18,21
50:19,20
51:6,14
54:25
64:19,23
77:11
85:21
86:21 89:5
90:16 91:6
99:1
102:24
117:1
118:15
122:3,19
123:1,13,
17,18
125:1
129:1
131:11,23
133:3
136:13
159:3,5,
17,20
160:13
165:24
166:7,14,
21 168:24
173:13
174:2,16
179:4,9,
11,12,14

BLE's  178:17

bless  107:6

BLET  14:25

board  21:13
22:5,11,19
23:10,22
34:8 40:7,
8,18 41:25
46:9 47:10
49:11,13
50:17
68:17,23
69:12
78:25 79:3
80:16,17
83:11
84:12
95:19,24
103:18
107:3,4
114:5
119:9,13
122:11
123:12,21
127:11
131:3
134:9
135:8,24
136:5,17,
23 140:7
149:1
152:19
156:22
157:2,8
158:8
166:25
168:7
171:7,9
176:5,16,
17 177:20

boards  42:21
44:13
123:13
133:7,8
160:10

boat  118:15
131:25

bonus  15:24
16:6,7

bother
100:21

bottom  23:3
24:5 82:4
107:17
114:11
129:9,10
145:14
148:6
158:14
168:3,11
173:10
174:6

box  43:18
59:23,24

break  6:12,
20 27:12
36:13
37:21 39:4
83:18
115:16
116:15
157:14
161:23

breaking
152:15

broad  68:25

broken  89:18

BTC  159:21

BTU  14:25

built  66:10

bullet  14:16

business
69:16,21
72:1,2
73:13,14
93:17,19,
23,25
94:25
98:4,10
99:16
106:13
119:18
140:25
141:1,11
142:11
157:24
167:16
173:1

busted  121:1

─────────────
C
─────────────

calculate
15:15,19,
21 17:17
34:10 37:7
42:17,20
80:6 96:18
98:23
125:12
138:8

calculated
  33:18 34:6
  35:7 58:24
  79:8 80:8
  81:4
  125:14
  127:17,22
  128:16
  133:16
  175:15
  182:9
calculates
  15:18
calculating
  18:3
calculation
  34:23
  46:2,16
  48:16
  109:16
  137:6,21
  138:1,4,12
  140:1
  152:24
  154:14
calculations
  14:22 15:5
  42:15
  46:20
  66:13
  165:10,12
calculator
  51:2
calendar
  137:11

call  5:12
  20:5 22:2,
  14 29:8,11
  34:1 52:18
  53:4,22
  55:15
  57:18
  62:2,6,7,
  17 72:24
  75:12
  81:25
  92:23
  93:20
  95:12,13,
  15,17,21
  99:4,19
  100:9,17
  107:19
  108:6,10,
  13 112:9
  116:10,14,
  22 117:10
  121:1
  143:1,3
  148:22
  155:3,4,5
  169:1,6
  178:22
called  18:18
  19:15
  20:3,8
  21:16 28:2
  33:11 38:8
  47:10
  50:17
  51:9,10
  54:14,16
  61:24

62:13,14,
  21 69:1,3
  72:13
  74:15
  75:11
  95:19,24
  101:13
  109:3
  112:12,21
  113:7,9,14
  114:9
  120:12
  141:11
  155:17
  168:8
  176:1
  177:22
calling
  21:19,23
  24:22
  25:3,22,25
  75:19
calls  16:22
  19:11
  178:8
camera   57:19
caps
  147:20,22,
  23
carrier
  13:4,7
carries
  174:17
carry   53:11
  174:8

carryover
  174:23
  175:1

carryovers
  175:3
case   14:7
  40:2 46:8
  59:8 88:13
  107:7
  113:25
  145:6
  149:18
  151:21
categories
  39:21
  58:16,21
  84:5 88:9,
  14 89:4
  90:8
  102:23
  107:10
  164:6
category
  99:4
  104:11,13,
  19 105:1
  107:8
  119:24
  121:3
  164:19
CBA  17:8
  29:2 46:11
  95:2
  129:22
  149:23
  150:24

170:3

CBA's  35:15

cell  12:11,
 13 13:1,2

Center  18:19

cetera  154:5
 164:14
 168:6

chair  142:17

change
 45:23,24
 117:14

changed
 43:17 89:1

charge  30:13

chargeable
 121:11

charged  94:4
 175:11

chart  102:17
 103:24,25
 104:4,10,
 13,16
 105:2
 139:4

check  85:11
 163:21

Chiavetta
 7:2,13
 9:8,13
 10:5,13,21
 26:14,19,
 22 27:2,13

32:6,19
35:15,18
36:1,4,11,
18,22 37:5
94:10
115:23
132:14,19
139:12
150:15
155:24
157:21
161:9,20
162:4
169:14,23
170:2
171:21,23
174:18
176:7,13,
20 177:3
180:6,11,
25 183:6,
13,18
184:5

child's
 77:24

choose  51:17
 118:15
 155:2,3,5
 170:10

chose  22:18
 51:11
 52:25 65:1

Christmas
 151:7

Christy
 10:17

183:23

circumstance
 65:10
 86:18 88:5
 151:6
 154:9
 173:15

circumstances
 99:3
 133:24

claim  17:6
 28:23
 52:2,3,9
 53:1,6
 54:13 55:1
 149:12
 170:2

claims  15:10
 16:13,17
 17:1,2,7,
 8,12
 134:19,21,
 22,23
 135:4

clarify
 25:16,19
 33:7

class  5:23

clear  7:22
 75:17,25

clear-cut
 145:6

close  43:19
 145:4

code  11:18
12:16
44:9,16
67:20
76:6,12
80:10,12
83:7,8
84:12,13
87:14
103:23
104:3,22
105:12,14,
17 106:1,5
125:22
127:24,25
128:4
160:3
161:3
163:16,19,
23 164:9,
18 166:16,
21,22
167:11

coded  104:16
 106:16

codes  56:25
 65:6 66:23
 67:3,5,15,
 24 68:2
 73:12
 76:4,18
 84:2,3
 106:9
 119:22
 121:10
 135:6
 144:20

**ANTHONY SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Jennifer Gorneault on 10/27/2021      Index: Codified..connection

159:6,7,
13,17,18,
20 160:6,
12,17,20,
21,23
161:1
163:10
164:13,25
166:13,16

**Codified**
129:16

**collective**
16:25
17:25
33:22 35:8
37:9 44:9,
24 45:2,12
46:5,14
49:17
54:21
56:24 91:4
128:21
129:17
130:10
132:3,6
135:11
137:19
143:20,23
144:3
156:14
167:23
174:2,12,
14 182:13

**collects**
26:1

**column**  43:24
73:19 85:8

94:13,19
108:23,25
109:8,12,
15 110:1,8
111:14,16
121:25
128:3
160:4
166:15

**columns**
164:10

**combined**
108:5

**combo**  108:15

**commences**
112:9
116:9,13
117:9

**common**  37:11
46:17

**communicate**
54:8

**communications**
181:23

**company**  29:2
31:18,23
32:5
100:24,25
123:1
153:4
177:1
182:4

**company's**
5:24

**compare**
136:6

**compensate**
29:2 51:16
86:20

**compensated**
47:24
48:14,20
51:11
55:11
94:4,14
106:22
118:9,16
122:18
130:19,22
131:4,14
138:9
139:24
140:13
152:22
157:5

**compensation**
16:3 47:7
55:10
86:23
114:23
118:5,11
130:24
135:25

**compensation-
related**
17:12

**complete**
72:16
129:15

**completed**

137:14

**complicated**
67:2

**computer**
52:22

**Con**  158:5,
15,16,25
165:24

**concerned**
165:10

**concluded**
184:8

**conditions**
178:10

**conductor**
117:14,15
169:19

**conductors**
14:6,24
18:21
116:24
117:3,22
118:6,22
125:24
167:21

**conference**
27:4 29:23

**confirm**
101:17

**confused**
8:16 32:22
117:1

**connection**
27:5 39:6

**ANTHONY SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Jennifer Gorneault on 10/27/2021    Index: Conrail..correct

Conrail
  89:21
  116:21
  120:24
  123:24,25
  130:5
  158:18

consecutive
  68:4

consideration
  79:2
  113:15

considered
  47:24
  48:15,19
  49:3,25
  69:19 86:4
  87:3 95:17
  96:6
  103:16
  111:9,17,
  24 114:20
  115:3
  116:15
  118:2,12,
  20 140:9
  141:2
  144:21
  148:13,14
  151:3,16,
  19 152:12,
  13,15,18

Consolidated
  89:13

constantly
  20:2

construction
  8:23

Constructive
  128:4

Contents
  133:1

context
  111:10,18
  146:12,14

continue
  114:8
  178:22

continues
  114:19

contract
  43:18
  129:25
  161:2
  167:19
  179:9,10,
  11,14

contracts
  46:19 94:5

conversation
  29:15
  101:5

convert
  138:10

Cool   121:18

cooperate
  134:1

copies
  180:13,15

copy   31:7
  38:24
  184:2

correct   8:9
  13:20,21
  14:8 15:3,
  19 17:10,
  13 19:6,10
  20:1
  22:20,21
  23:1 24:8,
  21 31:24
  34:12 40:4
  41:6 42:4
  44:7,19
  46:25
  50:6,21
  51:5 52:23
  53:2,17,20
  55:5 57:8,
  12 60:9,12
  61:3,16,18
  62:15,22
  63:2,23
  65:17
  69:14
  71:2,22
  72:7 73:9,
  16 74:7,18
  75:6 77:16
  78:1,7,18
  79:10,14
  80:3 81:4,
  5 82:16
  84:7,18
  85:16
  86:1,7,16
  87:13,18,

21 90:9,15
  91:3,22
  92:6,12
  93:2,22
  94:20 95:1
  96:20,23
  97:2,4,17,
  21 99:13,
  14,22
  100:2,6,11
  102:12,13,
  16 106:14,
  18,21,23
  107:1,13,
  15 108:16
  111:4
  114:6,15,
  18 115:4
  117:25
  118:21,23
  119:16
  120:6
  121:17
  122:2
  123:19,22
  124:6,13
  125:5,8
  126:3,7
  127:4
  128:16,17
  129:23
  130:21
  131:2,7
  132:15,20,
  23 133:9
  134:24
  135:15,17
  137:4

**ANTHONY SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Jennifer Gorneault on 10/27/2021        Index: correcting..CSX

140:14,16
141:6,22
142:25
143:17
144:25
145:3
146:3
147:1,6,
17,25
148:3
149:20
150:4
151:23
153:5,8
154:21
155:12,18
157:9,12
158:12
162:21,22
164:16,21
165:17,20
166:1,5,
20,23
167:5,8
168:17
169:8
171:4
173:4,8
175:2
176:6
178:1,23,
24 179:15,
22 182:15

correcting
60:18

correctly
5:11 27:22

28:14
32:14
41:18
46:10
90:11
124:12
134:15

correspond
65:7
107:22
166:17

corresponds
70:22
163:20
164:14,18

cost 134:13

counsel
36:13
38:13
57:23
163:4
177:7

count 135:9,
12 142:7
147:19
152:21
175:16,17

counted
148:25

country
90:14

couple 6:6
35:10
37:23 59:1
103:1

116:4

courses
28:13,15

court 6:21
10:11
151:15
183:15
184:1

covers
89:14,18,
20 152:17
167:9

Covid 122:9
158:9,11

created
52:15
80:18
82:17
127:24

credit
136:20

crew 18:19,
23 19:5,8,
10,24
20:16,19
21:18,25
23:11,12,
16 24:13
42:7,13
54:16,18,
23 60:3,16
66:5,10,
16,17
67:19
68:16

69:21
75:15,18,
19 76:1,19
91:14,18
92:23,24,
25 93:20
96:4
104:14,23
119:10
125:23,25
126:5
134:6
156:3,11,
15,18
165:6,8
168:10
170:14
171:7,13,
18 172:6,
11

crews 21:20

CROSS-
EXAMINATION
5:7

cryptic
120:19

CSRA 89:12,
19 170:25

CSRE 124:4

csx 5:22
13:20,23
27:8 32:10
33:8,13
39:5 51:14
103:12,17
129:12

**ANTHONY SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Jennifer Gorneault on 10/27/2021        Index: CSX28935..days

130:10
156:23

CSX28935
130:8

CSXT  129:11

CU  164:20

current
13:24 14:1
21:8 23:17
34:19
40:24
53:10
79:16
88:18

customer
13:10,13,
14

cut  38:18,
19,20

cutting
23:25
154:8

―――――――
D
―――――――

daily  83:11
148:7

data  18:8
36:7 43:16
64:3 68:12
71:10
80:13,23
82:4,5
83:5 84:6,
14 87:11

126:18,19,
22,23,25
127:1,2,7,
8,24
163:22
165:14,16

date  40:5,
9,14
41:13,15,
16,19
59:4,6,9,
11,17,20,
23 61:11,
12 70:18,
23 72:8
78:21
82:11
84:8,9
104:23
129:16
162:19

dates  42:1
59:5,24
125:11

day  12:23
47:4,8,23,
25 48:1,21
50:1,11
52:6,8
55:10,13,
18,25
56:10,13
61:12
63:25
64:4,7,9
65:2,15
68:8

69:17,18,
25 71:8,15
73:6,7
75:9 84:9
85:22
90:17,18,
21,22
91:4,16,19
92:2,3,10
93:19,23
94:14
97:6,15,23
98:7,9
99:5
106:12
107:19
110:2,4,7,
8,11,12,
23,25
112:18
113:5,15
115:5
117:5,18
118:19
121:10
130:24
133:20,25
138:1,3
139:10,11,
21 140:11,
12,19,20,
21,22
141:5,13,
16,21,24
142:10,12,
21,24
143:2,4
144:1,4,

12,17
145:11,17
146:1,22,
25 147:15,
21 148:21
149:13
150:23
151:3,4,7,
17,19
152:8,21
154:3,4,5,
10,11,23
168:25
169:21
170:11
172:17
173:12,14,
25 175:13,
18,20,22
184:4

day-by-day
34:4

day-for-day
127:22

days  8:24
17:22
18:1,8
43:24
45:23 48:7
68:4,5
69:19
80:16,17
83:13,14
85:4 91:24
92:14
93:15
96:18

**ANTHONY SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Jennifer Gorneault on 10/27/2021          Index: DD2..determines

103:12
107:2
109:17,18,
21,22
111:3
120:5
131:13,21
133:17,21
134:2,4,8
135:23
136:2,8,
10,11,14,
19,23,24
137:3,11
138:3,15,
20,21,22,
24 139:8,
9,21 140:6
142:8
144:6,24
148:24
154:12
156:9
169:5,6
175:17,18

DD2  142:6

dealing  90:7

decide  51:20
124:20

decision
75:22

deduct  50:11
74:4,6
106:21

deducted
74:16

98:8,12
178:9

deduction
15:14 47:3
63:13 70:2
71:14
94:5,7,12,
13 98:6
112:20
113:2,6
114:1
116:18
117:5,20
118:13

deductions
56:2 63:8
64:5 73:25
74:11
83:23
88:19
89:25
96:14
104:5
112:23

deemed  135:6

Defendant
101:13

defined  95:2

delete  68:20

Dell  57:18

demand
90:16,18,
21 91:4,
15,19,24
92:2,3

99:5,21
140:19,21
169:6

denied  170:3

department
15:18 16:4
18:20
23:11,13,
17 26:1
67:19
88:20,24
144:16
156:4
160:12
177:9,11

department's
165:11

depend
170:18

depending
49:17 68:9
78:3,9
99:3
141:14

depends  23:9
152:20

deployments
103:15

deposed  6:4
13:18
32:10

deposition
6:11 10:2
29:18 31:7
32:3

139:16
180:7
181:5
183:1
184:7

describe
120:11
133:20

description
14:15
67:20
124:14
158:20

detail  156:5

details  34:5
35:19 37:7
93:24
119:13
120:15,16
123:7,9
124:15
127:22
158:21

determine
86:8
121:23
127:12
132:5
142:1
144:15,16

determined
144:18

determines
121:15
139:21

144:19

determining
121:9

difference
103:7
125:10
176:17,22

differences
46:18,22
47:16,17,
20 159:19

differentiatio
n 156:23

differently
104:22,23
175:16

differs
90:13

difficult
8:1 161:8

difficulties
43:10

digital
183:11

dinged 92:5

dinner
155:11

directly
26:18,23
67:17

director
14:1 21:10
24:16

directors
24:12

disciplinary
147:23

discipline
28:18,24

discipline-
related
28:12

discovery
65:23

discrepancy
175:14

discussed
50:5
103:21
133:14
174:1

discussing
108:21
145:21
152:6

display
79:17

displayed
43:15

displays
64:3

dispute
10:23
180:20

distance
12:20

divided
50:12

dizzy 110:16

docked 55:25
173:2

doctor 51:22
55:16
77:24
155:20

doctor's
143:11

document
30:20,23
37:1 57:22
65:24
66:3,18
67:7,8,22
81:7 82:17
87:24
88:23
102:2,3,12
103:2
119:3,14
129:6,13
132:16
153:21
160:2
166:10,12,
22 167:2,
3,12
168:16

documents
29:21
30:3,7,8
33:25
34:22

35:10
38:14
101:5
163:3
179:24
180:5,8,12
182:16

doe 137:10

dollar 70:22

dollars 35:5
56:18

Don 24:17

door 57:16

double
163:21

download
80:12

Dr's 96:11

drive 23:9
46:15
95:8,11

drop 60:22,
23 68:14,
15 75:11,
19 76:17
93:4,6,7,8
99:5,21
140:23,24
172:2,3,4,
6

dropped
74:21
75:2,20

dropping
  171:6

drops  93:10

DT  60:21
  68:15
  75:2,14
  164:18

dues  179:5,
  8,21

duly  5:4

dump  80:22

duty  19:14
  94:22
  103:11
  105:11,15,
  25 106:24,
  25 107:2,7
  115:11
  131:15
  151:16
  154:7
  168:7

_____

E

e-mail  36:14

e-mailed
  119:4

e-mails
  182:1

earlier  32:2
  58:15
  75:13
  114:25
  119:4

130:15
152:7
160:19
162:13
166:18
173:14
174:2
175:12

earn  91:24
  94:8
  136:13
  137:17
  138:16,17,
  18,20

earned  74:16
  91:8
  136:22

earning
  120:11

earnings
  15:20
  48:1,2,4,
  5,11,18,
  20,22
  49:4,5
  56:6,19,21
  57:1,3,4,9
  65:4,6,14
  66:12
  73:19
  74:1,2,4,
  6,12,14
  83:21 86:2
  94:4,15,17
  120:9,12,
  22,23
  121:4,5,7,

9 134:14,
18 135:9,
13 149:1,
17

easier  6:7
  7:20 11:3
  50:23
  79:11

easy  138:5

eat  115:17

effect  47:12

effective
  59:24
  62:16

elect  65:14

electronic
  28:17

elements
  144:20

eligibility
  150:21

eligible
  56:5 136:3
  138:21
  150:3

Elizabeth
  5:20

emailing
  183:15

Emergency
  122:11
  158:7

employee

19:12
28:23
34:17
36:24
37:15
40:1,6
47:6 48:13
50:19,20
60:20 62:2
64:19,23
69:20 74:8
80:18,24
82:8 83:7,
16,25
85:15
86:19 88:5
90:18 93:9
96:3
103:15
104:13
117:8
119:1
127:14
134:25
136:13
137:9,10
138:20
139:25
144:11
148:21
149:12,15
154:3
156:25
158:18
167:13

employee's
  66:14
  80:13,14

**ANTHONY SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Jennifer Gorneault on 10/27/2021     Index: employees..examined

employees
  16:5 17:19
  19:11
  22:3,14
  23:7 28:7,
  12 33:12,
  16 34:5,15
  36:9 37:2,
  12 42:24
  45:15
  51:15,25
  52:1,14
  68:22
  77:12
  82:6,18
  85:21 90:8
  102:24
  116:17
  119:6,8,15
  122:15,22
  123:4
  125:15,20
  126:1
  130:4,19
  131:9,18,
  20 132:4,
  10 136:1
  145:3
  146:20
  147:21
  160:13
  162:16
  165:16
  174:8,22

employment
  91:2

end  19:13

27:3 40:5,
9,14 41:2,
7,10,13,
15,19 42:1
52:16 59:4
79:9 82:11
83:25
99:25
101:18
136:1
137:5

ended  79:18,
22

ending
  116:14

engine  14:2,
4,5 16:5
17:19
21:10
33:16
37:12,15
165:15

engineer
  18:21
  112:11,16
  117:13
  118:18
  145:14
  153:10
  178:8

engineer's
  146:25

engineers
  14:6,24
  107:18
  114:20

116:14
117:24
118:2,15
125:24
138:14
178:16
179:1,7

ensure
  155:16

enter  139:13

entire  13:8
  49:14
  50:11 64:4
  79:2,3,4,
  23 110:7

entitled
  139:4

entitlement
  18:14,16
  47:8 52:3,
  7 53:1
  54:9 55:1,
  4,9,13
  56:8 85:23
  87:3 94:9
  96:5
  115:3,6,9,
  11 145:12
  146:21

entitlements
  17:20,24
  52:5 53:12
  57:2,3,5,
  10 69:20
  136:3
  137:16

138:19
148:24
149:13

entry  61:6,
  19

environments
  20:22

equates
  108:8

ERB  122:7,
  8,9 158:5

essentially
  22:14 34:9
  41:10
  73:23
  127:6
  152:25
  167:3
  173:19

established
  45:4
  178:16,19

estimate
  69:2

estimates
  79:17

ethernet
  26:18,23

ETI  153:9

evening
  72:23

exact  87:10

examined  5:5

**ANTHONY SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Jennifer Gorneault on 10/27/2021          Index: exceeds..figure

exceeds
  107:2

exceptions
  140:10

exclusive
  134:19

exhibit
  29:19
  38:10
  58:12
  65:21
  81:15 88:2
  102:1
  126:11
  129:3
  130:12
  163:1,8
  166:9
  167:1

exhibits
  183:14

exists  22:13
  66:24

expand  43:18

expected
  182:24

expecting
  112:1

expels  71:10

expired
  176:6

explain
  23:20
  33:25

49:12
91:21
97:23
103:6
112:14
128:25
133:17

explains
  143:21

explanation
  35:6

explanatory
  181:11

extent
  129:13
  131:23
  167:23
  172:18,19

extra  22:10
  34:8 40:7,
  18 41:25
  42:21
  44:13
  49:11,13
  53:3
  68:23,25
  69:12 77:7
  84:12
  103:18
  119:9,13
  127:11
  133:7,8
  134:9
  135:8
  136:5,14,
  17,23

137:3,10
140:7
149:1,4,6
152:19
157:2
160:10
166:25
168:5,7
176:15

Extraboard
  119:1
  166:7

_____

F

F-O-R-K-U-M
  11:11

FACS  28:2
  33:3

fact  84:4
  129:14
  137:21

fail  175:25

fair  29:12

fairly  67:2

fall  35:7
  94:15

falls  109:19
  148:22

familiar
  28:9 33:6,
  13 91:11,
  16 156:21

family
  87:15,17

96:8
143:10
145:16

fancy  20:6

fast  31:4

faster
  101:21
  158:3

February
  12:24
  59:11,13,
  17 60:11
  129:16

Federal
  146:19

feed  18:14

feeds  52:16
  170:16
  172:7

feel  8:2,8
  30:16,19

feeling
  113:17,18

FF  87:14

field  65:4

fields  43:6
  85:10
  107:15
  163:22

figure  10:12
  37:16,21
  79:11
  81:18

**ANTHONY SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Jennifer Gorneault on 10/27/2021          Index: file..fun

| | | | |
|---|---|---|---|
| 84:25 | 89:14 | 147:9 | frame 40:8 |
| 85:3,24 | | 155:14,15, | 78:25 |
| 86:3 | FM 87:16,20 | 22 156:8 | 88:17 |
| 159:24 | FMLA 5:25 | 158:5,10, | 90:19 |
| 164:2 | 24:24 | 15,16,25 | 92:17 |
| file 9:14, | 25:4,14,21 | 169:11,20 | 99:24 |
| 15 10:3 | 26:6 46:3, | 170:4,10 | 125:16 |
| 39:2 58:18 | 10,23 | 171:1 | 127:14 |
| finally | 47:7,22,23 | 173:16 | free 8:8 |
| 13:11 | 48:14 | 176:3 | freezing |
| find 9:6 | 51:16,21 | 178:8,17 | 43:12 |
| 10:3 | 52:24 | focus 105:9 | French 5:15 |
| 57:18,22 | 54:10 | folks 131:1 | Friday |
| 120:21 | 55:16 60:4 | follow 141:3 | 40:10,11, |
| 161:12,13 | 61:2,5,23 | | 12,16,18, |
| 164:9 | 63:12 65:2 | forgive 5:18 | 19,20 |
| 180:21 | 71:16 | forgot 6:23 | 41:11,14, |
| fine 9:3 | 72:11,14, | 8:14 | 16 96:15 |
| 10:21 | 23 73:3,15 | Forkum | 98:10 |
| 25:18 | 78:12,13 | 11:11,13 | 99:12 |
| 27:13 | 86:2,5,21, | form 32:6, | 100:12 |
| 29:10 | 23 87:5,9, | 19 155:24 | Fridays 83:1 |
| 54:16 | 19 88:4 | 171:21,23 | Frog 12:6 |
| 84:20 | 91:24 92:9 | 177:3 | front 8:22 |
| 115:17,22 | 94:2 99:16 | forwarded | 52:15 |
| 124:20 | 100:15 | 183:23 | 53:25 |
| 157:19 | 105:23 | foundation | 54:4,10 |
| finished | 110:20 | 169:16 | 69:3 |
| 153:23 | 111:25 | 176:8,19, | full 11:4 |
| 168:20 | 113:1 | 21 | 37:6 75:9 |
| five-minute | 114:9 | FP 61:2,4 | 93:24 |
| 27:12 | 131:19,22 | 87:12,19 | 97:19 |
| flip 30:10 | 132:5,7 | 164:18 | 171:2,3 |
| Florida | 139:10,25 | FR 164:20 | 175:11 |
| 11:18 12:7 | 140:8,11 | | fun 57:21 |
| | 141:10,17 | | |
| | 142:15 | | |
| | 146:6,21 | | |

**ANTHONY SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Jennifer Gorneault on 10/27/2021          Index: function..guarantee

function
   25:4 29:23
   144:14,15

functions
   25:10

─────────
          G
─────────

G-O-R-N-E-A-U-
L-T   11:7

garnishments
   15:14

Gateway
   33:6,7,8,
   11,14,16
   34:22
   42:25

generally
   120:13
   141:3
   157:3
   167:7
   170:24

generate
   87:4

generates
   42:23

gestures
   7:24

gift
   148:23,25
   149:9,10,
   11,16,19,
   21 150:8,
   12,21

give   11:15
   13:9 14:14
   27:6,9
   69:2 80:14
   128:18
   136:24
   137:16
   140:6

giving   74:8
   158:20

glad   57:13

God   107:6

good   5:9
   23:15
   27:14
   29:15 58:6
   113:18
   115:15,23
   162:6
   168:3
   181:21

Gorneault
   5:3,10,13,
   16,17 11:6

govern
   162:13
   167:24

governed
   44:24
   45:1,9,11
   179:9,11

Government
   146:19

governs
   46:11,12

130:11
132:6
162:16
167:21

grab   65:5

grace   156:7

grandfathered
   90:2,4
   124:1

granted
   168:5

great   39:8

gross   15:2,
   4,11,12,
   19,22
   16:10
   42:17,21
   46:3

grossing
   14:23
   25:23

ground   6:6

group   15:3,
   13 16:1,22
   18:13,18
   19:1,22
   23:5,19
   24:7,10
   45:21
   91:17

Guar   38:9

guarantee
   6:3 21:5,
   13 22:4,5,

10 24:20
26:4
31:11,19
33:17
34:1,2,3,
6,8,11,14,
16 35:3,6,
16,19 36:8
37:3 38:15
40:7 41:4,
18,25
42:7,19,21
43:17
44:13
46:9,16
47:3,12,
13,25
48:3,7,10,
11,12,16,
23 49:6,
11,23
50:2,5,12
55:3,22,23
56:3,5,14,
17,20,22
57:7,11
58:23
63:17,19,
22 66:5,
10,14,16
70:20
73:19,22,
24 74:3,8,
10,17
78:21,22
79:15
80:2,6,7,
18 81:3,19

**ANTHONY SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Jennifer Gorneault on 10/27/2021        Index: guaranteed..helpful

82:20,23
83:20,24
87:25
88:4,6,10,
15,18
90:12
94:8,16
96:25
97:9,10,
13,14,19
98:6,8,12,
23,24
100:19
103:18
104:5
106:20,22,
25 109:16
112:6,14,
20 114:16,
21 118:3
119:2,10,
23,24
120:8,9,
11,12
121:2,4,
11,12,16,
21,24
127:11,16,
23 128:11,
15,23
130:11,20
131:5
132:7
133:6,7,12
134:9,12
135:7,8,13
136:6,17,
18,23

140:4
145:18
148:8,9,15
149:1,7,
14,17,19
152:8,14,
19,23
153:2
155:7
156:22
157:2,7
159:11
160:10,15
162:15
163:22
167:16,22
169:3,20
170:1,3,7,
11 171:2,
3,20
172:5,8,
13,16,21
173:2
174:4
175:2,3,7,
12 176:14,
16 177:20,
24 178:9,
12,18
179:8,13,
19 182:7,8

guaranteed
40:17
44:22,23
49:13,16,
19 56:18
57:1,5
157:4

166:25
170:16

guarantees
136:5
148:7
152:15
175:15

guess  9:15
17:18
60:16
65:20
105:11
108:9
153:15,19
183:2

guy  56:23
57:14 58:1
74:24

guys  20:11
39:5

———————

H

half  97:3
98:12,24
100:19
161:12

hand  85:5

handle  16:8,
9 134:2
170:14,15

handled
46:16
134:8
156:18

handles
18:20

handling
67:17

happen  56:2
68:12
137:12

happened
71:1,20
143:6
153:18

happening
8:23 74:17

happy  32:23

hard  7:12

head  5:17
7:25
22:12,16
54:6 76:9
84:15
106:2

hear  8:13,
25 9:2
12:19
18:22
26:13 45:6

heard  21:16
28:1,3
104:20

held  14:9,
11 135:7

helpful  7:23
164:22

helps  80:5
  81:8,18

hey  26:7
  93:23

high  109:16

high-earning
  136:16

higher
  100:14

highlight
  65:9 70:6
  153:20

highlighted
  153:17

highlights
  153:14

hire  83:16

hired  89:23

history
  41:22
  127:12
  170:15,16

hit  82:12
  139:3
  144:12

Hoe  9:22

hold  120:20
  139:12
  150:15
  169:14,15
  177:19

holds  9:20

holiday
  148:22,23,
  24 149:3,
  8,11,15,21
  150:2,5,8,
  12,13,18,
  21 151:1,8
  153:7

home  11:16

honestly
  85:12
  146:11
  177:6

hopes  77:17

hospital
  143:11

hospitalizatio
  n  103:22,23
  104:3,4,8,
  17 105:12

host  9:23

hour  161:13

hours  51:4
  55:15
  68:10 72:3
  110:13
  112:19,21
  125:12
  176:2,4,5

house  28:6
  166:12

housed  37:8

housekeeping
  183:14

huh-uh  7:24

—————————

         I

—————————

i.e  145:15

id  40:1
  82:8
  159:11

idea  24:9
  105:5

identify
  101:16

III  133:2,4

immediately
  92:19

impact  55:12
  60:3 93:25
  121:2

impacted
  48:5,17,19

important
  7:3,21
  8:11

impressive
  54:22

incentive
  152:16
  153:3

inclement
  95:5,7

include
  48:21
  77:22
  146:6

169:11

included
  48:1
  134:20
  140:2

includes
  34:6

including
  7:1 21:11

income  15:22

increased
  134:13

increases
  134:13

increasing
  68:19

increments
  68:7

incur  172:20

Index  133:1

indicators
  165:25

individual
  5:22 37:17

individuals
  45:21

information
  25:25
  34:1,10
  35:1 37:8,
  16 39:3,25
  42:13,23
  43:3 44:1,

**ANTHONY SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Jennifer Gorneault on 10/27/2021                    Index: initial..jobs

3,6 54:5
67:13
79:17
80:15,21,
25 106:16
119:7
124:25
125:6
127:15
146:19
181:12

initial 80:7
81:3,19
132:15

initiated
76:1

Injured
105:15

Injury
105:11,25

input 80:2

instance
17:2 40:13
59:10
100:17
123:13
136:15
139:24
140:19
141:10
153:7
155:14
164:18
165:24
172:24

instances
110:23

instruction
37:3

instructional
37:10
82:17

instructions
35:24
80:19

Instructor
153:11

intending
9:9

interaction
33:3

interfacing
20:2

interfere
153:2

interfering
12:21

intermittent
24:24
78:13

Internal
33:8

internally
137:8

internet
27:5

interpret
67:4

101:6,7
135:21
177:5

interpretation
168:15
177:9

interpreting
134:15

Interrogatorie
s 101:12,14
102:11
111:6
116:5

interrogatory
180:14

interrupt
84:19

intranet
33:11

introduce
6:23

involved
25:11 35:5

issue 15:15
19:12

issued 16:21

issues 28:12
29:25
90:20,23

item 64:2

J

J-E-N-N-I-F-E-
R 11:6

January
137:15

Jennifer 5:3
11:5 26:7,
20 29:8,20
31:6 35:20
36:2,4
38:11
58:13
94:11
101:18
115:18
132:20
139:12,16
150:15
161:20
169:14
171:24
174:20
176:9

Jennifer's
29:17

job 7:11
62:5,19
77:5,6,9,
17,21 84:9
134:25
135:3
154:6
172:11

jobs 77:13,
17 136:16

Joe  9:21
  182:20
  183:8,10,
  17

Joe's  9:20

John  5:21

Johnson  14:4
  180:19

Jones  177:10

judgment
  168:16

July  34:20
  82:14

June  41:20
  70:2,3,18,
  19,23
  72:12

jury
  106:24,25
  107:2,7
  115:11
  131:15
  151:15

_____

K

_____

keeping
  61:10

Kentucky
  89:15

key  66:24

kid  87:20

kind  6:14
  7:25 13:19

17:16
44:12
56:2,21
61:9,11
74:8,25
75:10
77:25
83:5,18
95:23 96:6
131:19
138:25
148:8
149:2
152:17
156:16
160:21,22
166:18

kinds  16:2
28:8 78:5
131:8
140:18
141:9

KK  29:19

knew  71:11

knowledge
  54:20
  168:9

_____

L

_____

Labor  101:7
  144:19
  177:8,10

lack  169:15
  176:8

laid  43:25

71:12
72:14

Lane  12:6

language
  98:24
  117:17
  168:23

laptop
  26:18,24

Laughter
  13:10,14
  54:20

launching
  30:18

law  5:4

lawyer  182:3

lay  59:21
  73:12
  168:15
  176:18,25

layer  6:9

laying  76:4

layoff  37:8
  59:21,25
  60:4,17,20
  71:9 73:12
  76:2,16,17
  122:8,13,
  16,17,18,
  21  123:1
  158:5,14,
  15,25
  163:5,10,
  17,20

164:12,19,
20,23
165:22

Layoff_all
  122:23

Layoff_bo
  123:21

Layoff_cr
  123:23

layoffs
  66:12
  122:19

lays  35:4
  63:11
  70:10
  71:25

leading
  150:4

lean  82:1

Leap  12:6

leave  18:1
  24:24
  25:4,21
  46:3 47:22
  52:8 53:10
  54:10
  55:16 65:2
  69:18,19
  78:13 86:5
  87:2,9,10
  91:25 92:9
  102:23
  105:16,18,
  19 111:11
  114:10

ANTHONY SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.
Jennifer Gorneault on 10/27/2021          Index: leaves..lose

115:5,8
121:14,16
131:8,10,
13,15,17,
19,21
132:5,7
136:11
137:18
138:22
139:11
140:18
141:9
143:25
145:11,17
149:13
151:11,13
155:14,15
169:11,20
170:4,10
171:1
173:14
178:9

**leaves**
105:10
106:8

**leeway**
155:15

**left** 62:4
80:10 99:5
157:15,16
166:15

**legacy** 20:5,
7,8

**LEH** 159:21

**letter** 45:3,
7,14,19

**letters**
45:17

**letting**
61:10 74:9

**level** 109:16
145:2

**liability**
83:20

**life** 54:17,
18,23
77:23

**limit** 49:19

**limitation**
147:20

**limited**
28:10

**limiting**
88:16

**links** 33:12

**Lisa** 9:8
29:11,12
36:1 39:3
176:14
183:14

**list** 22:15,
20,24 23:3
24:5 66:19
102:22
159:24
164:8
168:11

**listed** 31:19

**lists** 123:12

**literally**
80:22 96:3

**live** 32:17

**living**
134:13

**LL** 38:10
58:20
163:14

**loaded** 172:6

**local** 142:17
147:1

**location**
89:11

**locations**
133:25

**log** 20:15
34:15 53:3
119:11

**logged** 20:17

**logic** 66:5,
7,8,25
119:25
120:10
121:22
122:3
123:7,9
144:8,22
158:21

**logs** 43:2

**long** 11:12,
17 12:8,25
13:2,6,22
14:9 34:19
53:18

78:25
110:20
113:7
115:21
134:6
141:4,14
161:11
173:24
177:4

**Long-term**
103:6,8,
13,16

**longer**
126:24

**looked** 67:1
106:17
112:10
118:25
119:1
143:21
173:13
180:3

**loosing**
141:18

**lose** 47:9
51:4,8,22
55:2,9,21
56:13
86:10,13
88:6,15
90:11
97:20
98:5,8
99:3,12,20
113:1,6,23
114:16

**ANTHONY SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Jennifer Gorneault on 10/27/2021     Index: loses..management

140:15
142:13,14,
21,22
143:12,16,
25 152:8
170:7,8,9,
11 171:1
177:23
178:18

loses  176:3

losing  173:6
178:15

loss
106:20,25
112:18,22
155:6

lost  50:15
55:2,12
61:20,25
62:4,12
63:21
64:16,18,
25 69:24
72:7 73:2
75:5 85:23
86:9
97:19,24
98:11
100:15
107:25
108:3,7
109:2,4
112:2
140:5
141:7,8
169:21

lot  29:13
67:23
142:4
157:16
162:13
182:7

low  26:15
27:3

loyalty
13:10

luncheon
116:1

——————

M

——————

made  38:14
75:22 77:7
103:25
158:1
180:15

magic  138:19

magnify
163:6

maiden  11:11

mainframe
19:16,18,
21,23,24,
25 20:3,5,
9,15,18
21:19 22:1
52:14,16
126:23

Mainframe/crew
27:24

Makala  29:7,

17 31:1
32:25
38:1,7,8,
25 58:10,
18 65:19
66:1,20
81:12
87:23
101:11,15
111:6
116:4
121:19
124:19
126:9
129:2,9
130:7
133:11
157:23
162:10
163:4
164:1,5,23

make  6:7
9:6 10:2
15:18
28:14
30:20
43:7,11
49:22
50:23
53:1,11,13
103:24
109:24
110:4
114:13
134:1
136:17
148:11
155:22

158:3
168:16

makes  7:20
8:21 30:3
79:8

making  7:11
8:7 25:6
134:20

manage  78:13
91:15

managed
133:12
134:5
144:19

management
18:19,24
19:5,9,11,
24 20:20
21:19,25
23:11,13,
16 24:13
27:24
60:16
67:19
68:16
69:21
75:16,18,
20 76:1,19
91:14,18
92:23,24
93:1,20
96:4
104:15,24
125:23,25
126:5
134:6

**ANTHONY SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Jennifer Gorneault on 10/27/2021       Index: maneuver..Mary

156:4,11,
16,18
165:7,9
168:10
170:14
171:8,13,
18 172:7,
12

maneuver
60:16

manner
171:19

manual
144:10
145:5

mark  18:13
22:5,19,23
23:24
24:19,23,
25 26:2,3
37:8 46:15
47:1,21
51:3,21
52:18,20,
24 53:15
54:8 55:15
58:11
59:22,25
60:17,20
61:1 63:1
73:11,12,
14 75:9,10
86:13,14
87:2 92:15
98:3,6
99:11
112:25

113:4,16,
19 114:4
139:25
141:10,12
150:22
155:14,21
162:24
163:7
168:5
170:9
178:17,21

marked  23:8
29:19
38:10
47:11
50:10,15
51:6 61:23
62:20
63:3,4,16
65:21
71:13
72:22
81:15 88:2
99:11
102:1
104:14
110:7,10,
21 113:10,
13,19,21
114:22
118:4
120:1
126:11
129:3
130:12
140:8
141:15
145:16

163:1,8
166:9
167:1
170:10
177:21

marking  22:9
23:21
25:5,6
26:5 46:9
53:18
59:15
60:13 61:5
63:20
73:16 76:5
96:4 98:9
111:18
134:7
142:11
143:14
155:16
156:17,18
170:4
171:19
177:18

markoff
46:24
47:23,24
49:24
51:12 52:1
55:8,11
69:22
70:19 72:8
73:3 86:2,
20,24 87:5
90:22
91:16
96:6,7

99:6,8,10
104:8
105:14,17
108:7
110:20
118:9
130:20
131:22
146:21
150:10

markoffs
49:15,18
88:22
105:20
106:22
111:19,25
156:8

marks  22:7
24:4 25:21
47:6 48:14
53:21
63:12
69:20
70:10
72:1,2
73:8,10
112:11,16,
21 117:13
176:3,4
178:8

markup  76:2
106:9
154:22

markups
66:12

Mary  87:16

**ANTHONY SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Jennifer Gorneault on 10/27/2021    Index: Master..multiplier

124:24

Master 53:23
92:22

materials
180:16

math 50:25
96:24

matter 98:11

max 68:11

Meadow 11:17

meaning 47:9
55:8 68:9
69:9
76:12,14
109:2
111:12
121:12
147:20

means 59:2
65:14
74:25 75:4
92:2,3
108:1,18
110:1,3
112:15
121:5
122:12
146:1
156:24
163:11

meant 134:23

meet 115:24
136:2

member 45:11

46:1
87:15,17

members
174:16
179:1,5

merging
130:5

message
26:15

mid 137:14

middle 11:8,
10 29:13
100:4

Middleburg
11:18 12:6

midnight
40:21
41:5,10
59:13 61:7
63:25
70:25
71:11 73:8
77:12
99:25
100:4,13
110:14,15
154:4,13,
23 155:9

miles 138:9

military
94:21,22
99:21
103:5,7,9,
13,15
141:23

142:3,5,9

mind
153:11,16

mine 6:11
51:1

minimum
176:1

minus 48:11

minute 38:3

minutes 58:2
162:5

mispronounce
29:9

missed 112:9
116:10,13,
22 117:10
143:3

missing
38:24
108:6

misstating
127:4
147:2

MM 65:20,21
124:24
128:11
157:24
163:14

moment 85:19
128:18

Monday 79:19
96:14
98:10

99:11,23,
24 100:3,
5,7 113:1,
16 155:11

money 70:1
173:6,7

monitor 70:5

month 12:22

monthly
148:7

months 12:3

morning 5:9
77:12

mouth 8:5

move 59:12
69:13 70:5
77:3,8
81:25
114:8

moving 77:8

MRK 59:22
62:25

MSJ 101:12,
14

multi-task
161:25

multiple
44:13
77:17
95:15

multiplier
138:10

**ANTHONY SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Jennifer Gorneault on 10/27/2021     Index: multipliers..official

multipliers
 138:7

Munley  24:17

―――――――――――――
         N
―――――――――――――

N's  110:17

names  29:13

Nathan
 177:10

navigate
 158:2

NCSX  18:18

necessarily
 62:19 75:8
 76:3
 110:22
 122:24
 157:4,7

needed  10:9

negatively
 48:16

negotiated
 100:25

negotiations
 101:2

net  15:5,15

network
 26:15 27:3

neutral
 151:3,16,
 19

night  100:5

155:1,11

NM  159:21

NN  88:2

no-show
 95:23

nods  7:24
 22:12,16
 54:6 84:15

non-
compensated
 47:2 55:7
 69:22 87:5
 88:22
 90:22 96:7
 108:7
 122:17
 177:18,25

non-
grandfathered
 116:17

noon  155:20

normal  17:5
 52:7 140:1

north  89:19
 91:1
 131:24
 162:16
 167:6

northern
 89:17,21
 130:4,18
 132:4,9,
 20,21

Nos  102:11

note  97:23
 99:1
 133:23
 168:19
 170:20,21,
 22 175:10

noted  68:7

notes  119:19
 180:2

notice  29:17
 31:7 32:3
 92:20 97:7
 150:18

number  12:15
 13:1 45:23
 54:19
 68:18,19
 79:1,5,7
 80:7,8,17
 93:14
 109:17
 116:5
 122:3
 129:10,11
 136:2
 138:14,20
 139:7
 144:12,23

numbers
 49:23
 80:16

numerical
 76:12

―――――――――――――
         O
―――――――――――――

object  32:19
 155:24
 169:15
 171:21,23
 177:3

objection
 10:20 32:6
 36:17
 94:10
 139:13,14
 150:16,19
 161:17
 169:25
 174:18
 176:7

objections
 7:14
 169:23

occur  59:19
 72:8 77:11

occurred
 59:13 60:1
 70:17,23

occurs  112:2

October
 40:25 41:5

offender  7:9

office  8:24
 9:20
 183:16

official
 98:3

**ANTHONY SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Jennifer Gorneault on 10/27/2021                    Index: offset..pay

offset    48:22
  49:6
  56:14,17,
  20,22
  57:4,6
  94:16
  121:12,15
  135:13
  136:22
  138:4
  149:6,17
  152:9,23
  175:2

oldest    60:6,
  7

one-day
  117:19
  118:12

online    28:13

oo    102:1

open    43:19

operate
  171:17
  172:16,20

operates
  126:5
  134:4

operation
  176:15

opportunity
  31:14

opposed    7:23
  15:24
  26:24  32:5

179:20

option    26:24

options    16:8

order    51:13
  61:11  78:2
  85:3
  177:23
  183:9,11

Orders    142:6

original
  25:13
  128:5
  153:20

os    122:9

─────────────

              P

─────────────

p.m.    60:11
  154:7
  184:8

pace    30:3

pacing    57:16

packet
  180:16

pages    65:25
  120:17

paid    48:13
  49:2,7
  52:7  56:8,
  16  57:1
  65:15
  74:11
  86:19  92:4
  102:23

106:7
107:8,10
121:13
127:17
128:16
131:8,10,
  17,19
136:7
141:5
142:2
148:22
149:15
151:11,13
152:7
182:9

pandemic
  158:9

paragraph
  107:18
  112:5
  116:8
  133:17
  134:11
  135:19,20,
  21,23
  148:10
  152:10
  153:25
  174:7
  175:6,24

part    17:4
  20:20
  27:23
  29:22
  31:11
  38:17,19
  78:20

81:17
90:14
91:2,12
101:1,22,
  23  117:4,
  18  132:15
134:5
138:2
144:9
149:16
171:4
177:22

parties
  134:1

parts    20:11
  30:24
  46:11

pass    15:12

pay    6:3
  14:22
  15:11,15
  18:15  21:5
  25:10
  28:14
  31:11,20
  33:17
  34:11
  35:16,19
  38:15
  41:4,25
  42:17,19,
  21  44:12,
  18  45:24
  46:2,3,12
  48:22
  49:5,16
  50:12

**ANTHONY SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Jennifer Gorneault on 10/27/2021      Index: paycheck..period

52:6,15
55:3
56:14,22
57:7,11
58:23
63:17,19,
22 65:2,6
73:19,24
74:17
78:22
79:15
80:2,6,7
81:3 82:6,
7,10,11,
14,19,20,
23,24
83:21,24
88:4,6,10,
15 90:12
94:8 96:25
97:15
106:20
114:16
119:12
120:11
121:24
127:13,16,
18 128:11,
16,23
130:11,20
131:5
132:7
135:14
139:24
144:20
148:8
149:4,6,7
150:18

paycheck
49:1,3

paychecks
15:16

paying   160:9
179:8,21

payment
48:23 52:1
53:13
127:23
148:25

payments
65:5 136:7

payroll   14:2
15:4,13
18:15
19:22
20:17,19

151:1,8
152:9
153:2,7
162:15
167:23
169:20
170:1,3,7,
12 171:20
172:5,13,
17,22
173:2
174:4
175:2,3
176:14
178:9,13,
19 179:5,
8,13,19
182:7,8

21:10
25:23 33:4
36:7
42:13,14
67:17
88:20
91:17
126:18,22
127:1,8,
24,25
137:8
144:14

PB   69:15,
16,23

penalized
121:23
130:20
131:5
169:2
178:11,12

penalties
63:8 64:5
83:23
100:14
121:22
175:8

penalty
17:2,6
47:11
56:25
63:13,17,
18 64:8,
10,24
70:14,22
71:3,13
72:5 73:5
94:13,19

121:25
134:19,21,
23 135:4
172:20

penalty-type
135:6

pending
6:15,19

people   28:11
34:22
68:20
69:12 90:4
111:9,17
124:2
143:5
147:23
155:13
157:6

people's
68:17

percent
102:20

perfect
91:10,25

perform
15:5,13
25:3 42:15
66:13
136:4
137:7
142:17
145:5

performed
137:14

period   34:8

**ANTHONY SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Jennifer Gorneault on 10/27/2021    Index: permission..positioning

40:5,9,10,
14,17
41:4,13,
15,19 42:1
48:2,11,22
49:6,15
50:4,5,10,
11,16
56:6,19
57:5,21
59:4 61:17
72:9 74:12
78:22
79:2,4,5,
9,16,18,
22,24 80:2
82:7,10,
11,14,19,
21,23,24
83:22 91:9
112:7,9,
13,24
114:17
116:9,13
117:9
119:12
156:7
172:21
178:13,18

permission
147:4
168:5

permits
51:14
114:12

person  12:13
53:9 69:21

personal
17:21
18:1,7
47:22
51:15 52:8
55:18,25
56:10,13
65:2,15
69:16,17,
18,19
70:11 72:1
73:13,14
77:23 78:2
85:22 86:5
87:2 92:8
93:17,18,
19,23,25
99:15
106:8,12
115:5
118:19
121:14,16
131:13,21
136:11
137:17
138:22
140:25
141:1,11
145:11,17
147:15
149:13
154:5,10,
11,12,23
156:9

125:1,10
168:15
171:13
176:25

169:5,21
170:11
173:1,12,
14

personalized
130:25

perspective
25:23
146:11

phone  12:11,
13 13:1,2
52:21 53:4
54:19
93:14
95:16

phrases
16:15

pick  142:9

piece  8:15
26:4 28:21
54:1 91:15
178:3

PL  139:8
148:24

place  34:20
53:16 67:2
75:5 88:21
119:10
129:18
172:10

placement
23:6,21
61:10

placing  71:7

Plaintiffs
6:17

plan  78:8
137:15

PLD  145:10

PLD's  151:14

plug  26:23
82:10

plugged
26:25

point  9:24
24:19 32:4
79:14

points  14:17
90:24 94:1

policies
5:25 33:11

pool
156:21,24
157:1,2,4,
7

poorly
113:17

portions
128:21

position
13:25
14:1,10,
11,20 77:7
114:7
168:6

positioning
171:9

possibility
  136:19

possibly
  57:15

potential
  5:23

potentially
  88:6

PP  126:11

practices
  5:25

pre-approved
  111:1

preceding
  150:23

prefer  10:18

prepare
  180:6
  181:4

prepared
  31:17

prescribed
  5:4

present  6:16

previous
  11:11
  108:12

previously
  32:17

primarily
  5:24 6:2
  90:7

print  34:16

printout
  43:16

prior  23:17
  31:7 40:15
  89:23 90:5
  127:21
  147:18
  151:2,4
  155:1,16
  168:24,25

privileges
  181:21

problem  5:19
  10:4 181:1

problems  9:3

process
  51:20

produce
  176:12

produced
  65:23
  129:12
  130:9

production
  132:16

program
  71:10
  149:14
  153:3

programmed
  149:14

programming
  66:4

programs
  152:16

progression
  60:6 83:17

Project
  119:23

prompt  8:4

pronouncing
  5:10

prorated
  138:23

protect
  107:20,21,
  24 108:2,
  11,18
  109:1,3
  112:3
  114:21
  118:3

provide
  36:10,13
  38:21
  67:14
  85:15
  86:23
  136:9
  152:6
  153:1
  154:1
  164:9

provided
  36:7 38:13
  67:18 81:7
  82:5
  132:12

180:5,9

provision
  149:22
  173:13,20
  174:1

provisions
  128:24
  143:19
  171:16

pull  29:7,
  17 36:24
  38:1,7
  65:6 82:6
  87:23
  119:2,11
  126:9
  130:7
  149:12,16
  162:10
  163:5
  164:5

pulled  82:8
  126:18
  135:8

purposes
  10:9
  114:21
  118:3,19
  140:1
  145:18
  148:15
  184:2

put  10:1
  14:19
  32:25
  37:23

52:21
65:19
66:20 73:6
78:1,11
81:12
98:15
110:19
111:5
116:4
150:16
168:9

putting  8:5
71:8
107:14

---

**Q**

Q-1  134:18

Q-7  145:14

QQ  129:3

qualification
139:14

qualify
136:10
139:1
142:18
150:1

qualifying
136:2,9,
21,25
138:4,8,
12,21,24
139:9,11,
21,22
140:2,9,
12,20,21

141:5,12,
16,21,24
142:8,10,
21,24
143:2,4,
12,13,15
144:4,6,7,
12,17,21,
24

question
6:15,19,20
7:5,8,18
8:14,19
9:9 24:7,
11,14
25:12,13,
14,16,19
32:13,22
43:8
105:11
130:18
139:18
146:4
148:4
156:2
168:10
170:5,18,
19,20
171:8,18
173:5,10
176:14,16,
20,21
182:18

questions
6:1,18
7:14,17
8:11,12,13

11:2
30:19,22
32:2,16
53:7,11
67:23
139:15
161:19
162:1
171:12
176:12,15
178:6
182:20,21,
23

quick  43:11
109:6
130:8
133:4
135:22
148:11

quote  155:10

---

**R**

R1  68:9

R2  68:3
110:3

R3  68:10

rate  6:18
24:19
29:16
44:11,15,
17,22,24
45:11,24
46:2,12
80:11
83:10,11,

15,17
159:11

rates  134:12
160:16
166:7,13,
25

ratio  44:12

raw  83:5

reach  39:4

read  30:11,
20 31:15
33:25
35:4,24
37:3
102:20,21
135:22
148:10
168:19,24
177:2

readable
58:14

reading
41:17
90:10
123:6
153:23
169:8
176:25

ready  22:22
74:23
75:11

real  30:9
109:6
130:8

**ANTHONY SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Jennifer Gorneault on 10/27/2021        Index: real-time..referring

| | | | |
|---|---|---|---|
| real-time | reasons 67:3 | 65:24 66:2 | 49:19 50:1 |
| 80:1 | 86:15 | 101:17 | 55:6 70:19 |
| realize | 99:10 | 102:2 | 102:18,19 |
| 57:19 | 125:19 | 129:5 | 155:7 |
| realty | 163:5 | recollection | reduced |
| 154:25 | 164:12,19, | 181:8 | 47:25 48:4 |
| reason 6:12 | 23 | reconvene | 50:18 55:3 |
| 22:17,23 | reassurance | 27:12 58:5 | 56:7 85:21 |
| 29:24 51:7 | 129:14 | record 6:25 | 88:10 |
| 55:20 | recall | 8:1,8 9:9, | 112:6 |
| 59:21 | 129:24 | 11 11:4 | 177:21,24 |
| 60:14 | receive 31:6 | 27:19 | reducing |
| 61:21 | 34:13 | 38:2,6 | 68:18 |
| 66:24 | 57:4,6 | 55:12 | reduction |
| 67:3,5,20 | 106:19 | 59:22 60:4 | 47:3 |
| 68:2 73:12 | 114:23 | 62:1,4 | 112:13 |
| 76:4,17 | 118:5 | 64:6 | 121:25 |
| 84:2,10,13 | 135:25 | 70:20,21 | Reductions |
| 90:12 | 137:3,9,10 | 71:5,6,8, | 88:1 |
| 99:6,7,8 | 180:23 | 14,17 72:8 | refer 44:9 |
| 104:25 | received | 73:2,6 | 45:15 |
| 114:22 | 74:12 | 76:3 | 67:18 |
| 118:4 | 146:18 | 107:25 | 80:11 |
| 125:22 | 180:13 | 109:2,4 | 123:21 |
| 130:23 | receives | 112:2,18, | 160:15 |
| 153:6 | 42:13 | 22 116:3 | 177:22 |
| 160:20 | recent 60:7, | 127:18 | referenced |
| 161:2 | 8 130:1 | 162:10 | 67:1 93:7 |
| 163:10,16, | recess 27:17 | recorded | referencing |
| 17,19,20, | 38:4 58:8 | 9:16 | 167:13 |
| 23 164:9, | 116:1 | 10:14,19 | referring |
| 17,20 | 157:22 | records | 14:6 16:19 |
| 165:22 | 162:8 | 28:7,8,17 | 22:1 35:21 |
| 166:3 | recognize | 34:7 35:16 | 37:2,25 |
| 172:15 | 58:13 | 127:13 | 39:20 |
| 177:19 | | reduce 48:9 | |

44:21
46:23
94:19
111:15,19
120:25
121:1
134:22
135:23
160:19

refers  44:11
94:12,13

reflect
41:14 59:5
88:9,14
96:2

reflected
48:25
83:14,17
90:24
121:24
165:11,12
167:11

reflecting
64:10

reflections
165:11

reflects
44:17
70:25 82:5

refresh
43:11

regard  6:2
156:23

region  89:14
130:14

132:21
167:22

regions
167:9

regroup
162:5

regular
48:21
94:15,16
134:14
135:2
147:14

reimbursed
135:11

related  5:24
15:22
28:23 34:7
80:11
105:23
122:9,12
127:10,16
170:13,19

relates
128:11

Relations
101:7
144:19
177:8,11

relevant
182:10

Relieve
158:7

Relocation
16:8

rely  177:8

remain  89:24
150:9,22
176:1
178:22

remained
140:5

remaining
49:14

remember
54:19
93:14
107:14
173:16

remotely  6:8
30:2,13

renegotiated
162:20

repeat  8:19,
25 25:12,
13 32:24
73:11
126:20
139:18

repeatedly
172:25

rephrase
8:18 32:23
172:18

report  16:23
19:13
24:20 42:3
52:15
69:24

84:23
119:18
128:1
167:16
175:25

reporter
6:21 10:11
183:15
184:2

reports
79:21
168:7

represent
16:24

represented
14:25

request
47:7,22
52:1 55:8,
10 92:20
118:10
146:20

requested
10:8 55:13

requests
38:14

require
147:8

required
45:23
123:1
154:6
169:1

requirement

**ANTHONY SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Jennifer Gorneault on 10/27/2021    Index: reserve..Saturday

141:8

reserve
122:11
183:6

reserved
10:9

reserving
183:5

reside  28:18
33:12 67:3

resources
33:12,15

respect
25:4,9
31:18
32:16
33:17
38:15
46:19
125:10
131:16
150:18
182:7

respond
180:23

response
38:13
101:14

responses
101:12
102:11

responsibiliti
es  14:13,15
25:8

responsible
14:21 16:4
18:2

rest  68:4,
7,8 72:20
107:19
109:20
110:2,4,8,
11,12,25
111:3
120:4,5
133:17,20,
21 134:4,7
146:1
154:4,10
169:5
175:18
184:3

restating
147:12

restricted
17:8

result  48:12
117:19
119:25
120:10

results  47:2
120:10

resume  14:19

retain  168:6

reverse
179:17

review  31:15
64:4 82:12
120:15

123:14
132:9
144:10
158:19
181:4,7

reviewed
68:13
102:14
179:23
180:8,12
181:22

reward  13:10

RF  164:20

ring  132:12

road  10:24
155:17

role  14:16
21:9 23:17

roughly
63:21 69:2
70:12

row  59:10,
21

RPT  61:8,9
62:24
70:21 71:5

RR  130:12

rule  6:14
119:18
121:15
122:14
124:10
141:4
158:17

167:16

rules  6:7
66:9
119:23,25
120:10,13
121:22
122:16,18
124:7,8
138:6
152:14
157:25
166:17
167:12
172:16,19,
25

run  82:19
84:24

running  74:9
95:9

runs  40:11,
13

_____

S

safe  155:10

Sandra  6:22
7:11 8:1
11:20,21
38:2
119:18

satisfied
178:10

Saturday
40:15,18,
19,20,21,
25 41:5,8,

**ANTHONY SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Jennifer Gorneault on 10/27/2021     Index: Saturdays..Short-term

9,14 77:12
82:24,25
83:1 98:10
125:15,16

Saturdays
 40:15

save  124:17

scenario
 51:3 55:14
 71:24,25
 100:1
 113:22
 155:8

scenarios
 66:11

schedule
 18:12
 90:20

scheduled
 107:19
 147:18
 151:2
 154:3
 168:25

Schobert
 5:21 36:19
 38:8,9
 40:3 43:2
 66:21
 122:1
 163:12
 165:14

Schobert's
 160:2

scope  139:15

150:17
169:16
174:19
176:8

screen  29:22
 39:1,15
 51:2 58:11
 82:1 128:2
 164:1

screens
 20:16,17

screw  5:17

scroll  30:5
 31:2,10
 65:25
 81:14
 101:15
 102:9
 129:8
 151:25
 158:24
 162:18

scrolling
 30:2

search  82:12

section  99:2
 120:14
 122:20
 152:2,4,6
 153:17
 169:5
 171:12
 173:23,24
 175:7

sections

121:8

send  57:23
 62:9
 161:9,10,
 21 184:1

sending  10:4
 161:17

seniority
 59:12
 77:3,8
 78:16

sense  8:21
 30:4

sentence
 116:8,14,
 16 117:13
 118:1

separate
 42:11
 104:10,13,
 19 105:1,
 12,14,18,
 19 161:3

sequence
 63:11

series  8:11

service
 68:10
 134:2
 139:6
 145:15,19,
 22 146:7
 173:12

session

20:16,18

sessions
 20:13

set  133:8
 138:14
 149:21

setting  30:9
 180:22

share  29:23
 39:1,14
 51:2 58:11
 109:10
 129:1

shared
 124:18

sharing  39:1
 66:20
 81:13
 84:21
 85:19
 109:9
 118:25
 126:9

she'll  184:1

sheet  37:10
 58:14 60:6
 64:20 80:9
 164:17

sheets  67:18

shift  19:13
 72:17

Short-term
 103:6,7,10

show 35:9
 39:12
 58:10 59:9
 80:15
 83:12,24
 95:20,22
 100:21
 106:9
 110:9
showing
 29:21
 95:14
shown 179:25
shows 59:11
 73:14
sick 17:18,
 19,20
 96:1,4,5,
 6,11
 104:14
 143:10,14
 145:16
 150:7
sickness
 96:8
 145:16
sicks 103:21
side 16:10
 45:3,5,7,
 8,14,17,
 18,19 47:6
 56:3 60:3
 117:5
 130:3
 164:1

168:24
175:16
signature
 10:10
 101:24
 102:6
 183:7
signed 21:12
 102:15
silos 20:21
 21:1
similar
 90:21
 114:25
 141:17
 143:19
 157:1
 168:23
 173:13
 174:1
simply
 124:14
 127:13
simultaneously
 82:20
sixteen
 11:14
skip 67:22,
 23 74:24
slide 57:20
slow 66:1
slowing
 35:13

slowly 31:2
SMB 77:1
snow 95:8,
 10,11
somebody's
 25:24
someone's
 46:3 153:2
sort 12:21
 13:10
 14:16
 25:18
 30:13
 39:19 49:8
 70:6 85:5
 101:17
 125:12
 138:15
 143:22
 144:6
 156:7
 180:11
sounds 27:14
 114:3
 115:23
 136:12
 162:6
 176:2
south 89:19
 91:6
 131:24
 167:7,19
 175:8
southern
 89:13,20

130:14
132:18
167:22
speak 6:13
 8:17 23:10
 25:7
 136:21
 140:6
 156:10
 169:13,18
speaking
 7:3,4
 88:16
 170:24
 177:1
special
 122:10
 133:24
 149:2
specific
 36:24
 45:20 53:7
 65:6 104:8
 123:12,18
 124:9,11
 133:25
 141:9
 156:4
 165:1,23
 166:4
 167:3
 169:4
specifically
 7:17 46:24
spell 11:4,
 19,22,23

84:11

spelled
144:2,6
150:24

spent 23:15

split 164:1

spread 39:19
58:14 60:6
64:20
67:18

spreadsheet
36:5,6
39:18,20
42:6 52:11
58:25
80:5,22
82:5 84:3,
23 85:1,2,
18,25 86:6
87:8,11
88:8
107:23
108:22
112:10
120:1
124:23
126:13
127:5,9,
20,21
128:6
145:21
160:16,18,
20 163:9,
11,19
165:13

spreadsheets

35:19,23
37:24,25
38:12,16
76:19
160:22,24
161:1,3,5,
17

Sprint
13:12,14

ss 162:25
163:1
167:18

staff 67:8,
12

stamped
183:19

stamps
183:25

stand 74:10

standing
139:13
150:19

stands 21:22
61:4 76:11

start 9:19
11:2 14:14
21:8 22:9
23:3 24:4
30:18,21
35:13
40:21
41:2,4
49:9,21
99:24

started 21:6
58:22
62:19

starting
61:11
79:5,7

starts 48:7
100:3
155:9
159:10

state 11:3

stated 34:25

statement
34:2,3,24
35:4 37:4,
17 49:4
114:24
115:1
116:19
117:7,15,
21

Statements
34:14

stating
154:2

status 67:20
73:17
84:2,12
125:22
163:5,23
164:9,12,
13,14,19,
23

stay
113:19,21

114:9

stays 50:17

step 53:4
83:15
139:2

stock 15:24
16:5,7,8

stop 39:1
51:19
66:20
81:13,16,
21 84:21
85:19
109:9
118:25
120:8
124:19
126:9
181:14

stored
126:24

straight
138:1,3
147:10

street 11:19

strike
182:18

structural
36:8

structures
100:24

stuff 6:9
38:20
172:9

**ANTHONY SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Jennifer Gorneault on 10/27/2021    Index: submit..talking

submit 15:10
  17:5 52:2
  53:6 65:5
  135:4
submitted
  149:11
submitting
  54:13
subset
  120:12
suited 23:20
  24:10
summaries
  83:6 84:24
summarize
  14:20
  88:20
summary
  88:19
  120:18
  123:6,16
  124:14
Sunday 96:15
  98:10
  99:13
  100:4,5,13
supervisor
  53:22
  147:1,9,16
supplier
  10:12
surrounding
  6:2

switched
  13:12

sworn 5:4
  13:19
  21:7,11

synching
  153:18

system
  18:10,15
  19:2,4,5,
  9,18,21
  21:16,19,
  23 22:1
  24:22,25
  25:3,11,
  22,25
  27:21,22,
  24 28:2
  33:10
  34:16,18,
  19 42:5,8,
  12,22
  44:14
  52:10,17,
  25 53:4,
  15,19,25
  54:5,11,14
  61:14 64:4
  66:6,10,
  15,16
  67:6,16
  79:15
  119:10
  125:23
  126:1,5,15
  133:21

134:6
135:9
147:24
148:2
165:5,7,9
170:17
172:7,8

systems
  19:24
  42:10,14,
  15

─────────

        T

T&e 21:22
  24:22
  25:3,22,25
  28:12,17
  36:9 52:1,
  14 119:8,
  15 122:14,
  22 123:4
  126:1,22
  131:20
  138:5
  156:24

T-E-C-S
  21:18,22

T-E-C-X
  27:21

Table 88:19
  133:1

takes 15:4
  106:11
  170:25

taking 6:24

14:22
79:1,23
87:19,20
139:10

talk 10:24
  16:15 84:8
  90:17
  92:25
  119:22
  120:16
  178:2,3
  181:15

talked 38:12
  58:21
  75:13 93:4
  112:8
  116:7
  124:22
  171:2
  175:12

talking 16:5
  18:23 21:5
  24:2 27:21
  42:10,24
  52:11
  58:22
  80:20
  81:1,18
  82:14
  117:8
  124:2
  125:11
  126:4
  128:5,23
  130:14
  133:12,19
  134:18

**ANTHONY SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Jennifer Gorneault on 10/27/2021                    Index: talks..time

137:22
144:8
145:23
152:4
162:12,14

talks 148:6
171:6

taxes 15:14

team 14:21
52:13

Technical
43:10

technically
140:5

technological
29:25

technologicall
y 9:4

technology
85:11

TECS 21:17,
18 27:21
42:14
67:6,16

telling
30:13
59:24
61:22

tells 7:18
67:9

ten 12:9

Tennessee
62:9

term 68:16
126:24
138:11

terms 25:23
124:9
133:18
134:22
135:2
147:22
155:10
162:15
167:22

territory
45:20
89:10,12,
17 132:10
156:16

testified
5:5 181:24
182:6

testify
31:18
170:1
172:3
179:25

testifying
32:4

testimony
7:21 13:19
14:3 21:7,
11 31:23
33:10
36:25
108:12
173:17
181:9,23

182:10

Texts 182:1

Theoretically
143:8

therefor
47:24
112:23

thing 6:10
7:25 41:23
43:13,23
57:20
73:15
77:25
96:9,10,
11,12
119:19
138:25
149:3,23
171:11
179:17
183:23
184:4

things 6:7
7:20 17:1,
17 30:11,
12 35:14
59:1 66:25
67:9 77:22
103:10
111:25
116:4
125:13,14
157:15
159:22,25
162:14

thinking 8:6

183:21

thought
25:13
84:18
158:22

Thurs 97:24

Thursday
40:12
62:25 63:5
96:15
98:4,7
99:12,23,
25 100:10

ticket 16:21
17:16 18:6
19:12
72:19

tickets
16:19 19:7

tie 72:15

tied 44:15
72:13,19,
20

time 7:13,
14 9:4
11:21 13:8
14:23
15:1,10
16:11,12,
16,18,21,
23 17:15,
17,19
18:1,6,9,
13,17,20
19:1,2,4

**ANTHONY SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Jennifer Gorneault on 10/27/2021        Index: time-to-gross..trains

23:5,16,19
24:2,6,10
29:20
30:20
34:7,8
40:8 43:9
51:15,16
55:6
57:22,25
59:7
62:13,16
71:4,7,12
72:4 74:9,
13 78:5,
14,24
85:25
86:5,12,
19,20,22
88:9,14,17
90:11,19
91:9 92:8,
9,14,17,19
99:24
102:23
103:17,19
112:6
113:23
115:14,15
119:11
125:16
127:10,14
129:21,25
134:19,21,
23 135:5
136:25
138:8,17,
18 140:4,
7,9 142:18

143:19
150:4
152:5,11,
12,19,20,
22 154:8,
17 157:11,
17 161:11
169:2
170:19

time-to-gross
14:22

timelines
125:13

times  9:5
59:23
78:23
95:15
125:11
142:5

Tingly
23:12,14

today  6:2,3,
25 14:15
21:5 31:8,
23 36:14
61:15
62:24
64:1,15
81:11
88:13,16
119:4
129:18
162:14
170:1
179:24
180:3

181:9,13,
23 182:6,
11,17
183:2,21

toggle  164:4

toking  21:5

Tom  10:6,20
35:12
36:16
80:20
81:7,9,11
119:4
132:11
161:16
162:2
176:11
180:23
181:11,16,
19 183:4

tomorrow
184:1

Tony  40:2
43:2 69:24

top  14:16
31:5 44:1
58:19 60:7
76:8 82:8
84:25 89:5
106:2
114:14
121:19
135:5,19
151:24
168:2,18
173:23,24
175:6,23

topics  31:19
176:22

tops  58:2

total  74:9

track  58:19,
22

Trail  11:17

train  14:2,
4,5 16:4
17:18
21:10
33:16
37:11,14
53:23
72:25
92:22
136:13
160:11
165:15

training
67:12
153:10

trainman
168:5
170:7,25
171:19
176:2
178:7

trainmen
167:21
173:22
175:8,24
177:18

trains  95:9

**ANTHONY SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Jennifer Gorneault on 10/27/2021     Index: transcript..unavailable

transcript
  7:22 10:7

transitioned
  89:22

Transportation
  5:23 13:20

trickier
  11:22

truck  12:20

trucks  12:19

true  60:20
  86:12
  88:6,7
  99:15
  116:16,19
  117:3,7,
  10,11,16,
  17,21
  118:5
  131:3
  140:17
  151:10,12
  154:16
  155:13
  170:24
  179:17

TT  81:15

Tuck  5:8,20
  9:11,17
  10:1,18,22
  11:1 26:16
  27:8,11,
  15,18,20
  35:12,17,
  22 36:3,

16,20
38:5,11
58:4,7,9
87:23 88:3
115:14,20,
24 116:2,7
132:11,17,
24 157:14,
23 158:1
161:16,22
162:2,6,9,
12,24
163:2,9,25
169:24
170:6
176:11,18,
23 182:19,
25 183:8
184:6

Tues  97:24

Tuesday
  60:11
  61:1,20
  63:12
  64:11,24
  70:15,25
  71:1,21
  98:4,7
  113:5,18
  154:23,24,
  25 155:9,
  21

turn  47:9
  50:16
  60:18,22,
  23 61:23
  68:14,15,

21,24
69:1,2,5,
6,7,8
74:21
75:3,11,
12,19
76:17
93:4,6,7,
10 99:5,21
107:20,21,
24 108:2,
11,18
109:2,3
112:4,12,
17,21
113:14
114:21
118:3
140:23,24
168:8
172:6
175:25
177:19,21

turns  7:3
  60:18
  68:18,19,
  24 69:4

tweak  45:22

two-week
  40:8,10
  41:1 79:2,
  3,4,18,24
  114:17

type  15:14
  64:21,22
  78:9 106:4
  111:11

124:24
145:20
150:10
153:3

types  23:21
  28:7 86:19
  87:10 88:9
  89:6,7,9
  105:21
  106:20
  107:9
  125:6
  143:18
  151:11
  165:16

typically
  9:11 50:3

─────────
      U
─────────

uh-huh  7:24
  43:20
  56:11
  59:18
  70:13 73:1
  125:18
  176:23

ultimately
  135:3

unable  22:18

Unavail
  158:16

unavailability
  117:4

unavailable
  48:9 50:8,

**ANTHONY SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Jennifer Gorneault on 10/27/2021 Index: uncompensated..vacation

9 51:7
107:20,21,
24 108:2,
11,13,15,
17,19,24
109:1,13,
18,22
110:23
111:10,17
112:3
114:20
117:19
118:2,12
145:15,19,
22,25
146:7
173:11

uncompensated
141:20

underneath
97:8

understand
8:12,13,15
10:10 14:4
21:2 27:22
28:6,16
31:22
32:3,13
34:23,24
36:23,25
46:10
48:24
102:8
109:24
117:6
129:20
138:13

169:10,24
172:11
175:14
181:11

understanding
22:8,10
23:18 28:4
32:8,9
100:23
101:4
108:12
124:11
128:15
134:3

understood
32:15

union 14:23
16:24 23:7
45:16
90:13
94:24,25
97:22
98:3,9
99:21
123:3
124:8,11
126:2,6
130:25
142:10,11
143:24
151:22
154:19
160:7
165:1,19,
23 166:4
179:5

Unions
128:22
159:23

unpaid
102:23
105:10
107:8,10
140:18
169:12
170:25
175:18

unplanned
111:24

unquote
155:10

UTE 45:18

utilize
145:17

UTU 45:15
46:1,7,18
47:1 51:3
89:5,8,10,
18,21
90:14,25
91:1,6
97:6,18,22
116:17,19,
20,23
117:3,5,7,
8,10,15,
17,22
118:6,22
119:6
120:24
122:11
123:13,21

124:5
125:1,10,
15,20
129:25
130:3,18
131:9,18,
23 158:5,8
159:20
160:10,13
162:16
166:25
167:4,6,7,
13,19
170:25
174:22
175:16
179:2,5,8,
9,13

UTU's 89:6

UU 163:7,8

V

vacation
17:18
18:1,8
26:6 51:15
52:7 53:9
65:15 87:1
92:8
106:8,15
111:2,22
115:2
131:11,21
136:9,11,
14,20,25
137:3,11,

**ANTHONY SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Jennifer Gorneault on 10/27/2021          Index: vacations..work

17 138:4,
8,12,15,22
139:7,14
140:1,9,22
142:7
143:21
144:4,17,
21 150:25
151:2,4,7
152:5,8,11
153:1
154:5,11,
13 155:9
169:5
174:3,8,17

vacations
156:8

vacay 151:14

values 125:3

verification
102:10

verified
102:11

verify 80:15

version 10:7
43:14
58:10,14
127:6
158:1
183:12

versions
183:20

versus 16:16
156:22

video 7:19
9:15 29:23

view 28:11
36:8,9
42:24
43:5,16,25
80:1,13,
14,18,24
82:9
119:2,20

violate 17:3
181:20

violated
17:9 29:1

violating
135:3

violation
135:11

voluntarily
75:4 93:8

voluntary
172:4

vv 166:8,9

―――――――――
W
―――――――――

w0 76:10

w0dt 75:2,4

wage 15:22

wages 25:24
134:13

wait 7:7
167:17
183:19,24

walk 59:2
89:3

warehouse
126:19,25
127:2

ways 54:7

weather
95:4,6,7
99:18,19
142:20
145:16

web 34:19
42:7 52:15
53:24
54:4,10
57:19
66:5,10,
16,17
104:23
119:10

web-based
42:12

Wednesday
61:8,15
63:13,25
64:1,2,16
71:20,21
98:4,7

week 40:24
43:14 50:4
77:14 84:9
98:16,21,
22 103:12,
14 133:25
178:23
184:3

week's
171:2,3
178:18

weekend
100:18
103:10
178:18

weekly 97:9,
13,15,19
98:23
148:7
175:11

weeks 40:16
41:2 97:1
138:25
139:7

whys 103:23
108:24

window 8:24

witnesses
18:23

WODT 93:11

women 29:16

word 19:17
69:9

words 8:5
11:22

work 9:7
10:11
12:12,14
13:19
15:23
16:20,22
17:15

**ANTHONY SCHOBERT, ET AL. vs CSX TRANSPORTATION, INC.**
Jennifer Gorneault on 10/27/2021     Index: worked..zoom

19:11
22:3,18,23
41:21
45:21 47:9
50:15
55:2,9,12,
21 56:13
61:20,25
62:4,12,17
64:18,25
72:7,13,
17,24 73:2
74:24 77:7
85:23
86:9,10,13
95:8,14,
19,22
97:19,24
98:5,8,11
100:15
103:12
107:25
108:3,8
109:2,4,
13,14
111:23
112:1,2,
18,22
113:1,6,8,
9,23
114:11,12
127:12
133:21
140:5,15
141:7,8,18
142:13,14,
21,22
143:12,16,

25 148:21
149:3
150:2,4,7,
12,23
155:6
157:5
169:12,21
170:8,9,15
171:1
176:3
177:23

**worked**
13:22,23
74:15 85:6
177:4

**workforce**
14:24
16:24

**working**
16:19,23
18:6 19:7
89:23
135:5
136:16
153:18
157:3
181:16

**works** 21:13
78:17

**worry** 11:23

**worse** 93:15

**worst** 7:9

**worth** 56:10

**written**
181:22

**wrong** 8:8

**ww** 167:1

_____

**X**
_____

**xx** 158:6
159:1

_____

**Y**
_____

**year** 12:22
53:10
122:10
136:1,6
137:6,12
138:15
158:8
174:9

**year's**
136:3,10
138:19

**years** 11:14
12:3,10
13:3,23
14:12
21:8,9
139:6
146:22

**yesterday**
10:8 13:11
14:3 57:17
64:16
180:19
183:24

**yesterday's**
10:14

**Yolanda**
13:11

**York** 5:21
36:19

_____

**Z**
_____

**zip** 11:18

**zoom** 9:16,
19,20,21,
23 10:12
70:7
81:23,25
109:7,8
164:5